# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| MICHAEL HOFFMAN, SUSAN HOFFMAN, BARBARA BARRETT, ROBERT K. WILLMS, DALIA GLOTTMANN, OSCAR GLOTTMANN, MATT SPIEGEL, MARILYN C. BERNETSKY, ROBERT K. CAMPBELL, RUTH E. CAVANAUGH, JEFFREY L. CODD, DENNIS M. DEBONE, KATHRYN L. DEBONE, SALVATORE B. FIORDELIS, EDWARD GREEN, JAMES P. HAYES, MARTIN LIEBERMAN, SANDRA LIEBERMAN, MARTIN AND SANDRA LIEBERMAN, CHERYL J. MCKINNEY, KEVIN DEAN PALMER, W.B. PHIFER, YAKOV PRAGER, JACK RICKARD, MARTHA E. RICKARD, ALFRED SHAW, GLORIA SHAW, SHERON YVONNE SMITH, BARBARA STEWART, CHRIS THOME, ANN J. WINN, and WILLIAM M. WINN, on Behalf of Themselves and All Others Similarly Situated, | Civil Action No.:   05-cv-6817 (DAB)<br>05-cv-7027<br>05-cv-8448<br><br>CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND FOR VIOLATION OF THE <u>INVESTMENT COMPANY ACT</u><br><br><u>JURY TRIAL DEMANDED</u><br><br>**<u>ECF Case</u>** |
| Plaintiffs, |  |
| vs. |  |
| UBS AG, UBS GLOBAL ASSET MANAGEMENT (US) INC., UBS GLOBAL ASSET MANAGEMENT (AMERICAS) INC., UBS GLOBAL ASSET MANAGEMENT INTERNATIONAL LTD., DSI INTERNATIONAL MANAGEMENT, INC., and UBS FINANCIAL SERVICES INC., formerly known as UBS PAINEWEBBER INC., |  |
| Defendants. |  |

Plaintiffs, by and through their counsel, allege the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings, as well as other regulatory filings, reports, and advisories, press releases, and

media reports.  Plaintiffs believe that substantial additional evidentiary support will exist for the

allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal class action arising out of Defendants' failure to disclose their

unlawful and deceitful course of conduct that was designed to financially advantage Defendants

to the detriment of Plaintiffs and other members of the class and subclasses.  The action is

brought by Plaintiffs against UBS AG and its related entities (collectively, "UBS" or

"Defendants") on behalf of a class (the "Class") comprised of three subclasses.  The "Purchaser

Subclass" consists of all persons or entities who purchased from UBS one or more of the UBS

proprietary funds ("UBS Funds") or one or more non-proprietary funds participating in the UBS

Revenue Sharing Program (collectively, with the UBS Funds, the "Tier I Funds"), from May 1,

2000 through April 30, 2005, inclusive (the "Class Period").  The "Financial Plan Subclass"

consists of all persons who incurred fees or charges during the Class Period in connection with

the opening and/or utilization of a financial plan -- *e.g.*, a fee-based account offering financial

advice from Defendant UBS Financial Services Inc., ("UBSFS").  Finally, the "Investment

Company Act Subclass" ("ICA Subclass") is comprised of all persons who held shares or like

interests of any UBS Fund on or after July 29, 2004 and who continue to hold.

2.      UBSFS refers to its brokers as "Financial Advisers" whose stated goal is "to help

clients realize their financial objectives and live their dreams." UBS.com, Wealth Management

US, http://financialservicesinc.ubs.com/Home (last visited Apr. 26, 2006).  UBSFS further states

that "[o]ur clients' success is our success." UBS.com, Our Values, www.ubs.com/1/e/about/our_

values.html (last visited Apr. 26, 2006).  In truth, the UBS Defendants engaged in a scheme to

entice investors to open accounts purporting to provide, for a fee, objective investment advice

when the real purpose was to use scripted "proposals" to push investors into a limited number of

2

pre-determined mutual funds in order to make millions in profits for Defendants at the expense of Plaintiffs and the members of the Class.

3.     Defendants, in clear contravention of their disclosure obligations and fiduciary responsibilities, failed properly to disclose that they had been aggressively pushing their Financial Advisors to sell Tier I Funds that provided financial incentives and rewards to UBS and its employees based on sales volume of the Tier I Funds.  Instead of offering fair, honest and unbiased recommendations to Plaintiffs and the other members of the Class, the UBS Financial Advisers gave pre-determined recommendations, steering clients into a pre-selected, limited number of mutual funds so that the Defendants could reap millions of dollars in kickbacks from Tier I Funds, with whom they had struck secret, highly-lucrative deals to profit at shareholders' expense.

4.     Defendants cultivated a clandestine, incentive-driven culture to sell Tier I Funds to the exclusion of other funds, regardless of the shareholders' best interests.  Defendants' sales practices created a material, insurmountable conflict of interest by providing substantial monetary incentives to sell Tier I Funds, sales of which increased Defendants' overall profits. During the Class Period, UBS used its nationwide network of Financial Advisers to unlawfully steer Plaintiffs and other members of the Class into Tier I Funds that carried higher expenses than other funds.  As detailed below, while UBS and its Defendant subsidiaries claimed to provide unbiased financial planning and fund investment advice in their clients' best interests, they instead made it standard business practice to give their customers self-serving, biased investment advice for the sole purpose of pushing customers into the Tier I Funds as part of a secret plan and scheme to unlawfully generate fees.

5.    Defendants' tactics to increase sales of Tier I Funds included sales contests with cash and non-cash prizes, various types of bonuses and rewards, and higher compensation payouts for selling Tier I Funds.  Additionally, excessive commissions were paid directly or indirectly out of the Tier I Funds' assets as payments to UBS for steering clients towards those Tier I Funds.

6.    In return for revenue sharing, payments made by fund companies to Defendants in exchange for the promotion of their mutual fund, Tier I Funds received a number of marketing benefits.  First, UBS included all Tier I Funds on its "Tier I" fund company list, which Financial Advisers were directed to consult before making recommendations of mutual fund products to clients.  Second, UBS ensured that these Tier I Funds had a "higher profile" in UBS' sales system than non-participating funds by, *inter alia*, increasing their visibility and interaction with UBS Financial Advisers.

7.    The Tier I Fund List included the following mutual fund families:

- AIM
- Alliance
- American Funds
- Columbia
- Davis Funds
- Dreyfus
- Eaton Vance
- Federated
- Fidelity
- Franklin Templeton
- John Hancock
- Hartford
- Lord Abbett
- MFS
- Oppenheimer
- PIMCO
- Pioneer
- Putnam
- Scudder

- UBS
- Van Kampen

8.     Defendants' sales practices created a material insurmountable conflict of interest between Defendants and their clients by providing substantial monetary incentives to sell Tier I Funds, sales of which increased Defendants' overall profits but diminished investors' returns in the process.  Yet, while Tier I Funds were aggressively marketed to investors, Defendants failed to disclose any of their financial incentives for selling Tier I Funds.  Defendants' failure to disclose the incentives and material conflicts of interest constitutes a violation of the federal securities laws.

9.     During the Class Period, UBS used its nationwide network of  UBSFS Financial Advisers and the sale of bogus Financial Plans to steer Plaintiffs and other members of the Class into the Tier I Funds.  Plaintiffs and other members of the Financial Plan Subclass paid unjustifiable ongoing fees for financial advice in connection with their Financial Plans only to be steered into predetermined Proprietary Funds.

10.     Plaintiffs and the members of the Class received diminished returns on their Tier I Fund investments as:  (a) the Tier I Funds did not perform as well as comparable, non-Tier I funds during the Class Period; and (b) Tier I Funds used investor assets to pay kickbacks to UBSFS as part of a *quid pro quo* arrangement whereby UBSFS would push even more investors into the Tier I Funds.

11.     Defendants enticed Plaintiffs and the members of the Financial Plan Subclass into signing up for fee-based brokerage plans or programs (the "Financial Plans") by misrepresenting that for an annual fee of 1.5% UBSFS Financial Advisors would provide ongoing financial "advice" to investors as to which mutual funds to purchase.  The fees charged to the investor by the Financial Adviser were in addition to fees charged by the mutual fund companies.  However,

these annual fees for investment advice constituted trumped-up charges for a variety of reasons, including that rather than providing unbiased investment advice in the best interest of the client, Defendants simply used the Financial Plans as an additional mechanism to push Plaintiffs and the members of the Financial Plan Subclass to purchase Tier I Funds.

12.     Defendant UBS Global Asset Management, an investment adviser subsidiary of UBS, created further undisclosed material conflicts of interest by providing additional compensation to UBSFS to draw investors into UBS Funds, consisting of 26 mutual fund portfolios, regardless of whether such investments were in the investors' best interests. UBS Global Asset Management financed these arrangements by charging excessive fees to the Funds that should have been invested in the underlying portfolio. In doing so, UBS Global Asset Management breached its fiduciary duties to investors under the securities laws.

13.     Plaintiffs seek to recover damages caused to the Class and Subclasses by Defendants' violations of the Securities Act of 1933 ("Securities Act"), the Securities Exchange Act of 1934 ("Exchange Act"), the Investment Company Act of 1940 (the "ICA"), and state law.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa; Section 22 of the Securities Act, 15 U.S.C. § 77v; and Sections 36(b) and 48(a) of the Investment Company Act, 15 U.S.C. §§ 80a-35(b) and 80a-47(a); and 28 U.S.C. §§1331, 1337.

15.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391. Substantial acts in furtherance of the alleged fraud, including the preparation and dissemination of materially false and misleading information, occurred within this District. Defendants UBS Global Asset Management (US) Inc. and UBS

Financial Services Inc., formerly known as UBS Painewebber Inc., are and were at all relevant times headquartered in New York, New York.

16.   In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

### Lead Plaintiffs' Steering Committee

17.   In accordance with the Court's December 13, 2005 Order, Plaintiffs listed in this section have been designated as members of the Steering Committee to represent the Lead Plaintiffs.

18.   Lead Plaintiffs Michael Hoffman and Susan Hoffman purchased shares of UBS S&P 500 Index Fund Davis New York Venture Fund and Liberty Utilities Fund during the Class Period and were damaged thereby.

19.   Lead Plaintiff Barbara Barrett purchased shares of American Funds AMCAP Fund, American Funds Euro Pacific Fund, Lord Abbett Affiliated Fund, Lord Abbett Mid Cap Value Fund, PIMCO Real Return Fund and Pioneer High Yield Fund during the Class Period and was damaged thereby.

20.   Lead Plaintiff Robert K. Willms purchased shares of MFS Core Growth Fund, MFS Emerging Growth Fund, MFS Massachusetts Investors Growth Stock Fund, MFS Massachusetts Investors Trust, MFS Mid-Cap Growth Fund and MFS Value Fund during the Class Period and was damaged thereby.

21.   Plaintiffs Dalia and Oscar Glottmann purchased shares of John Hancock Trends Fund and Oppenheimer Global Fund during the Class Period and were damaged thereby.

22.     Plaintiff Matt Spiegel purchased shares of MFS Emerging Growth Fund, AIM Weingarten Fund,  and AIM Basic Value Fund during the Class Period and was damaged thereby.

**Additional Plaintiffs**

23.     Plaintiff Marilyn C. Bernetsky purchased shares of Columbia High Yield Opportunities Fund, MFS High Income Fund, Oppenheimer Quest Value Fund, American Funds Bond Fund of America and American Funds Investment Company of America during the Class Period and was damaged thereby.

24.     Plaintiff Robert K. Campbell purchased shares of American Funds Euro Pacific Growth Fund, Franklin Templeton Mutual Qualified Fund, MFS Emerging Growth Fund, MFS Massachusetts Investors Growth Stock, MFS Massachusetts Investors Trust and Putnam OTC & Emerging Growth Fund during the Class Period and was damaged thereby.

25.     Plaintiff Ruth E. Cavanaugh purchased AARP-Scudder Growth Inc. Fund, Oppenheimer Quest Balance Fund and MFS Total Return Fund during the Class Period and was damaged thereby.

26.     Plaintiff Jeffrey L. Codd purchased shares of John Hancock Growth Trends Fund, John Hancock Small Cap Equity Fund, Oppenheimer Quest Balanced Fund and UBS Allocation Fund during the Class Period and was damaged thereby.

27.     Plaintiff Dennis M. Debone purchased shares of American Funds Washington Mutual Investors Fund, Federated Market Opportunity Fund, Franklin Templeton US Government Fund, PIMCO Low Duration Fund, Pioneer Oak Ridge Small Cap Growth Fund, UBS Global Allocation Fund and UBS PACE (Personalized Asset Consulting and Evaluation) Money Market Fund during the Class Period and was damaged thereby.

28.     Plaintiff Kathryn L. Debone purchased shares of American Funds Washington Mutual Investors Fund, Federated Market Opportunity Fund, Franklin Templeton US Government Fund, UBS PACE Small/Medium Company Growth Equity Investments Fund, UBS PACE Small/Medium Company Value Equity Investments Fund and UBS PACE Money Market Fund during the Class Period and was damaged thereby.

29.     Plaintiff Edward Green purchased shares of American Balanced Fund during the Class Period and was damaged thereby.

30.     Plaintiff James P. Hayes purchased AIM Aggressive Growth Fund, AIM Capital Development Fund, AIM Charter Fund, AIM Premier Equity Fund, AIM Global Aggressive Growth Fund, AIM Income Fund, Eaton Vance Worldwide Health Sciences Fund, Federated Technology Fund, Federated Government Income Securities Fund, PIMCO Real Return Fund, Eaton Vance Worldwide Health Science Fund, Federated High-Income Bond Fund and Franklin Balance Sheet Investment Fund during the Class Period and was damaged thereby.

31.     Plaintiff Martin Lieberman purchased shares of Franklin Templeton Growth Fund during the Class Period and was damaged thereby.

32.     Plaintiff Sandra Lieberman purchased shares of Franklin Templeton Fund and Franklin Templeton Growth Fund during the Class Period and was damaged thereby.

33.     Plaintiffs Martin and Sandra Lieberman purchased shares of American Funds Capital World Growth during the Class Period and or were damaged thereby.

34.     Plaintiff Cheryl J. McKinney purchased shares of AIM Balanced Fund during the Class Period and was damaged thereby.

35.     Plaintiff Kevin Dean Palmer purchased shares of Eaton Vance Worldwide Health Science Fund, PIMCO PEA Innovation Fund, PIMCO PEA Target Fund, PIMCO Renaissance

Fund, Federated Kaufman Small Cap Fund, Oppenheimer Main Street Small Cap Fund, PIMCO RCM Global Technology Fund, American Funds Growth Fund, Fidelity Advisor Healthcare Fund, Fidelity Advisor Growth and Income Fund, Scudder Growth Fund, Van Kampen Equity and Income Fund and Eaton Vance Asian Small Company Fund during the Class Period and was damaged thereby.

36.     Plaintiff W. B. Phifer purchased shares of Putnam Discovery Growth Fund and Federated Kaufman Fund during the Class Period and was damaged thereby.

37.     Plaintiff Yakov Prager purchased shares of Franklin Templeton Biotech Discovery Fund and Davis NY Venture Fund during the Class Period and was damaged thereby.

38.     Plaintiffs Jack and Martha E. Rickard purchased shares of Alliance Bernstein High Yield Fund and Alliance Bernstein Global Technology Fund during the Class Period and were damaged thereby.

39.     Plaintiff Alfred Shaw purchased shares of American Funds Capital Income Builder Fund, Columbia Acorn Fund and Lord Abbett Bond Debenture Fund during the Class Period and was damaged thereby.

40.     Plaintiff Gloria Shaw purchased shares of Eaton Vance Worldwide Health Sciences Fund, AIM Basic Value Fund, American Funds AMCAP Fund and Alliance Bernstein International Value Fund during the Class Period and was damaged thereby.

41.     Plaintiff Sheron Yvonne Smith purchased shares of Franklin Income Fund during the Class Period and was damaged thereby.

42.     Plaintiff Barbara Stewart purchased shares of Lord Abbett Affiliated Fund during the Class Period and was damaged thereby.

43.     Plaintiff Chris Thome purchased shares of American Funds Capital World Growth Fund during the Class Period and was damaged thereby.

44.     Plaintiff Ann J. Winn purchased shares of AIM Income Fund, Dreyfus U.S. Treasury Intermediate Term Fund, Lord Abbett Mid Cap Value Fund, MFS Value Fund, Oppenheimer U.S. Government Fund, PIMCO Total Return Fund and Van Kampen Real Estate Securities Fund during the Class Period and was damaged thereby.

45.     Plaintiff William M. Winn purchased shares of PIMCO Real Return Fund, Franklin Income Fund and Oppenheimer U.S. Government Fund during the Class Period and was damaged thereby.

**ICA Subclass**

46.     Plaintiff Salvatore B. Fiordelis brings this action on behalf of the ICA Subclass. Plaintiff Fiordelis held shares of UBS PACE International Emerging Markets Equity Investment Fund, UBS PACE Large Company Growth Equity Fund, UBS PACE Small/Medium Company Growth Investment Fund, UBS PACE Small/Medium Company Value Equity Investment Fund, UBS PACE Global Fixed Income Investment Fund, UBS PACE Strategic Fixed Income Investment Fund and UBS PACE International Equity Investment Fund on or after July 29, 2004 and continues to hold.

**Financial Plan Subclass**

47.     Plaintiff Salvatore B. Fiordelis also brings this action on behalf of the Financial Plan Subclass. Plaintiff Fiodelis opened a fee-based UBS Financial Plan through UBSFS during the Class Period and was damaged thereby. Though his PACE plan, Plaintiff Fiordelis purchased shares of UBS PACE International Emerging Markets Equity Investment Fund, UBS PACE Large Company Growth Equity Fund, UBS PACE Small/Medium Company Growth Investment Fund, UBS PACE Small/Medium Company Value Equity Investment Fund, UBS

PACE Global Fixed Income Investment Fund, UBS PACE Strategic Fixed Income Investment Fund and UBS PACE International Equity Investment Fund.

48.     The Financial Plan Subclass includes all persons who purchased fee-based accounts offering financial advice through UBSFS, which include, but are not limited to PACE and Insight One.

**The Parent Company Defendant**

49.     Defendant UBS AG ("UBS AG") is the ultimate parent of all of the Defendants named in this Complaint and was the ultimate beneficiary of the secret plan and scheme to push Tier I Funds as alleged herein.  UBS AG is a global investment banking and securities firm incorporated in Switzerland and its scope of operations extends to all types of banking, financial, advisory, trading and service activities worldwide.  UBS AG is engaged in securities trading and brokerage activities, as well as investment banking, research and analysis, financing and financial advisory services.  Through its subsidiaries, UBS AG also markets, sponsors, and provides investment advisory, distribution, and administrative services to mutual funds, including the UBS Funds.  UBS AG is headquartered in Zurich and is located at Bahnhofstrasse 45, Zurich, Switzerland.

**The Investment Adviser Defendants**

50.     Defendant UBS Global Asset Management (US) Inc. ("UBS Global AM"), is a Delaware corporation registered as an investment adviser under the Investment Advisers Act.  Its office is located at 51 West 52nd Street, New York, NY 10019-6114.  It is a wholly-owned subsidiary of UBS AG.  As an investment management subsidiary, UBS Global AM was responsible for overseeing the day-to-day management of the UBS Funds, including the placing of orders for the purchase and sale of portfolio securities, in return for fees calculated as a percentage of net assets under management.  Defendant UBS Global AM, in breach of its

fiduciary duties, provided self-serving and deceptive advice to its clients in order to benefit from its secret plan with the UBSFS Defendants to sell the UBS Funds.

51.     Defendant UBS Global Asset Management (Americas) Inc. ("UBS Global Americas") is a Delaware corporation registered as an investment adviser under the Investment Advisers Act. Its offices are located at One North Wacker Drive, Chicago, IL 60606. It is an indirect, wholly-owned subsidiary of UBS AG and is an investment management firm managing approximately $36.6 billion as of 2003. As an investment adviser, UBS Global Americas was responsible for overseeing the day-to-day management of the UBS Funds, including the placing of orders for the purchase and sale of portfolio securities. In return, UBS Global Americas received fees calculated as a percentage of net assets under management. In breach of its fiduciary duties, UBS Global Americas provided self-serving and deceptive advice to its clients in order to benefit from Defendants' secret plan and scheme to push the UBS Funds. Prior to 2002, UBS Global Americas was known as Brinson Partners, Inc.

52.     Defendant UBS Global Asset Management International Ltd. ("UBS Global International") is the international parent company of UBS Global Asset Management (Americas) Inc. It has approximately $419 billion in assets under management around the world. Its headquarters are located at 21 Lombard Street, London, EC3V 9AH, United Kingdom, X0 00000.

53.     Collectively, UBS Global AM, UBS Global Americas, and UBS Global International, are referred to herein as the "Investment Adviser Defendants." In January 2001, UBS acquired PaineWebber. In connection with the merger, on February 20, 2001 PaineWebber's investment management subsidiary, Mitchell Hutchens Asset Management was renamed Brinson Advisers, Inc. On April 8, 2002, UBS asset management companies consisting

of Brinson Partners, Brinson Advisors, Brinson Canada in the Americas region, Phillip & Drew in the United Kingdom, and UBS Asset Management in Europe, Middle East, Africa and the Asia Pacific regions merged to form UBS Global Asset Management.

**Investment Sub-Adviser Defendant**

54.     Defendant DSI International Management, Inc. ("DSI"), a wholly-owned asset management subsidiary of UBS Global Asset Management, is the sub-adviser for the UBS Funds. DSI International Management, Inc. is a Delaware corporation registered as an investment adviser under the Investment Advisers Act. As an investment sub-adviser, DSI was responsible for overseeing the day-to-day management of the UBS Funds, including the selection, placing of orders for the purchase and sale of portfolio securities in return for fees calculated as a percentage of net assets under management. In breach of its fiduciary duties, DSI provided self-serving and deceptive advice to its clients in order to benefit from Defendants' secret plan and scheme to push the UBS Funds. DSI's office is located at 400 Atlantic Street, Stamford, CT 06901.

**The Broker-Dealer Defendant**

55.     Defendant UBS Financial Services Inc. ("UBSFS," or "Broker-Dealer Defendant"), formerly known as UBS PaineWebber Inc., is a broker-dealer incorporated in Delaware and registered with the SEC. Prior to 2003, UBS Financial Services Inc. was known as UBS Painewebber Inc. Its address is 1285 Avenue of the Americas, New York, NY 10019.

**The Distributor Defendant**

56.     Defendant UBS Global Asset Management (US) Inc. is the distributor of the UBS Funds and maintains its headquarters at 51 West 52nd Street, New York, NY 10019-6114. UBS Global AM's predecessor, Mitchell Hutchins Asset Management, Inc., was known as Brinson Advisors, Inc. as of 2001. In 2002, it became known as UBS Global Asset Management (U.S.).

57.     UBS Global Asset Management (US) Inc. is referred to herein as the "Distributor Defendant."

## SUBSTANTIVE ALLEGATIONS

58.     The wrongful activity set forth herein involves the interrelated activities of two groups of UBS Defendants.  The Broker-Dealer Defendant, UBSFS, in clear contravention of its disclosure obligations and fiduciary responsibilities, failed to disclose that it had coerced its Financial Advisors to push the sale of Tier I Funds that provided UBSFS with undisclosed revenue sharing arrangements, or kickbacks, and its Financial Advisors with wrongful financial incentives.  UBSFS also failed to disclose that it steered investors into plans or programs that were supposed to provide financial advice, but in reality were simply another way to charge investors additional, unearned fees and to offer biased advice to pressure Plaintiffs and the Class to purchase still more Tier I Funds.  In addition to the wrongdoing of the broker-dealer arm of UBS, the UBS Investment Adviser Defendants and their affiliates charged excessive fees to shareholders.

### Background

59.     UBSFS is one of the nation's largest broker-dealers.  UBSFS executes, on average, approximately 24,000 mutual fund trades per day.  In 2003, UBSFS completed approximately 4.5 million mutual fund trades.  Letter from Mark S. Shelton, General Counsel UBS Financial Services Inc., to Securities and Exchange Commission (April 12, 2004) (on file with author); re: File No. S7-06-04: Confirmation Requirements and Point of Sale Disclosure Requirements for Transactions in Certain Mutual Funds and Other Securities.  During the Class Period, UBSFS created a false atmosphere in which investors were systematically led to believe they could rely on UBSFS Financial Advisers to guide them into programs and funds that were in the investors' best interest.  UBS states:

Our relationship with you is about much more than the fees and charges for our services. It's about listening, understanding and helping you plan and manage your financial life the way you want.

Your Financial Advisor is committed to building that relationship—a relationship we call "You & Us." More than a slogan, "You & Us" embodies our belief that sound financial decisions only come when powerful resources are matched with a real understanding of each client's needs.

UBS, *Information About Your Relationship With Us* 29 (2006) *available at*

http://www.ubs.com/1/e/wealth-mgmt_ww/ubs_international/relationship.html (follow

"Information About Your Relationship With Us" hyperlink).

60.     Broker-dealers or financial advisers who sell mutual fund shares are compensated

through both transaction costs and ongoing costs. Transaction costs are often  referred to as sales

loads and are broken down into front-end sales loads or contingent deferred sales charges

("CDSC"), both of which are paid by the customer based on the dollar amount of the investment.

The front-end sales load is collected from the customer at the time of sale of the mutual fund

shares, while the CDSC is collected from the customer upon redemption of the mutual fund

shares. Some broker-dealers, including UBS, also receive ongoing payments known as 12b-1

trailing commissions, based on the amount of customer assets held in the mutual fund. The 12b-

1 payments are made pursuant to each fund's 12b-1 plan, which sets forth the amount of the

annual fee a mutual fund pays for distribution costs, including payments to broker-dealers.

61.     As a result of UBS' acts of charging revenue sharing payments to Tier I  mutual

Fund families and their investors, and misrepresenting to Plaintiffs and the Class the ongoing

costs and fairness of those fees, typical investors would suffer losses caused by unjustified and

excessive expenses and fees. But because the fund expenses are deducted from fund assets

instead of separately charged to investors, the investors would be unaware of the increased

expenses, and the resulting losses would aggregate over the long-term period of their investment.

In addition, the lack of transparency of the Tier I Funds' fee structures ensured that investors would be unaware of the nature and existence of the increased fees. According to recent survey by Cerulli Associates, a research and consulting firm, "47% of [investment] advisors surveyed … expressed some reluctance to continue selling [Tier I] firm funds if disclosure of revenue-sharing agreements was required." Cerulli Associates, *Mutual Fund Revenue Sharing: Current Practices and Projected Implications* 70 (2005). Thus, by failing to disclose the Tier I Funds' increased expenses and fees, UBS could profit at the unwitting investors' expense.

62.     Endemic in UBS' corporate culture was the drive to sell Tier I Funds. Unbeknownst to investors, it was substantially more profitable for UBS to sell Tier I Funds than other mutual funds available to UBS clients. Thus, in an effort to increase Fund management fees and thereby boost their overall profitability, UBS pressured its Financial Advisors to steer Plaintiffs and other Class members into Tier I Funds instead of funds offered by other companies, regardless of the comparative value of those other funds.

**The Sales Loads Paid To The Brokers Were Not Justified**

63.     According to a recent study regarding mutual fund investors, approximately 98% of mutual fund shareholders make such investments as long-term savings and about 77% cite retirement savings as their primary financial goal. David J. Carter, *Mutual Fund Board and Shareholder Action*, 3 Vill. J. of Law & Inv. Mgmt. 1, 8 (2001). Many investors purchase mutual funds through brokers such as UBSFS, ostensibly paying their financial consultant to guide their fund selection. According to a recent survey by the SEC, investors believed that anyone with a title other than a broker, for example a "financial consultant" or "financial adviser," provided something more than a broker. In addition, many assumed that investment advisers, financial consultants and financial advisers all provided financial planning. Cynthia A.

Glassman, Speech by SEC Commissioner, *SEC in Transition: What We've Done and What's Ahead*, June 15, 2005, *available at* http://ftp.sec.gov/news/speech/spch061505cag.htm.

64.    When investors speak to financial advisers regarding the purchase of mutual funds, financial advisers can help the investor by providing (a) assistance selecting funds that are harder to find and evaluate; (b) access to funds with lower costs (excluding distribution costs); and (c) access to funds with better performance.  Daniel Bergstresser et al., *Assessing the Costs and Benefits of Brokers in the Mutual Fund Industry* (Jan. 16, 2006) (Working Paper Series, Am. Fin. Assoc. 2006 Boston Meetings), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=616981.

65.    Investors can avoid the fees associated with the services of distribution professionals, such as financial advisers, by determining all the above-mentioned issues for themselves and purchasing mutual funds directly from a fund company.  Many investors choose, however, to pay the fees and commissions to obtain financial guidance from financial advisers. These commissions are often known as a "sales load" or "sales charges."  As discussed above, there are two general types of sales loads — a front-end sales load investors pay when they purchase fund shares and a back-end or deferred sales load investors pay when they redeem their shares.  12b-1 fees can also be used to compensate brokers in place of part of their sales load. Securities and Exchange Commission, Mutual Fund Fees and Expenses, http://www.sec.gov/answers/mffees.htm (last visited Apr. 25, 2006).

66.    According to a recent study, in 2002 mutual fund investors paid as much as $3.6 billion in front-end loads, $2.8 billion in back-end loads and another $8.8 billion in 12b-1 fees, all in addition to the $23.8 billion investors paid during that same year for investment management fees and other operational expenses.  Bergstresser et al., *Assessing the Costs, supra*

¶62. Thus, the effort to sell a mutual fund consumes material resources from the investors, often deducting around 5% from their total investments in a fund. In 2002, the fees associated with funds sold through a broker were twice as large as the fees charged to investors who purchased funds directly from the mutual fund family. *Id.*

67.     UBS gave the impression of providing the benefits of objective investment advice to investors. In order to attract mutual fund investors, which would result in heavy sales loads for its financial advisers, the UBSFS website suggested to investors the following:

> Your Financial Adviser can help you review appropriate investment strategies and select mutual funds designed to pursue your investment goals.
>
> To give you a wide selection of mutual funds, we offer two comprehensive fund categories:
>
> - Non-Proprietary Mutual Funds: We have established selling arrangements with more than 150 fund companies that, together, equals over 8,000+ mutual funds.
>
> - UBS Funds: These draw on the extensive resources of UBS Global Asset Management. Alternatively, consider our PACE Select portfolios, part of a mutual fund advisory program, which brings institutional investment advisers to individual investors.

UBS.com, Mutual Funds, http://financialservicesinc.ubs.com/Home/PWSmain/0,1093,SE80-L11294-EN1294,00.html (last visited May 2, 2006).

68.     However, Defendant UBSFS failed to provide any benefits to the investors who used its services to purchase the Tier I Funds. Defendant's unlawful mutual fund sales practices focused on maximizing Defendant's profit to the detriment of investors, placing investors in mutual funds that did not perform as well as their peers and were more expensive with respect to fees. Defendant did this in order to secure undisclosed kickbacks from the Tier I Funds, took advantage of investors' reliance on their financial expertise, and steered those investors into

unsuitable mutual funds, inappropriate class shares and brokerage programs that incurred higher costs to the investor.

**Specific Programs Were Designed To Promote amd Reward Sales Of Tier I Funds**

69.     UBSFS entered into covert arrangements with certain families of funds to prioritize and promote their funds in exchange for kickbacks. UBSFS made false and misleading statements to Class members through its websites and Financial Advisers' interaction with investors because UBSFS portrayed its promotion and prioritization of funds as based on objective analysis and due diligence. Additionally, Financial Advisers misled investors into believing that the prospectuses delivered to investors provided all the material information that the investors would need to make a decision about the mutual fund they were purchasing. However, none of the sources provided by UBSFS disclosed that UBSFS promoted and prioritized certain funds over others because of the kickback arrangements.

70.     UBSFS categorized the mutual fund companies whose products were available to its clients as either "Tier I" or "Tier II" fund companies, and promoted Tier I Funds as being better for its clients than other funds available. UBSFS clients were led to believe that these categories reflected objective factors indicating that Funds from the "Tier I" fund companies had performed better than those in the "Tier II" fund companies. Only 21 mutual fund complexes out of the 150 with which UBS had distribution agreements were ranked by UBS as "Tier I" fund companies, including UBS's own UBS Mutual Fund Family. Defendant's efforts to emphasize the Tier I Funds were successful, given that "Tier I" companies constituted a whopping 90% of the UBSFS Defendants' business. Eric Jacobson, *Fund Spy: The Sordid Business of Revenue Sharing*, Morningstar.com, Feb. 24, 2005, http://news.morningstar.com/ article/article.asp?id=128002&_QSBPA=Y.

**Branch Manager Compensation Was Tied to Sales of Tier I Funds**

71.     Defendants incentivized branch managers to spend money on rewards, bonuses and other incentives to Financial Advisers who pushed the sale of Tier I Funds and pressured their employees by ensuring that branch managers' salaries were directly affected by the profitability of the firm, and specifically, the branch they ran.  The sale of Tier I Funds greatly increased the profitability of the branch and UBSFS.  To track how well those incentives were working, UBS maintained a system to track office-to-office performance as well as broker-to-broker performance.

72.     In addition to the sales loads, commissions or concessions charged by their mutual funds offerings, Defendants also received revenue through reimbursements from mutual funds for the cost of educational programs or seminars for employees and clients and from payments based on total sales or client assets.  UBS, *Information About Your Relationship With Us* 5, *supra* ¶ 58.

73.     Additionally, according to Former UBSFS Financial Adviser A, who was a UBSFS Financial Advisor during the Class Period, the branch managers were given discretion to structure sales contests for their offices.  Branch managers were authorized to consider the prizes awarded by the sales contests as part of the individual branch's expense budget.  For example, contests based on the sale of Tier I Funds would provide rewards such as a mountain bike or a trip to Bermuda.

74.     The branch manager was incentivized to push financial advisers to sell Tier I Funds because it would result in an increased bonus or commission plan and simultaneously make them look good to the corporate managers.

**Financial Advisers Received Increased Compensation and Benefits for Promoting Tier I Funds**

75.     UBS had very developed and profitable arrangements in place with the Tier I Funds, in furtherance of the revenue sharing agreements.  Individual UBS Financial Advisers promoted Tier I Funds because they received bonuses based on their total asset level and revenues.  Mutual fund wholesalers, unit investment trust wholesalers and investment managers paid for perks or expenses on behalf of Financial Advisers such as training, educational efforts, meals, and gifts.  UBS, *Information About Your Relationship With Us* 6, *supra* ¶ 58.

76.     Investment managers and affiliates arranged for "directed commissions" to be paid to Financial Advisers or affiliates for trading activities.  *Id.*

77.     According to a former Columbia Funds wholesaler, "[when] UBS gets paid 2 basis points on total sales at the end of the year, it's a kickback.  And they get paid an additional 5 basis points or 3 basis points on total assets under management at Putnam Funds.  That's a revenue sharing program."

78.     According to Former UBSFS Financial Advisor A, UBSFS Financial Advisers also benefited by being taken out to lunches by wholesaler representatives from the Tier I Funds as frequently as three to four days per week.  The former employee specifically remembered the following Tier I Fund families marketing their Funds to UBSFS Financial Advisers:

- Columbia
- American
- John Hancock
- Dreyfus
- PIMCO
- MFS

79.     While en route to these lunches, the Tier I wholesalers had opportunities to talk directly with UBSFS Financial Advisers, an advantage not conferred upon wholesalers from

other fund companies.  According to Former UBSFS Financial Adviser B, who was a UBSFS

Financial Advisor during the Class Period, the Advisers were invited to lunch by an INVESCO/

AIM fund wholesaler and offered a vacation to Colorado.

**UBS Created A Culture That Increased Sales Of Tier I Funds**

80.    Defendants cultivated a clandestine, incentive-driven culture among UBS

Financial Advisers to promote Tier I Funds above others, regardless of their comparative value.

81.    Defendants' evaluation of these "Tier I" fund companies was neither objective

nor performance-based.  Instead, unbeknownst to Plaintiffs and other members of the Class,

Defendants blatantly solicited "Tier I" mutual fund distributors and advisers to sponsor UBS

company events, office parties, training, educational meetings and conferences in exchange for

their fund company being ranked a "Tier I" company.  UBSFS clients that were deemed "Tier I"

participants earned significant benefits in that their products were favorably perceived as having

achieved "Tier I" status based on performance, while representatives from these "Tier I"

companies were given greater access to UBS branch offices and were invited to corporate

training and marketing events.  Consequently, "Tier I" companies were given increased

opportunities to interact with UBS Financial Advisers to promote the sale of their mutual funds,

even when, according to only recent disclosures,  "[a]s a general rule, such in-person branch

access … is not provided to 'Tier II' fund companies."  UBS.com, Mutual Fund Revenue

Sharing Program, http://financialserv icesinc.ubs.com/Home/PWSarain/0,1093,SE80-L11294-

L22809-EN2809,00.html (last visited Apr. 26, 2006).

82.    Brokers and distributors from other mutual fund companies were forced to engage

in this "pay to play" arrangement with UBSFS because Defendants condoned and even promoted

this practice as a required course of conduct by UBSFS Financial Advisers.  In other words, if

fund companies did not pay UBSFS, then UBSFS Financial Advisers would not sell their funds.

83.     For example, according to Former UBSFS Financial Advisor B, in 2001 American Skandia refused to pay UBS to sell its funds, and as a result American Skandia was removed from the "Tier I" list of funds. Additionally, a letter was sent by Defendants to the Financial Advisers telling them that they were no longer permitted to sell American Skandia products, and American Skandia wholesalers were no longer welcome on the premises at UBS. This action disadvantaged UBS clients and Class members who had already been placed in American Skandia fund products, because UBSFA Financial Advisors no longer received training or additional expertise regarding American Skandia products, since the Financial Advisors could only obtain product information materials via mail.

84.     Additionally, according to Former UBSFS Financial Adviser B, these predatory tactics also disadvantaged smaller mutual fund families that could not afford to pay to become Tier I Funds. For example, there was a family of mutual funds called the Enterprise Funds which was not sold at a rate commensurate with other funds that were paying big bonuses to UBS to be on the Tier I Fund list. Thus, Financial Advisers were not able to choose investments based on what they felt was best for the client, and certain advisers left as a result.

**The Performance of Most UBS Shelf Space Funds Was Below The Industry Average**

85.     Defendants' decision to steer investors into Tier I Funds over other funds was detrimental to investors, as is illustrated by the Tier I Funds' poor performance. Additionally, even though the investor was paying a fee for unbiased advice that would direct him or her into appropriate and suitable funds, no such advice was provided. For example, during the Class Period, all of AIM's Mutual Funds, a Tier I Fund Family for UBS, posted returns that were below the industry's category average returns:

|  | 2002 | 2003 | 2004 |
|---|---|---|---|
| **AIM's Total Return** | -20.6 | 29.4 | 11.1 |
| **Industry Category Average** | -20.4 | 30.1 | 11.4 |

Morningstar.com, *AIM Investments Mutual Funds Family Snapshot*, Mar. 31, 2006,

http://quicktake.morningstar.com (password required).

      86.     More evidence of the Tier I Funds' poor performance can be found in industry

analysts' publications.  For example, industry analyst Morningstar provides a fund family score,

which is an asset-weighted average of all of a fund company's Morningstar ratings (also known

as star ratings) within an asset class.  The fund family score can help investors determine a firm's

overall profitability within a specific asset class (domestic stock, international stock, municipal

bond or taxable bond), and can range from 1.0 to 5.0.  A score below 2.5 is an indication that the

fund company has met with little success in that asset class.  A score between 2.5 and 3.5

indicates the fund company is about average, while a score above 3.5 indicates the fund company

has a fair amount of prowess.  The more funds a firm manages per asset class, the stronger the

significance of the fund family score with respect to fund's performance.  In this regard, the

majority of AIM's assets were not successful and the remaining were only average, as illustrated

by the chart below:

| Asset Class | Score | % of Assets |
|---|---|---|
| **Domestic Stock** | 2.3 | 74.03 |
| **Taxable Bond** | 1.6 | 5.16 |
| **International Stock** | 3.0 | 14.04 |
| **Municipal Bond** | 2.9 | 1.99 |

Morningstar.com, *AIM Investments Fund Family Snapshot*, Mar. 31, 1006,

http://quicktake.morningstar.com (password required).

87.    John Hancock Mutual Funds, which was also one of UBS' Tier I Funds, also had total returns below the category average and a poor fund family score:

|  | 2002 | 2003 | 2004 |
|---|---|---|---|
| JH's Total Return | -11.5 | 19.1 | 8.6 |
| Industry Category Average | -9.7 | 23.5 | 10.1 |

| Asset Class | Score | % of Assets |
|---|---|---|
| Domestic Stock | 2.3 | 57.51 |
| International Stock | 2.1 | 5.51 |
| Taxable Bond | 2.8 | 16.82 |
| Municipal Bond | 2.8 | 1.84 |

Morningstar.com, *John Hancock Fund Family Snapshot*, Mar. 31, 2006, http://quicktake.morningstar.com (password required).

88.    MFS, another of UBS' Tier I participants, also followed the same trend as other Tier I Funds, yielding total returns that were below the industry's category average returns.

|  | 2002 | 2003 | 2004 |
|---|---|---|---|
| MFS's Total Return | -18.2 | 21.1 | 11.5 |
| Industry Category Average | -16.5 | 23.5 | 9.9 |

| Asset Class | Score | % of Assets |
|---|---|---|
| Domestic Stock | 2.4 | 49.98 |
| Taxable Bond | 2.6 | 10.22 |
| Municipal Bond | 2.8 | 6.67 |
| International Stock | 3.4 | 15.22 |

Morningstar.com, *MFS Mutual Funds Family Snapshot,* Mar. 31, 2006, http://quicktake.

morningstar.com (password required).

89.    Putnam, another of Defendants' Tier I Funds, followed the same trend, having

total returns that were below the industry's category average returns.

|  | 2002 | 2003 | 2004 |
|---|---|---|---|
| **Putnam's Total Return** | -16.9 | 23.4 | 9.9 |
| **Industry Category Average** | -16.0 | 25.4 | 10.7 |

| Asset Class | Score | % of Assets |
|---|---|---|
| **Domestic Stock** | 2.1 | 58.29 |
| **Taxable Bond** | 2.5 | 12.41 |
| **Municipal Bond** | 2.7 | 7.86 |
| **International Stock** | 2.6 | 12.76 |

Morningstar.com, *Putnam Mutual Funds Family Snapshot,* Mar. 31, 2006,

http://quicktake.morningstar.com (password required).

90.    Other fund families such as Van Kampen, Lord Abbett and Federated also had

only average returns overall, but still received "Tier I" status because of their kickback

arrangements with Defendants. *See* Morningstar.com, *Van Kampen Mutual Funds Family*

*Snapshot,* Mar. 31, 2006, http://quicktake.morningstar.com (password required);

Morningstar.com, *Lord Abbett Mutual Funds Family Snapshot,* Mar. 31, 2006,

http://quicktake.morningstar.com (password required); and Morningstar.com, *Federated Mutual*

*Funds Family Snapshot,* Mar. 31, 2006, http://quicktake.morningstar.com (password required).

91.    According to Former UBSFS Financial Adviser A, individual Tier I Funds that

underperformed were nevertheless aggressively pushed by UBS Financial Advisers to the

detriment of the Plaintiffs and the Class.  For example, Former UBSFS Financial Advisor A

recalled that the UBS Tactical Allocation Fund and UBS Strategy Fund were heavily promoted during the Class Period. The Strategy Fund was rolled out at the end of 1999 and raised $1.5 billion in the first nine months of its existence. The brokers were paid an extra 25 basis points on top of the regular commissions for this fund alone, even while at $1.5 billion assets, the added compensation paid out was already in the millions. The fund performed poorly shortly after that and became known in the office by the brokers as the "Tragedy" Fund rather than the Strategy Fund.

92.     As is illustrated by the pattern of the Tier I Funds' underperformance relative to their peers, the Tier I Funds' performance played virtually no role in Defendant UBSFS's promotion of these fund families over others. In fact, the performance of the Tier I Funds relative to their peers demonstrates that Defendants' Financial Advisers should have generally recommended other funds besides the Tier I Funds to investors, but that incentives and pressure coming from Defendants prevented them from acting in the client's best interests.

## The Shelf Space Arrangements Resulted in Investors Paying Higher Fees To Brokers

93.     Investors paid more than a sales load to UBS' brokerage firms as a result of its shelf space arrangements. As a result of Defendants' kickback agreements, additional ongoing costs were deducted from investors' invested principal in the Tier I Funds to compensate UBS Financial Advisers for providing biased, predetermined advice to investors. Specifically, brokerage commissions, shareholder fees, advisory fees and 12b-1 fees were deducted from the investors' principal to pay financial advisers for their role in steering investors into the Tier I Funds.

94.     Directed brokerage is the practice whereby investment advisers direct underlying portfolio securities transactions to broker-dealers that sell shares of the fund in order to

remunerate those brokers for pushing the advisers' mutual funds shares onto investors. This practice directly harms investors, especially where, as here, the fund is alleged to be "paying up," or trading securities at commission rates higher than the fund would otherwise pay if it were not indirectly paying for distribution through directing brokerage. Directed brokerage creates a material conflict of interest because the investment adviser has a strong incentive to use brokerage commissions to increase the size of its funds (thereby increasing management/advisory fees) and to avoid paying financial advisers out of its own assets. Directed brokerage may also be used to circumvent NASD rules on sales charges, undermining the protection afforded to investors under §22(b) of the ICA, which states that:

> [T]he price at which such security is offered or sold to the public shall not include an excessive sales load but shall allow for reasonable compensation for sales personnel, broker-dealers, and underwriters, and for reasonable sales loads to investors...

17 C.F.R. 270.22(b)(1).

95.     In connection with managing the underlying portfolios' funds, the Tier I Funds' investment advisers often directed excessive commissions on such trades to UBSFS, among others. In return for the efforts of UBSFS to steer its clients into the Tier I Funds, the Funds paid UBSFS directed brokerage commissions that were in excess of what they would have paid under an agreement reached with the broker-dealers through arm's-length bargaining. The investment advisers would use these excessive commissions, which are Fund assets belonging to investors, to meet their revenue sharing commitments.

96.     According to Former UBSFS Financial Adviser C:

> basically you had to pay a gatekeeper fee of like twenty five thousand, you had to be willing to do that right off the bat, to just even get in... Then once you were in you were required to participate in at least four meetings a year at a fee of like, it's phenomenal, like fifteen thousand or more. Then they ask for directed trades.

97.     Furthermore, Tier I Fund investors paid additional expenses to the brokers.  Aside from 12b-1 fees that would pay for distribution expenses and administrative services, UBS brokers received networking fees in consideration for transfer agent and other services that they provided to mutual funds.  These networking fees are paid from the investors' assets in the mutual fund, and are a fixed amount based on the number of accounts of that fund family held at UBS Financial Services Inc.  *See* UBS, Mutual Fund Revenue Sharing Program, http://financialservicesinc.ubs.com/Home/PWSmain/0,1093,SE80-L11294-L22809-EN2809,00.html (last visited May 2, 2006).  Under the Investment Advisers' direction, the aggregate expenses paid from fund assets were excessive.

98.     UBSFS Financial Advisers also had an incentive to push Proprietary Funds because such sales increased the fees they themselves received.  Financial Advisers received a percentage of the sales charge, based on their payout rate.  According to a UBS Brochure entitled "Information About Your Relationship With Us," dated February 28, 2006, the Financial Advisers also receive a portion of any ongoing payments called "trailers," provided by the 12b-1 fees or annual distribution fees paid to UBS.  *See supra* ¶58.

99.     UBSFS Financial Advisers also received, in addition to increased basis points,[1] additional compensation for pushing UBS mutual funds.  The UBS "Paine Webber Inc. Financial Adviser Compensation System Weekly Commission Detail" for 2001 contained a line item "Promotional or Incentive" income for the broker.  According to the 2001 Financial Adviser Compensation Plan for UBS Paine Webber, an additional 1% was paid when UBS PACE Multi-Adviser and Select Adviser Funds were sold.  With regard to the other UBS Funds, Financial

---

[1] A basis point ("bp") is one-hundredth of a percentage point (0.01%).  For example, 10bp of $1 billion equals $1 million.

Advisers received commissions that were roughly 9 to 10 bps higher than for non-proprietary funds. PaineWebber, Inc., 2001 Financial Adviser Compensation Plan (2001 on file with author).

100.    Additionally, according to Former UBSFS Financial Adviser A, UBSFS Financial Advisers were incentivized to sell proprietary funds by being rewarded with more house accounts and leads, which would in turn mean more revenue for the financial adviser.

101.    In light of these incentives, UBSFS Financial Advisers pushed the Tier I Funds onto unsuspecting investors, regardless of the best interests of those investors.

102.    During the Class Period, Defendant UBSFS offered fee-based accounts that provided various financial consultant services to a substantial percentage of its clients. These Financial Plans included fee-based account programs such as PACE Multi Advisor Series, PACE Select Series, and Insight One Accounts.

103.    Fee-based brokerage accounts provide customers with an opportunity to consult with an investment professional, receive advice on security selection and portfolio construction, and then buy and sell securities for their portfolios without paying a commission for their trades.

104.    With fee-based brokerage accounts, investors are charged a yearly fee for portfolio construction advice and investment recommendations. When the investors buy or sell the security, the trades are commission free. Members of the Financial Plan Subclass were led to believe they were receiving objective advice specifically tailored to their individual financial situations from professionals who are looking out for their clients' best interests. To the contrary, Defendants' Financial Plans were worthless because their Financial Advisers' recommendations were based upon the unlawful incentive schemes as described herein.

105.    According to a NASD Notice to Members in November 2003, brokers are supposed to take into consideration the following factors in determining whether a fee-based account is appropriate for a customer in lieu of a commission-based account including:

- Cost;
- Overall needs and objectives, *i.e:* anticipated level of trading activity in the account; and
- Whether the investor participates in a moderate level of trading.

NASD, Notice to Members, Nov. 4, 2003, http://www.nasd.com/web/idcplg?IdcService=SS_Get_PAGE=2ssDocName=NASDW_003078.

106.    During the Class Period, UBSFS utilized wrongful and hidden incentives on both the firm and Financial Advisor level to push fee-based programs.  The percentage of brokerage revenues that financial consultants received in fee-based programs was higher than the percentage of revenues that financial consultants received on most other products and services, such as selling mutual funds, insurance products or opening a flat fee brokerage account. According to Former UBSFS Financial Adviser D, who was a UBSFS Financial Advisor during the Class Period, if a Financial Adviser successfully sold a fee-based plan or program such as PACE or Insight One as opposed to selling the mutual fund by itself, the Financial Adviser received an extra 4% in his or her payout.  For example, a UBSFS Financial Adviser may generally receive a certain percentage, such as 36%, of the revenue that he or she brings in. However, if the Financial Adviser sold a fee-based plan, he or she received an additional 4% and was paid a total of 40% on the revenue from that business.  Furthermore, the Financial Advisers received additional 12b-1 fees through sales of PACE funds, which they would not have received from other plans or programs.

107.    This additional, material payout to Financial Advisers was not disclosed to UBSFS clients.  As a result, UBSFS Financial Advisers were able to wrongfully and materially

increase their revenue to the detriment of investors, by pushing these programs onto unwitting investors.

**UBSFS Misled Investors Into Buying Fee-Based**
**Accounts and UBS PACE Funds By Falsely Touting "Unbiased" Advice**

108.    UBSFS created various fee-based accounts as part of their financial planning program, including the Insight One account plan, one of the largest fee-based brokerage programs in the U.S.  In reality, these accounts were meant to implement what UBS called the "holistic wealth management model" to "boost revenue by capturing a greater share of their clients' financial holdings."  Mark Sutton, Chairman & CEO, UBS, Speech at Investor Day 2005, Wealth Management USA (May 13, 2005) *available at* http://ww.ubs.com/7/showmedia/investors/investortoday/2005?contentid=782338name=investor _Day_4_%20Sutton_Final.pdf.

109.    According to Former UBSFS Financial Adviser D, UBSFS Financial Advisers were also incentivized to steer mutual fund investors into other fee-based programs such as the Insight One accounts, from which they would receive an extra 4% in payout.

110.    Although UBS states that its goal in financial planning is to help clients "accumulate, preserve, and transfer [their] wealth," they fail to properly disclose how investors may pay more with fee-based programs than when purchasing the mutual fund separately. Instead, they obliquely mention in a brochure's overview that investors who are purchasing this financial guidance, "should consider the specific features of each product and the effect on your total cost when asset-based fees are applied to certain products, such as mutual funds and unit investment trusts that also carry built-in management and administrative fees."  UBS, *Information About Your Relationship With Us* 4, *supra* ¶ 58.

111.   Furthermore, there are wrongful incentives on both the firm and Financial Advisor levels to push fee-based plans or programs.  The percentage of firm revenues that Financial Advisors receive in fee-based programs is higher than the percentage of firm revenues they receive on most other products and services.

112.   The PACE plan was one fee-based account through which investors would be able to purchase mutual funds.  UBSFS states on its website that "[y]our Financial Advisor will work with you to select the account, or combination of accounts that best suits your needs." UBS.com, Account Services, http://financialservicesinc.ubs.com/Home/PWSmain/0,1093,SE80-L1859-EN859,00.html (last visited May 3, 2006).

> UBSFS further states that:

> Through the PACE programs, Financial Advisers assist you in implementing an asset allocation strategy using mutual funds, *based on your specific financial goals, time horizon and risk tolerance*."

> \*   \*   \*

> You pay a maximum annual program fee of 1.5% of eligible assets.  The fee includes such services as *asset allocation, fund analysis*, automatic services -- including rebalancing, contributions and withdrawals -- client performance reporting, and your Financial Advisor's guidance.

> \*   \*   \*

> The various funds may pay our Firm additional amounts, based on our overall sales and/or assets, known as "revenue sharing."

> In addition to the PACE program fee, each mutual fund has its own operating expenses and management fees.  Fees vary depending on the fund.  For affiliated funds in the program, operating and management fees are paid to our Firm or one of our affiliates.

UBS, *Information About Your Relationship With Us*, 12 (2005), http://financialservicesinc. ubs.com/PWIC/CMA/workflow/FILE_DATA/PWS/pdf/Information_About_Your_Relationship _With_Us.pdf  (emphasis added).

113.    The PACE program is a 100% mutual fund investment vehicle in which investors

pay up to 1.5% annually on eligible assets to participate.  There are two PACE platforms, the

Select Advisor and the Multi Advisor programs.  The PACE Select program is a UBS-specific

product, whereby UBS rebalances and picks the funds to include in the PACE Select program,

which is comprised solely of UBS Funds.  The PACE Multi Advisor Program is structured such

that the UBSFS Financial Adviser builds a client's portfolio from multiple firms' fund families

available to the investor.  Investors are drawn into these accounts because mutual fund sales

loads are waived for them.  According to Former UBSFS Financial Adviser D, the majority of

investors in PACE programs picked the PACE Multi Advisor Program.  Once in the PACE Multi

Advisor Program, it was easier for Financial Advisers to push investors into the Tier I Funds.

The former UBSFS Financial Adviser noted that selling PACE Multi Advisor programs was easy

because it was akin to telling the investor "Hey I am charging you the one percent to manage

your money.  Typically, this would have cost you 5%.  I'm going to waive that."  However,

during the sale the Financial Adviser would fail to explain that the fees charged go directly to

UBSFS and that in the long run, the UBSFS Financial Adviser would get paid more than if the

investor had paid the sales load for the mutual fund.

114.    In reality, UBSFS received revenue sharing payments from the Tier I Funds so

that the Financial Advisers could push unknowing investors into Tier I Funds.  The UBSFS

Financial Advisers misrepresented themselves as looking out for the investors' interests even

while they were solely focused on maximizing their own revenue.

115.    Investors would pay an annual PACE program participation fee of up to 1.5% on

eligible assets.  Investors paid this fee in return for services such as asset allocation, fund

analysis, and Financial Advisers' financial advice.  Fund investors paid for unbiased professional

advice and got nothing of the kind — instead they were pushed into the Tier I Funds as a result of Defendants' wrongful and concealed incentivization scheme. UBSFS Financial Advisers used this plan to steer investors into Tier I Funds that paid UBSFS additional amounts based on overall sales and/or assets, known as "revenue sharing." These Funds benefited from the additional operating expenses and management fees that were paid by investors. UBS, *Information About Your Relationship With Us, supra*, ¶58.

116.     According to Former UBSFS Financial Adviser B, Financial Advisers were coerced to sell investors the PACE Select and the PACE Multi Advisor programs. Former Financial Adviser B noted that meetings were held once per month at their office, where the sales manager would review each Financial Adviser's progress on selling PACE accounts. If a Financial Adviser did not place a sufficient number of customers in the PACE accounts, the manager would want to speak to the Financial Adviser about this. Additionally, when a Financial Adviser left the firm, that Financial Adviser's business was reallocated to the highest PACE producers.

117.     As described above by Former Financial Adviser B, PACE Funds were the funds of choice while other funds were frowned upon at UBS. In fact, according to another former Financial Adviser, Former UBSFS Financial Advisor D, PACE Funds were marketed all the time. Corporate visitors frequently came to the UBSFS offices and explained the benefits of fee-based accounts to Financial Advisers. The offices held so-called "PACE days," where someone from the mutual fund arena would show Financial Advisers how sell the program and go through PACE proposals. There was even a "proposal" tailored to PACE funds that was on the UBSFS system, which brokers would use in their marketing efforts.

118.    According to Former UBSFS Financial Advisor D, Financial Advisors who gathered the most assets in fee-based accounts were given rewards such as a trip to Salt Lake City, when the Winter Olympics were being held in Utah.  Financial Advisers who won these vacations were taken to meet former Olympians and to learn about the Winter Olympic sports.

119.    However, in addition to the fact that Defendants used the Financial Plans to charge unearned ongoing fees for providing "unbiased" advice that was never provided, the PACE fee-based accounts were also not suitable for many investors because the low dollar amount for entry ($10,000) was not large enough to adequately or properly diversify an investor's portfolio.  In fact, according to former Financial Adviser B, most brokerage firms usually had a minimum requirement of $50,000 for a diversified managed account, but the PACE accounts' low minimum-entry level was effectuated to generate more accounts from which to gather more fees and steer clients into Tier I Funds.  Clients in the PACE accounts paid all the standard mutual fund fees as well as the 1.5% asset management fee.  In clear contradiction to the message that UBS sends to its customers, this former Financial Adviser noted that UBSFS Financial Advisers were not encouraged to reduce fees, but instead to increase them to help line their own pockets.

## THE PROSPECTUSES AND DEFENDANTS' PUBLIC STATEMENTS
## WERE MATERIALLY FALSE AND MISLEADING

### The Tier I Funds' Prospectuses, Their Statements of
### Additional Information and Defendants' Public Statements Were
### Materially False and Misleading With Respect to the Shelf Space Arrangements

120.    The revenue sharing arrangements, kickbacks and hidden incentives created by Defendants as described above caused material conflicts of interest with respect to the Financial Advisers' investment advice given to their clients and their management of client accounts. These conflicts of interest were not disclosed to Plaintiffs and the other members of the Class,

and, in fact, were actively concealed from them. Disclosure of these sales incentives and compensation structures were necessary for UBS's clients to make informed investment decisions.

121.   UBS disclosed information to its customers concerning mutual fund purchases primarily through supplying customers with the prospectuses and, if requested, the statements of additional information ("SAIs") issued by the mutual funds.

122.   A mutual fund's prospectus and its SAIs are required to disclose all material facts in order to provide investors with information that will assist them in making an informed decision about whether to invest in a mutual fund. The law requires that such disclosures be in straight-forward and easy to understand language such that it is readily comprehensible to the average investor. *See* Plain English Disclosure, SEC Release Nos. 33-7497, 34-39593 (Oct. 1, 1998) (to be codified at 17 C.F.R. pts. 228, 229, 230, 239 and 274).

123.   Prior to investing in any of the Tier I Funds, Plaintiffs and members of the Class were entitled to receive the appropriate prospectuses. The SAI is not distributed to investors, but is purportedly available to them upon request. The prospectuses and SAIs were deceptive and misleading as they failed to disclose Defendants' practice of steering investors into Tier I Funds.

124.   Each of the Tier I Funds' prospectuses and their SAIs issued during the Class Period failed to adequately disclose to investors material information about the mutual funds and the fees and costs associated with them. As seen below, each of the prospectuses and their SAIs contained the same materially false and misleading statements and omissions regarding directed brokerage, 12b-1 fees and soft dollars. For example, the April 1, 2003 Prospectus for the Massachusetts Financial Services ("MFS") Investors Growth Stock Fund — one of the Tier I Funds identified in ¶ 6 *supra*, is substantially identical in relevant substance to all the other Tier I

prospectuses issued during the Class Period in that it states under the heading "Portfolio

Transactions And Brokerage Commissions":

> The advisory fee paid by the Fund to the Adviser is not reduced as a
> consequence of the Adviser's receipt of Research.  To the extent the
> Fund's portfolio transactions are used to obtain Research, the brokerage
> commissions paid by the Fund might exceed those that might otherwise be
> paid, by an amount which cannot be currently determined.  The Research
> received is useful and of value to the Adviser in serving both the Fund and
> other clients of the Adviser.  While the Research is not expected to reduce
> the expenses of the Adviser, the Adviser would, through the use of the
> Research, avoid the additional expenses which would be incurred if it
> should attempt to develop comparable information through its own staff.

> In effecting portfolio transactions on behalf of the Fund and the Adviser's
> other clients, the Adviser from time to time may instruct the broker-dealer
> that executes a transaction to allocate, or "step out," a portion of such
> transaction to another broker-dealer.  The broker-dealer to which the
> Adviser has "stepped out" would then settle and complete the designated
> portion of the transaction, and the executing broker-dealer would settle
> and complete the remaining portion of the transaction that has not been
> "stepped out."  Each broker-dealer would receive a commission or
> brokerage fee with respect to that portion of the transaction that it settles
> and completes.

> Consistent with the Advisory Agreement and applicable rules and
> regulations, the Adviser may consider sales of shares of the Fund and of
> other funds or accounts of the Adviser as a factor in the selection of
> broker-dealers to execute the Fund's portfolio transactions.

MFS Investors Growth Stock Fund, prospectus effective Mar. 30, 2003 (Form N-1A) (Mar. 28,

2003).

125.    The MFS Tier I prospectus quoted above is materially false and misleading, as are

all of the Tier I prospectuses, in that it fails to disclose that directed brokerage commissions were

paid from MFS to UBS (or to any other broker-dealers) to satisfy predetermined, pre-negotiated

arrangements for specific amounts of brokerage commissions with UBS.  *See also, e.g.*; Putnam

Discovery Growth Fund, prospectus effective Apr. 30, 2003 (Form N-1A) (Apr. 30, 2003); AIM

Real Estate Fund, prospectus effective Apr. 30, 2003 (Form N-1A) (Apr. 25, 2003);

Oppenheimer Multiple Strategies Fund, prospectus effective Nov. 21, 2003 (Form N-1A) (Nov. 21, 2003); Columbia Growth Fund, prospectus effective Jan. 1, 2004 (Form N-1A) (Dec. 31, 2003).

126.   In an SEC action against MFS filed March 31, 2004 for violation of the federal securities laws, the SEC determined that such statements as those made in the Tier I prospectus cited above are inadequate and in violation of the federal securities laws.  The SEC concluded that such statements "did not adequately disclose to … shareholders that [MFS] allocated fund brokerage commissions to satisfy strategic alliances."  SEC Order Instituting Administrative and Cease-And-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions, In the Matter of Massachusetts Financial Services Company, Mar. 31, 2004, *available at* http://www.sec.gov/litigation/admin/ia-2224.htm.  The SEC further explained that such statements in prospectuses did not effectively communicate and "did not adequately disclose that MFS had entered into bilateral arrangements with those broker-dealers to allocate specific negotiated amounts to fund brokerage commissions for specified marketing and distribution services."  *Id.* (emphasis added).  Therefore, as the statements in the Tier I Funds' prospectuses are identical in substance to the inadequate disclosures made by MFS referenced above, the Tier I Funds' Prospectuses similarly violated the disclosure requirements mandated by the federal securities laws.[2]

---

[2] Furthermore, the SEC has also fined and sanctioned UBS' Tier I fund family Franklin/Templeton for failing to adequately disclose the shelf space arrangements it had with broker-dealers.  The SEC noted that:

> Although the SAIs stated that [Franklin/Templeton] could consider a broker-dealer's sales of fund shares when selecting a broker-dealer to execute portfolio transactions, they did not describe FTDI's practice of annually negotiating shelf space arrangements with certain broker-dealers.  They did not make clear to fund shareholders that brokerage commissions were used to offset shelf space payment

127.    The Tier I prospectuses, and each of them, failed to disclose the material conflicts of interest that existed between the investor and UBS.

128.    UBS' reliance on the Tier I Funds' prospectuses and SAIs to "disclose" the revenue sharing arrangements was insufficient to make investors aware of the costs and risks associated with these arrangements.  The SEC recently brought administrative actions against broker-dealers for failing to adequately disclose their revenue sharing relationships to investors by relying solely on Shelf Space Funds' prospectuses and SAIs.  As was explained in the SEC Administrative Cease-and-Desist Order brought against Citigroup Global Corp ("CGMI"):

> CGMI relied on the participating funds' prospectuses and SAIs to satisfy
> its disclosure obligations with regard to its revenue sharing
> program....[M]ost of the disclosures were generally vague and lacked
> sufficient information to inform CGMI's customers of the nature and
> scope of CGMI's revenue sharing program.  For example, the
> prospectuses and SAIs did not specifically disclose the magnitude of the
> revenue sharing payments that CGMI received from the fund complexes
> or that certain fund complexes had greater access to, or increased visibility
> in, CGMI's retail network.  As a result, CGMI's *customers were not
> provided with sufficient information to appreciate the dimension of the
> conflict of interest the revenue sharing program created.*

---

obligations under at least some of these shelf space arrangements.  They also did
not make clear that use of brokerage payments in this manner was not specifically
authorized by the funds' distribution plans approved by the FT
[Franklin/Templeton] Fund Boards pursuant to Rule 12b-1.

SEC Order Instituting Administrative And Cease-And-Desist Proceedings, Making Findings,
And Imposing Remedial Sanctions, In the Matter of Franklin Advisers, Inc. and
Franklin/Templeton Distributors, Inc., *available at* http://www.sec.gov/litigation/admin/34-
50841.htm (emphasis added).  *See also* SEC Order Instituting Administrative And Cease-And-
Desist Proceedings, Making Findings, And Imposing Remedial Sanctions, In the Matter of
OppenheimerFunds, Inc. and OppenheimerFunds Distributor, Inc., Sept. 14, 2004, *available at*
http://www.sec.gov/litigation/admin/34-52420.pdf; SEC Order Instituting Administrative And
Cease-And-Desist Proceedings, Making Findings, And Imposing Remedial Sanctions, In the
Matter of Putnam Investment Management, LLC, Mar. 23, 2005, *available at*
http://www.sec.gov/litigation/admin/ia-2370.pdf.

In the Matter of Citigroup Global Markets, Inc., Order Instituting Administrative and Cease-and-

Desist Proceedings, SEC Act Release No. 8557, Mar. 23, 2005, *available at*

http://www.sec.gov/litigation/admin/33-8557.pdf.  (emphasis added).

129.    Likewise, in an SEC action against Edward D. Jones, another broker-dealer, the

SEC also came to the same conclusions, and noted that the:

> [P]referred families' *prospectuses and SAIs fail to disclose adequate
> information about the source and the amount of revenue sharing
> payments to Edward Jones and the dimensions of the resulting potential
> conflicts of interest.*  Although the Preferred Families' prospectuses and
> SAI's contained various disclosures concerning payments to broker-
> dealers distributing their funds, few of these disclosures adequately
> described Edward Jones' potential conflict of interest.

In the Matter of Edward D. Jones & Co., L.P., Order Instituting Administrative and Cease-and-

Desist Proceedings, SEC Release No. 8520, Dec. 22, 2004, *available at*

http://www.sec.gov/litigation/admin/33-8632.pdf.  (emphasis added).

130.    Similarly here, the Broker-Dealer Defendants improperly relied on prospectuses

and SAIs that failed to disclose the financial *quid pro quo* arrangements discussed above.  The

Tier I prospectuses and SAIs also failed to disclose that participants in the Broker-Dealers'

financial *quid pro quo* arrangements used brokerage commissions to pay for a portion of

advisory fees and other fees derived from the Tier I Funds and their investors, in addition to the

sales loads accompanying the initial purchase of shares.  The Broker-Dealer Defendants took no

other steps to ensure that investors were made aware of the material scope of these arrangements,

the nature of which was also not disclosed, leaving Tier I investors unaware that the payments

made by Tier I Funds to the Broker-Dealer Defendants were in exchange for the Broker-Dealer

Defendants' "Financial Advisers" steering investors into the Tier I Funds.  In fact, the additional

fees were paid to sway the financial advisers into misrepresenting the value and performance of

the Tier I Funds.  Defendants, therefore, misled investors into believing that the Tier I Funds

were given priority over other mutual funds due to their performance and the consultants' objective analyses of different mutual funds.

131.    Plaintiffs and other members of the Class were entitled to receive one or more Prospectuses, pursuant to which the Tier I Funds shares were offered.

132.    Prospectuses and their SAIs are required to disclose all material facts in order to provide investors with information that will assist them in making an informed decision about whether to invest in a mutual fund.  The law requires that such disclosures be in straightforward and easy to understand language such that it is readily comprehensible to the average investor, *supra* ¶ 121.

133.    Each of the Tier I Funds' Prospectuses and their SAIs issued during the Class Period failed to adequately disclose to investors material information about the mutual funds and the fees and costs associated with them.  As seen below, each of the Prospectuses and their SAIs contained the same materially false and misleading statements and omissions regarding directed brokerage, 12b-1 fees and soft dollars.

134.    Each of the Prospectuses and their SAIs issued during the Class Period contained substantially the same materially false and misleading omissions of key information regarding the Funds' directed brokerage and 12b-1 fees that were required to be disclosed in "easy to understand language" such that a reasonable investor could make an informed decision whether or not to invest in the Funds.

135.    Prior to 2004, UBS Funds' SAIs contained the following language:

> The Underwriter may also use distribution fees to pay additional compensation to dealers and to offset other costs allocated to the Underwriter's distribution activities.

UBS Funds, prospectus effective Oct. 28, 2003 (Form N-1A) (Oct. 28, 2003).[3]

136.    After the SEC's recent sweep of investigations into the industry, these illicit arrangements, including directed brokerage agreements, revenue sharing arrangements and unlawful 12b-1 distribution plans, were brought to light and participants began to revise their disclosures. Defendants have altered the "disclosures" in their SAIs, but the changed statements still fail to adequately disclose the magnitude of the conflicts of interest created by their revenue sharing arrangements and the decreased returns that investors suffer:

> ADDITIONAL COMPENSATION TO AFFILIATED DEALER
>
> UBS Global AM pays its affiliate, UBS Financial Services Inc., the following additional compensation in connection with the sale of Fund shares:
> - 0.05% of the value (at the time of sale) of all shares of a Fund sold through UBS Financial Services Inc.
> - a monthly retention fee at the annual rate of 0.10% of the value of shares of a Fund that are held in a UBS Financial Services Inc. account at month-end. . . .
>
> The foregoing payments are made by UBS Global AM out of its own resources.

UBS Funds, prospectus effective Oct. 28, 2004 (Form N-1A) (Oct. 28, 2004).

137.    As evidenced above, prior to 2004, Defendants stated in their prospectuses that 'distribution fees' paid for additional compensation. Beginning in or around 2004, the prospectus contained language that "payments are made by UBS Global AM out of its own resources," illustrating that 12b-1 commissions had been misappropriated and used for purposes that did not benefit investors. Furthermore, the SAIs continued to inadequately disclose the full scope of Defendants' harmful practices even after the revised disclosures in their 2004 filings.

---

[3] All the UBS Funds prospectuses and SAIs contained similar language concerning distribution fees.

Aside from the additional "disclosure" quote above, Defendants have also changed the source of

funding for their revenue sharing payments from fund assets to "indirect" use of fund assets.

This change in disclosure clearly illustrates that the ongoing costs of revenue sharing were

coming directly from investors' assets, similar to 12b-1 fees.

**Material Omissions Regarding Directed Brokerage**

138.    The Hartford mutual fund family — one of the Tier I Funds — is just one

example of a fund complex engaged in making Tier I payments to UBS.  However, the Hartford

Funds' Prospectuses and their SAIs are identical in substance to the Prospectuses and SAIs for

all Tier I Funds during the Class Period.  For example, the March 1, 2003 SAI for the Hartford

Mutual Funds, Inc., is in relevant part substantially identical to all other Tier I Fund SAIs issued

during the Class Period in that it states under the heading "Portfolio Transactions And

Brokerage" the following:

> The Companies have no obligation to deal with any dealer or group of
> dealers in the execution of transactions in portfolio securities. Subject to
> any policy established by each Company's board of directors and
> HIFSCO, HIMCO and Wellington Management, as applicable, are
> primarily responsible for the investment decisions of each Fund and the
> placing of its portfolio transactions.  In placing orders, it is the policy of
> each Fund to obtain the most favorable net results, taking into account
> various factors, including price, dealer spread or commission, if any, size
> of the transaction and difficulty of execution.  While HIMCO and
> Wellington Management generally seek reasonably competitive spreads or
> commissions, the Funds do not necessarily pay the lowest possible spread
> or commission.  Upon instructions from HIFSCO, Wellington
> Management may direct certain brokerage transactions to broker-dealers
> who also sell shares of funds in the fund complex.  Upon instructions from
> HIFSCO, Wellington Management may also direct certain brokerage
> transactions to broker-dealers that pay for certain other services used by
> the Funds.

Hartford Mutual Funds, Inc., prospectus effective Mar. 1, 2003 (Form N-1A) (Feb. 28, 2003).

This statement is materially false and misleading, as are all of the Tier I Fund Prospectuses and

their SAIs, in that it fails to disclose that Hartford directed brokerage commissions to UBS to

satisfy pre-determined, covert arrangements for specific amounts of brokerage commissions with UBS. Additionally, the above statement is materially false and misleading for the following reasons:

a.    investor assets were used to pay UBS to satisfy bilateral arrangements between the Tier I Funds and UBS, known as the "Tier I" program, whereby the broker steered clients into the Tier I Funds;

b.    brokerage commissions over and above those allowed by Rule 12b-1 were used to pay for the "Tier I programs";

c.    brokerage payments were directed to UBS to satisfy the "Tier I" arrangements and that this directed brokerage was a form of marketing that was not disclosed in or authorized by the Tier I Funds Rule 12b-1 Plan; and

d.    such revenue sharing payments created undisclosed conflicts of interest.

**Material Omissions Regarding 12b-1 Fees**

139.    With respect to statements regarding 12b-1 fees, the March 1, 2003 SAI for the Hartford Mutual Funds, Inc. is in relevant part substantially identical in substance to all Tier I Fund SAIs issued during the Class Period in that it states the following with respect to 12b-1 fees:

> GENERAL Distribution fees paid to HIFSCO may be spent on any activities or expenses primarily intended to result in the sale of the applicable Company's shares including: (a) payment of initial and ongoing commissions and other compensation payments to brokers, dealers, financial institutions or others who sell each Fund's shares, (b) compensation to employees of HIFSCO, (c) compensation to and expenses, including overhead such as communications and telephone, training, supplies, photocopying and similar types of expenses, of HIFSCO incurred in the printing and mailing or other dissemination of all prospectuses and statements of additional information, (d) the costs of preparation, printing and mailing of reports used for sales literature and related expenses, i.e., advertisements and sales literature, and (e) other distribution-related expenses and for the provision of personal service

> and/or the maintenance of shareholder accounts. These plans are
> considered compensation type plans which means that the Funds pay
> HIFSCO the entire fee regardless of HIFSCO's expenditures.

*Id.* The above statement is materially false and misleading in that it fails to state that Hartford

used 12b-1 fees to participate in "Tier I programs" at UBS to provide kickbacks to UBS for

directing their clients into Tier I Funds. Additionally, the above statement is materially false and

misleading for the following reasons:

      a.    investor assets were used to pay UBS to satisfy bilateral arrangements

between the Tier I Funds and UBS, known as the "Tier I" programs, whereby the broker steered

clients into the Tier I Funds;

      b.    brokerage commissions over and above those allowed by Rule 12b-1 were

used to pay for the "Tier I" program;

      c.    brokerage payments were directed to UBS to satisfy the "Tier I"

arrangements and that this directed brokerage was a form of marketing that was not disclosed in

or authorized by the Defendants' Rule 12b-1 Plan; and

      d.    such revenue sharing payments created undisclosed conflicts of interest.

**Defendants' Recent Website Statement Concerning
Revenue Sharing Arrangements is Not an Adequate "Disclosure"**

      140.    In light of the recent regulatory investigation into the illegal, but widespread

practice of not disclosing revenue sharing, Defendants began in 2005 to disclose their

arrangements on their website regarding the formulas they used with Tier I Funds. Defendants'

website disclosure, however, is vague and inadequate. Defendants' website disclosure sets out

the formula that Defendants generally use for these revenue sharing arrangements, but fails to

provide enough specificity for investors to understand the impact of these arrangements on their

investments. The details regarding the revenue sharing formulas are spelled out in ranges,

segmenting different payments, and investors are expected to calculate the total revenue sharing payments for themselves. *See* UBS.com, Mutual Fund Revenue Sharing Program, http://financialservicesinc.ubs.com/Home/PWSmain/0,1093,SE80-L11294-L22809-EN2809,00.html (last visited May 2, 2006). However, even if investors calculate the range of payments they may be making UBSFS, these calculations fail to provide a specific amount or the source of the payments, and therefore they are still inadequate.

141.   Defendants' website further states that alternative types of payments are also made for preferred treatment by UBSFS, but still fails to explain what type of payments they are or what type of payment each fund family makes. As has been noted by Cerulli Associates in their Revenue Sharing Report, "[b]ecause some firms do not make all types of payments (if only because they refuse to do so), disclosure language parallels a potato chip bag that reads 'may contain one of the following oils.' Until an investor can look at two funds and clearly see that 'Fund A pays 35 basis point of revenue sharing and Fund B pays 40,' it will be nearly impossible to truly evaluate any conflicts of interest." Cerulli Associates, *Mutual Fund Revenue Sharing: Current Practices and Projected Implications* 71 (2005).

**Defendants Failed To Disclose Their Fraudulent Practices**

142.   Defendants created material conflicts of interest with respect to the UBS Financial Advisers' management of client accounts. These conflicts of interest were not disclosed to Plaintiffs and the other members of the Class. Disclosure of these sales incentives and compensation structures was necessary for investors to make informed purchases. Through a constant barrage of financial incentives and programs, pressure was exerted on UBS Financial Services Inc. and its financial advisers to sell Tier I Funds in order to receive additional compensation.

143.    Under the Revenue Sharing Program, payment was made to UBS by the "Tier I" funds in exchange for UBSFS pushing "Tier I Funds" to its customers. The result was that non-proprietary mutual funds were paying for "Tier I." At the time the Revenue Sharing Program was instituted, UBS anticipated receiving millions of dollars in revenue under it.

144.    UBSFS disclosed information to customers concerning mutual fund purchases primarily through supplying customers with the prospectuses and, if requested, the statements of additional information ("SAIs") issued by the mutual funds.

145.    Prior to investing in any of the Tier I Funds, Plaintiffs and each member of the Purchaser Subclass were entitled to receive the appropriate prospectuses. The prospectuses and registration statements were deceptive and misleading as they failed to disclose Defendants' practice of steering investors to Tier I Funds.

**Defendants' Fraudulent Course Of Conduct**

146.    The practice of aggressively selling Tier I Funds to investors, without disclosing Defendants' strong financial interest in recommending such funds over other investment choices, coupled with Defendants' undisclosed practice of paying excessive commissions to UBSFS for steering investors their way, is a clear violation of Defendants' fiduciary obligations of loyalty and care to their clients and operated as a fraud and deceit against them. As a result of the undisclosed scheme, Plaintiffs and other members of the Class sustained damages.

147.    Defendants are liable for (i) making false statements, and/or for failing to disclose material adverse facts while selling shares of the Tier I Funds, and/or (ii) participating in a scheme to defraud and/or a course of conduct that operated as a fraud or deceit on purchasers of the Tier I Funds shares during the Class Period. The wrongful conduct alleged herein enabled Defendants to profit at the expense of Plaintiffs and other members of the Class.

148.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Tier I Funds were materially false and misleading, knew that such statements and documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Tier I Funds, their control over, and/or receipt and/or modification of Tier I Funds' allegedly materially misleading misstatements and/or their associations with the Tier I Funds which made them privy to confidential information concerning the Tier I Funds, culpably participated in the fraudulent course of conduct alleged herein.

149.    Defendants were highly motivated to allow and facilitate the conduct alleged herein and participated in and/or had actual knowledge of the fraudulent conduct alleged herein. In exchange for allowing the unlawful practices alleged herein, the Advisers, *inter alia,* received increased management fees which inured to their benefit and the benefit of UBS.  In addition, UBSFS was highly motivated to engage in the wrongdoing alleged herein because it incurred lower costs selling the Tier I Funds, thereby increasing its profitability.  Furthermore, UBSFS profited through the receipt of excessive commissions from the Tier I Funds.

150.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public statements issued or disseminated in the name of UBS and Tier I Funds were materially false and misleading, knew that such statements would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their knowledge of the true facts