regarding the kickbacks scheme and influence exerted to push the Tier I Funds on UBS clients, and their control over, and/or receipt and/or modification of Tier I Funds' materially misleading omissions and misstatements and/or their associations with UBS which made them privy to confidential proprietary information concerning UBS' incentive scheme, culpably participated in the fraudulent scheme alleged herein. Defendants were highly motivated to allow and facilitate the wrongful conduct alleged herein and participated in and/or had actual knowledge of the fraudulent conduct alleged herein.

151.    In order to convince potential clients to invest their money with UBS, UBS went to great lengths to distinguish itself from other financial brokerage firms. In its public filings, press releases, public statements, marketing materials and on its website, UBSFS touted its ethics, ability and experience of UBSFS's Financial Advisers to provide UBSFS clients with unbiased, objective, customized financial planning and trustworthy advice.

152.    With respect to the ethics, ability and expertise of UBSFS's Financial Advisers, UBSFS represented that its financial advisors provided "sound advice" and specific recommendations based on the advisors' "expertise," and that UBSFS Financial Advisers were "trusted and knowledgeable." UBSFS stated as follows:

> We believe that the best way to help you meet your goals is through a relationship with a Financial Advisor.
>
> Establishing a relationship is easy. Our Financial Advisors are based in communities across the country and easily accessible. They can even be reached online or over the phone for the conversations that are important to you.
>
> Once you establish a strong relationship, your Financial Advisor will be attuned to your financial life, and your needs and goals.
>
> Supported by a team of professionals in their branch office and throughout the world, Financial Advisors have access to the research, investments, services, technology and professional development programs of one of the world's premier wealth management firms.

Whether it's the capabilities of UBS Global Asset Management, an attorney to help create an estate planning strategy*, or specialists to structure an employee benefit plan, your Financial Advisor is your trusted partner for helping you manage your wealth.

Our consultative approach — combined with our comprehensive investments and services — allows our Financial Advisors to help you pursue your financial objectives.  At our firm, we understand that we succeed only if we help our clients succeed.

UBS.com, About our Financial Advisors, http://web.archive.org/web/20050311135722/

financialservicesinc.ubs.com/Home/PWSmain/0,1093,SE77-L1846-EN846,00.html (last visited

May 2, 2006).

    153.    With regard to picking an appropriate mutual fund with your UBSFS Financial

Advisers, Defendants offer a complementary mutual fund evaluation.  The UBS website states:

There's no question that mutual funds have evolved into the "investment of choice" for millions of Americans. However, the sheer number of available funds has grown to over 17,000, leaving you with an overwhelming selection to choose from.

In addition, you need to stay on top of changes within each fund's management structure — as well as your own personal financial situation — requiring you to continually reevaluate your holdings in accordance with your long-term goals.

To help you to assess your current mutual fund holdings objectively, your Financial Advisor can offer you a complimentary mutual fund evaluation, which provides in-depth information about your holdings in particular and your portfolio in general.  Your evaluation may include:

- An appraisal of your existing portfolio holdings and allocations

- Detailed three-year statistics on the performance of each fund

- Important disclosures about your current funds

- A detailed portfolio exposure report, which can provide analysis on mutual funds and other asset classes, such as stocks, closed-end funds, variable annuities, and exchange-traded funds.

Once your evaluation is complete, you will have the necessary tools to determine how to position your portfolio to meet your investment objectives.

UBS.com, Evaluation Program, http://web.archive.org/web/20060429143430/

http://financialservicesinc.ubs.com/Home/PWSmain/0,1093,SE80-L11294-L2882-

EN882,00.html (last visited May 2, 2006).

154.    UBSFS's representations that it provided its clients with experienced, unbiased,

objective and trustworthy advice were materially misleading as they failed to disclose the truth

about UBSFS and its financial advisors.

155.    The financial planning and advice provided by UBSFS Financial Advisers was

not unbiased, objective, or trustworthy, as represented by UBSFS.  Instead, it was highly biased

in favor of Tier I Funds because of the undisclosed kickbacks and other incentives provided

without regard to client's best interests.  There was no customized financial planning.  Instead,

there was a standard allocation formula at UBSFS that all UBSFS Financial Advisers were

pressured to follow.  Thus, regardless of the financial position or goals of any particular UBSFS

client, the result was always the same:  a portfolio of Tier I Funds.  Defendants'

misrepresentation of providing unbiased advice was one of the reason 90% of UBS's total fund

sales were of Tier I Funds.

156.    The fees carried by the Tier I Funds were also not transparent because, according

to Former UBSFS Financial Adviser D, brokerage houses usually send invoices for the fees they

charge their customers but with the PACE programs they were deducting from clients' accounts

automatically, and then hidden in a line item on the clients' statement called "management fees."

157.    The Financial Advisers also failed to disclose to their customers that the amount

of attention received was based on the amount of assets the investor put into the account.

According to Former UBSFS Financial Adviser D, clients who created at least $15,000 in profits

for the Financial Adviser would be considered A clients and get two meetings a year; clients who

created between $7,500 and $15,000 in revenue would be considered B clients and receive one meeting a year; and clients who created under $7,000 revenue for the Financial Adviser would be considered C clients and received one phone call a year. For example, a $500,000 account would only create enough revenue for the Financial Adviser to be considered a C client.

158.    The compensation system and reporting structure at UBSFS was set up to push the sale of UBSFS Tier I and fee-based programs over everything else. The compensation of the Financial Advisers depended in large part on the sale of UBSFS-affiliated financial products. Additionally, the branch managers were judged on their ability to influence and control the Financial Advisers under them, which was reflected primarily in the amount of UBS-affiliated financial products sold by those Financial Advisers, and were compensated and awarded bonuses tied to their offices' sales of Tier I Funds.

159.    Despite the representations by Defendants that their Financial Advisers would provide objective advice tailored to the particular needs of clients, the Advisers instead routinely recommended investing in an array of Tier I Funds, most of which were under-performing compared to non-Tier I funds. This fact was readily known to Defendants and their Financial Advisers because the performance of each Tier I Fund relative to its competitors was published regularly by Morningstar. Additionally, UBSFS Financial Advisers were charged with knowing and researching the mutual fund companies that they sell, and in the course of their research, would certainly have received Morningstar and other industry reports about the Funds' relative performance on a regular basis.

160.    Any financial advisor reviewing the relative performance of Tier I Funds as compared with their peer groups at any time during the Class Period would have seen, at least beginning in 2002, that on a weighted-average basis, the majority of Tier I Funds were

underperforming their peers or yielding merely average returns. Such facts, however, were not revealed to the Class by Defendants or their Financial Advisers at the time the Financial Advisers placed Class members in those underperforming Funds.

161.    Furthermore, as alleged in more detail below, Defendants did not disclose to their prospective customers that they were getting kickbacks from the Tier I Funds in return for recommending to their customers that they purchase shares of those Funds.

## THE UBS MUTUAL FUNDS' INVESTMENT ADVISERS AND DISTRIBUTORS ENGAGED IN UNLAWFUL CONDUCT

162.    During the relevant time frame, compensation and fees paid to the Investment Adviser and Distributor Defendants rose dramatically even though the services provided by these Defendants remained the same, and no additional benefits were provided to the Funds or their investors in return for the additional fees. As a result, the advisory and distribution fees were excessive.

163.    A major reason for the dramatic increase in compensation to the Investment Adviser Defendants, Distributor Defendants and affiliates was the growth in the size of the UBS Funds, resulting from Defendants' use of UBS Fund assets to promote the sale of UBS Fund shares through participation in revenue sharing or "shelf space" programs. Among other things, these programs included: (a) cash payments to financial advisers in return for the financial advisers' agreement to promote sales of UBS Fund shares; (b) the directing of UBS Fund portfolio brokerage to brokerage firms in return for agreements by the financial advisers to promote the shares of the UBS Funds; and (c) "Soft Dollar" commission arrangements with financial advisers. These payments resulted in the growth of the UBS Funds, which benefited the Investment Adviser and Distributor Defendants because it allowed their advisory and other asset-based fees to increase. The aforesaid Defendants engaged in those programs in an effort to

generate increased compensation even though many of those programs were in violation of SEC and NASD rules and regulations. Defendants engaged in such activity despite ample evidence that the increase in their compensation was not justified by any increase in the quality or nature of the services which they provided to the UBS Funds or their investors, or by additional benefits to the UBS Funds or their investors.

164.    Although an increase in mutual fund assets can benefit investors through economies of scale that decrease the expenses of operating such Funds on a per share basis, Defendants failed to reduce their fees to pass on the economies of scale to the UBS Funds or their investors. Instead, they utilized the economies of scale for their own benefit.

165.    The fee structure imposed by Defendants on the UBS Funds and their investors far exceeded the fees that would be paid as a result of arm's-length bargaining. Fees for essentially the same services that were paid by similar funds not affiliated with Defendants were substantially less.

166.    In addition, UBS Fund assets were used to pay large amounts of "Rule 12b-1" fees to the Distributor Defendants without any benefit accruing to the UBS Funds or their investors from those payments. The Investment Advisers Defendants' management fees were also excessive because they used Fund assets to pay for their out-of-pocket expenses although they were already being compensated on a basis that reimbursed them for such expenses. For example, they caused the UBS Funds to make "Soft Dollar" commission payments to financial advisers, through which financial advisers were paid commissions at a rate that exceeded the normal rate for effectuating portfolio transactions, in return for services that would normally be provided by the advisers and for which the advisers were already being paid. Soft Dollar commissions were utilized by Defendants to shift significant expenses from the investment

advisers to the UBS Funds and their investors without any corresponding offset in the level of the management fee.

167.    Furthermore, the Directors of the UBS Funds ("Directors") failed to satisfy their duty to independently and conscientiously evaluate the Funds' 12b-1 and advisory fee arrangements, a factor which strongly supports a finding of fee excessiveness.  The Directors were unable to perform their duties as the "watchdogs" of the UBS Funds because they failed to obtain enough information adequately to evaluate the UBS Funds' distribution fees as required by Rule 12b-1.  As a result of the Directors' failure to be adequately informed, they were unable to evaluate whether Defendants' use of UBS Fund assets for Shelf Space agreements was in the UBS Funds' and their investors' best interest and whether the fees being charged were excessive.  Moreover, the increase in the UBS Funds' net assets, accompanied by an increase in the expense ratios and Defendants' failure to reduce their fees, were red flags which the Directors disregarded.  As a result, the Directors did not perform their duties as "watchdogs" of the UBS Funds because they failed to ensure that any economies of scale that were being realized from the increase in UBS Funds assets were passed to the UBS Funds and their investors.  The Directors' failure to satisfy their duties resulted in excessive fees being charged to the UBS Funds that were disproportionate to the services rendered and were not the product of arm's-length bargaining.

## THE INVESTMENT ADVISER AND DISTRIBUTOR DEFENDANTS BREACHED THEIR DUTIES BY CHARGING EXCESSIVE FEES NOT REASONABLY RELATED TO THE SERVICES PROVIDED

168.    The fees charged to a mutual fund and its investors should be the equivalent of fees that would have been negotiated within the bounds of arm's-length bargaining.  Directors are responsible for negotiating the fees charged to the fund on behalf of the investors who, individually, are unable to negotiate such fees.  At the same time, investment advisers and their

affiliates have a fiduciary duty with respect to the fees that are charged to investors, in that such fees must be reasonably related to the services provided.

169.    Congress has underscored directors' duties by adopting Section 15(c) of the Investment Company Act, requiring directors to be adequately informed of the terms of any investment advisory contracts, and giving them the authority to demand documents and other information from investment advisers in order to make informed and independent decisions when evaluating such contracts. *See* 15 U.S.C. § 80a-15(c). However, as alleged below, the Directors were beholden to the Investment Adviser Defendants, failed to adequately inform themselves and disregarded red flags showing that the advisory and distribution fees were excessive.  Furthermore, the Directors failed to hold the Investment Adviser Defendants accountable for revenue sharing agreements entered into by them with various brokerage firms, or for other Shelf Space payments for which the Investment Adviser and Distributor Defendants charged the Funds, and therefore their investors, excessive fees and commissions.

**The Excessive Fees At Issue**

170.    Investment Advisory Fees:  Investment advisory fees are calculated as a percentage of assets under management.  As the fund assets increase, the dollar amount of such fees parallels this growth.  Directors are charged with ensuring that such growth does not result in a windfall to advisers where commensurate services are not provided.  Investment advisory fees are paid to investment advisers for managing the underlying portfolio, *i.e.*, choosing the securities in which a mutual fund should invest and conducting the operations required to support the management of the portfolio, and include the overhead and administrative costs involved in conducting the business of the investment adviser.

171.    Rule 12b-1 Fees:  SEC Rule 12b-1 permits a fund to pay "12b-1" distribution fees out of fund assets, but only if the fund has adopted a 12b-1 plan authorizing their payment, and

only if the Directors properly find that there is a reasonable likelihood that the plan will benefit the fund and its investors. Distribution fees are comprised of fees paid to the Distributor Defendants for marketing and selling fund shares, including compensation for advertising, the printing and mailing of prospectuses and sales literature to investors and payments to financial advisers and others who sell fund shares. Like the investment advisory fees, 12b-1 fees are calculated as a percentage of assets under management and the dollar amount of such fees increases with the size of the fund.

172.   Service Fees and Administrative Fees: Service and administrative fees are paid to persons to respond to investor inquiries, furnish investors with information about their investments, and to provide other services required to enable the functioning of the fund. These two types of fees may pay for similar expenses or may significantly overlap, as described more fully below. Unlike distribution fees, a fund may pay shareholder service and administrative fees without adopting a 12b-1 plan. Accordingly, such fees are often not visible to investors and are highly susceptible to manipulation by the Investment Adviser Defendant. Like the investment advisory fees and the 12b-1 fees, the service and administrative fees are calculated as a percentage of assets under management and the dollar amount of such fees increases with the size of the fund.

173.   Transfer Agency Fees: Transfer agency fees are paid to an in-house, affiliated or independent third party to handle sales and redemptions of fund shares, maintain shareholder records, compute the net asset value (the "NAV") of the fund daily, and payout dividends and capital gains. Like the investment advisory fees, the 12b-1 fees and the administrative/service fees, the transfer agency fees are calculated as a percentage of assets under management and the dollar amount of such fees increases with the size of the fund.

174.    These foregoing fees are the principal components of a funds "expense ratio," which is the ratio of total expenses to net assets.  The expense ratio determines the fund's efficiency and cost effectiveness, and consequently a lower number is desirable because it reflects higher total returns.

### Factors That Show The Fees Charged To The UBS Funds And Their Investors Were Not Reasonably Related To The Services Provided And Were Excessive

175.    Courts recognize that certain factors indicate that fees are excessive.  In particular, the following factors bear on whether the investment adviser and its affiliates are charging excessive fees to a fund and its investors:

- the nature and quality of services being paid for by the fund and its investors;

- whether the investment advisory fees are reduced to reflect the "fall-out benefits" the advisers receive, which are those benefits other than the advisory fees that flow to the adviser and its affiliates as a result of the adviser's relationship with the fund;

- what fees other fund families or funds within the same fund family charge for similar services to similar mutual funds;

- whether economies of scale were passed to the funds and their investors or kept by the investment adviser; and

- whether the funds' directors or trustees exercised a sufficient level of care and conscientiousness in approving the investment advisory and distribution agreements.

176.    These factors, when applied to the UBS Funds, demonstrate that the fees charged to the UBS Funds and their investors were not reasonably related to the services provided and were excessive.

### The Economies Of Scale Were Not Passed On To Investors

177.    While Defendants were profiting from the UBS Funds' growth, they failed to pass the economies of scale generated from such growth to the Funds and their investors.  The

legislative history of Section 36(b) recognizes that an investment adviser's failure to pass on

economies of scale to the fund is the principal cause of excessive fees:

> It is noted ... that problems arise due to the economies of scale attributable
> to the dramatic growth of the mutual fund industry. In some instances
> these economies of scale have not been shared with investors. Recently
> there has been a desirable tendency on the part of some fund managers to
> reduce their effective charges as the fund grows in size. Accordingly, the
> best industry practice will provide a guide.

S. Rep. No. 91-184, at 5-6 (1969), as reprinted in 1970 U.S. Code Cong. & Ad. News, at 4901-

02.

178.    An investment adviser's profit is a function of revenue minus the costs of

providing services. Defendants' incremental costs of providing advisory services to the UBS

Funds were nominal. The additional fees received by Defendants were disproportionate given

that the nature, quality and level of the services they provided remained the same. On a per share

basis, it does not cost more to manage additional assets in a growing fund because economies of

scale occur at both the fund complex and portfolio levels for various costs incurred. For

example, many of the costs, such as the costs of research for a particular investment, remain

fixed regardless of the amount of assets in a given fund devoted to that investment. As has been

noted, the mutual fund industry is a business in which economies of scale are present and are

statistically significant. *See* Jim Saxton, Chairman, Joint Economic Committee of the United

States Congress, *The Mutual Fund Industry: An Overview and Analysis* 19 (2002) (citing

William Baumol *et al.*, *The Economics of Mutual Fund Markets: Competition Versus Regulation*

186, 190 (Kluwer Academic 1990)), *available at* http://www.house.gov/jec/mutual2.pdf. As

explained by Lori Walsh, a financial economist for the SEC, "If the asset growth is successful,

this should translate into a lower expense ratio and higher expected net returns, all other things

equal." Lori Walsh, *The Costs and Benefits to Fund Shareholders of 12b-1 Plans: An*

*Examination of Fund Flows, Expenses and Returns,* available at http://www.sec.gov/rules/
proposed/s70904/lwalsh042604.pdf.

179.    The growth of assets under management by the Investment Adviser Defendants
has generated substantial economies of scale which, to the great benefit of the Investment
Adviser and Distributor Defendants, have not been passed on to the Funds and their investors
through lower fees.  Instead, Defendants retained these economies of scale for themselves as a
windfall and continued charging greatly increased expenses without providing additional,
commensurate services.

180.    Between 2003 and 2005, UBS PACE Strategic Fixed Income Investments Fund
increased from $301 million to $463 million in assets under management, but the expense ratios
increased or remained the same as is illustrated in the chart below:

|                    | Class A | Class B | Class C | Class P* |
|--------------------|---------|---------|---------|----------|
| **2005 FYE 7/31/05** | 1.23%  | 1.94%  | 1.70%  | 0.93%   |
| **2004 FYE 7/31/04** | 1.21%  | 1.94%  | 1.70%  | 0.93%   |
| **2003 FYE 7/31/03** | 1.21%  | 1.93%  | 1.70%  | 0.90%   |

UBS Pace Select Advisors Trust, annual report for fiscal year ending July 31, 2003 (Form N-
CSR) (Oct. 9, 2003); UBS Pace Select Advisors Trust, annual report for fiscal year ending July
31, 2005 (Form N-CSR) (Oct. 7, 2005).

181.    Between 2003 and 2005, UBS S&P 500 Index Fund grew from $123 million to
$222 million in assets under management, but the expense ratios increased or remained the same
as is illustrated in the chart below:

|                    | Class A | Class B | Class C |
|--------------------|---------|---------|---------|
| **2005 FYE 5/31/05** | 0.70   | 1.10   | 1.45   |
| **2004 FYE 5/31/04** | 0.70   | 1.10   | 1.45   |
| **2003 FYE 5/31/03** | 0.67   | N/A    | 1.42   |

UBS S&P 500 Index Fund, annual report for fiscal year ending May 31, 2003 (Form N-CSR) (Aug. 7, 2003); UBS S&P 500 Index Fund, annual report for fiscal year ending May 31, 2005 (Form N-CSR) (Aug. 8, 2005).

     182.    Between 2003 and 2005, UBS PACE Small/Medium Company Value Equity Fund grew from $274 million to $445 million in assets under management, but the Fund's Class P expense ratios increased or remained the same as is illustrated in the chart below:

|  | Class P* |
|---|---|
| **2005 FYE 7/31/05** | 1.16 |
| **2004 FYE 7/31/04** | 1.16 |
| **2003 FYE 7/31/03** | 1.11 |

UBS Pace Select Advisors Trust, annual report for fiscal year ending July 31, 2003 (Form N-CSR) (Oct. 9, 2003); UBS Pace Select Advisors Trust, annual report for fiscal year ending July 31, 2005 (Form N-CSR) (Oct. 7, 2005).

     183.    Between 2004 and 2005, UBS PACE Global Fixed Income Investments Funds grew from $339 million to $438 million in assets under management, but the Fund's expense ratios increased or remained the same as is illustrated in the chart below:

|  | Class A | Class B | Class C | Class P* |
|---|---|---|---|---|
| **2005 FYE 7/31/05** | 1.37 | 2.12 | 1.86 | 1.14 |
| **2004 FYE 7/31/04** | 1.36 | 2.11 | 1.85 | 1.13 |
| **2003 FYE 7/31/03** | 1.33 | 2.09 | 1.83 | 1.07 |

*Id.*

184.     UBS Funds' historical trend of failing to pass economies of scale to investors

resulted in a huge windfall for the Investment Adviser Defendants, all to the detriment of

investors who were paying excessive fees.

**The Illusory Breakpoints In The Funds' Advisory Agreements Illustrate That
The Economies of Scale Were Not Passed On To The Funds And Their Investors**

185.     A "fee breakpoint" has been explained as follows:

> Many funds employ a declining rate structure in which the percentage fee
> rate decreases in steps or at designated breakpoints as assets increase....
> The declining rate schedule reflects the expectation that costs efficiencies
> or scale economies will be realized in the management and administration
> of the fund's portfolio and operations as the fund grows.

John P. Freeman & Stewart L. Brown, *Mutual Fund Advisory Fees: The Cost of Conflicts of*

*Interest*, 26 Iowa J. Corp. L. 609, 620 n.59 (2001).

186.     While some of the advisory contracts for the Funds include breakpoints, many of

these breakpoints were meaningless because, as a practical matter, they did not pass any of the

economies of scale to Fund investors.  For example, UBS PACE Small/Medium Company

Growth Fund's first breakpoint is at $750 million, but the Fund is presently at $431 million and

has never been over $750 million since its inception in August, 1995.  UBS PACE Select

Advisors Trust, annual report for fiscal year ending July 31, 2005 (Form N-CSR) (Oct. 7, 2005).

UBS PACE International Emerging Markets Equity Fund's first breakpoint is $500 million, but

the Fund has never held over $500 million in assets since its inception in August, 1995.  *Id.*  UBS

PACE Strategic Fixed Income Investment Fund's first breakpoint discount is at $500 million, but

the Fund's assets have not never been over $500 million at any time since its inception in August

of 1995.  *Id.*

187.    Additionally, fund companies sometimes hire outside money managers, known as sub-advisers, to do the day-to-day stock or bond picking for their portfolios.  As New York Attorney General Eliot Spitzer noted when he testified in front of the Senate, typically when parties engage in arm's-length negotiations, the sub-adviser agrees to be compensated with a portion of the advisory fee governed by breakpoints that kick in as the fund grows larger.  Rachel McTague, *Spitzer Says Advisers Overcharged Funds; Fund Boards Breached Duty to Shareholders*, Securities Regulation & Law Report, Feb. 2, 2004, *available at* http://corplawcenter.bna.com/pic2/clb.nsf/id/BNAP-5VPRZJ?OpenDocument.  This "typical" arrangement stands in sharp contrast to the facts in the instant matter.  Despite the fact that the Advisers did negotiate lower breakpoint fees with the sub-advisers (which yield more profits for them as the funds grow), the advisers continued to charge shareholders their "full" fee for "management services," pocketing the difference.

188.    For example, for UBS PACE International Equity Fund whose fiscal year ended in July 31, 2005, advisory fees had their first breakpoint at $500 million.  UBS Pace Select Advisors Trust, annual report for fiscal year ending July 31, 2005 (Form N-CSR) (Oct. 7, 2005).  However, the Investment Adviser Defendant outsourced part of its advisory duties to a sub-adviser with whom it is capable of negotiating a rate that fairly reflects the economies of scale created when managing a fund.  The Investment Adviser Defendant negotiated the first breakpoint with the sub-adviser at $150 million; the second one at $250 million and the final one at $350 million.  *Id.*  Because the sub-adviser's fee breakpoints only apply to the UBS PACE International Equity Fund when its assets are under $350 million, the investment adviser is able to couch its savings inside its own breakpoints, which do not kick in until the Fund's assets reach $500 million.  Therefore, when the assets in UBS Pace International Equity Fund grew between

$0 and $500 million, the sub-advisers' breakpoint structure resulted in the Investment Adviser Defendants receiving an additional 5 to 15 bps without performing any additional work.

189.    Additionally, for UBS PACE International Emerging Market Fund, whose fiscal year ended in July 31, 2005, advisory fees had their first breakpoint at $500 million. *Id.* However, the Investment Adviser Defendant outsourced part of its advisory duties to a sub-adviser with whom it is capable of negotiating a rate that fairly reflects the economies of scale created when managing a fund.  The Investment Adviser Defendant negotiated the first breakpoint with the sub-adviser at $150 million and the second one at $250 million. *Id.*

190.    Again, because the sub-adviser's fee breakpoints only apply to the Fund when its assets are under $250 million, the investment adviser hides its savings inside its own breakpoints, which do not kick in until the Fund's assets reach $500 million.  Thus, when UBS PACE International Emerging Market Fund 's assets increased from $0 to $500 million, the Investment Adviser Defendant received an additional 15 bps in fees without performing any additional work as a result of the sub-advisers' breakpoints.

191.    For UBS PACE Global Fixed Income Investments Fund, whose fiscal year ended in July 31, 2005, advisory fees had their first breakpoint at $1 billion. *Id.* However, the Investment Adviser Defendant outsourced part of its advisory duties to a sub-adviser with whom it is capable of negotiating a rate that fairly reflects the economies of scale created when managing a fund.  The Investment Adviser Defendant negotiated the first breakpoint with the sub-adviser at $400 million. *Id.* As seen above, the sub-adviser's fee breakpoints only apply to the Fund when its assets are under $400 million, allowing the investment adviser to tuck its savings inside its own breakpoints, which do not kick in until the Fund's assets reach $1 billion. Therefore, while the assets in UBS PACE Global Fixed Income Investment Fund grew from $0

to $400 million as a result of the sub-advisers' breakpoints, the Investment Adviser Defendant was receiving an additional 5 bps without performing any additional work.

192.    As demonstrated above, the advisory fee breakpoints' lack of impact on fees levied on the Funds and their clear contrast to the savings gleaned by the Investment Adviser Defendant from the sub-advisers' contract further illustrates that the economies of scale were not passed to the Funds' investors.

**The Nature and Quality of Services Do Not Justify The Excessive Fees**

193.    The nature of the advisory services provided to the UBS Funds did not justify the excessive expense ratios carried by the Funds. Defendants cannot justify their high fees by arguing that their managers and analysts are of superior quality and provide superior performance. The performance of these Funds was not up to par with other, similar funds in the industry, and thus could not justify the higher fees.

194.    UBS PACE Small/Medium Company Growth Equity Fund's performance ranking has recently fallen to the bottom half of its category of funds. For example, in 2003 this Fund ranked in the 39th percentile of all funds in its category, but by 2004 it had fallen to 69th and in 2005 it slipped to 90th in terms of performance in its category of Funds. Morningstar.com, *UBS PACE Small/Medium Company Growth Equity: Total Returns*, Apr. 30, 2006, http://quicktake.morningstar.com (password required).

195.    UBS PACE Small/Medium Company Value Equity Fund also experienced a lip in performance ranking. In 2003, this Fund ranked in the 61st percentile, but by 2004 it had slipped to 75th and by 2005 it fell further to the 81st in terms of its performance in its fund category. Morningstar.com, *UBS PACE Small/Medium Company Value Equity: Total Returns*, Apr. 30, 2006, http://quicktake.morningstar.com (password required).

196.    Additionally, the UBS S&P 500 Index Fund cannot justify its fees by arguing that it offers superior performance because, according to Morningstar, this Fund has had both fairly average returns and fairly average risk.  Morningstar.com, *UBS S&P 500 Index Y: Data Interpreter*, http://quicktake.morningstar.com (password required) (last visited May 2, 2006).

197.    As demonstrated above, the UBS Funds' performance cannot justify the excessive fees charged to the Funds.

**The Fees Charged To The Funds And Their Investors Were
Excessive Relative To Similar Funds Offered In The Industry**

198.    The lower fees charged by similar funds also demonstrates that UBS Funds carry excessively-high expense ratios.  Additionally, they illustrate that investors can obtain the same services for lower fees from other funds and that UBS' Fund's fees are not reasonably related to the services they are providing investors.  For example, UBS U.S. Allocation Fund's Class B expense ratio is currently 1.70% , currently which is significantly higher than the category average of 1.45%.  Morningstar.com: *UBS U.S. Allocation C: Fees and Expenses*, http://quicktake.morningstar.com (password required) (last visited May 2, 2006).

## THE FEES CHARGED WERE NOT
## REASONABLY RELATED TO SERVICES
## PROVIDED TO THE UBS FUNDS AND THEIR INVESTORS

**The Investment Adviser Defendants Placed the Expense of
Revenue Sharing Payments on the Funds and Their Investors**

199.    The Investment Adviser and Distributor Defendants also charged excessive fees by charging the UBS Funds and their investors for Defendants' revenue sharing expenses described above.

200.    Revenue sharing arrangements are very appealing to investment advisers because they can increase sales from three to ten fold.  Smita Madhur, *Revenue-Sharing Boosts Mutual Fund Sales Tenfold*, Financial-Planning.com, Jan. 24, 2005, http://www.financial-

planning.com/pubs/fpi/20050124101.html.  At the same time, revenue sharing arrangements are very expensive for investors because their high costs translate into higher and potentially excessive fees levied upon shareholders.

201.    Defendants participated in revenue sharing programs with various brokerage houses, including, but not limited to UBSFS.  These payments to brokers increased the fees levied on the Funds and their investors because the Investment Adviser Defendants, in determining the amount they would charge for their advisory fees, accounted for the costs of the revenue sharing agreements for which they paid broker-dealers and others, in order to ensure the recovery of their full profit after the revenue sharing payments were made.

**The Investment Advisory Fees Were Excessive Because They Were Not Reasonably Related To The Services Provided To The Funds Or Their Investors**

202.    A recent report on revenue sharing by Cerulli Associates notes that advisory fees are the most significant source of revenue sharing.  Cerulli, *Mutual Fund Revenue Sharing: Current Practices and Projected Implications* 24 (2005).  The advisory fee can be inflated in order to finance the adviser's revenue sharing obligations and, as shown herein, the Investment Adviser Defendants did just this with respect to the UBS Funds.

203.    Investment advisory fees are meant to cover management of the invested funds, including management and administrative activities related to managing the fund's portfolios. Report of the SEC on the Public Policy Implications of Investment Company Growth, H.R. Rep. No. 89-2337 (1966).

204.    The investment advisory fees implemented by the Investment Adviser Defendants for revenue sharing do not fit either of these categories.

205.    The SEC has expressed concern over these practices, stating that, "[r]evenue sharing arrangements not only pose potential conflicts of interest, but also may have the indirect

effect of reducing investors' returns by increasing the distribution-related costs incurred by funds. Even though revenue sharing is paid to broker-dealers directly by fund investment advisers, rather than out of fund assets, it is possible that some advisers may seek to increase the advisory fees that they charge the fund to finance those distribution activities . . . Moreover, revenue sharing arrangements may prevent some advisers from reducing their current advisory fees." Confirmation Requirements and Point of Sale Disclosure Requirements for Transactions in Certain Mutual Funds and Other Securities, and Other Confirmation Requirement Amendments, and Amendments to the Registration Form for Mutual Funds, 69 Fed. Reg. 6438, 6441 n.21 (Feb. 10, 2004) (to be codified at 17 C.R.F. pts. 239, 240 and 274).

206.    The nature of Defendants' revenue sharing program was such that it strongly incentivized broker-dealers to expand their marketing efforts on behalf of the UBS Funds. As a result of such activities, the aggregate net assets—against which the management fees were charged on a percentage basis—increased, with a consequent increase in the dollar amount of the advisory fees. The Investment Adviser Defendants therefore received "something for nothing" from the UBS Funds and their investors because the fees were not the result of any increase or improvement in the services being provided, and did not reflect any legitimate increase in the cost of the services being provided to the advisers and their affiliates.

207.    In addition, the advisory fee payments made by the Funds and their investors that were utilized for revenue sharing were charged in violation of Rule 12b-1. Advisory fees paid to an investment adviser with the intent of allocating a certain amount towards distribution practices, such as revenue sharing, are regulated under Rule 12b-1 and Section 36(b). As the SEC explained, "Rule 12b-1 could apply . . . in certain cases in which the adviser makes distribution related payments out of its own resources . . . 'if any allowance were made in the

investment adviser's fee to provide money to finance distribution.'" Investment Company

Institute, 1998 SEC No-Act. LEXIS 976, at *16 (Oct. 30, 1998) (citing Payment of Asset-Based

Sales Loads By Registered Open-End Management Investment Companies, Investment

Company Act Release No. 16431, 1988 SEC LEXIS 1206 (June 13, 1988)) (emphasis added).

Defendants paid for part of these revenue sharing arrangements through advisory fees to

circumvent limits placed on such distribution payments by Rule 12b-1.

**Defendants Received Massive 12b-1 Fees But Provided**
**No Benefit To The UBS Funds Or Their Investors In Return**

208.    As discussed above, Rule 12b-1, promulgated by the SEC pursuant to the

Investment Company Act, prohibits mutual funds from directly or indirectly distributing or

marketing their own shares unless certain enumerated conditions set forth in Rule 12b-1 are met.

The Rule 12b-1 conditions are, amongst others, that payments for marketing must be made

pursuant to a written plan "describing all material aspects of the proposed financing of

distribution;" all agreements with any person relating to implementation of the plan must be in

writing; the plan must be approved by a vote of the majority of the board of directors; and the

board of directors must review, at least quarterly, "a written report of the amounts so expended

and the purposes for which such expenditures were made." 17 C.F.R. § 270.12b-1(b).

Additionally, the directors "have a duty to request and evaluate, and any person who is a party to

any agreement with such company relating to such plan shall have a duty to furnish such

information as may reasonably be necessary to an informed determination of whether such plan

should be implemented or continued." 17 C.F.R. § 270.12b-1(d). The directors may continue the

plan "only if the directors who vote to approve such implementation or continuation conclude, in

the exercise of reasonable business judgment and in light of their fiduciary duties under state law

and sections 36(a) and (b) (15 U.S.C. § 80a-35(a) and (b)) of the Act that there is a reasonable

likelihood that the plan will benefit the company and its shareholders." 17 C.F.R. § 270.12b-1(e). As noted above, Rule 12b-1 fees are assessed as a percentage of assets under management and, accordingly, grow proportionately with the size of the Funds.

209.   However, the Rule 12b-1 fees charged to the Funds were excessive because those payments did not result in any benefits to the Funds. As alleged above, as the Funds were marketed and the number of Fund investors increased, the economies of scale thereby created, if any, were not passed on to the Funds through lower fees.

210.   The increase in assets and fees while the expense ratio also increased was a red flag that the Director Defendants should have recognized as evidence that the 12b-1 payments were disproportionate to any benefit received by the Funds from those payments. If anything, the Funds' marketing efforts were creating diminished marginal returns under circumstances where increased Fund size correlated with reduced liquidity and Fund performance.

**The Directors' Failure To Act Independently And Conscientiously Resulted In Defendants Charging Excessive Fees To The Funds And Their Investors**

211.   Mutual funds are typically created and managed by investment advisers for a profit. Investment advisers usually supervise a mutual fund's daily operations, and often select affiliated persons to serve on the board of directors. As former SEC Commissioner Manuel Cohen remarked when referring to testimony by investment advisers:

> They also made the point that the investment advisor creates the fund, and operates it in effect as a business. Many of them stated that "It is our fund, we run it, we manage it, we control it," and I don't think there is anything wrong with them saying it. They were just admitting what is a fact of life. The investment advisor does control the fund.

Freeman & Brown, *Mutual Fund Advisory Fees*, 26 Iowa J. Corp. L. at 615 n.24 (citing

Statement of Manuel Cohen, Commissioner, SEC, Investment Company Act Amendments of

1976: Hearings on H.R. 9510, H.R. 9511 Before the Subcomm. on Commerce and Fin. of the Comm. on Interstate and Foreign Commerce (1967)).

212.    As a result of the investment adviser's control of the fund, the relationship between investment advisers and mutual funds contains many potential conflicts of interest. This conflict arises because part of the fees the investment advisers charge, which reduce investors' returns, represents revenue and a source of profit to the investment adviser. *See* GAO Report, *Mutual Fund Fees: Additional Disclosure Could Encourage Price Competition* 14, 82 ("GAO Report") (June 2000), *available at* http://www.gao.gov/new.items/gg00126.pdf.

213.    ICA was enacted in response to concerns that mutual fund shareholders were not being adequately protected as a result of these conflicts of interest. As a result, the Directors were made responsible for overseeing the investment advisers' activities. GAO Report at 14. More specifically, the Investment Company Act requires the presence of independent directors on the board of directors to review and approve the fees the funds and their investors are charged. *See* 15 U.S.C. § 80a-10(a). The board of directors is responsible for approving the investment advisory agreements, 12b-1 plans and fees paid to Investment Adviser Defendants. In reviewing and approving the foregoing, the Directors are required to act in the best interest of the investors.

214.    Acting in the investors' best interests requires the Directors to exercise due care in approving the fees charged to those funds that the directors have the responsibility to oversee. This is why the expertise of the independent directors, whether they are fully informed about all facts bearing on the adviser's fee, and the extent of care and conscientiousness with which they perform their duties, are among the most important factors to be examined in evaluating whether

the compensation fund advisers and distributors receive is reasonable under §36(b) of the ICA. *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 930 (2d Cir. 1982).

215.    One of the ways to evaluate whether the Directors fulfilled their duties with adequate care and conscientiousness is to determine whether they acted independently in approving the Funds' fee arrangements or whether the Directors' actions were controlled by the Funds' investment advisers.  In determining whether or not a director is considered an "interested person," the ICA states that "[a] natural person shall be presumed not to be a controlled person."  15 U.S.C. § 80a-2(a)(9).  The term "interested person" is defined to include "any affiliated person" of an investment company, investment adviser, or principal underwriter. *Id.* at § 80a-2(a)(19)(A)(i); (B)(i).  "Affiliated person" is further defined as "any person directly or indirectly controlling, controlled by, or under common control with, such other person." *Id.* at § 80a-2(a)(3)(C) (emphasis added).  Finally, the ICA defines "control" as "the power to exercise a controlling influence over the management or policies of a company." *Id.* at § 80a-2(a)(9) (emphasis added).

216.    The presumption that a director is not a "controlled person" under the ICA may be rebutted by "evidence." *Id.* at § 80a-2(a)(9).  Such evidence may include allegations that non-employee directors followed a course of action suggested by the investment adviser which prejudiced the Funds' shareholders.  If the Directors rubber-stamp follow suggestions of the Investment Adviser Defendants, they cannot fulfill their statutory duties to act as "watchdogs" for the Funds.

217.    According to the Funds' respective prospectuses, the Directors who served on the Board of Directors of the UBS Funds during the relevant time period include:

UBS Allocation Fund: Margo Alexander who has served since 1996; Meyer Feldberg who has served since 1992; Richard Armstrong who has served since 1996; David Beaubien who has served since 2001; Richard Burt who has served since 1996; and William White who has served since 2001.

UBS Global Allocation Fund: Walter Auch who has served since 1994; Frank Reilly who has served since 1994; Edward Roob who has served since 1994; Adela Cepeda who has served since 2004; and J. Mikesell Thomas who has served since 2004.

S&P 500 Index Fund: Margo Alexander who has served since 1997, Meyer Feldberg who has served since 1997; Richard Armstrong who has served since 1997; David Beaubien who has served since 2001, Richard Burt who has served since 1997, Carl Schafer who has served since 1997; and William White who has served since 2001.

UBS PACE Funds (all): Margo Alexander who has served since 1995; Meyer Feldberg who has served since 1997; Richard Armstrong who has served since 2001; David Beaubien who has served since 1995, Richard Burt who has served since 1995, and William White who has served since 1995.

218.    However, the fee structures in place show that the Directors failed to earnestly consider the shareholders' interests when negotiating the various fees of the UBS Funds.  As was noted in a *Forbes* article:

> [T]he board meeting agenda is drawn up not by fund directors, but by the very managers they are supposed to be negotiating with…The board, currently 12 members, is not even solicited for input.  Once called to order, directors oversee 41 funds at once.  UBS typically slots 15 minutes for "executive sessions" when the 10 independents meet privately.
>
> UBS fund directors haven't exactly been agonizing over the fees.  One category, the so-called 12b-1 fee, is a charge for marketing a fund and is predicated on the notion that bringing in additional assets will help existing shareholders by spreading costs over a larger base by spreading costs over a larger base.  Between 1998 and early 2001 the UBS fund

> board spent 10 to 15 minutes of each quarterly meeting reviewing 12b-1
> fees for all the funds.  That comes to less than 30 seconds per fund,
> maximum.  This, despite a Securities & Exchange Commission rule saying
> directors are obliged to ensure that when the 12b-1s bring in new
> investment dollars, shareholders get a break on expense ratios.

Neil Weinberg, *Funds and Games*, Forbes, May 26, 2003.

219.    Therefore, the purportedly "non-interested" Directors blindly followed the

Investment Adviser Defendants' suggested courses of action by rubber-stamping fees and

arrangements which prejudiced the UBS Funds' investors.  Even if the Directors were considered

"independent," they failed to fulfill their duties with the care and conscientiousness necessary to

ensure that the fees paid to Defendants from UBS Fund and investor assets were reasonable and

not excessive.  Specifically, Directors failed to genuinely consider and recognize that no

economies of scale were passed to investors as the UBS Funds grew; that the fees were

significantly more expensive than comparable funds; and that the advisory fees should be

reduced to reflect the fall-out benefits received by Defendants.

220.    The Directors knew that the cost of these revenue sharing and directed brokerage

payments should have been borne by the Defendants as their own out-of-pocket expenses, yet

did nothing to prevent the siphoning of these payments from Fund and investor assets or to

appropriately reduce the advisory fee.  The fact that the Directors did not even question the acts

or recommendations of the Defendants with respect to these programs (which only benefited

Defendants) demonstrates the Directors' failure to act as a "watchdog" of the Investment Adviser

Defendants.

221.    Another of these instances was the Directors' lack of action with respect to the fee

levels and structures in place for the UBS Funds.  Again, by failing to act to reduce the UBS

Funds' fees, the Directors neglected to represent the UBS Funds and their investors with the

degree of care and conscientiousness required of them.

222.    Another example of the Directors following a course of action set by the Investment Adviser Defendants instead of acting in the investors' best interest is found in the Directors' failure to implement fee structures that had meaningful — or even any — breakpoints for certain UBS Funds, while adopting them in others.  The SEC has made clear that it is the duty of the directors to carefully scrutinize the advisory and other fees to ensure that the economies of scale are being passed to investors as Fund assets grow so that the increases in advisory and other fees are not a windfall to the investment advisers and their affiliates:

> If the fund or fund family is experiencing economies of scale, fund directors have an obligation to ensure that fund shareholders share in the benefits of the reduced costs by, for example, requiring that the adviser's fees be lowered, breakpoints be included in the adviser's fees, or that the adviser provide additional services under the advisory contract.  If the fund or fund family is not experiencing economies of scale, then the directors may seek to determine from the adviser how the adviser might operate more efficiently in order to produce economies of scale as fund assets grow.

SEC, Division of Investment Management: Report on Mutual Fund Fees and Expenses (Dec. 2000), *available at* http://www.sec.gov/news/studies/feestudy.htm.

223.    While Plaintiffs and other UBS Fund investors have contributed to the growth of Fund assets, they received no benefits in return.  The Directors continually allowed investor assets to be used for only the benefit of the Investment Adviser Defendants and their affiliates.  As purportedly "independent" Directors, they had a duty to question the Investment Adviser Defendants' and their affiliates' practices, and to ensure that any economies of scale that were being realized from the increase in the UBS Funds' assets were being passed on to shareholders, the rightful recipients.  The Directors ultimately failed to exercise the requisite care and conscientiousness in performing their statutory duties by approving a course of action suggested by the Investment Adviser Defendants that was of no benefit to the UBS Funds or their investors.

The Directors' approval of such actions, which prejudiced the UBS Funds and their investors, further demonstrates that they were controlled by the Investment Adviser Defendants.

224.     Additionally, the Directors failed to ensure that the economies of scale were passed to the UBS Funds and their investors and that the Funds' expense ratios are reasonable in relation to comparable funds.

## CLASS ACTION ALLEGATIONS

225.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class comprised of these subclasses:  the Purchaser Subclass, the Holder Subclass, and the Financial Plan Subclass.  Excluded from the Class are Defendants, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

226.     As discussed above, the Subclasses are defined as follows:

> The Purchasers Subclass:  This subclass includes all persons or entities who purchased shares or like interests of any of the Tier I Funds during the Class Period.

> The Financial Plan Subclass: This subclass includes all persons or entities who incurred initial and/or ongoing fees and charges in connection with the opening and/or utilization of a Financial Plan from UBSFS during the Class Period.

> The ICA Subclass:  This subclass includes all persons or entities who held shares or like interests of any of the UBS Funds on or after July 29, 2004 and who continue to hold.

227.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of the Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed class.  Record owners and other members of the Class may be identified from records maintained by the Tier I Funds and may be notified of the

pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal securities laws that is complained of herein.

228.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.   Whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.   Whether the ICA was violated by Defendants' acts as alleged herein;

c.   Whether Defendants' acts as alleged herein violated New York General Business Law Sections 349-350; and

d.   Whether and to what extent the members of the Class have sustained damages and the proper measure of such damages.

229.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SECURITIES ACT CLAIMS

## COUNT I

### ON BEHALF OF THE PURCHASER SUBCLASS AGAINST DEFENDANT
### UBSFS  FOR VIOLATION OF SECTION 12(a)(2) OF THE SECURITIES ACT

230.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except that, for purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

231.   This claim is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of the Purchaser Subclass against UBSFS for UBSFS's failure to disclose sales practices that created an insurmountable conflict of interest.

232.   UBSFS was the seller, or the successor in interest to the seller, within the meaning of the Securities Act, for one or more of the Tier I Fund shares sold to members of the Purchaser Subclass because it either:  (a) transferred the title of shares of the Tier I Funds to members of the Purchaser Subclass; (b) transferred the title of shares of the Tier I Funds to the Tier I Funds' distributors that in turn sold those shares as agents for the Tier I Funds; and/or (c) solicited the purchase of shares of the Tier I Funds by members of the Purchaser Subclass.

233.   During its sale of the Tier I Funds to members of the Purchaser Subclass, UBSFS failed to disclose the ongoing costs, directed brokerage and other unlawful inducements alleged herein that its Financial Advisers and firm received.  These inducements created an insurmountable conflict of interest.  UBS also caused to be issued to members of the Purchaser Subclass the Prospectuses that failed to disclose that fees and commissions from the Tier I Funds would be used to pay brokers for directing investors into the Tier I Funds.

234.   As set forth herein, when they became effective, all Tier I Funds' Prospectuses were misleading as they omitted the following material facts:

      a.     that the Investment Advisers to the Tier I Funds authorized the payment from Fund assets of excessive commissions to broker-dealers in exchange for preferential marketing services and that such payments were in breach of their fiduciary duties, in violation of Section 12(b) of the Investment Company Act, and unprotected by any "safe harbor";

      b.     that the Investment Advisers to the Tier I Funds directed brokerage payments to firms that favored the Tier I Funds, which was a form of marketing that was not disclosed in or authorized by the Funds' Rule 12b-1 plans;

      c.     that the Tier I Funds' Rule 12b-1 plans were not in compliance with Rule 12b-1, and that payments made pursuant to the plans were in violation of Section 12 of the Investment Company Act because, among other reasons, the plans were not properly evaluated by the Tier I Funds' Directors and trustees and there was not a reasonable likelihood that the plans would benefit the company and its shareholders;

      d.     that by paying brokers to aggressively steer their clients into the Tier I Funds, the Investment Advisers to the Tier I Funds were knowingly aiding and abetting breaches of fiduciary duty, and profiting from the brokers' unlawful conduct;

      e.     that any economies of scale achieved by marketing of the Tier I Funds to new investors were not passed on to the Tier I Funds' investors; on the contrary, as the Tier I Funds grew, fees charged to the Tier I Funds' investors continued to increase;

      f.     that the Investment Advisers to the Tier I Funds unlawfully used Soft Dollars and excessive commissions, taken from the Tier I Funds assets, to pay for overhead expenses that should have been borne by the Tier I Funds' Investment Advisers instead of their investors; and

g.     Members of the Purchasers Subclass have sustained damages due to UBSFS's violations.

235.    At the time they purchased the Tier I Funds shares traceable to the defective Prospectuses, Plaintiffs and the other members of the Purchaser Subclass were without knowledge of the facts concerning the material omissions alleged herein and could not reasonably have possessed such knowledge.  This claim was brought within the applicable statute of limitations.

**COUNT II**

**ON BEHALF OF PURCHASER SUBCLASS AGAINST
DEFENDANTS UBS AND UBSFS FOR VIOLATIONS OF
SECTION 15 OF THE SECURITIES ACT**

236.    Plaintiffs repeat and reallege each and every allegation contained above, except that for purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

237.    This claim is brought by Plaintiffs on behalf of themselves and members of the Purchaser Subclass pursuant to Section 15 of the Securities Act against UBS as control persons of UBSFS.  It is appropriate to treat these Defendants as a group for pleading purposes and to presume that the false, misleading, and incomplete information conveyed in the prospectuses, public filings, press releases and other publications are the collective actions of UBS.

238.    UBS was a "control person" of Defendant UBSFS within the meaning of Section 15 of the Securities Act, by virtue of its position of operational control and/or authority over the UBS Tier I Funds.  Defendant UBS, directly and indirectly, had and exercised the power and authority to cause Defendant UBSFS to engage in the wrongful conduct complained of herein. UBS issued, caused to be issued, and participated in the issuance of materially false and misleading statements in the prospectuses.

239.    Pursuant to Section 15 of the Securities Act, by reason of the foregoing,
Defendant UBS is liable to Plaintiffs and the other members of the Purchaser Subclass to the
same extent as Defendant UBSFS for its primary violations of Section 15 of the Securities Act.

240.    By virtue of the foregoing, Plaintiffs and members of the Purchaser Subclass are
entitled to damages against UBS.

**COUNT III**

**EXCHANGE ACT CLAIMS**
**FRAUD-ON-THE MARKET ALLEGATIONS**

241.    At all relevant times, the market for the Tier I Funds was efficient for, *inter alia*,
the following reasons:

        a.    The Tier I Funds met the requirements for listing, and were listed and
actively traded through a highly efficient and automated market;

        b.    Periodic public reports concerning the Tier I Funds were regularly filed
with the SEC;

        c.    Persons associated with the Tier I Funds regularly communicated with
public investors via established market communication mechanisms, including through regular
disseminations of press releases on the national circuits of major newswire services and through
other wide-ranging public disclosures, such as communications with the financial press and other
similar reporting services; and

        d.    The Tier I Funds were followed by several securities analysts employed
by major brokerage firms who wrote reports which were distributed to the sales force and certain
customers of their respective brokerage firms.  Each of these reports was publicly available and
entered the public marketplace.

e.      As a result of the foregoing, the market for the Tier I Funds promptly digested current information regarding the Tier I Funds from all publicly available sources and reflected such information in the respective value for the Tier I Funds as well as the market trend and demand for the shares of the Tier I Funds.  Investors who purchased or otherwise acquired shares or interests in the Tier I Funds relied on the integrity of the market for such securities. Under the circumstances, all purchasers of the Tier I Funds during the Class Period suffered similar injury through their purchase or acquisition of the Tier I Funds at a value that did not reflect the risks and costs of the continuing course of conduct alleged herein, and a presumption of reliance applies.

## COUNT IV

### AGAINST UBSFS FOR VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER ON BEHALF OF THE PURCHASER SUBCLASS

242.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein except for claims brought pursuant to the Securities Act.

243.    During the Class Period, UBSFS carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did deceive the investing public, including Plaintiffs and other members of the Purchaser Subclass as alleged herein and caused Plaintiffs and other members of the Purchaser Subclass to purchase Tier I Funds at distorted prices and to otherwise suffer damages.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

244.    UBSFS (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of conduct which operated as a fraud and deceit upon the purchasers of the Tier I Funds, including Plaintiffs and other members

of the Purchaser Subclass, in an effort to enrich themselves through undisclosed manipulative tactics by which they wrongfully distorted the pricing of their securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. UBSFS is sued as a primary participant in the wrongful and illegal conduct and scheme charged herein.

245. UBSFS, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Tier I Funds' operations, as specified herein.

246. UBSFS employed devices and artifices to defraud and engaged in a course of conduct and scheme as alleged herein to unlawfully manipulate and profit from excessive fees and commissions paid to it as a result of its undisclosed competitions to peddle the Tier I Funds, and thereby engaged in transactions, practices and a course of conduct which operated as a fraud and deceit upon Plaintiffs and members of the Purchaser Subclass.

247. UBSFS had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth.

248. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of the Tier I Funds were distorted during the Class Period such that they did not reflect the risks and costs of the continuing course of conduct alleged herein. In ignorance of the fact that market prices of the shares were distorted, and relying directly or indirectly on the false and misleading statements

made by UBSFS, or upon the integrity of the market in which the securities trade, and/or on the

absence of material adverse information that was known to or recklessly disregarded by UBSFS

but not disclosed in public statements by UBSFS during the Class Period, Plaintiffs and the other

members of the Purchaser Subclass acquired the shares or interest in the Tier I Funds during the

Class Period at distorted prices and were damaged thereby.

249.    At the time of said misrepresentations and omissions, Plaintiffs and other

members of the Purchaser Subclass were ignorant of their falsity, and believed them to be true.

Had Plaintiffs and other members of the Class known the truth concerning the Tier I Funds'

operations, which UBSFS did not disclose, Plaintiffs and other members of the Purchaser

Subclass would not have purchased or otherwise acquired their shares or, if they had acquired

such shares during the Class Period, they would not have done so at the distorted prices which

they paid.

250.    By virtue of the foregoing, UBSFS has violated Section 10(b) of the Exchange

Act and Rule 10b-5 promulgated thereunder.

251.    As a direct and proximate result of UBSFS'S wrongful conduct, Plaintiffs and

other members of the Class suffered damages in connection with their purchases and acquisitions

of Tier I Funds during the Class Period.

## COUNT V

**ON BEHALF OF THE PURCHASER SUBCLASS AGAINST UBSFS
FOR VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT
AND RULE 10b-5(a) AND (c) PROMULGATED THEREUNDER**

252.    Plaintiffs repeat and reallege each and every allegation contained above as if fully

set forth herein except for claims brought pursuant to the Securities Act.

253.    During the Class Period, UBSFS carried out a plan, scheme and course of conduct

which was intended to, and throughout the Class Period, did deceive the investing public,

including members of the Purchaser Subclass as alleged herein, and caused members of the Purchaser Subclass to purchase shares of the Tier I Funds and to otherwise suffer damages.  In furtherance of this unlawful scheme, plan and course of conduct, UBSFS took the actions set forth herein.

254.    UBSFS: (i) employed devices, schemes, and artifices to defraud; and (ii) engaged in acts, practices, and a course of conduct which operated as a fraud and deceit upon the purchasers of the Tier I Funds, including members of the Purchaser Subclass, in an effort to enrich themselves through undisclosed manipulative tactics by which they wrongfully distorted the value and market trends of the Tier I Funds in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  UBSFS is sued as the primary participant in the wrongful and illegal conduct and scheme charged herein.

255.    UBSFS, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about UBSFS and the Tier I Funds' operations, as specified herein.

256.    UBSFS employed devices and artifices to defraud and engaged in a course of conduct and scheme as alleged herein to unlawfully manipulate and profit from excessive fees and commissions as a result of the undisclosed sales practices to peddle the Tier I Funds alleged above and thereby engaged in transactions, practices and a course of conduct which operated as a fraud and deceit upon members of the Purchaser Subclass.

257.    Plaintiffs and the members of the Purchaser Subclass reasonably relied upon the integrity of the market in which the Tier I Funds traded.

258.    Plaintiffs and the members of the Purchaser Subclass were ignorant of UBSFS'S fraudulent scheme.  Had Plaintiffs and the members of the Purchaser Subclass known of UBSFS'S unlawful scheme, they would not have purchased or otherwise acquired shares of the Tier I Funds or if they had, they would not have purchased or otherwise acquired them at the artificial prices they paid for such securities.

259.    Plaintiffs and the members of the Purchaser Subclass were injured because the risks that materialized were risks of which they were unaware and resulted from UBSFS'S scheme to defraud as alleged herein.  Absent UBSFS's wrongful conduct, members of the Purchaser Subclass would not have been injured.

260.    By virtue of the foregoing, UBSFS violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

261.    As a direct and proximate result of UBSFS'S wrongful conduct, members of the Purchaser Subclass suffered damages in connection with their purchases and acquisitions of the Tier I Funds during the Class Period.

## COUNT VI

### ON BEHALF OF THE PURCHASER SUBCLASS
### AGAINST DEFENDANT UBS FOR VIOLATIONS OF
### SECTION 20(a) OF THE EXCHANGE ACT

262.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein except for claims brought pursuant to the Securities Act.

263.    This claim is brought on behalf of the Purchaser Subclass pursuant to Section 20(a) of the Exchange Act against UBS Defendants as a control person of UBSFS.

264.    UBS acted as a controlling person of the Tier I Funds within the meaning of Section 20(a) of the Exchange Act for the reasons alleged herein.  By virtue of its operational and management control of the Tier I Funds' respective businesses and systematic involvement

in the fraudulent scheme alleged herein, UBS had the power to influence and control and did influence and control, directly or indirectly, the decision-making and actions of the UBSFS, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. UBS had the ability to prevent the issuance of the statements alleged to be false and misleading or could have caused such statements to be corrected.

265. In particular, UBS had direct and supervisory involvement in the operations of UBSFS and, therefore, is presumed to have had the power to control or influence the particular transaction giving rise to the securities violations as alleged herein, and to have exercised same.

266. As set forth above, UBS and UBSFS each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of its position as a controlling person UBS is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of UBS Defendants' wrongful conduct, Plaintiffs and other members of the Purchaser Subclass suffered damages in connection with their purchases of Tier I Funds securities during the Class Period.

### COUNT VII

**AGAINST UBSFS FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER FOR DECEPTION ON BEHALF OF THE FINANCIAL PLANS SUBCLASS**

267. The Financial Plan Subclass Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein except for Claims brought pursuant to the Securities Act.

268. The Financial Plan Subclass Plaintiff does not allege that the Financial Plan Subclass members' purchases of the Financial Plans constitute purchases of securities. However, in the event that Defendants argue and the Court holds that Plaintiff's claims with respect to the Financial Plans are claims of deception in connection with the purchase or sale of a security,

Plaintiff alleges that Defendants' sale of the Financial Plans to the members of the Financial Plan Subclass constitute violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

269.   As alleged above, the process through which the Financial Plans were marketed, including the standardized representations made by Defendants and their Financial Advisers concerning the experience and objectivity of the Financial Advisers, the purportedly individualized nature of the recommendations, the Financial Advisers' ability to recommend those investments that were appropriate for the Financial Plan Subclass members regardless of whether they were Tier I Funds to UBS, and their failure to disclose their relationship with Tier I Funds, was materially deceptive to the Financial Plan Subclass members and induced them to purchase the Financial Plans.

270.   At the time they purchased the Financial Plans, the Financial Plan Subclass members were without knowledge of the facts constituting the material omissions alleged herein and could not reasonably have possessed such knowledge.

271.   As a result of the aforesaid deception, the Financial Plan Subclass members were injured by being induced to pay an average of 1.5% of eligible assets annually for the Financial Plan, without receiving the service they had been promised in connection with that plan. Furthermore, as a result of that deception, the Financial Plan Subclass members subsequently purchased the Financial Plan as alleged above, and were injured and suffered damages in that regard as alleged above.

272.   By virtue of the foregoing, UBSFS violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

273.    As a direct and proximate result of UBSFS's wrongful conduct, members of the

Financial Plan Subclass suffered damages in connection with the fees and charges incurred with

their opening and/or utilizing a Financial Plan during the Class Period.

## ICA CLAIMS

## COUNT VIII

## AGAINST THE INVESTMENT ADVISER DEFENDANTS AND DISTRIBUTOR DEFENDANTS PURSUANT TO SECTION 36(b) OF THE ICA BROUGHT BY PLAINTIFFS AS A DIRECT CLAIM ON BEHALF OF THE PROPRIETARY FUNDS

274.    The ICA Subclass Plaintiff repeats and realleges each and every allegation

contained above as if fully set forth herein.

275.    This Count is brought by the ICA Subclass Plaintiff individually and for the

benefit of the ICA Subclass and UBS Funds against the Distributor and Investment Adviser

Defendants, for breach of their fiduciary duties in respect of compensation as defined by Section

36(b) of the ICA.

276.    The Defendants in this Count each had a fiduciary duty to the UBS Funds and

their investors with respect to the receipt of compensation for services and payments of a

material nature made by and to such Defendants.

277.    As alleged above, the fees received by the Distributor, and Investment Adviser

were excessive, in that they were so disproportionately large that they bore no reasonable

relationship to the services rendered and would not have been negotiated in an arm's-length

relationship.

278.    By reason of the conduct described above, the Distributor and Investment Adviser

Defendant violated Section 36(b) of the ICA.  As a direct, proximate and foreseeable result of

these Defendants' breaches of fiduciary duties in their roles as principal underwriter, and

investment advisers, respectively, to the UBS Funds and their investors, the UBS Funds and their investors have sustained many millions of dollars in damages.

279.    The ICA Subclass Plaintiff, in this count, seeks to recover the excessive advisory, Rule 12b-1, and other fees charged the UBS Funds and their investors by Defendants and their affiliates for the benefit of the Funds.

## COUNT IX

### AGAINST THE DISTRIBUTOR AND INVESTMENT ADVISER DEFENDANTS PURSUANT TO SECTION 36(b) OF THE INVESTMENT COMPANY ACT DERIVATIVELY ON BEHALF OF THE UBS FUNDS HELD BY PLAINTIFFS

280.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

281.    In the alternative, in the event that this Court rules that Count VIII should be dismissed on the basis that § 36(b) is a derivative claim, Plaintiffs assert a derivative claim under Sections 36(b) of the ICA on behalf of all of the UBS Funds in which Plaintiffs are shareholders.

282.    This Count is brought by Plaintiffs derivatively on behalf of the UBS Funds held by Plaintiffs, against the Distributor and Investment Adviser Defendants, for breach of their fiduciary duties with respect to compensation as defined by Section 36(b) of the ICA.  Section 36(b) does not require plaintiffs to make a demand on the Funds' Directors before bringing a claim.

283.    The Defendants in this Count each had a fiduciary duty to the UBS Funds and their investors with respect to the receipt of compensation for services and payments of a material nature made by and to such Defendants.

284.    As alleged above, the fees received by the Distributor and Investment Adviser Defendants were excessive, in that they were so disproportionately large that they bore no

reasonable relationship to the services rendered and would not have been negotiated in an arm's-length relationship.

285.    By reason of the conduct described above, the Distributor and Investment Adviser Defendants violated Section 36(b) of the ICA.  As a direct, proximate and foreseeable result of these Defendants' breaches of fiduciary duties in their roles as principal underwriters, and investment advisers, respectively, to the UBS Funds and their investors, the UBS Funds and their investors have sustained many millions of dollars in damages.

286.    Plaintiffs, in this count, seek to recover the excessive advisory, Rule 12b-1, and other fees charged the UBS Funds and their investors by Defendants and their affiliates for the benefit of the Funds.

## COUNT X

**ON BEHALF OF THE ICA SUBCLASS AGAINST UBS AS
CONTROL PERSON OF THE DISTRIBUTOR DEFENDANT AND THE
INVESTMENT ADVISER DEFENDANTS FOR VIOLATION OF
SECTION 48(a) OF THE ICA**

287.    The ICA Subclass Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

288.    This Count is brought on behalf of the members of the ICA Subclass pursuant to Section 48(a) of the ICA against UBS as control person of the Distributor Defendant and the Investment Adviser Defendants, who caused the Distributor Defendant and the Investment Adviser Defendants to commit the violations of the ICA alleged herein.

289.    The Distributor Defendant is liable under Sections 36(b) of the ICA to the Funds as set forth herein.

290.    The Investment Adviser Defendants are liable under Section 36(b) of the ICA as set forth herein.

291.    UBS was a "control person" of the Distributor Defendant and the Investment Adviser Defendants and caused the violations complained of herein.  By virtue of its position of operational control and/or authority over the Investment Adviser Defendants and/or Distributor Defendant – UBS, directly and indirectly, had, and exercised, the power and authority to cause the Distributor Defendant and/or the Investment Adviser Defendants to engage in the wrongful conduct complained of herein.

292.    Pursuant to Section 48(a) of the ICA, UBS is liable to Plaintiffs to the same extent as are the Distributor Defendant and the Investment Adviser Defendants for their primary violations of Sections 36(b) of the ICA.

293.    By virtue of the foregoing, the Funds, Plaintiffs and other members of the ICA Subclass are entitled to damages against UBS.

294.    In the alternative, in the event that this Court rules that the Section 48(a) claim is derivative, Plaintiffs bring this count derivatively on behalf of the UBS Funds rather than directly on behalf of the ICA Subclass.

## COUNT XI

### ON BEHALF OF THE FINANCIAL PLAN SUBCLASS
### AGAINST UBSFS FOR BREACH OF FIDUCIARY DUTY

295.    The Financial Subclass Plaintiff repeats and realleges each of the preceding allegations as though fully set forth herein, except for the Claims brought pursuant to the Securities Act.

296.    As Advisers to the UBS Funds, the Investment Adviser Defendants were fiduciaries to members of the Financial Plan Subclass and were required to act with the highest obligations of good faith, loyalty, fair dealing, due care and candor.

297.    As set forth above, the Investment Adviser Defendants breached their fiduciary duties to members of the Financial Plans Subclass.

298.    Members of the Financial Plan Subclass have been injured as a direct, proximate and foreseeable result of such breach on the part of the Investment Adviser Defendants and have suffered substantial damages.

299.    Because the UBSFS Financial Adviser Defendants acted with reckless and willful disregard for the rights of members of Financial Plan Subclass, the UBSFS Financial Adviser Defendants are liable for punitive damages in an amount to be determined by the jury.

## COUNT XII

### FOR VIOLATIONS OF THE NEW YORK GENERAL BUSINESS LAW §349 ON BEHALF OF THE FINANCIAL PLAN SUBCLASS AGAINST ALL DEFENDANTS

300.    The Financial Plan Subclass Plaintiff hereby realleges and incorporates by reference all paragraphs previously alleged herein except for claims brought pursuant to the Securities Act. Pursuant to Section 349(h) of New York's General Business Law, Plaintiff asserts this cause of action against each and every Defendant on behalf of himself and the Financial Plan Subclass for violations of Section 349 of New York's General Business Law ("Section 349"). It is appropriate to treat these Defendants as a group for pleading purposes and to presume that the misconduct complained of herein represents the collective action of all Defendants.

301.    As set forth herein, Defendants' acts, practices, representations, statements, omissions, and courses of conduct with respect to the advertising, marketing, and sale of financial plans violate Section 349 in that, among other things:

(a)    Defendants misrepresented, and continue to misrepresent, that they provide personalized, objective financial advice and recommendations;

(b)    Defendants misrepresented, and continue to misrepresent, that their financial advice and recommendations are intended exclusively to promote clients' best interests;

(c)    Defendants inadequately disclosed and/or concealed, and continue to inadequately disclose and/or conceal, conflicts of interest, including that their financial advice and recommendations were designed to generate fees and sales commissions and increase assets under Defendants' management without regard to the client's best interest;

(d)    Defendants inadequately disclosed and/or concealed, and continue to inadequately disclose and/or conceal that their financial advice and recommendations were intended to induce clients to purchase Defendants' financial products without regard for the client's best interest;

(e)    Defendants' advertisements and marketing practices fail to disclose, inadequately disclose, and/or conceal material information regarding hidden costs and fees and conflicts of interest;

(f)    Defendants' advertising and marketing practices were and are likely to mislead, deceive, and/or damage consumers.

302.    Defendants' omissions, misrepresentations and practices alleged with respect to the Financial Plans were unfair and deceptive when made and were made with the intent to, and did, (a) deceive Plaintiff and the members of the Financial Plan Subclass, and (b) induce Plaintiff and members of the Financial Plan Subclass to purchase the Financial Plans offered by Defendants, in violation of Section 349.

303.    Members of the Financial Plan Subclass never knew, nor could they have known, of Defendants' omissions, misrepresentations, and unlawful practices with respect to the advertising, marketing, and sale of Defendants' Financial Plans.

304. As a direct and proximate result of Defendants' misrepresentations, misleading statements, and/or deceptive practices, in violation of Section 349, the members of the Financial Plan Subclass have been injured and suffered harm in that, among other things, members of the Financial Plan Subclass have purchased Defendants' financial plans when they otherwise would not have and/or the Financial Plan Subclass members paid more for the Financial Plans than they otherwise would have.

305. Pursuant to Section 349 of New York's General Business Law, the members of the Financial Plan Subclass are entitled to damages against all Defendants and an order permanently enjoining Defendants from engaging in the unlawful practices described herein, as well as recovery of attorneys' fees and costs of the litigation.

## COUNT XIII

### FOR VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW §350
### ON BEHALF OF THE FINANCIAL PLAN SUBCLASS AGAINST ALL DEFENDANTS

306. The Financial Plan Subclass Plaintiff hereby realleges and incorporates by reference all paragraphs previously alleged herein, except for claims brought pursuant to the Securities Act. Pursuant to Section 350-e(3) of New York's General Business Law, members of the Financial Plan Subclass assert this cause of action against each and every Defendant on behalf of himself and the Financial Plan Subclass for violations of Sections 350 of New York's General Business Law ("Section 350"). It is appropriate to treat these Defendants as a group for pleading purposes and to presume that the misconduct complained of herein represents the collective action of all Defendants.

307. As set forth herein, Defendants' acts, practices, representations, statements, omissions, and courses of conduct with respect to the advertising, marketing, and sale of Financial Plans violate Section 350 in that, among other things:

(a)     Defendants misrepresented, and continue to misrepresent, that they provide personalized, objective financial advice and recommendations in the advertising and marketing of their financial plans and members of the Financial Plan Subclass relied on these misrepresentations in purchasing their Financial Plans;

(b)     Defendants misrepresented, and continue to misrepresent, in the advertising and marketing of their Financial Plans that their financial advice and recommendations are intended exclusively to promote clients' best interests and members of the Financial Plan Subclass relied on these misrepresentations in purchasing their Financial Plans;

(c)     Defendants' advertisements and marketing practices fail to disclose, inadequately disclose, and/or conceal material information;

(d)     Defendants' advertising and marketing practices were and are likely to mislead, deceive, and/or damage consumers.

308.     Defendants' omissions, misrepresentations and practices alleged with respect to the Financial Plans were misleading and deceptive when made and were made with the intent to, and did, (a) deceive the members of the Financial Plan subclass, and (b) induce members of the Financial Plan subclass to purchase the Financial Plans offered by Defendants, in violation of Section 350.

309.     The members of the Financial Plan subclass never knew, nor could they have known, of Defendants' omissions, misrepresentations, and unlawful practices with respect to the advertising, marketing, and sale of Defendants' Financial Plans.

310.     As a direct and proximate result of Defendants' misrepresentations, misleading statements, and/or deceptive practices, in violation of Section 350, members of the Financial Plan Subclass have been injured and suffered harm in that, among other things, the members of

the Financial Plan Subclass have purchased Defendants' Financial Plans when they otherwise would not have and/or the Financial Plan Subclass have paid more for the financial plans than they otherwise would have.

311.   Pursuant to Section 350-e(3) of New York's General Business Law, the members of the Financial Plan Subclass are entitled to damages against all Defendants and an order permanently enjoining Defendants from engaging in the unlawful practices described herein, as well as recovery of attorneys' fees and costs of the litigation.

## REQUEST FOR ORDER PRESERVING ELECTRONIC MAIL RELATED TO THE ABOVE-MENTIONED ACTION

312.   On July 13, 2005, the SEC entered a cease-and-desist order against UBS Securities LLC for violating the record-keeping requirements of Section 17(a)(1) of the Exchange Act and Rule 17a-4.  UBS failed to preserve for three years (July 1, 1999 to June 30, 2002), the first two years of which the records should be in an easily accessible place, all electronic mail communications (including inter-office memoranda and communications) received and sent by its employees that related to its business as a member of an exchange, broker or dealer.  The SEC, NYSE, and NASD discovered UBS lacked adequate systems or procedures to ensure the preservation of electronic mail during their investigation of the company's research and investment banking activity.  As a result, UBS agreed to pay penalties and fines totaling $2.1 million to proceedings and actions taken by the SEC, NYSE, and NASD.  In light of Defendants' failure to maintain adequate systems for preserving emails, Plaintiffs respectfully request the Court order that all documents related to the allegations set forth herein be adequately preserved.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment as follows:

a. Determining that this action is a proper class action and certifying the Court-appointed steering committee of the Lead Plaintiffs and any other proposed Class Representatives as Class representatives and appointing Lead Counsel as Class counsel pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b. Awarding compensatory damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c. Awarding Plaintiffs and other members of the Class rescission of their contracts with the Advisers, including recovery of all fees which would otherwise apply and recovery of all fees paid to the Advisers pursuant to such agreements;

d. Awarding Plaintiffs and other members of the Class punitive damages;

e. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

f. Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: May 3, 2006

                                    Respectfully submitted,

                                    **MILBERG WEISS BERSHAD**
                                    **& SCHULMAN LLP**

                    By: _____
                                    Steven G. Schulman (SS-2561)
                                    Jerome Congress (JC-2060)
                                    Janine Pollack (JP-0178)
                                    Kim E. Miller (KM-6996)
                                    Michael R. Reese (MR-3183)
                                    One Pennsylvania Plaza
                                    New York, New York  10119-0165
                                    Tel: (212) 594-5300
                                    Fax: (212) 868-1229


                                    **STULL, STULL & BRODY**
                                    Jules Brody (JB-9151)
                                    Mark Levine (ML-9620)
                                    6 East 45th Street
                                    New York, New York  10017
                                    Tel: (212) 687-7230
                                    Fax: (212) 490-2022

                                    *Lead Counsel for Plaintiffs and the Class*

**WEISS & LURIE**
Joseph H. Weiss
551 Fifth Avenue - Suite 1600
New York, New York  10176

**LAW OFFICES OF**
   **CHARLES J. PIVEN, P.A.**
Charles J. Piven
The World Trade Center-Baltimore
401 East Pratt Street, Suite 2525
Baltimore, Maryland  21202
Telephone:  (410) 986-0036

**MURRAY, FRANK & SAILER LLP**
Eric J. Belfi
275 Madison Avenue
New York, New York 10016
Telephone: (212) 682-1818
Facsimile:  (212) 682-1892

**DELL & LITTLE, L.L.P.**
Joseph G. Dell
350 Old Country Road - Suite 105
Garden City, NY  11530

*Plaintiffs' Counsel*

## CERTIFICATE OF SERVICE

I, Kim E. Miller, an attorney with the law firm of Milberg Weiss Bershad &

Schulman LLP, hereby certify that on May 3, 2006, I caused a true and correct copy of

the Consolidated Amended Class Action Complaint to be served via electronic mail and

regular U.S. Mail upon the following parties:

**WILLIAMS & CONNOLLY LLP**
John K. Villa
Christopher N. Manning
Bradley J. Bondi
725 Twelfth Street, N.W.
Washington, D.C. 20005

**WILLKIE FARR & GALLAGHER LLP**
Martin Klotz
787 Seventh Avenue
New York, NY 10119-6099

**PAUL, HASTINGS, JANOFSKY & WALKER LLP**
Barry G. Sher
Richard C. Schoenstein
75 East 55th Street
New York, NY 10022

**BRYAN CAVE LLP**
Eric Rieder
1290 Avenue of the Americas
New York, NY 10104

Kim. E. Miller