**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

MICHAEL HOFFMAN, SUSAN HOFFMAN,
and YAKOV PRAGER, on behalf of themselves
and all others similarly situated,

                            Plaintiffs,

          vs.

UBS-AG, et al.,

                            Defendants.

No. 05 Civ. 6817 (DAB)(JCF)

Member Cases:  05 Civ. 7027 (DAB)(JCF)
                     05 Civ. 8448 (DAB)(JCF)

**ECF CASE**

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**WILLIAMS & CONNOLLY LLP**
John K. Villa (JV-3390)
Christopher N. Manning (CM-4231)
Bradley J. Bondi (BB-7497)
725 Twelfth Street, N.W.
Washington, D.C.  20005

*Counsel for Defendants UBS-AG, UBS*
*Global Asset Management (US) Inc., UBS*
*Global Asset Management (Americas) Inc.,*
*UBS Global Asset International Ltd., DSI*
*International Management, Inc., and UBS*
*Financial Services Inc. f/k/a UBS*
*PaineWebber, Inc.*

July 31, 2006

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS .................................................................................... 6

    A.    Statutory and Regulatory Background ................................................ 6

    B.    Plaintiffs' Allegations ............................................................................. 8

SUMMARY OF ARGUMENT .............................................................................. 14

ARGUMENT ............................................................................................................ 19

I.    PLAINTIFFS FAIL TO ALLEGE VIOLATIONS OF THE EXCHANGE
    ACT OR THE SECURITIES ACT .......................................................... 19

    A.    There Was No Legal Duty To Disclose the "Facts" Plaintiffs Allege Were
        Omitted ...................................................................................................... 19

    B.    Plaintiffs Have Failed to Plead Loss Causation ................................... 27

    C.    Plaintiffs' Claim that They Were Injured Because They Would
        Have Invested in Other Mutual Funds Is Foreclosed by the Supreme
        Court's Decision in *Blue Chip Stamps* ................................................ 29

    D.    Plaintiffs Have Not Pled Fraud with the Requisite Particularity Nor
        Have They Pled Facts Giving Rise to a Strong Inference of
        Fraudulent Intent ................................................................................... 30

        1.    Failure to Plead Fraud with the Requisite Particularity
            Under Rule 9(b) – Securities Act and Exchange Act Claims ............. 30

        2.    Failure to Plead a Strong Inference of Scienter under
            the PSLRA – Exchange Act Claims ....................................... 31

    E.    The Complaint Fails to Allege the Requisite Elements for a
        Claim Under Section 12(a)(2) of the Securities Act ........................... 32

        1.    The Complaint Fails To Allege Compensable Damages
            Under the Securities Act ........................................................ 32

        2.    The Complaint Fails To Allege that the UBSFS Defendants
            Are "Sellers" of Securities Within the Meaning of
            Section 12(a)(2) ....................................................................... 34

    F.    The Complaint Fails To State a Claim Under Section 10(b) of
        the Exchange Act and Rule 10b-5 ...................................................... 35

    G.    Plaintiffs Do Not Have Standing to Bring Claims Based on Activity By Funds
        None of Them Own ................................................................................ 37

II.     DEFENDANT UBS-AG IS NOT LIABLE UNDER EITHER SECTION
        15 OF THE SECURITIES ACT OR SECTION 20(A) OF THE
        EXCHANGE ACT .......................................................................................... 38

III.    CERTAIN OF PLAINTIFFS' CLAIMS UNDER SECTIONS 12 AND
        15 OF THE SECURITIES ACT ARE BARRED BY THE STATUTE
        OF LIMITATIONS ....................................................................................... 39

IV.     THE COMPLAINT FAILS TO STATE A CLAIM AGAINST THE INVESTMENT
        ADVISOR AND DISTRIBUTOR DEFENDANTS UNDER THE INVESTMENT
        COMPANY ACT (THE "ICA").................................................................... 40

        A.      Count VIII Must Be Dismissed Because Section 36(b) Does Not Provide
                For a Direct Private Right Of Action .................................................. 40

        B.      Count IX Should Be Dismissed For Failure To State a Claim ...................... 43

        C.      Count X Must Also Be Dismissed ...................................................... 49

V.      THE COMPLAINT FAILS TO STATE A CLAIM AGAINST ANY
        DEFENDANT UNDER STATE LAW........................................................... 50

        A.      SLUSA Preempts the Three Counts Founded Upon
                State Law .......................................................................................... 50

        B.      Sections 349 and 350 of the New York General Business
                Law Do Not Apply To Sales of Securities ........................................... 52

CONCLUSION ............................................................................................................. 53

APPENDIX A: Glossary of Relevant Terms Used in the Mutual Fund Industry

APPENDIX B: Summary Chart of Reasons for Dismissing All Counts in the Complaint

Exhibit 1: UBS, "Information About Your Relationship With Us"

Exhibit 2: Form ADV, Schedules A and B for UBS Global Asset Management (Americas)

Exhibit 3: SEC Form N-1A

# TABLE OF AUTHORITIES

## FEDERAL CASES

Alexander v. Sandoval, 532 U.S. 275 (2001) ...............................................................................50

Allard v. Arthur Andersen & Co., 924 F. Supp. 488 (S.D.N.Y. 1996)...................................16, 30

In re AllianceBernstein Mut. Funds Excessive Fees Litig., No. 04-CIV-4885(SWK),
    2006 WL 74439 (S.D.N.Y. Jan. 11, 2006) ...........................................................................1

Alliance for Environmental Renewal, Inc. v. Pyramid Crossgates Co., 436 F.3d 82 (2d
    Cir. 2006)...............................................................................................................................38

In re Am. Mut. Funds Fee Litig., No. CV 04-5593-GAFRNBX, 2005 WL. 3989803
    (C.D. Cal. Dec. 16, 2005) ...............................................................................................50, 52

Anisfeld v. Cantor Fitzgerald & Co., 631 F. Supp. 1461 (S.D.N.Y. 1986)..................................33

Atencio v.  Smith Barney, Citigroup Inc., No. 04 Civ. 5653(MBM), 2005 WL. 267556
    (S.D.N.Y. Feb. 2, 2005)........................................................................................................51

Basic Inc. v. Levinson, 485 U.S. 224 (1988)..........................................................................19, 37

Bloor v. Carro, Spanbock, Londin, Rodman & Fass, 754 F.2d 57 (2d Cir. 1985) ......................36

Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975).......................................16, 29, 30

In re Broderbund/Learning Co. Sec. Litigation, 294 F.3d 1201 (9th Cir. 2002) ..........................33

Burks v. Lasker, 441 U.S. 471 (1979) .........................................................................................42

Canizaro v. Kohlmeyer & Co., 370 F. Supp. 282 (E.D. La. 1974), aff'd, 512 F.2d 484
    (5th Cir. 1975)......................................................................................................................34

In re Carter-Wallace, Inc. Sec. Litigation, 220 F.3d 36 (2d Cir. 2000) ......................................32

Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164
    (1994)....................................................................................................................................19

Clark v. Nevis Capital Mgmt., LLC, No. 04 Civ 2702(RWS), 2005 WL. 488641
    (S.D.N.Y Mar. 2, 2005) ........................................................................................................ 37

Cohen v. Nw. Growth Corp., 385 F. Supp. 2d 935 (D.S.D. 2005)................................................39

Cortec Industries v. Sum Holding L.P., 949 F.2d 42 (2d Cir. 1991)...............................................5

Craighead v. E.F. Hutton & Co., 899 F.2d 485 (6th Cir. 1990) .....................................35

In re Davis Selected Mutual Funds Litig., No. 04-CIV-4186(MGC), 2005 WL 2509732
       (S.D.N.Y Oct. 11, 2005) ............................................................................1, 45

Desiderio v. NASD, Inc., 191 F.3d 198 (2d Cir. 1999)................................................26

In re Deutsche Telekom AG Sec. Litig., No. 00 Civ. 9475, 2002 WL 244597, (S.D.N.Y.
       Feb. 20, 2002) ........................................................................................38

Dodds v. Cigna Sec., Inc., 12 F.3d 346 (2d Cir. 1993)................................................39

In re Dreyfus Mut. Funds Fee Litig., 428 F. Supp. 2d 357 (W.D. Pa. 2006) ...............................42

Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005) ..................................................15, 27

In re Eaton Vance Mut. Funds Fee Litig., 380 F. Supp. 2d 222 (S.D.N.Y. 2005)............ passim

In re Enron Corp. Sec., Derivative & ERISA Litig., No. MDL-1446, Civ. A. H-01-3624,
       2004 WL 405886 (S.D. Tex. Feb. 25, 2004) ....................................................39

Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976).........................................................32

In re Evergreen Mut. Funds Fee Litig., 423 F. Supp. 2d 249 (S.D.N.Y. 2006)........................1, 49

Fogel v. Chestnutt, 668 F.2d 100 (2d Cir. 1981) ............................................................44

In re Franklin Mut. Funds Fee Litig., 388 F. Supp. 2d 451 (D.N.J. 2005) ....................................43

Gartenberg v. Merrill Lynch Asset Mgmt., 694 F.2d 923 (2d Cir. 1982) .................................6, 43

In re Global Crossing Ltd. Sec. Litig., No. 02 Civ. 910(GEL), 2005 WL. 1875445
       (S.D.N.Y. Aug. 5, 2005) .............................................................................38

In re Goldman Sachs Mut. Funds Fee Litig., No. 04 Civ. 2567(NRB), 2006 WL. 126772
       (S.D.N.Y. Jan. 13, 2006)........................................................................... passim

Hogan v. Baker, No. Civ. A 305CV0073P, 2005 WL. 1949476 (N.D. Tex. Aug. 12,
       2005) .................................................................................................42

Kalish v. Franklin Advisers, Inc., 742 F. Supp. 1222 (S.D.N.Y. 1990) .........................................44

Kamen v. Kemper Finance Services, Inc., 500 U.S. 90 (1991)......................................................41

Kramer v. Time Warner Inc., 937 F.2d 767 (2d Cir. 1991).........................................................5, 8

Krinsk v. Fund Asset Mgmt., Inc., 715 F. Supp. 472 (S.D.N.Y. 1988), aff'd, 875 F.2d 404 (2d Cir. 1989)......................................................................................................47

Lentell v. Merrill Lynch & Co., 396 F.3d 161 (2d Cir.), cert. denied, 126 S. Ct. 421 (2005)......................................................................................................15, 27, 36

Liberty Ridge LLC v. RealTech System Corp., 173 F. Supp. 2d 129 (S.D.N.Y 2001) ...............31

Lipsky v. Commw. United Corp., 551 F.2d 887 (2d Cir. 1976)....................................................26

In re Merrill Lynch & Co Research Rep. Sec. Litig., 272 F. Supp. 2d 243 (S.D.N.Y. 2003) ..................................................................................................................5, 25, 34

In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig., No. 04-CIV-3759(RO), 2006 WL 1628005 (S.D.N.Y. June 9, 2006)……………………………………………     passim

Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng, 697 F. Supp. 1224 (D.D.C. 1988) ..........34

Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 126 S. Ct. 1503 (2006)............................51

Meyer v. Oppenheimer Mgmt.t Corp., 895 F.2d 861 (2d Cir. 1990) ...........................................46

Migdal v. Rowe Price-Fleming International, 248 F.3d 321 (4th Cir. 2001) ................................49

Miller v. Pezzani (In re Worlds of Wonder Sec. Litig.), 35 F.3d 1407 (9th Cir. 1994) ...............33

Mills v. Polar Molecular Corp., 12 F.3d 1170 (2d Cir. 1993) ......................................................30

Montcalm County Board of Comm'rs v. McDonald & Co. Sec., 833 F. Supp. 1225 (W.D. Mich. 1993)....................................................................................................34

In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig., No. 03-CIV-8208(RO), 2006 WL 1008138 (S.D.N.Y. Apr. 18, 2006)........................................................... passim

Morin v. Trupin, 747 F. Supp. 1051 (S.D.N.Y. 1990)...................................................................33

Morris v. Gilbert, 649 F. Supp. 1491 (E.D.N.Y. 1986) ..........................................................52, 53

Morris v. Wachovia Sec., Inc., 448 F.3d 268 (4th Cir. 2006) ......................................................37

In re Motel 6 Sec. Litig., 93 Civ. 2183, 1995 WL. 431326(JFK) (S.D.N.Y. July 20, 1995) ........52

Mutchka v. Harris, 373 F. Supp. 2d 1021 (C.D. Cal. 2005) .........................................................45

In re NYSE Specialists Sec. Litig., 405 F. Supp. 2d 281 (S.D.N.Y. 2005)...................................37

Olmsted v. Pruco Life Ins. Co., 283 F.3d 429 (2d Cir. 2002) .......................................................50

In re Oppenheimer Funds Fee Litig., 426 F. Supp. 157 (S.D.N.Y 2006) .......................................1

Pinter v. Dahl, 486 U.S. 622 (1988) ...............................................................................17, 34, 35

Press v. Quick & Reilly, Inc., 218 F.3d 121 (2d Cir. 2000)……………………………….. passim

Prof'l Mgmt. Associates, Inc. Employees' Profit Sharing Plan v. KPMG LLP, 335 F.3d
    800 (8th Cir. 2003)...............................................................................................................52

In re Prudential Sec. Inc. LP Litig., 107 F.3d 3 (2d Cir. 1996) ....................................................26

Randall v. Loftsgaarden, 478 U.S. 647 (1986) .......................................................................32, 33

Riley v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 292 F.3d 1334 (11th Cir.), cert.
    denied, 537 U.S. 950 (2002) .................................................................................................51

Rombach v. Chang, 355 F.3d 164 (2d Cir. 2004).................................................................30, 31

Ryder Int'l Corp. v. First Am. Nat'l Bank, 943 F.2d 1521 (11th Cir. 1991)................................34

In re Salomon Smith Barney Mut. Fund Fees Litig., No. 04 Civ. 4055(PAC) (S.D.N.Y.
    Jul. 26, 2006)................................................................................................................ passim

SEC v. First Jersey Sec. Inc., 101 F.3d 1450 (2d Cir. 1996)....................................................32, 38

Smith v. Oppenheimer & Co., Inc., No. G830948 CA, 1985 WL 5853, (W.D. Mich. Apr.
    9, 1985) .................................................................................................................................26

Three Crown LP v. Salomon Brothers, Inc., 906 F. Supp. 876 (S.D.N.Y. 1995)....................16, 30

In re Towers Fin. Corp. Noteholders Litig., No. 93 Civ. 0810(WK)(AJP), 1995 WL
    571888 (S.D.N.Y. Sept. 20, 1995)........................................................................................36

In re Ultrafem Inc. Sec. Litigation, 91 F. Supp. 2d 678 (S.D.N.Y. 2000) ....................................19

United States v. Alvarado, No. 01 CR. 156, 2001 WL 1631396, (S.D.N.Y. Dec. 19,
    2001) .....................................................................................................................................20

United States v. Skelly, 442 F.3d 94 (2d Cir. 2006)......................................................................20

In re Van Wagoner Funds, Inc. Sec. Litig., 382 F. Supp. 2d 1173 (N.D. Cal. 2004)....................37

In re WorldCom, Inc. Sec. Litig., 294 F. Supp. 2d 431 (S.D.N.Y. 2003) .....................................39

Yampolsky v. Morgan Stanley Inv. Advisers, Inc., Nos. 03 Civ. 5710 (RO), 03 Civ. 5896(RO), 2004 WL. 1065533 (S.D.N.Y. May 12, 2004) ................................................44

Young v. Nationwide Life Ins. Co., 183 F.R.D. 502 (S.D. Tex. 1998) .........................................37

## STATE CASES

Gray v. Seaboard Sec., Inc., 788 N.Y.S.2d 471 (N.Y. App. Div. 2005) .......................................52

In re Syncor International Corp. S'holders Litig., 857 A.2d 994 (Del. Ch. 2004) .........................41

Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031 (Del. 2004) ..................................41

## FEDERAL STATUTES AND RULES

15 U.S.C. § 77l(a)(2).................................................................................................7, 32, 33

15 U.S.C. § 77m...........................................................................................................39, 40

15 U.S.C. § 77o.....................................................................................................................7

15 U.S.C. § 78bb(e) ............................................................................................................49

15 U.S.C. § 78bb(f)(1)(A).....................................................................................................51

15 U.S.C. § 78j(b) .................................................................................................................6

15 U.S.C. § 78t(a) .................................................................................................................7

15 U.S.C. § 78u-4(b)(1) .......................................................................................................31

15 U.S.C. § 80a-35(b) .....................................................................................................41, 43

15 U.S.C. § 80a-35(b)(3) .....................................................................................................41

15 U.S.C. § 80a-1 et seq .......................................................................................................6

15 U.S.C. § 80b-1 et seq .......................................................................................................6

17 C.F.R. § 240.10b-5...........................................................................................................6

17 C.F.R. § 270.12b-1(a)(2)................................................................................................46

Fed. R. Civ. P. 9(b) .............................................................................................................30

Fed. R. Civ. P. 12(b)(6)......................................................................................53

Fed. R. Evid. 201(b)(2) .......................................................................................8

## LEGISLATIVE MATERIALS

*The Mutual Funds Integrity And Fee Transparency Act Of 2003: Hearing Before the H.
Subcomm. on Capital Markets, Insurance, and Government Sponsored
Enterprises, Comm. on Financial Services*, 108th Cong. 5471 (2003) ...........................21

## ADMINISTRATIVE MATERIALS

Proposed Rules, Exchange Act Release No. 33-8358, reprinted in 69 Fed. Reg. at 6437
(Feb. 10, 2004)...................................................................................22

42 Fed. Reg. 25318 (May 17, 1977) ...............................................................22

## MISCELLANEOUS

Amy L. Goodman, *The Investment Company Regulation Deskbook* § 7.4(2)  (1997) .................47

Thomas P. Lemke et al., *Regulation of Investment Companies* § 7.05(1) (2004) ..................47, 48

Defendants UBS-AG, UBS Global Asset Management (US) Inc., UBS Global Asset Management (Americas), Inc., UBS Global Asset Management International Ltd., DSI International Management, Inc., and UBS Financial Services Inc., by their undersigned counsel, respectfully submit the following Memorandum in Support of Defendants' Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint (the "Complaint") for Violations of the Securities Act of 1933, the Securities Exchange Act of 1934 (the "Exchange Act"), the Investment Company Act of 1940, and New York state law.

## PRELIMINARY STATEMENT

This suit alleges violations of the securities laws based on theories that have been rejected by the Second Circuit in *Press v. Quick & Reilly, Inc.*, 218 F.3d 121 (2d Cir. 2000), and nine decisions of this court.[1]

Plaintiffs make two distinct claims in their Complaint. The first is directed toward the sale of Tier I mutual funds by UBS brokers (who are a part of UBS Financial Services, Inc. ("UBSFS")). The second is directed toward the allegedly excessive fees charged by UBS proprietary funds.

1. Plaintiffs' first claim is that UBSFS and its brokers (known as "financial advisors") steered investors into a group of 21 of the largest fund families in America (the UBS

---

[1]    The relevant decisions from the Southern District of New York are the following: *In re Salomon Smith Barney Mut. Fund Fees Litig.*, No. 04 Civ. 4055 (PAC) (S.D.N.Y. Jul. 26, 2006); *In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*, No. 04-CIV-3759(RO), 2006 WL 1628005 (S.D.N.Y. June 9, 2006); *In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, No. 03-CIV-8208 (RO), 2006 WL 1008138 (S.D.N.Y. Apr. 18, 2006); *In re Oppenheimer Funds Fee Litig.,* 426 F. Supp. 157 (S.D.N.Y. 2006); *In re Evergreen Mut. Funds Fee Litig.,* 423 F. Supp. 2d 249 (S.D.N.Y. 2006); *In re Goldman Sachs Mut. Funds Fee Litig.*, No. 04-CIV-2567(NRB), 2006 WL 126772  (S.D.N.Y. Jan. 13, 2006); *In re AllianceBernstein Mut. Funds Excessive Fees Litig.*, No. 04-CIV-4885(SWK), 2006 WL 74439 (S.D.N.Y. Jan. 11, 2006);  *In re Davis Selected Mut. Funds Litig.,* No. 04-CIV-4186 (MGC), 2005 WL 2509732 (S.D.N.Y Oct. 11, 2005); *In re Eaton Vance Mut. Funds Fee Litig.,* 380 F. Supp. 2d 222, 232 (S.D.N.Y. 2005).

1

denominated "Tier I funds") <u>because</u> those families paid revenue sharing to UBSFS – which, Plaintiffs claim, was not adequately disclosed.[2]  As a result, Plaintiffs allegedly incurred compensable damages because the Tier I funds allegedly did not perform well during the class period.  The Plaintiffs' theory is that had the class members been told more, they would not have purchased mutual funds from Fidelity, American Funds and other Tier I fund families, but would have selected funds (or perhaps other investments) that they now know to have been more profitable.  For a host of reasons, this does not constitute securities fraud.

Correctly recognizing that a fraud-based class action cannot be predicated on occasional oral statements by individual brokers, Plaintiffs base this fraud claim on the allegation that there was insufficient disclosure to investors that certain mutual funds were classified as Tier I in exchange for providing benefits to UBSFS.  Specifically, Plaintiffs claim that UBSFS received revenue sharing, directed brokerage, and sponsorship of training and other events from Tier I funds, and that some brokers received free lunches from Tier I fund representatives.  Separately, they suggest that the internal UBSFS compensation system for its own financial advisors and branch managers provided "undisclosed" incentives that encouraged them to steer investors into Tier I funds and into fee-based brokerage accounts that, in turn, channeled investors into Tier I funds.  Even assuming the truth of these allegations, failure to disclose this information to investors is fraudulent in the eyes of the law only if the information is required to be disclosed.  An unbroken string of decisions of this Court, including most recently the rulings in *In re Merrill Lynch Investment Management* and *In re Morgan Stanley & Van Kampen* directly reject Plaintiffs' assertions that UBSFS had a duty to disclose its internal compensation structure to investors.  With respect to the marketing payments Tier I fund families allegedly made to

---

[2]     A glossary of relevant terms used in the fund industry is included as Appendix A.

UBSFS, UBSFS met its disclosure obligations under both SEC and NASD rules by providing investors with general disclosures in the prospectuses and statements of additional information prepared by the fund families.  That was the conclusion of the Second Circuit in *Press v. Quick & Reilly, Inc.*, with respect to an analytically identical revenue sharing issue, and no court has reached a different conclusion on this point.

Another obvious (and independently fatal) defect in Plaintiffs' securities fraud claims is that they cannot demonstrate "loss causation" – an essential element of a securities fraud claim – because it is impossible for them to show that the value of their securities (known as the Net Asset Value ("NAV") of the mutual fund share) was impacted by the alleged failure to provide full disclosure.  The NAV of mutual fund shares was determined by a statutory formula based upon the value of the assets under management minus liabilities.  It was not, and indeed could not, have been affected by the disclosure or alleged lack of disclosure regarding revenue sharing or UBSFS' internal compensation structure.  *See In re Salomon Smith Barney*, slip op. at 14.  In an attempt to cure this defect, Plaintiffs make the impossibly speculative and fanciful claim that if only they had been told more, they would not have purchased the mutual funds they did, but instead would have selected more profitable investments.  This argument fails.  As the court held in *In re Morgan Stanley & Van Kampen*, "[i]t is long-established that a shareholder cannot recover for 'damages' based on hypothetical investments he did not make."  *In re Morgan Stanley & Van Kampen*, 2006 WL 1008138, at *10.

2.  Plaintiffs' second distinct claim relates to fees paid by UBS' family of proprietary mutual funds to their independent investment advisors – other UBS affiliates.  This claim is that the fees paid to the investment advisors and distributors of UBS proprietary funds (principally UBS Global Asset Management) were excessive because, *inter alia*, as the UBS funds increased

in size there was no corresponding reduction in fees and the fees paid to the funds were used by

the investment advisers for allegedly improper purposes (i.e., to satisfy revenue sharing

agreements). Decisions from this Court have repeatedly and correctly rejected, as insufficient in

law, claims identical to those made by Plaintiffs here. *See, e.g., In re Goldman Sachs Mut.*

*Funds Fee Litig.*, No. 04 Civ. 2567 (NRB), 2006 WL 126772 (S.D.N.Y. Jan. 13, 2006). To

establish excessiveness, Plaintiffs must allege facts that, if true, would demonstrate that the fees

charged were "so disproportionately large that [they bore] no reasonable relationship to the

services rendered and could not have been the product of arm's-length bargaining." *Id.* at *8.

Plaintiffs, like those in numerous previous suits, have failed to do this. There is absolutely

nothing new in Plaintiffs' allegations to distinguish them from previously rejected theories of

liability.

Finally, in reading the Complaint, the Court must examine with care Plaintiffs'

assertions. This is because Plaintiffs insinuate repeatedly, but do not allege outright, assertions

they apparently believe are significant to their case. Several of these insinuations relate to the

"motive" for the alleged fraud – a purported differential payment and compensation structure for

selling Tier I as opposed to Tier II mutual funds. One prominent example is the suggestion that

UBS financial advisors were paid more to sell Tier I funds than Tier II funds. Although the court

in *In re Morgan Stanley & Van Kampen* dismissed a complaint where such "differential

compensation" was alleged, a careful examination will reveal it is <u>not</u> alleged here.[3]  In fact, the

UBS client brochure cited by Plaintiffs (¶¶ 59, 72, 75) provides compensation tables to refute

---

[3]      By contrast, there are allegations of minute differences in compensation for the sale of
<u>UBS proprietary funds</u> – <u>not</u> for all Tier I funds - amounting to $2.25 - $2.50 on a $2,500
transaction.  (¶ 99.)

this allegation.[4]  The Complaint also implies but, due to the strictures of Rule 11 does not plead,

that only Tier I funds paid revenue sharing to UBSFS.  Indeed, under Plaintiffs' theory, this

would have been the financial incentive UBSFS had to "push" Tier I over Tier II.  This

proposition, too, is refuted by the very client brochure Plaintiffs cite to the Court.[5]  Additionally,

Plaintiffs cite the performance of a very few of the hundreds of Tier I funds to suggest that the

Tier I funds, as a whole, underperformed during the class period.  Although the performance of

Tier I funds is not relevant to this motion because the inadequacy of Plaintiffs' legal theories is

ground enough to dismiss this suit, the Court, if necessary, could take judicial notice of the

financial performance of the Tier I fund families.[6]  Alternatively, because the Plaintiffs drew

information about the performance of Tier I funds from Morningstar in framing their Complaint

(¶¶ 86-90), Defendants are entitled to cite to other information available on Morningstar at the

12(b)(6) stage.[7]  Either way, the Court can readily determine that out of the twenty-one Tier I

---

[4]     *See* UBS, "Information about  Your Relationship with Us," *available at*
http://financialservicesinc.ubs.com/PWIC/CMA/workflow/FILE_DATA/PWS/pdf/Information_
About_Your_Relationship_With_Us.pdf (last visited Jul. 21, 2006).  A copy of this brochure is
attached as Exhibit 1.

[5]     *Id.*

[6]     *See In re Merrill Lynch & Co Research Rep. Sec. Litig.*, 272 F. Supp. 2d 243, 254 & n.9
(S.D.N.Y. 2003) (performance of funds at issue as established by internet database considered by
court on motion to dismiss) (*citing In re Allied Capital Corp. Sec. Litig.,* No. 02 Civ. 3812, 2003
WL 1964184, at *3 (S.D.N.Y. Apr. 25, 2003) (stating that on a motion to dismiss, the court may
take judicial notice of "well-publicized stock prices") (*quoting Ganino v. Citizens Utils. Co.,* 228
F.3d 154, 167 n. 8 (2d Cir. 2000)); *accord Fant v. Perelman,* No. 97 Civ. 8435, 1999 WL
199078 (S.D.N.Y. Apr. 9, 1999) (closing prices of the relevant securities considered by the court
on a motion to dismiss).

[7]     *See Cortec Industries v. Sum Holding L.P.*, 949 F.2d 42, 46 (2d Cir. 1991) ("Where
plaintiff has actual notice of all the information in movant's papers and has relied upon these
documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one
under Rule 56 is largely dissipated."); *see also Kramer v. Time Warner Inc.*, 937 F.2d 767, 769-
70 (2d Cir. 1991) ("it is highly impractical and inconsistent with Fed. R. Evid. 201 to preclude a

fund families, <u>nineteen</u> had more than half of their front-load funds (Class A shares) outperform the market over the last five years.[8] Thus, even if Plaintiffs' damages theory were recognized in law, a majority of their purported class apparently <u>benefited</u> from the UBSFS conduct under attack.

While Plaintiffs' artful pleading is troublesome, it does not affect the legal analysis. The Complaint should be dismissed under well-established precedent.

## STATEMENT OF FACTS

### A.  Statutory and Regulatory Background

The Investment Advisors Act of 1940, 15 U.S.C. § 80b-1 *et seq.*, sets forth a comprehensive scheme for the regulation of investment advisors – those who manage the mutual funds themselves.  The Investment Company Act (the "ICA"), 15 U.S.C. § 80a-1 *et seq.*, provides the statutory framework for the regulation of investment companies, including "open end management investment companies," known informally as mutual funds.  Section 36(b) of the ICA grants security holders and the SEC the right to sue investment advisers in order to

---

district court from considering [documents referenced in a complaint] ... Were courts to refrain from considering such documents, complaints that quoted only selected and misleading portions of such documents could not be dismissed under Rule 12(b)(6) even though they would be doomed to failure.")

[8]      The performance results for the Tier I mutual funds during the past five years was derived from the "Morningstar Principia Mutual Funds Advanced" compact disc, dated July 2006, and consists of data as of June 30, 2006.  If the Court does not have access to the Morningstar compact disc, the Court may access the same information through a subscription account to www.morningstar.com.  To access the information, click on the "Advisor Workstation" and create an investment list of funds.  This list allows you to use Morningstar categories to run performance information on funds.  The Court should use the "Look Up" tab to enter the name or ticker symbol of a particular Tier I fund.  Then, choose the "Annualized monthly return review."  Next, choose "% Rank Cat 5 Yr (Mo-End)" to determine the performance of that particular fund compared to the other funds in its category over a five-year time period.  The higher the percentage, the better the fund performed compared to other funds in its category.  Any performance over 50% indicates that it outperformed the average for funds in that particular category.

recover excessive fees.  To be excessive, the fee must be "so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Gartenberg v. Merrill Lynch Asset Mgmt.*, 694 F.2d 923, 928 (2d Cir. 1982).

Section 10(b) of the Securities Exchange Act of 1934 makes it "unlawful for any person, directly or indirectly ... [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b).  Rule 10b-5, which implements that provision, makes it unlawful, "in connection with the purchase or sale of any security, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5.

Section 12(a)(2) of the Securities Act imposes liability on "any person who – offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances in which they were made, not misleading." 15 U.S.C. § 77*l*(a)(2).

Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a), and Section 15 of the Securities Act, 15 U.S.C. § 77o, create liability for control persons of primary violators of those statutes.  Under Section 20(a) of the Exchange Act, a control person is liable unless he or she acted in good faith and "did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).  Under Section 15 of the Securities Act,

7

liability attaches "unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts." 15 U.S.C. § 77o.

### B. Plaintiffs' Allegations

This securities class action lawsuit has been brought on behalf of individual investors who allegedly purchased or held shares of mutual funds sold by UBSFS or who participated in a UBS financial plan during the purported class period of May 1, 2000 through April 20, 2005.[9] Plaintiffs have named as defendants the following entities, and allege as follows:  Defendant UBS-AG ("UBS-AG") is a global investment banking and securities firm incorporated in Switzerland and is the ultimate parent of the entity Defendants named in the Complaint.  (¶ 49.) Defendants UBS Global Asset Management (US) Inc. ("UBS Global AM"), UBS Global Asset Management (Americas) Inc. ("UBS Global Americas"), UBS Global Asset Management International Ltd., and DSI International Management, Inc. ("DSI") are alleged to oversee the day-to-day management of UBS's proprietary funds and are referred to collectively as the "Investment Advisor Defendants."  (¶¶ 50-54.)[10]  Defendant UBS Financial Services Inc.

---

[9]     There are three purported subclasses: 1) the "Purchaser Subclass," 2) the "Financial Plans Subclass," and 3) the "Investment Company Act Subclass" ("ICA Subclass").  Members of the Purchaser Subclass purchased shares of Tier I funds during the class period.  Members of the Financial Plans Subclass incurred fees or charges during the class period in connection with the opening or maintenance of a UBS financial plan.  Finally, members of the ICA Subclass held shares or like interests in any UBS Fund on or after July 29, 2004 and continue to hold them.

[10]     Plaintiffs allege that UBS Global Asset Management International Ltd. "is the international parent company of UBS Global Asset Management." (¶ 52.)  This is an error.  The direct parent of UBS Global Asset Management (Americas) Inc. is UBS Americas Inc., which is in turn owned by UBS AG.  UBS Global International is not the parent of either UBS Global Asset Management (Americas) Inc. or UBS Americas Inc., as demonstrated by the attached Form ADV, Schedules A and B for UBS Global Asset Management (Americas) Inc., which list UBS Americas Inc. as the holding company for UBS Global Asset Management (Americas) Inc. and UBS AG as the sole parent company of UBS Americas Inc, see Ex. 2.  The Court may take judicial notice of these documents because they are filed with the SEC.  See Kramer v. Time Warner Inc., 937 F.2d 767, 769-70 (2d Cir. 1991) (holding that that district courts could take judicial notice of public documents filed with the SEC under Fed. R. Evid. 201(b)(2)).

("UBSFS") is a broker-dealer incorporated in Delaware and registered with the SEC and is referred to as the "Broker-Dealer Defendant." (¶ 55.) UBS Global AM is also the distributor of UBS proprietary funds and is referred to as the "Distributor Defendant." (¶¶ 56-57.)

Plaintiffs' lengthy Complaint contends that the Defendants violated applicable laws by allegedly failing properly to disclose to investors purchasing or holding mutual funds that (1) UBSFS' internal compensation system was structured to encourage individual financial advisors to steer investors into Tier I funds and UBS' PACE fee-based brokerage accounts; and (2) Tier I mutual fund families paid revenue sharing to UBSFS. Plaintiffs separately claim that the fees charged to investors in UBS proprietary funds were excessive. Because Plaintiffs' complaint is both long and diffuse, we have grouped and summarized their allegations for the benefit of the Court.

### The Mutual Fund Tier Program

UBS financial advisors offer investors over 8000 mutual funds from 150 different mutual fund families, each with different financial goals. (¶ 67.) In addition, UBSFS offers thousands of other investment products, from stocks, bonds and annuities to hedge funds and private equity funds.[11] At UBS, 21 mutual fund families, generally among the best known and mostly widely held, are grouped into a category known as "Tier I." (¶ 7.) Further, there are over 125 Tier II mutual fund families from which investors may choose. (¶ 67.) Indeed, UBSFS customers could choose among a broad range of funds encompassing every conceivable investment objective. Tier I, during the relevant time period, included the following mutual fund families: AIM, Alliance, American Funds, Columbia, Davis, Dreyfus, Eaton-Vance, Federated, Fidelity,

---

[11]     UBS Wealth Management, *available at* http://financialservicesinc.ubs.com/Home/PW-Smain/0,1093,SE80-EN80,00.html (last visited Jul. 28, 2006).

Franklin Templeton, John Hancock, Hartford, Lord Abbett, MFS, Oppenheimer, PIMCO, Pioneer, Putnam, Scudder, UBS and Van Kampen.  (¶ 7.)

Plaintiffs allege that fund families were placed in Tier I "as a result of UBS's acts of charging revenue-sharing to Tier I mutual funds." (¶ 61.)  The revenue sharing – often referred to in the Complaint as "kickbacks" – is alleged to have been paid in the form of "brokerage commissions, shareholder fees, advisory fees and 12b-1 fees." (¶ 93.)  The "kickback" most prominently mentioned is "directed brokerage" (¶ 94), which has been the basis for a number of unsuccessful lawsuits against financial services firms in the recent past.  The Complaint suggests that brokerage commissions were used by Tier I fund families to meet their revenue sharing commitments (¶ 96), but Plaintiffs plead no objective facts to demonstrate that the brokerage commissions paid by Tier I fund families were excessive or even above average.  The other forms of revenue sharing complained of by Plaintiffs – payment of various fund fees –  are all customary in the industry and must be approved by the directors of the mutual fund.  Finally, Plaintiffs make a vague and general allegation that defendants "solicited" the Tier I companies to "sponsor UBS company events, office parties, training, educational meetings and conferences." (¶ 81.)  There is, however, no allegation of fact as to whether and to what extent these events occurred, or the financial impact, if any, of these events.  In other parts of the Complaint, Plaintiffs quote UBS' website disclosures which state that UBS "received revenue through reimbursement from mutual funds for the costs of educational programs or seminars for employees and clients." (¶ 72.)

According to Plaintiffs, if a fund company did not make revenue sharing payments, UBSFS financial advisors simply would not sell shares offered by that fund company.  (¶ 82.) Plaintiffs offer American Skandia as an example of this practice, and claim, mistakenly, that

10

American Skandia was a Tier I fund family, then further allege that it was removed from Tier I when it refused to make revenue sharing payments to UBSFS.  (¶ 83.)

Plaintiffs claim that because UBSFS received revenue sharing payments from Tier I fund families, it "steered" investors into Tier I funds regardless of their performance.  (¶ 3.)

**Internal UBSFS Compensation Incentives for Selling Tier I Funds**

Plaintiffs allege (on the basis of anecdotal claims) that UBSFS financial advisors and branch managers received enhanced compensation from UBSFS for selling Tier I funds to investors.  Plaintiffs allege that branch manager compensation, bonuses, and commission plans were indirectly tied to their branch's sale of Tier I funds.  (¶¶ 73-74.)  In addition, Plaintiffs claim that some branches "were given discretion to structure sales contests" in their individual branches and held sales contests with nominal rewards for financial advisors centered on Tier I funds.  (¶ 73.)

**Tier I Funds' Compensation Directly to Individual UBSFS Financial Advisors**

Plaintiffs also allege that Tier I funds directly provided incentives to individual financial advisors to push their funds.  The nominal incentives alleged by Plaintiffs are that some financial advisors were taken to lunch by fund wholesalers and one unnamed former advisor was offered (but apparently did not accept) a vacation in Colorado.  (¶¶ 78-79.)

**Differential Compensation for Sales of UBS Proprietary Funds**

Plaintiffs allege that financial advisors received slightly higher compensation from UBSFS when they sold shares of UBS proprietary funds.  (¶¶ 91, 98.)  However, there is no similar allegation that financial advisors received higher compensation for selling Tier I funds over Tier II funds.  As to the UBS proprietary funds, Plaintiffs allege that for a new fund in 1999 (before the class period), financial advisors were paid an additional 25 basis points (¶ 91) over

11

their regular commission – which amounts to ¼% or $6.25 on a $2,500 purchase.  Plaintiffs also

allege an additional fee on a second fund in 2001 – purportedly 1%, or $25 on a $2,500 purchase.

(¶ 99.)  Finally, according to Plaintiffs, the normal additional fee a financial advisor received for

selling UBS proprietary funds was 9 or 10 basis points (.09% or .1%), which amounts to an

additional $2.25 or $2.50 commission on a $2,500 purchase.  (¶ 99.)

**The UBS Pace Investment Program**

The UBS Personal Asset Consulting and Evaluation (PACE) program is a service that

combines financial consulting and planning with access to a large group of no-load and load-

waived mutual funds.  Plaintiffs observe that the UBS PACE investment program consisted of

the Select Advisor and the Multi Advisor Programs; that mutual fund sales loads are waived for

investors in these programs; and that to participate investors paid up to 1.5% annually on eligible

assets.  (¶ 113.)  Plaintiffs claim that UBSFS financial advisors went to great lengths to steer

investors into these products by mischaracterizing the advice that came with the product (¶ 104),

and by telling investors that they would save money with the products (¶ 113).  Plaintiffs further

allege that once in these fee-based accounts, investors simply were "pushed" into Tier I funds –

and that investors therefore did not receive the objective investment advice for which they paid.

(¶ 113.)  According to Plaintiffs, financial advisors were motivated to push these fee-based

accounts on investors because they provided higher payouts and rewards and because they could

be scolded by superiors if they did not sell enough of these products.  (¶¶ 99, 106, 111, 116-18.)

**Alleged Lack of Adequate Disclosure**

According to Plaintiffs, the arrangements between UBSFS and Tier I fund families were

not disclosed to investors with adequate detail.  (¶ 58.)  Though Plaintiffs acknowledge that they

were provided with fund prospectuses and SAIs upon request, they contend that the prospectuses

and SAIs were "misleading." (¶¶ 124-26, 135, 138-39.) To support this conclusion, Plaintiffs cite to portions of prospectuses and SAIs from <u>three</u> of the <u>twenty-one</u> Tier I mutual fund families. (¶¶ 124, 135, 138-39.)

Further, Plaintiffs allege that the incentives to financial advisors and branch managers to sell Tier I funds and PACE accounts also were not adequately disclosed to investors. (¶ 58.) Plaintiffs offer no specifics as to how or when such a disclosure ought to have been made. Nor do Plaintiffs point to any law, regulation, or guidance mandating that a firm's internal compensation structure must be disclosed.

Plaintiffs claim that, as a result of UBSFS' alleged failure to make proper disclosures, they were not aware of defendants' motivation to push Tier I funds and were unwittingly duped into buying them. (¶ 68.) Plaintiffs claim that this chain of events damaged them because Tier I funds allegedly performed poorly. (¶ 85.) To support this claim, Plaintiffs give limited performance statistics for <u>four</u> out of the <u>twenty-one</u> Tier I mutual fund families. (¶¶ 85-89.)

Further, though the allegations are vague, Plaintiffs claim that because the Tier I funds performed poorly, the sales loads paid to financial advisors were "not justified." (¶ 63.)

## Alleged Excessive Fees of the UBS Proprietary Funds

In addition to the allegations against UBSFS, Plaintiffs allege that UBS Global AM's fund managers – the investment advisers for the UBS proprietary funds – charged excessive fees to investors. (¶ 12.)

To support the claim that the fees charged by UBS Global AM were excessive, Plaintiffs offer five supporting allegations. First, according to Plaintiffs, as the UBS proprietary funds grew, there was no corresponding reduction in fees charged to investors. (¶¶ 178-84.) Second, Plaintiffs allege that the breakpoints – asset levels at which investor fees are reduced – were set

too high. (¶¶ 185-86.)  Plaintiffs point out that UBS Global AM was able to negotiate lower

breakpoint arrangements with some sub-advisers with which it contracted. (¶¶ 187-91.)  Third,

Plaintiffs claim that UBS Global AM charged higher fees than some other similar funds while

some of its funds underperformed. (¶¶ 193-98.)  To support this claim, Plaintiffs cite to the

performance statistics for three of the thirty-nine UBS proprietary funds, and expense

information for one share class of one of the funds.  Fourth, Plaintiffs contend that UBS Global

AM used its advisory fees and 12b-1 fees to make revenue sharing payments. (¶¶ 202-10.)

Finally, Plaintiffs allege that the directors of the UBS funds were not independent and did not

properly review the funds' fee plans. (¶¶ 211-24.)  Plaintiffs nowhere allege that the fees

charged to them as shareholders of a UBS proprietary fund were not fully disclosed to them.

## SUMMARY OF ARGUMENT

Plaintiffs bring this suit knowing full well that the legal issues they raise have been the

subject of nine decisions in the Southern District of New York, all adverse to Plaintiffs'

positions, and that two of those decisions, *In re Salomon Smith Barney* and *In re Merrill Lynch*

*Investment Management*, are in all respects identical to the instant case.  In addition, the Second

Circuit, in *Press v. Quick & Reilly, Inc.*, has directly addressed and rejected Plaintiffs'

centerpiece argument, concerning the duty to disclose revenue sharing.  Each of the Counts in

the Complaint should be dismissed with prejudice for the following reasons:[12]

1. Common Deficiencies of Counts Brought Under the Securities Act and Exchange Act

(Counts I, II, III, IV, V, VI, VII).  As discussed below in Section I(A), Plaintiffs allege

violations of the Securities Act and Exchange Act, asserting that Defendants failed to disclose

specific details of the revenue sharing arrangements they had with Tier I funds and their internal

---

[12]     A summary chart of reasons for dismissing all Counts in the Complaint is included as
Appendix B.

compensation structure.  During the relevant period of time, however, no law or rule required disclosure in the detail Plaintiffs advocate.  Indeed, the SEC and the Second Circuit determined that disclosures concerning revenue sharing, analytically identical to those made by defendants here, were adequate.  *See Press v. Quick & Reilly, Inc.*, 218 F.3d 121 (2d Cir. 2000).  Further, a string of decisions from this District, including *In re Merrill Lynch Investment Management* and *In re Morgan Stanley & Van Kampen*, have held that there is no duty to disclose a financial services firm's internal compensation structure.  The additional compensation Plaintiffs point to as incentives are nominal, in any event, and have been dismissed by other courts as immaterial as a matter of law.

As we detail in Section I(B), Plaintiffs' Securities Act and Exchange Act claims also should be dismissed because the Complaint does not and cannot plead the element of loss causation.  Loss causation is a required element for a Rule 10b-5 cause of action, and failure to plead it also is grounds for dismissal of a claim under Section 12 of the Securities Act.  Under the Supreme Court's decision in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005) and the Second Circuit's decision in *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir.), *cert. denied*, 126 S. Ct. 421 (2005), a plaintiff must allege that a defendant's purported material misstatements or omissions were the cause of the suffered financial losses in order to plead loss causation successfully.  Plaintiffs do not allege that Defendants' alleged misstatements or omissions were the cause of their financial losses – to the extent that Plaintiffs may have suffered financial losses at all.  Within the last several months, the courts in *In re Salomon Smith Barney* and *In re Morgan Stanley & Van Kampen* rejected allegations identical to those made by Plaintiffs here because they did not plead the element of loss causation.

The Securities Act and Exchange Act Counts also should be dismissed because, as explained in Section I(C), the Plaintiffs' allegations of harm are speculative, and thus are foreclosed by the Supreme Court's decision in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975). Plaintiffs assert that they would have invested in some unidentified, better-performing mutual funds if they received more information about UBSFS' revenue sharing arrangements with Tier I fund families and its internal compensation structure. The Supreme Court has held that the "loss of the opportunity to purchase" securities is not actionable. *Id.* at 753-54. Following *Blue Chip Stamps*, this court has held that plaintiffs cannot maintain a securities action for damages on the theory that they lost the opportunity to invest in other unidentified and purportedly more profitable securities. *See Allard v. Arthur Andersen & Co.*, 924 F. Supp. 488, 493 (S.D.N.Y. 1996); *Three Crown LP  v. Salomon Bros., Inc.*, 906 F. Supp. 876, 889 (S.D.N.Y. 1995).

Finally, as we explain in Section I(D), Plaintiffs' Securities Act and Exchange Act claims must be dismissed because they both have failed to allege fraud with the requisite particularity under the heightened pleading requirements of Rule 9(b), and have failed to allege facts giving rise to a strong inference of scienter, the required state of mind for a violation of Section 10(b).

2. Securities Act Claim. As is made plain in Section I(E)(1), the claim brought under Section 12(a)(2) of the Securities Act (Count I) should be dismissed for an additional reason: Plaintiffs fail to allege compensable damages under the Securities Act. Where a plaintiff still owns a security, the plaintiff may obtain only rescission, i.e., a return of the purchase price in exchange for the security. But in order to obtain rescission, a plaintiff must allege that she tendered the securities to the seller. Nowhere do Plaintiffs allege that they have tendered their mutual fund shares to UBSFS. If a plaintiff no longer owns a security, she can obtain damages

under Section 12, but only if she pleads that she sold that security at a loss. The Complaint does not allege that Plaintiffs sold their shares of Tier I mutual funds at a loss, and thus the Counts brought under Section 12(a)(2) of the Securities Act must be dismissed for failure to plead compensable damages.

The Securities Act claim should also be dismissed because, as we set forth in Section I(E)(2), the Complaint fails to allege that UBSFS is a "seller" of securities within the meaning of Section 12(a)(2). The Supreme Court has held that a broker, such as UBSFS, is deemed a "seller" only to the extent that the broker "solicits" the purchase from the customer. *Pinter v. Dahl*, 486 U.S. 622, 646 (1988). The Complaint lacks specific allegations that UBSFS financial advisors at any time solicited individual class members to purchase Tier I fund shares.

3. Claims Under Section 10(b) of the Exchange Act and Rule 10b-5. Plaintiffs' claims under Section 10(b) should be dismissed not only because of the reasons stated above, but also because Plaintiffs cannot show reliance by any of the investors. As we make clear in Section I(F)(1), although Plaintiffs allude to Rule 10b-5(a) and (c) (so-called "scheme liability") in addition to their claims under Rule 10b-5(b), this is plainly a misrepresentation-by-omission case under Rule 10b-5(b). In any event, reliance is a required element of a 10b-5 cause of action regardless of the subsection under which Plaintiffs proceed. Plaintiffs fail to plead reliance because they utilize the fraud on the market doctrine (Count III) to establish a presumption of reliance. Courts uniformly have held, however, that this doctrine does not apply to mutual funds because the price of mutual fund shares is not determined by an efficient market but rather by the net asset value of all the underlying securities it holds at a given time.

Finally, as Section I(G) makes plain, Plaintiffs' claims with respect to certain funds must be dismissed because they do not have standing to bring claims based on activity by funds that none of them owned.

4.  Claims Brought Against UBS-AG Under Section 15 of the Securities Act (Count II) and Section 20(a) of the Exchange Act (Count VI).  As we set forth in Section II, in order to state a claim under these Counts, a plaintiff must allege a primary violation of the Securities or Exchange Acts and control by the defendant of the primary violator.  For the reasons described above and in detail below, the Complaint fails to state a violation of the Securities or Exchange Acts.  In addition, the Complaint lacks any factual basis for imposing control person liability on UBS-AG.  The Complaint offers nothing more than conclusory statements about UBS-AG's control person status, and these statements are insufficient as a matter of law.

5.  Claims Under Section 12 and 15 of the Securities Act.  Section III explains that, if the Court accepts the Plaintiffs' disclaimer of fraud, then Plaintiffs' Section 12 and 15 Claims brought on behalf of the "Purchasers Subclass" would be barred for Plaintiffs who purchased shares more than a year prior to the filing of the first complaint seeking to include them in a class action, or at the most no longer than three years before the filing of such complaint.

6.  Investment Company Act Claims (Counts VIII, IX, and X).  Turning to the allegations involving the UBS proprietary funds, both Counts VIII and IX of the Complaint are based on the same alleged violation of Section 36(b) of the Investment Company Act (ICA) – that the fees received by the Investment Advisor and Distributor Defendants were excessive.  Count VIII is brought as a direct claim and Count IX as a derivative claim.  Section IV(A) makes plain that under governing Delaware law, the direct claim in Count VIII must be brought derivatively.  The derivative claim in Count IX should be dismissed for failure to state a claim as detailed in

Section IV(B).  The same types of allegations were dismissed by this Court very recently in *In re Salomon Smith Barney*, *In re Merrill Lynch Investment Management*, *In re Morgan Stanley & Van Kampen*, and other cases.  As with the allegations in those cases, the allegations in the Complaint are insufficient as a matter of law to state a claim for excessive fees.  Finally, as discussed in Section IV(C), Count X, which is brought under Section 48(a) of the ICA, must additionally be dismissed because it is a secondary liability provision, and Plaintiffs have not alleged the basis for any primary liability under the ICA.  Moreover, it is well established that there is no private right of action under Section 48(a).

7. <u>State Law Claims</u>.  Section V(A) shows that Plaintiffs' remaining claims for breach of fiduciary duty under New York State law (Count XI) and violations of Sections 349 and 350 of New York's General Business Law have been soundly rejected time and again by this and other federal courts – as well as by state courts of New York.  The Securities Litigation Uniform Standards Act ("SLUSA") clearly preempts these claims.  Additionally, as Section V(B) explains, it is well established that Sections 349 and 350 of the New York General Business Law, which are essentially consumer protection statutes, do not apply to the sale of securities.

## ARGUMENT

**I.     PLAINTIFFS FAIL TO ALLEGE VIOLATIONS OF THE EXCHANGE ACT OR THE SECURITIES ACT.**

### A. There Was No Legal Duty To Disclose the "Facts" Plaintiffs Allege Were Omitted.

It is a well-established principle of law that "[t]o be actionable under the Securities Act or the Exchange Act, an omission must involve information that the defendant had a duty to disclose." *In re Morgan Stanley & Van Kampen*, 2006 WL 1008138, at *7 (*citing In re*

*TimeWarner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)).[13]  In the instant case, there was no

duty to disclose the facts at issue, or, to put it another way, the duty to disclose was met fully by

what was disclosed.

Plaintiffs complain that they were unaware of the internal incentives that existed at

UBSFS for financial advisors and branch managers to sell Tier I funds. (*e.g.* ¶¶ 71-75, 91, 98-

100.)  They attempt to cast this as a violation of law.  However, the Second Circuit and

numerous district courts have held that "no SEC rule requires the registered representatives who

deal with [customers] to disclose their own compensation, whether pegged to a particular trade

or otherwise." *United States v. Skelly*, 442 F.3d 94, 97 (2d Cir. 2006) (*citing United States v.*

*Alvarado*, No. 01 CR. 156, 2001 WL 1631396, at *8 (S.D.N.Y. Dec. 19, 2001) ("Neither the

SEC nor NASD have required registered representatives of broker/dealers to disclose their own

compensation in a securities transaction, although both have been fully aware that registered

representatives often received special incentives beyond the normal compensation to sell a

particular product.")).  Judge Owen echoed the sentiments of these courts in both the *In re*

*Morgan Stanley & Van Kampen* and *In re Merrill Lynch Investment Management* opinions

holding that "[t]he current SEC regulations impose no duty on defendants to disclose the

allocation of broker compensation." *In re Morgan Stanley & Van Kampen*, 2006 WL 1008138,

at *7 (quotation omitted) (citing *Alvarado*, 2001 WL 1631396).

---

[13]      *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164,
174 (1994) ("[T]here can be no fraud absent a duty to speak.") (quotation omitted); *Basic Inc. v.*
*Levinson*, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading
under Rule 10b-5."); *In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 699 (S.D.N.Y. 2000)
(dismissing Section 12(a)(2) claims where the plaintiffs failed to demonstrate that the defendants
were obligated to disclose the omitted language).

Further, as the *In re Morgan Stanley* court ruled, in the absence of disclosure obligations, the information Plaintiffs claim was not disclosed simply is not material. *Id.* at *8. In that case, the court addressed allegations almost identical to those here – i.e., that brokers received rewards and increased compensation for selling particular funds and that branch manager compensation was tied to preferred fund sales. *Id.* Indeed, the allegations of sales contests and incremental bonuses here are far weaker than those alleged in *In re Morgan Stanley*. Judge Owen held that, as a matter of law, nominal incentives to brokers and financial advisors to sell a particular group of funds are immaterial as a matter of law. *Id.* The same analysis applies here.

In addition to UBSFS' internal compensation structure, Plaintiffs complain about the alleged lack of disclosure of UBSFS' revenue sharing arrangements with Tier I fund families. Plaintiffs point particularly to alleged directed brokerage payments and the payment of other customary fees from Tier I fund families to UBSFS . (¶¶ 124-26, 135, 138-39.) Insofar as UBSFS had a duty to disclose revenue sharing arrangements with Tier I funds, it complied with that duty fully.

To begin with, while Plaintiffs attempt to demonize revenue sharing, neither the SEC nor the National Association of Securities Dealers ("NASD")  prohibited the practice during the class period. The Director of the Division of Investment Management of the SEC observed in his 2003 testimony before Congress that revenue sharing was an accepted practice in the industry, and that revenue sharing payments were not a fund expense, but are made from the advisor's own resources. *The Mutual Funds Integrity And Fee Transparency Act Of 2003: Hearing Before the H. Subcomm. on Capital Markets, Insurance, and Government Sponsored Enterprises, Comm. on Financial Services*, 108th Cong. 5471, at 6 (2003) (testimony of Paul F. Roye, Dir. of Inv. Mgmt., U.S. S.E.C.) *available at* http://www.sec.gov/news/testimony/-

061803tspfr.htm ("Roye Test."). "As a result, mutual funds are not required to disclose these payments." *Id.* Moreover, while broker-dealers like UBSFS are required under Rule 10b-10 to disclose their receipt of revenue sharing payments, "[a] broker-dealer may satisfy this disclosure obligation by, among other things, delivering to its customer a copy of the fund's prospectus, at or before the completion of the transaction, if the prospectus contains adequate disclosures." *Id.*

The SEC took the same position in revenue sharing litigation before the Second Circuit. In *Press v. Quick & Reilly, Inc.*, a class of plaintiffs alleged that broker-dealers defrauded them by failing to disclose revenue sharing payments from money market funds into which the broker-dealers allocated plaintiffs' uninvested funds. Just as here, the plaintiffs in *Press* claimed that the money market funds that received funds from these "automatic sweep" programs were not selected on the basis of superior financial performance, but because they paid revenue sharing to the defendant broker-dealers. 218 F.3d at 123-24. While the plaintiffs alleged that the failure to disclose these compensation arrangements, and the alleged conflicts of interest created by them, violated Section 10(b) of the Exchange Act, the SEC, in an *amicus* brief solicited by the court, saw the issue differently. The SEC took the position that the broker-dealers "could rely on the disclosures in the fund prospectuses and SAIs to satisfy" their disclosure obligations. *Id.* at 127. The SEC's brief then went on to address the adequacy of the disclosures in the prospectuses and SAIs for the money market funds. On that issue, the SEC found the disclosures adequate and advised that the purpose of disclosing revenue sharing is "'to inform customers of the nature and extent of a broker-dealer's conflict of interest,' and, therefore, 'disclosure with precision is not necessary' with respect to those types of payments." *Id.* at 128 (*quoting* SEC brief).

The Second Circuit affirmed the district court's dismissal of the complaint, adopting the position of the SEC. *Id.* at 131. The court further stated that it was deferring to the SEC's

interpretation of its own rule and that any deficiencies in the disclosure regime were left to the

SEC to sort out. *Id.* at 132.  The SEC did not alter a broker-dealer's disclosure obligations in the

wake of *Press.*  Accordingly, during the time frame covered by the complaint, the SEC required

only general disclosures about revenue sharing – not the precise disclosures that Plaintiffs seek.[14]

Plaintiffs cite in their Complaint various disclosures which, they claim, did not

adequately disclose revenue sharing arrangements to investors.  Plaintiffs cite the following

disclosure from an April 1, 2003 Prospectus for the Massachusetts Financial Services Investors

Growth Stock Fund:

> In effecting portfolio transactions on behalf of the Fund and the Adviser's
> other clients, <u>the Adviser from time to time may instruct the broker-dealer
> that executes a transaction to allocate, or "step out," a portion of such
> transaction to another broker-dealer.</u>  The broker-dealer to which the
> Adviser has "stepped out" would then settle and complete the designated
> portion of the transaction, and the executing broker-dealer would settle
> and complete the remaining portion of the transaction that has not been
> "stepped-out."  Each broker-dealer would receive a commission or
> brokerage fee with respect to that portion of the transaction that it settles
> and completes.

---

[14]  As early as 1977, the SEC was aware that broker-dealers often received compensation
from third parties in connection with the sale of mutual fund shares. *See* Proposed Rules,
Exchange Act Release No. 33-8358, *reprinted in* 69 Fed. Reg. at 6437, 6442 (Feb. 10, 2004).  In
adopting Rule 10b-10 – under which the SEC brings enforcement actions against individual
brokers for failure to make disclosures to investors about securities transactions – the SEC noted
the existence of such arrangements and determined that a broker-dealer would satisfy its
disclosure obligations by providing a prospectus to a fund purchaser that adequately disclosed
such information. *See id.* at 6439 (*citing* Rule 10b-10 Adopting Release, Exchange Act Release
No. 13508, n. 41 (May 5, 1977), *reprinted in* 42 Fed. Reg. 25318 (May 17, 1977)).  Further, the
SEC noted in the release that "[p]rospectus disclosure does not identify which individual broker-
dealers receive revenue sharing, let alone quantify those arrangements ... Prospectus disclosure,
moreover, is not designed to inform investors about whether their particular broker-dealers are
compensated in other ways for distributing fund shares, such as by receiving commissions for
fund portfolio brokerage transactions." *Id.* at 6444.  No action had been taken on these rules by
the end of the Class Period in this case, which is April 30, 2005 and therefore the law applicable
here is the law as it stood at the time of the acts charged in the complaint.

> Consistent with the Advisory Agreement and applicable rules and regulations, the Adviser may consider sales of shares of the Fund and of other funds or accounts of the Adviser as a factor in the selection of broker-dealers to execute the Fund's portfolio transactions.

(¶ 124.) (Emphasis added.)  Plaintiffs also cite the following disclosure from a March 1, 2003

SAI for the Hartford Mutual Funds, Inc.:[15]

> General Distribution fees paid to HIFSCO may be spent on any activities or expenses primarily intended to result in the sale of the applicable Company's shares including: (a) payment of initial and ongoing commissions and other compensation payments to brokers, dealers, financial institutions or others who sell each Fund's shares, (b) compensation to employees of HIFSCO, (c) compensation to and expenses, including overhead such as communications and telephone, training, supplies, photocopying and similar types of expenses, of HIFSCO incurred in the printing and mailing or other dissemination of all prospectuses and statements of additional information....

(¶ 138.) (Emphasis added).  As support for their claim that alleged directed brokerage

arrangements were not disclosed to investors, Plaintiffs cite another disclosure from the Hartford

SAI:

> The Companies have no obligation to deal with any dealer or group of dealers in the execution of transactions in portfolio securities.  Subject to any policy established by each Company's board of directors and HIFSCO, HIMCO, and Wellington Management, as applicable, are primarily responsible for the investment decisions of each Fund and the placing of its portfolio transactions.  In placing orders it is the policy of each Fund to obtain the most favorable net results, taking into account various factors, including price, dealer spread or commission, if any, size of the transaction and difficulty of the execution.  While HIMCO and Wellington Management generally seek reasonably competitive spreads or commissions, the Funds do not necessarily pay the lowest possible spread or commission.  Upon instructions from HIFSCO, Wellington Management may direct certain brokerage transactions to broker/dealers who also sell shares of funds in the fund complex.  Upon instructions from

---

[15]     It is not clear how the disclosures in the Hartford SAI are relevant to Plaintiffs' claims as not a single Plaintiff named in the Complaint owned a share of any of the Hartford mutual funds. For a discussion of Plaintiffs' lack of standing with respect to these funds see Section I(G) below.

> HIFSCO, Wellington Management may also direct certain brokerage
> transactions to broker/dealers that pay for certain other services used by
> the Funds.

(¶ 139.) (Emphasis added).  Finally, to support their allegations that UBS proprietary funds did

not disclose adequately their revenue sharing arrangements to investors, Plaintiffs cite the

following disclosure in an October, 2003 UBS prospectus:

> The Underwriter may also use distribution fees to pay additional
> compensation to dealers and to offset other costs allocated to the
> Underwriter's distribution activities.

(¶ 135.) (Emphasis added.0

However, the disclosures cited by Plaintiffs in the Complaint are analytically identical to

those in *Press* that the SEC explicitly found to be adequate under the law.  The disclosures in

*Press* stated in relevant part:

> [T]he Fund makes payments to the Adviser at a maximum annual rate of
> .25 of 1% of the Fund's aggregate average daily net assets ...
> Substantially all such monies (together with significant amounts from the
> Adviser's own resources) are paid ... to [among others], broker-dealers
> and other financial intermediaries for their distribution assistance ...

218 F.3d at 124.

Like the disclosures in *Press*, the Tier I fund disclosures cited by Plaintiffs perform the

function that the SEC requires of them – they put investors on notice of UBSFS' potential

conflict of interest in selling Tier I funds.  As the Tier I fund disclosures are analytically identical

to those which the SEC found in *Press* to be adequate, Plaintiffs' assertion that the Tier I

prospectuses and SAIs were inadequate is incorrect as a matter of law.

The SEC's *amicus* brief in *Press* is not the only indication of what is required to be

disclosed in a mutual fund prospectus or SAI.  SEC Form N-1A identifies with great detail and

precision all the information that must be disclosed by a mutual fund.  *See* Form N-1A, Ex. 3;

25

*see also In re Merrill Lynch & Co. Research Reps. Sec. Litig.*, 272 F. Supp. 2d 243, 249

(S.D.N.Y. 2003) ("[T]he information required to be disclosed in mutual fund registration

statements and prospectuses is specifically set forth in SEC Form N-1A."). Nowhere in the

Complaint do Plaintiffs allege that the Tier I fund prospectuses or SAIs failed to meet the

detailed requirements of Form N-1A.

Because both the SEC's *amicus* brief in *Press* and Form N-1A confirm that the Tier I

prospectuses and SAIs included adequate disclosures about their revenue sharing agreements

with UBSFS, UBSFS could meet its disclosure obligations by providing investors with these

prospectuses when they purchased Tier I fund shares. Plaintiffs do not allege that UBSFS failed

to provide prospectuses to them – and thus Plaintiffs fail to allege that UBSFS failed to comply

with its duty to disclose.[16]

---

[16]    Seeking any shred of support for their argument, plaintiffs make allegations that other
courts have held to be irrelevant – that various cease-and-desist orders entered between the SEC
and broker-dealers and mutual fund families other than UBS are evidence that the Tier I fund
prospectuses did not properly disclose revenue sharing arrangements. (*See, e.g.* ¶¶ 126, 129.)
Plaintiffs' reliance on these third-party orders is misplaced for several reasons. First, the cease-
and-desist orders have no precedential value. *See In re Prudential Sec. Inc. LP Litig.*, 107 F.3d 3
(2d Cir. 1996) (table) *available at*, 1996 WL 739258, at *8 (holding that district court did not
abuse its discretion by ruling that a consent decree "did not constitute a 'determination' for the
purposes of the class exception, particularly because a consent decree does not result in an
adjudication against the consenting party"); *Lipsky v. Commw. United Corp.*, 551 F.2d 887, 893-
94 (2d Cir. 1976) (explaining that a consent decree is not a "true adjudication of the underlying
issues" and, thus, may not be given any preclusive effect in subsequent litigation; and holding
that "[s]ince it is clear that the [] consent judgment, itself, can have no possible bearing on the
[subsequent litigation], the SEC complaint which preceded the consent judgment is also
immaterial."); *Smith v. Oppenheimer & Co., Inc.*, No. G830948 CA, 1985 WL 5853, at *3 (W.D.
Mich. Apr. 9, 1985) ("A consent judgment between the S.E.C. and a private corporation is not
the result of an actual adjudication of any of the issues, and since it is not a true adjudication it
cannot be used in subsequent litigation between the company and other parties." (citing *Lipsky*,
551 F.2d 887)); *cf. Desiderio v. NASD, Inc.*, 191 F.3d 198, 206 (2d Cir. 1999) (holding that
NASD is a private party, not a government actor). As the court observed in *In re Morgan
Stanley & Van Kampen*, where settlement agreements were cited as precedent, "statements made
by the SEC and NASD in the settlement documents are not law; they are rather untested
assertions made by litigants." 2006 WL 1008138, at *4. Second, in citing these orders, Plaintiffs

**B. Plaintiffs Have Failed to Plead Loss Causation.**

In order to state a claim for a violation of Rule 10b-5, a plaintiff must plead both loss

causation <u>and</u> transaction causation. *See Lentell v. Merrill Lynch & Co.*, 396 F.3d at 172. In

addition, dismissal of a claim under Section 12(a)(2) is proper where a plaintiff has not pled loss

causation, as Congress added an express loss causation provision to Section 12 of the Securities

Act in 1995. *See* 15 U.S.C. § 78u-4(b)(4); *see also In re Salomon Smith Barney*, slip. op. at 11-

12. Transaction causation requires a plaintiff to allege that had she known information which

ought to have been disclosed, she would not have acted to purchase the security. *See id.* In order

to plead loss causation successfully, a plaintiff must state that the alleged material misstatements

or omissions were the cause of the suffered financial losses. *See id.* ("Loss causation is the

causal link between the alleged misconduct and the economic harm ultimately suffered by the

plaintiff.") (internal quotation omitted). Further, as the Supreme Court recently held in *Dura*

*Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), an investor <u>cannot</u> allege loss causation

merely by claiming that the price of a security at the time of purchase was inflated due to a

misstatement or omission. *See Dura*, 544 U.S. at 343. In addition, the court in *In re Merrill*

*Lynch Investment Management* held that "fees charged to shareholders ... do not constitute a

---

do not discuss the fact that the cease-and-desist orders entered into involved several issues other
than the allegedly inadequate disclosures. In the case of each fund, there were allegations made
by the SEC that the funds had violated other standards as well and failed to keep their boards of
directors fully informed about the fund's revenue sharing practices. Thus, it is not clear that the
SEC's primary motivation in citing these funds was inadequate prospectus disclosure; to claim
otherwise, as Plaintiffs do, is disingenuous. Finally, were the court to credit the cease-and-desist
orders as the legal precedents that Plaintiffs suggest they are, <u>every</u> financial services firm that
sold any of the four funds cited in the various orders potentially would be subject to liability
under Section 10(b) of the Exchange Act and Section 12(a)(2) of the Securities Act for failure to
make adequate disclosures. Such a result would not only bring the financial services industry to
a screeching halt, it would also run counter to the numerous decisions that have already rejected
Plaintiffs' theory.

loss," for purposes of alleging loss causation. *In re Merrill Lynch Inv. Mgmt.*, 2006 WL 1628005, at \*4.

Plaintiffs' make two claims as to economic losses caused by Defendants. First, Plaintiffs claim that if they had "known the truth concerning the Tier I Funds' operations, which UBSFS did not disclose, Plaintiffs ... would not have purchased or otherwise acquired their shares or, if they had acquired such shares during the Class Period, they would not have done so at the distorted prices which they paid." (¶ 249.) That allegation – even if it could be proved for every member of this class – does nothing more than address the pleading standard for transaction causation as described by the Second Circuit in *Lentell*. A claim that Plaintiffs purchased the Tier I fund shares at "distorted" prices is precisely the theory of loss causation rejected in *Dura*. Plaintiffs also allege that "[a]s a result of UBS' acts of charging revenue sharing payments to Tier I mutual fund families and their investors ... typical investors would suffer losses caused by unjustified expenses and fees." (¶ 61.) However, as noted above, excessive fees also cannot be the basis for alleging loss causation. *See In re Merrill Lynch Inv. Mgmt.*, 2006 WL 1628005, at \*4. Very recently, the court in *In re Salomon Smith Barney* rejected an identical allegation that the plaintiffs had suffered losses because they were charged excessive fees. The court held that, "disgorgement of the claimed excessive fees falls entirely outside of the federal securities scheme as Plaintiffs have not linked these fees in any way to a diminished value of the mutual fund shares." *In re Salomon Smith Barney*, slip. op. at 14. Plaintiffs in the instant matter also have not linked the alleged excessive fees in any way to a diminished value of the Tier I mutual fund shares they purchased, and their allegations therefore fall far short of the standard for pleading loss causation.