Accordingly, because Plaintiffs have failed to plead loss causation, their claims under Section 12 of the Securities Act and Section 10(b) of the Exchange Act should be dismissed.

### C. Plaintiffs' Claim that They Were Injured Because They Would Have Invested in Other Mutual Funds Is Foreclosed by the Supreme Court's Decision in *Blue Chip Stamps*.

Even if the Plaintiffs could succeed with their legal arguments, and they cannot, they are unable to demonstrate that they have been harmed.  Their claims appear to be that they suffered because the funds which they purchased did not perform as well as <u>other</u> funds.  In other words, they are claiming that they lost an opportunity to purchase "winning" funds – funds which they speculate would have done better than the Tier I funds they purchased through UBSFS.  Even if the Court were to indulge this fanciful claim as a well-pled allegation, it is foreclosed as a basis for securities fraud recovery by the Supreme Court's decision in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723 (1975).[17]

In *Blue Chip Stamps*, the Supreme Court held that a plaintiff could not maintain an action for damages under Rule 10b-5 on the theory that it was dissuaded from accepting a stock offering due to a materially misleading, overly pessimistic prospectus.  The Court further held that the "loss of the opportunity to purchase" a security is not actionable under Section 11 and 12 of the Securities Act.  *Id.* at 753-54.  The Court's holding clearly established that Plaintiffs cannot maintain a securities action for damages on the theory that they lost the opportunity to invest in other unidentified and purportedly more profitable securities.  Indeed, if this theory were accepted, plaintiffs could select any higher-returning investment – real estate, art, gold etc.

---

[17]     The court in *In re Merrill Lynch Investment Management* relied on *Blue Chip Stamps* to dismiss the plaintiffs' Securities Act and Exchange Act claims in that case.  *See In re Merrill Lynch Inv. Mgmt.*, 2006 WL 1628005, at *4.

– all easily identifiable in hindsight, and claim that they would have invested in it <u>if only</u> a better

disclosure was made.

The court in *In re Morgan Stanley & Van Kampen,* citing *Blue Chip Stamps*, recently

observed:

> Plaintiffs claim that they 'and other members of the Class received a return on
> their investment that was substantially less than the return on investment that they
> would have received had they invested the same dollars in a comparable fund.' It
> is long-established law that a shareholder cannot recover for 'damages' based on
> hypothetical investments he did not make.

2006 WL 1008138, at *10.[18]

Plaintiffs' claims under the Securities Act and Exchange Act should be dismissed

because their damages theory relies upon a flawed legal proposition that has been rejected

outright by the Supreme Court and other federal courts.

### D.    Plaintiffs Have Not Pled Fraud With the Requisite Particularity Nor Have They Pled Facts Giving Rise to a Strong Inference of Fraudulent Intent.

#### 1. Failure to Plead Fraud with the Requisite Particularity Under Rule 9(b) – Securities Act and Exchange Act Claims

Plaintiffs' federal securities fraud claims must be dismissed because they fail to plead

fraud with the requisite particularity. Rule 9(b) of the Federal Rules of Civil Procedure requires

that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall

be stated with particularity." Fed. R. Civ. P. 9(b). More specifically, the Second Circuit has held

that in order to comply with Rule 9(b) a complaint must, "(1) specify the statements that the

plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the

statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang*,

---

[18]    *See also Three Crown LP v. Salomon Bros., Inc.,* 906 F. Supp. 876, 889 (S.D.N.Y. 1995)
(Plaintiffs cannot seek "recovery for trades [they] never made or negotiated. The rationale of
*Blue Chip Stamps* precludes such recovery in Rule 10b-5 suits."); *accord Allard v. Arthur
Andersen & Co.,* 924 F. Supp. 488, 493 (S.D.N.Y. 1996).

355 F.3d 164, 170 (2d Cir. 2004) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175

(2d Cir. 1993)).  Because Plaintiffs' Section 12(a)(2) and Section 10(b) claims both sound in

fraud, they must meet the Second Circuit's very specific pleading requirements.[19]

Moreover, Plaintiffs' claims under Section 10(b) of the Exchange Act and Rule 10b-5  are

subject to the heightened pleading requirements of the Private Securities Litigation Reform Act

(the "PSLRA").  The PSLRA requires that a complaint "specify each statement alleged to have

been misleading, the reason or reasons why the statement is misleading, and, if an allegation

regarding the statement or omission is made on information and belief, the complaint shall state

with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

Finally, where a complaint involves multiple defendants – as is the case here – Rule 9(b)

and the PSLRA require a complaint to "disclose the specific nature of each defendant's

participation in the alleged fraud.*"  Liberty Ridge LLC v. RealTech Sys. Corp.,* 173 F. Supp. 2d

129, 136 (S.D.N.Y 2001) (internal quotation marks and citation omitted).  Plaintiffs' Complaint

utterly fails to meet the standards described above and therefore must be dismissed.

### 2. Failure to Plead a Strong Inference of Scienter Under the PSLRA – Exchange Act Claims

In addition, the PSLRA requires plaintiffs alleging misstatements or omissions in

violation of Section 10(b) of the Exchange Act "to state with particularity facts giving rise to a

strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-

---

[19]    Although Plaintiffs try to circumvent the strictures of Rule 9(b) by expressly disclaiming any allegation of fraud in their Section 12(a)(2) Count (¶¶ 230, 236), it is clear on the face of the Complaint that Plaintiffs' allegations are based in fraud.  When a Complaint is based in fraud, whether or not it is deemed as such, Rule 9(b) applies. *See Rombach v. Chang,* 355 F.3d 164, 170-71 (2d Cir. 2004) (Rule 9(b) applies to "all averments of fraud," and "is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action.")

4(b)(2).[20] The requisite state of mind for a Section 10(b) violation is scienter, "a mental state embracing intent to deceive, manipulate or defraud," or "at least knowing misconduct." *SEC v. First Jersey Sec. Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).

Plaintiffs have failed to meet their pleading burden with respect to the element of scienter. As a matter of commonsense, scienter cannot be shown when Defendants fully complied with applicable law – embodied in relevant decisions of the courts and the explicit requirements of Form N-1A – during the relevant time period. Even if this court were to find the disclosures at issue inadequate, Defendants did not engage in <u>knowing</u> misconduct. They could not anticipate changes in the law worked by future court decisions, nor could they reasonably be bound by consent orders between the SEC and other private parties that turned on different facts. Complying with the published law during the time periods at issue was not conduct "which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000) (citation omitted). Plaintiffs have not, and indeed <u>cannot</u>, plead this necessary element of a Section 10(b) cause of action.

**E.  The Complaint Fails To Allege the Requisite Elements for a Claim Under Section 12(a)(2) of the Securities Act.**

1.  The Complaint Fails To Allege Compensable Damages Under the Securities Act.

The remedies available to Plaintiffs under Section 12(a)(2) are strictly limited. Where the plaintiff still owns the security at issue, he or she may only obtain rescission, i.e., a return of the purchase price in exchange for the security. *See Randall v. Loftsgaarden*, 478 U.S. 647, 655-56,

---

[20]    The PSLRA's heightened pleading requirements for scienter do not apply to claims under the Securities Act.

666 (1986).  As a pre-requisite to obtaining rescission, the plaintiff must plead that he or she

tendered – or at the very least offered to tender – the security to the defendant.  *See* 15 U.S.C. §

77*l*(a)(2); *Morin v. Trupin,* 747 F. Supp. 1051, 1063 (S.D.N.Y. 1990).  Although the Plaintiffs

appear to be seeking rescission of their investment contracts (the only remedy under Section

12(a)(2) if they still own the funds), the Complaint does not allege that Plaintiffs have tendered,

or offered to tender their securities.  Accordingly, Plaintiffs' Section 12(a)(2) claims should be

dismissed as a matter of law for failing to allege that the class offered to tender their securities.

*See Anisfeld v. Cantor Fitzgerald & Co.*, 631 F. Supp. 1461, 1464 (S.D.N.Y. 1986) (holding that

complaint does not contain an offer to tender, and is therefore insufficient and "subject to

dismissal on that aspect alone.").

 To the extent Plaintiffs may be attempting to proceed on a damages theory, Plaintiffs

must plead that they no longer own the mutual fund shares at issue and that they sold the shares

at an actual loss.  *See* 15 U.S.C. § 77*l*(b); *see also Randall*, 478 U.S. at 656 ("[T]he plaintiff is

entitled to a return of the consideration paid, reduced by the amount realized when he sold the

security and by any 'income received' on the security.").[21]  Thus, fund investors must have

suffered an actual out-of-pocket loss in order to recover damages under Section 12(a)(2).  *See In

re Broderbund/Learning Co. Sec. Litig.,* 294 F.3d 1201, 1205 (9th Cir. 2002) ("Here again, there

can be no recovery unless the purchaser has suffered a loss.")

 The Complaint does not allege that Plaintiffs sold their shares of Tier I mutual funds at a

loss.  Plaintiffs therefore cannot recover damages under Section 12(a)(2).  "Where it is apparent

from the face of the complaint that the plaintiff cannot recover her alleged losses [under Section

---

[21] A loss is measured by the difference between the amount paid for the security and its
price at the time it was sold. *See Miller v. Pezzani (In re Worlds of Wonder Sec. Litig.)*, 35 F.3d
1407, 1421 (9th Cir. 1994).

12], dismissal of the complaint pursuant to Fed. R. Civ. P. 12(b)(6) is proper." *In re Merrill Lynch & Co. Research Reps. Sec. Litig.,* 272 F. Supp. 2d at 253.

      2.      The Complaint Fails To Allege that the UBSFS Defendants Are
              "Sellers" of Securities Within the Meaning of Section 12(a)(2).

Plaintiffs assert that UBSFS – a financial services firm – violated Section 12(a)(2) of the Securities Act by failing "to disclose sales practices that created an insurmountable conflict of interest." (¶ 231.) Section 12, however, only extends liability to an individual who "offers or sells" a security. *See* 15 U.S.C. § 77l(a)(2); *see also Pinter v. Dahl*, 486 U.S. 622, 642-44 & n. 20 (1988). As the Supreme Court has clarified, a broker, such as UBSFS, is deemed a "seller" only to the extent that the broker "solicits" the purchase from the customer. *Pinter,* 486 U.S. at 646.

Courts have made it quite clear that "all brokers generally solicit business ... [but that] such general solicitation of business does <u>not</u> convert a broker into a section 12(2) 'seller.'" *Montcalm County Bd. of Comm'rs v. McDonald & Co. Sec.,* 833 F. Supp. 1225, 1234 (W.D. Mich. 1993) (emphasis added); *see also Ryder Int'l Corp. v. First Am. Nat'l Bank*, 943 F.2d 1521, 1534 (11th Cir. 1991) (observing that although "[a]ll brokers generally solicit business," Section 12(2) liability applies only to the specific instances where a broker "persuaded" an investor to purchase securities). The general rule is that a broker who simply answers questions and executes a trade at the customer's request is not a "seller" under Section 12. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng,* 697 F. Supp. 1224, 1228-29 (D.D.C. 1988) ("[T]here is no reading of the statute that would broaden its application to a broker/defendant who <u>buys</u> on behalf of a customer/plaintiff.").[22] "Brokers have been held liable as 'sellers' only

---

[22]     *See Canizaro v. Kohlmeyer & Co.*, 370 F. Supp. 282, 287-88 (E.D. La. 1974) (holding that there is no liability under section 12(2) because the defendant "merely 'checked the deal

in those cases where they were closely aligned with the title-holding parties or worked as agents

of the securities issuers." *Craighead v. E.F. Hutton & Co.,* 899 F.2d 485, 493 (6th Cir. 1990)

(*citing Pinter* and other cases).

    While Plaintiffs allege that UBSFS "solicited the purchase of shares," (¶ 232), the

Complaint lacks any specific instances where UBSFS solicited individual class members to

purchase Tier I fund shares.  The only allegations with respect to solicitation are Plaintiffs' vague

and conclusory assertions that investors were "steered" into Tier I funds and that UBSFS brokers

had an incentive to push Tier I funds.  These allegations, without more, are insufficient as a

matter of law to establish that UBSFS is a statutory "seller" within the meaning of Section 12.

*See Morin*, 747 F. Supp. at 1064 (dismissing complaint and directing defendants to allege the

specific conduct which warrants defendant's classification as a seller under Section 12).  As

such, Plaintiffs' factual allegations fall far short of imposing Section 12 liability on UBSFS, and

thus, for this additional reason, the Complaint must be dismissed.

### F.    The Complaint Fails To State a Claim Under Section 10(b) of the Exchange Act and Rule 10b-5.

    As an initial matter, although Plaintiffs attempt to invoke Rule 10b-5(a) and (c)'s

proscription of devices, schemes, and artifices to defraud (*see* Count V), it is evident that their

allegations are omission-based.  The thrust of the Complaint is that the defendants failed to state

---

out,' answered several of [plaintiff's] questions as requested and, then, advised [plaintiff] that based upon the information gathered, he could see no reason why [plaintiff] should not complete the transaction.") *aff'd,* 512 F.2d 484 (5th Cir. 1975).  In order to impose liability under Section 12, a broker must have "played a '*substantial* role' in persuading or seducing the purchasers into buying the securities." *Craighead v. E.F. Hutton & Co.,* 899 F.2d 485, 493 (6th Cir. 1990) (internal quotation omitted) (emphasis added); *see also Pinter v. Dahl*, 486 U.S. 622, 646-47 (1988) (focusing on the solicitation "directed at producing the sale" because it is at this stage that "investor is most likely to be injured, that is, by being persuaded to purchase securities without full and fair information.").

certain facts that Plaintiffs allege the defendants had a duty to disclose.  *See, e.g.*, (¶ 3) ("Defendants . . . failed properly to disclose . . . "); (¶ 8) ("Defendants failed to disclose . . . .").

These allegations properly fall under Rule 10b-5(b), not Rule 10b-5(a) or (c).  The Second Circuit has held that where the sole basis for a claim under Section 10(b) is misrepresentations or omissions, a plaintiff cannot make out a claim under Rule 10b-5(a) or (c).  *Lentell*, 396 F.3d at 177-78 (rejecting attempt to characterize allegations that defendant failed to disclose conflicts of interest under Rule 10b-5(a) and (c)).  That is the case here.  In any event, Plaintiffs' artful pleading is a distinction without a difference as "Plaintiffs must prove all of the established elements of a Rule 10b-5 claim even when proceeding under Rule 10b-5(a) & (c)." *In re Towers Fin. Corp. Noteholders Litig.,* No. 93 Civ. 0810(WK)(AJP), 1995 WL 571888, at *15-16 (S.D.N.Y. Sept. 20, 1995)).

"[I]n order to state a claim for relief under section 10(b) a plaintiff must allege that, in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's actions caused him injury." *In re Morgan Stanley & Van Kampen*, 2006 WL 1008138, at *6 (*quoting Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 61 (2d Cir. 1985)).  In addition to the Plaintiffs' failure to plead loss causation described above, Plaintiffs also have failed to plead the element of reliance.

Plaintiffs Cannot Utilize the Fraud on the Market Doctrine To Establish a
<u>Presumption of Reliance</u>.

In an attempt to avoid demonstrating that each individual plaintiff relied on the alleged misstatements or omissions, Plaintiffs attempt to make use of the fraud-on-the-market-doctrine. The fraud-on-the-market doctrine "creates a rebuttable presumption that (1) misrepresentations

by an issuer affect the price of securities traded in the open market; and (2) investors rely on the market price of securities as an accurate measure of their intrinsic value." *In re NYSE Specialists Sec. Litig.*, 405 F. Supp. 2d 281, 318 (S.D.N.Y. 2005) (*citing Basic Inc. v. Levinson,* 485 U.S. 224, 245-47 (1988)).  That presumption allows plaintiffs in many securities actions brought under Section 10(b) to satisfy the element of reliance.  Plaintiffs cannot, however, employ the fraud-on the-market-doctrine in the instant case because this court and others have held that the fraud-on-the-market doctrine is not applicable to open-ended mutual funds.  *See Clark v. Nevis Capital Mgmt., LLC*, No. 04 Civ. 2702 (RWS), 2005 WL 488641, at *18 (S.D.N.Y Mar. 2, 2005); *In re Van Wagoner Funds, Inc. Sec. Litig.*, 382 F. Supp. 2d 1173 (N.D. Cal. 2004).[23]  The reasoning underlying these decisions is that "the share price of a mutual fund is not affected by alleged misrepresentations or omissions." *Nevis,* 2005 WL 488641, at *18.  Rather, "[t]he share price of a mutual fund is determined by the value of all the underlying securities it holds at a given time, and the fund price fluctuates with the price of those underlying securities." *Id.*

Because Plaintiffs' attempt to satisfy the reliance element of Section 10(b) is based on a faulty legal theory, the Section 10(b) claims must be dismissed.

### G.  Plaintiffs Do Not Have Standing to Bring Claims Based on Activity By Funds None of Them Own.

As mentioned above in Section I(A), one of the SAIs to which Plaintiffs cite is from the Hartford funds.  Not a single Plaintiff named in the Complaint is alleged to have owned any Hartford mutual funds.  As a result, Plaintiffs have no standing with respect to these funds because they "cannot allege a personal injury fairly traceable to the defendants' allegedly

---

[23]     *See also Young v. Nationwide Life Ins. Co.,* 183 F.R.D. 502, 510 (S.D. Tex. 1998); *Morris v. Wachovia Sec., Inc.*, 448 F.3d 268, 281 (4th Cir. 2006) (explaining that allegations of an alleged pay-to-play scheme involving financial advice rendered by Wachovia investment advisors was "ill-suited for the fraud-on-the-market-theory.").

unlawful conduct." *Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82,

85 (2d Cir. 2006); *accord In re Salomon Smith Barney*, slip op. at 43.

## II.   DEFENDANT UBS-AG IS NOT LIABLE UNDER EITHER SECTION 15 OF THE SECURITIES ACT OR SECTION 20(A) OF THE EXCHANGE ACT.

Plaintiffs allege that UBS-AG[24] is liable for the actions of UBSFS under Section 15 of

the Securities Act and Section 20(a) of the Exchange Act.  In order to state such a claim, a

plaintiff must allege (a) a primary violation of the Securities or Exchange Acts and (b) control by

the defendant of the primary violator.  *See, e.g., In re Global Crossing, Ltd. Sec. Litig.,* No. 02

Civ. 910(GEL), 2005 WL 1875445, at *3 (S.D.N.Y. Aug. 5, 2005).  As set forth above, no

defendant is liable for primary violations of the Securities or Exchange Acts.  Further, "[t]o be

liable as a control person, the defendant must actually possess, in fact, rather than in theory, the

ability to direct the actions of the controlled person." *Id.* (quotation omitted).  The defendant

must have "possessed the power to direct or cause the direction of the management and policies

of a person, whether through the ownership of voting securities, by contract, or otherwise." *SEC

v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1472-73 (2d Cir. 1996) (quotation omitted).  The

defendant also must have had "actual control over the transaction in question.*" In re Global

Crossing*, 2005 WL 1875445, at *3 (quotation omitted).  Additionally, "[c]onclusory allegations

of control are insufficient as a matter of law." *Id.*; *see also In re Deutsche Telekom AG Sec.

Litig.,* No. 00 Civ. 9475, 2002 WL 244597, at *5-7 (S.D.N.Y. Feb. 20, 2002) (dismissing counts

brought under Section 15 of the Securities Act and Section 20(a) of the Exchange Act).  The

---

[24]      The Complaint brings suit for violations of Section 15 of the Securities Act and Section
20(a) of the Securities Exchange Act against "UBS."  Presumably, Plaintiffs are referring to
UBS-AG as there is no discussion in the Complaint's description of the parties of an entity called
"UBS."  UBS-AG is the parent company of UBSFS and the UBS Investment Adviser
Defendants and is therefore the only party for which control person liability under these sections
is even arguably appropriate.

Complaint lacks any factual basis for imposing control person liability on UBS-AG. Plaintiffs

offer nothing more than conclusory statements as to UBS-AG's control relationship with

UBSFS. Such allegations are insufficient as a matter of law.

## III.   CERTAIN OF PLAINTIFFS' CLAIMS UNDER SECTIONS 12 AND 15 OF THE SECURITIES ACT ARE BARRED BY THE STATUTE OF LIMITATIONS.

Plaintiffs' Section 12 and 15 claims are brought on behalf of a "Purchasers Subclass"

consisting of "all persons who purchased from UBS shares or like interests in one or more UBS

proprietary funds and/or one or more non-proprietary funds participating in the UBS Revenue

Sharing Program . . . from May 1, 2000 through April 30, 2005 inclusive." (¶ 1.) The applicable

statute of limitations for claims under Section 12(a)(2) is one year after discovery of the untrue

statement or the omission is made or one year after discovery should have been made. *See* 15

U.S.C. § 77m; *Dodds v. Cigna Sec., Inc.,* 12 F.3d 346, 350 n.1 (2d Cir. 1993) ("Since Section 15

merely creates a derivative liability for violations of Sections 11 and 12, Section 13 [statute-of-

limitations] applies to it as well."). Furthermore, Section 77m has a three-year statute of repose

so that in no case can a Section 12(a)(2) action be brought more than three years after the

security was sold. *See* 15 U.S.C. § 77m.

Although the Sarbanes-Oxley statute extends the statute of limitations for claims based

on "fraud, deceit, manipulation or contrivance," it does not extend the statute of limitation for

negligence and strict liability claims brought under Sections 11, 12, and 15. *In re WorldCom,*

*Inc. Sec. Litig.*, 294 F. Supp. 2d 431, 444 (S.D.N.Y. 2003) (quotation omitted); *see also Cohen v.*

*Nw. Growth Corp.*, 385 F. Supp. 2d 935, 942-43 (D.S.D. 2005) (applying three-year statute of

limitations to dismiss Section 12(a)(2) claims); *In re Enron Corp. Sec., Derivative & ERISA*

*Litig.,* No. MDL-1446, Civ. A. H-01-3624, 2004 WL 405886, at *12 (S.D. Tex. Feb. 25, 2004)

(holding that the Sarbanes-Oxley statute of limitations does not apply to negligence and strict liability claims brought under Sections 11 and 12).

Plaintiffs attempt to disclaim any allegations that could be construed as alleging fraud or intentional or reckless conduct for their claims under Sections 12 and 15. (¶¶ 230, 236.) If the Court accepts Plaintiffs' disclaimer of fraud for these claims, then those Counts are not subject to the statute of limitations extension under Sarbanes-Oxley, and the claims of certain plaintiffs would be barred. *See* 15 U.S.C. § 77m. In particular, plaintiffs who purchased shares longer than a year before filing suit are barred because they should have discovered the alleged omission had they exercised reasonable diligence. Even accepting the allegations in the Complaint on their face, Plaintiffs could have discovered these alleged omissions through the use of reasonable diligence. *See* Section I(A), *supra* (describing the widespread practice of revenue sharing). Further, it is irrefutable that Plaintiffs in the Purchasers Subclass who sold their shares prior to July 29, 2002, even if they were included in the first complaint filed on July 29, 2005, are barred by Section 77m. *Id.* Accordingly, claims by certain Plaintiffs for violations of Sections 12 and 15, to the extent they sound in negligence or strict liability, are barred by the statute of limitations.

## IV.   THE COMPLAINT FAILS TO STATE A CLAIM AGAINST THE INVESTMENT ADVISOR AND DISTRIBUTOR DEFENDANTS UNDER THE INVESTMENT COMPANY ACT (THE "ICA").

### A.   Count VIII Must Be Dismissed  Because Section 36(b) Does Not Provide for a Direct Private Right of Action.

Section 36(b) of the ICA imposes a fiduciary duty on mutual fund investment advisors to refrain from charging or accepting excessive fees for services provided and paid for out of fund

assets.[25]  Both Counts VIII and IX of the Amended Complaint are founded on Section 36(b).

The counts differ in only one respect: Count VIII is brought as a direct claim, while Count IX is

brought derivatively.  Plaintiffs observe in Count IX that the count is brought "[i]n the

alternative, in the event this Court rules that Count VIII should be dismissed on the basis that §

36(b) is a derivative claim."  (¶ 281.)  Plaintiffs clearly understand the prevailing law and

anticipate that the direct claim will be dismissed.  On this point they are correct.

Whether a plaintiff's claims are direct or derivative is a question of state law.  *Kamen v.*

*Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108 (1991).  The Investment Advisor Defendants and the

Distributor Defendants are Delaware Corporations, governed by Delaware law.  To state a direct

claim under Delaware law, a stockholder's asserted injury "must be independent of any alleged

injury to the corporation.  The stockholder must demonstrate that the duty breached was owed to

the stockholder and that he or she can prevail without showing an injury to the corporation."  *In*

*re Goldman Sachs Mut. Funds Fee Litig.*, 2006 WL 126772, at *5 (S.D.N.Y. Jan. 13, 2006)

(quotation omitted) (*citing Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1039

(Del. 2004).[26]  The allegations in Count VIII are that the "fees received by the Distributor, and

investment adviser were excessive."  (¶ 277).  However, the advisory and Rule 12b-1 fees were,

by Plaintiffs' own admission, paid out of the assets of the funds, not individual shareholder

---

[25]      Section 36(b) states in relevant part: "[T]he investment adviser of a registered investment
company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for
services, or of payments of a material nature, paid by such registered investment company, or by
the security holders thereof, to such investment adviser or any affiliated person of such
investment adviser." 15 U.S.C. § 80a-35(b).  Liability is imposed only upon the recipients of
compensation and may not exceed the amount of the compensation received. Additionally,
damages may not be recovered for any period prior to one year before institution of the action.
15 U.S.C. § 80a-35(b)(3).

[26]      In order to bring a claim directly, "[t]he stockholder must demonstrate that the duty
breached was owed to the stockholder and that he or she can prevail without showing an injury
to the corporation." *In re Syncor Int'l Corp. S'holders Litig.*, 857 A.2d 994, 997 (Del. Ch. 2004).

accounts. (¶ 61.) The Plaintiffs, accordingly, allege no injury not suffered by the funds themselves.

> In *In re Eaton Vance Mut. Funds Fee Litig.*, the court concluded that,

> the injury asserted, the misuse of Eaton Vance Funds' assets to provide excessive compensation to brokers, improper 12b-1 plans, and soft dollar compensation to brokers – is an injury to the Eaton Vance Funds that adversely affects the plaintiffs only indirectly. Therefore any claim resulting from these alleged actions belongs to the Eaton Vance Funds, and must be brought through a derivative action.

380 F. Supp. 2d 222, 234 (S.D.N.Y. 2005).

The plaintiffs in *In re Goldman Sachs*, similarly argued that their ICA claim charging excessive fees could be brought directly, because any increase in a mutual fund's fees and expenses automatically affects the price at which a shareholder can legally sell his shares and the increased fees and expenses are borne by the shareholders. The court rejected this assertion, holding that,

> a pro rata bearing of expense by individual shareholders seems to fall within the very essence of an injury which is not independent from that suffered by the corporation. Indeed, 'if the only injury to an investor is the indirect harm which consists of the diminution in the value of his or her shares, the suit must be derivative.

2006 WL 126772, at *6 (citation omitted). *See also Hogan v. Baker*, No. Civ. A 305CV0073P, 2005 WL 1949476, at *4 (N.D. Tex. Aug. 12, 2005) (under Delaware law claim is derivative where plaintiffs were injured "indirectly as a result of their investment in the Funds"); *see generally Burks v. Lasker*, 441 U.S. 471, 484 (1979) (characterizing Section 36(b) as providing for "derivative suits charging breach of fiduciary duty with respect to adviser's fees"); *In re Dreyfus Mut. Funds Fee Litig.*, 428 F. Supp. 2d 357, 360 (W.D. Pa. 2006) (Section 36(b) claims must be brought derivatively where "[p]laintiffs were harmed only because the value of their mutual fund holdings decreased as a result of the allegedly excessive fees."); *In re Franklin Mut.*

*Funds Fee Litig.*, 388 F. Supp. 2d 451, 468 (D.N.J. 2005) ("36(b) does not provide for a direct private right of action"). Accordingly, as Plaintiffs anticipate, Count VIII must be dismissed.

### B.     Count IX Should Be Dismissed for Failure To State a Claim.

Count IX is brought derivatively.  Nonetheless, the Plaintiffs cannot meet the legal standard for an excessive fee claim under Section 36(b) and this Count too should be dismissed. Indeed, the charges that the Plaintiffs direct against the Defendants in these counts are no different than the charges rejected by this Court in the last few months in *In re Salomon Smith Barney*, *In re Morgan Stanley & Van Kampen* and *In re Merrill Lynch Investment Management*. There too, the plaintiffs asserted claims under Section 36(b), claiming that funds had charged "excessive" fees. As should be the case here, the claims were held to be inadequate as a matter of law.

Section 36(b) narrowly focuses on the receipt of fees by investment advisors.  Under this section, plaintiffs "shall have the burden of proving a breach of fiduciary duty" by the receipt of excessive compensation or payments. 15 U.S.C. § 80a-35(b)(1).  To be liable for a violation of Section 36(b), "the adviser-manager must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *In re Goldman Sachs*, 2006 WL 126772, at *8.[27]  While the Plaintiffs engage in a great deal of hyperbole, they fail to allege facts that, if true, show that the fees at issue were excessive under established law. Their "[s]peculative, conclusory allegations of 36(b)

---

[27]     In making the excessiveness determination, courts consider (1) the nature and quality of the services provided by the advisers  to the shareholders; (2) the profitability of the mutual fund to the adviser-manager; (3) "fall-out" benefits; (4) the economies of scale achieved by the mutual fund and whether such savings were passed on to the shareholders; (5) comparative fee structures with other similar funds; and (6) the independence and conscientiousness of the mutual fund's outside trustees. *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 928-30 (2d Cir. 1982).

violations [are] insufficient to survive a motion to dismiss under Rule 12(b)(6)." *Yampolsky v. Morgan Stanley Inv. Advisers, Inc.*, Nos. 03 Civ. 5710 (RO), 03 Civ. 5896 (RO), 2004 WL 1065533, at *2 (S.D.N.Y. May 12, 2004).

Plaintiffs assert that the use of "UBS Fund assets to promote the sale of UBS Fund shares through participation in revenue sharing or 'shelf space' programs" caused a "dramatic increase in the compensation to the investment adviser Defendants, Distributor Defendants and affiliates." (¶ 163.) They allege that while "an increase in mutual fund assets can benefit investors through economies of scale ... Defendants failed to reduce their fees to pass on the economies of scale to the UBS Funds or their investors." (¶¶ 164, 177-84.) This court, however, has repeatedly ruled that "[m]ere allegations that fees increased with the size of the Funds are not enough to establish that the benefits from economies of scale were not passed on to investors." *In re Goldman Sachs*, 2006 WL 126772, at *9; *see also Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222, 1238 (S.D.N.Y. 1990) ("Plaintiffs in prior cases have argued in substance that since a fund increased dramatically in size, economies in scale must have been realized. The courts reject that argument.") (aff'd, 928 F.2d 590 (2d Cir. 1991)). As Judge Koeltl observed in *Eaton Vance*,

> [t]he plaintiffs argue that the Investment Adviser Defendants and the Trustee Defendants benefited from the distribution fees indirectly, because the fees were used to increase the assets under management and therefore increase the size of the fees payable to the Investment Adviser Defendants, which are calculated as a percentage of assets under management ... However, by its terms, § 36(b)(3) limits §36(b) claims to the recipients of the compensation or payments. It thereby excludes claims that are brought against investment advisers for alleged breaches of fiduciary duties that indirectly resulted in higher fees for the investment advisers.

380 F. Supp. 2d at 238 (citation omitted) (*citing Fogel v. Chestnutt*, 668 F.2d 100, 112 (2d Cir. 1981)).

Plaintiffs additionally allege that "UBS Fund assets were used to pay large amounts of 'Rule 12b-1' fees to the Distributor Defendants without any benefit accruing to the UBS Funds or their investors"; that the management fees of the Investment Adviser Defendants "were also excessive because they used Fund assets to pay for their out-of-pocket expenses although they were already being compensated" for such expenses; and that "Soft Dollar commissions were utilized by Defendants to shift significant expenses from the investment advisers to the UBS Funds and their investors without any corresponding offset in the level of the management fee." (¶ 166.) These allegations also fail as a matter of law.

First, Plaintiffs' implicit hypothesis is that all fees are <u>per se</u> excessive if one aspect of the fee allegedly was improper. The fees here were decidedly not improper, but in any event, this Court has held that allegations of improper purpose cannot establish a violation of Section 36(b). *See In re Goldman Sachs*, 2006 WL 126772, at *9-10 ("[P]laintiffs have at most alleged that the advisory and 12b-1 fees were used for improper purposes … [S]uch allegations do not suffice to state a claim under 36(b)"; *Eaton Vance*, 380 F. Supp. 2d at 237 ("The allegations that the defendants authorized improper 12b-1 fees, soft dollar payments, and commissions to brokers are insufficient to allege a claim under 36(b), which addresses only the negotiation and enforcement of payment arrangements between investment advisers and funds, not whether investment advisers acted improperly in the use of the funds.").[28] Indeed, if Plaintiffs'

---

[28]     *See also Mutchka v. Harris,* 373 F. Supp. 2d 1021, 1025 (C.D. Cal. 2005) ("As many circuits have recognized, Section 36(b) is limited in scope and only is meant to provide a cause of action against investment advisors who charge excessive fees. To conclude that any fee is excessive merely because investment advisors allegedly have breached some other fiduciary duty is inconsistent with the meaning of the statute and thus is rejected by the Court.") (citation and emphasis omitted). *Accord Meyer*, 895 F.2d at 866; *In re Davis Selected Mut. Funds Litig.*, No. 04-CIV-4186 (MGC), 2005 WL 2509732, at *2 (S.D.N.Y Oct. 11, 2005); *In re Goldman Sachs*, 2006 WL 126772, at *10 ("Finally, plaintiffs' allegations of 'kickbacks' do not constitute support for their allegations of excessive Rule 12b-1 fees. Plaintiffs essentially argue that the

hypothesis were adopted, Section 36(b)'s "excessiveness" standard would be transformed into an item-by-item review of the components of the fees without regard to whether a fee was above or even far below its peers.

Second, Rule 12b-1 permits funds to pay for marketing and distribution costs directly out of fund assets – a boon to those new investors to a mutual fund who had previously been saddled with these fees. *See In re Morgan Stanley & Van Kampen*, 2006 WL 1008138, at *4. Payments for distribution expenses, however, must be made pursuant to a written plan that is annually approved by a majority of the fund's independent directors and by shareholders. *See generally Meyer v. Oppenheimer Mgmt. Corp.*, 895 F.2d 861, 863 (2d Cir. 1990); 17 C.F.R. § 270.12b-1(a)(2). Plaintiffs nowhere allege that these procedures were not followed here.

In addition, Congress has given the NASD authority to limit sales charges. For example, under the rules relevant here, a fund sales load, whether imposed at the time of purchase or time of sale, could not exceed 8.5% of the offering price, if the fund did not charge a Rule 12b-1 fee. NASD Rule 2830 (d)(1)(A). The aggregate sales charges of a fund that did have a 12b-1 fee could not exceed 7.25 % of the amount invested. NASD Rule 2830 (d)(2)(B). Finally, the amount of the 12b-1 fee could not exceed 0.75% per year of the fund's annual net assets. NASD Rule 2830(d)(2)(E). These limits were approved by the SEC.

Plaintiffs' 12b-1 argument boils down to the assertion that "the Rule 12b-1 fees charged to the Fund were excessive <u>because</u> those payments did not result in any benefits to the Funds." (¶ 209.) (Emphasis added.) Even if this syllogism were not foreclosed by the foregoing authority, Plaintiffs wholly overlook the fact that Rule 12b-1 funds serve various purposes

fees were excessive because they were improper. Such assertions are insufficient to establish that the Rule 12b-1 fees bore no reasonable relationship to the services rendered.").

designed to serve existing shareholders. Rule 12b-1 plans are integral to the multiple share class

systems employed by many mutual funds. In comments received by the SEC in connection with

its adoption of Rule 12b-1, the industry observed that "the increase in fund assets likely to result

from permitting a fund to use its own assets for distribution would help management maintain a

significant degree of portfolio diversification, obtain better and lower cost portfolio execution

services, and attract reports and recommendations about securities transactions from Wall Street

professionals." Amy L. Goodman, *The Investment Company Regulation Deskbook* § 7.4(2)

(1997). Rule 12b-1 payments can additionally benefit shareholders by stabilizing cash flows,

giving funds "an enhanced ability to meet redemptions due to a continuous in-flow of new

assets." 1 Thomas P. Lemke et al., *Regulation of Investment Companies* § 7.05(1) (2004). This

is an important benefit, for redemptions can potentially injure a fund's shareholders. As one

court has observed, "an inflow of assets to a fund has a positive effect on investment

performance regardless of the fund's absolute size." *Krinsk v. Fund Asset Mgmt., Inc.*, 715 F.

Supp. 472, 500 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 404 (2d Cir. 1989).

The Complaint lacks any allegations that these benefits of Rule 12b-1 plans have not

inured to some or all of the funds at issue. Plaintiffs do not assert that the 12b-1 plans have not

supported a multiple share class system, nor do they allege that increased fund size did not help

portfolio diversification. Plaintiffs also do not suggest that the Rule 12b-1 plans did not help the

funds meet redemptions. Plaintiffs assert only that "the nature and quality of services do not

justify the excessive fees," but apart from the generalized assertions that "[t]he performance of

these Funds was not up to par with other, similar funds in the industry, and thus could not justify

the higher fees," they produce no evidence that could remotely be viewed as establishing

excessive Rule 12b-1 fees. As in *In re Morgan Stanley & Van Kampen*, where plaintiffs alleged

that Rule 12b-1 had been violated because "the average expense ratio of Morgan Stanley funds was almost 50% higher than the average expense ratio for non-Morgan Stanley Funds," the allegations here are "too vague and conclusory to meet the requirements of *Gartenberg*." 2006 WL 1008138, at *11-12 (emphasis, quotations and footnotes omitted).

Plaintiffs also challenge so-called soft dollar arrangements, alleging, for example, that UBS Funds made "Soft Dollar commission payments to financial advisers, through which financial advisors were paid commissions at a rate that exceeded the normal rate for effectuating portfolio transactions, in return for services that would normally be provided by the advisers and for which advisers were already being paid." (¶ 166.) Soft dollar arrangements are a "common and lawful practice in the industry," *In re Morgan Stanley & Van Kampen*, 2006 WL 1008138, at *4. The term "soft dollars" "generally refers to the practice whereby a [mutual fund investment advisor] uses brokerage commissions from client transactions to pay for research or brokerage services, in addition to basic execution services." Thomas P. Lemke & Gerald T. Lins, *Soft Dollars and Other Brokerage Arrangements* (2006), at v. The difference between the theoretical pure execution cost, and the amount actually paid in commissions, is referred to as soft dollars. In other words, research expenses – a cost of doing business – are bundled with execution costs and then passed along as commission expenses to investors. The research garnered by soft dollar arrangements benefits the mutual fund and is protected under Section 28 of the Exchange Act by safe harbor provisions. *See* 15 U.S.C. § 78bb(e). The Plaintiffs do not allege that any of the services received in connection with UBS's soft-dollar practices were outside the permissible safe harbor. Even if use of soft dollars fell outside the Section 28 safe harbor, however, the Complaint fails to identify the amount of soft dollars spent or describe the services received for these expenditures for any fund, let alone every fund. There also are no allegations that the costs

48

of these transactions were disproportionately high. Plaintiffs' allegations are conclusory and
speculative and they do not state a claim under the *Gartenberg* standards. *See In re Merrill
Lynch Inv. Mgmt.*, 2006 WL 1628005, at *6 (finding similar allegations "conclusory.")

Finally, Plaintiffs attempt to give weight to their excessive fee allegations by charging
that the UBS Directors were not sufficiently independent. Section 36(b), however, "is sharply
focused on the question of whether the fees themselves were excessive, and not on the status of
the directors who approved them ... Other sections of the ICA address the independence of the
funds' directors ... Section 36(b) was not enacted to provide a cause of action separate from
36(a) to govern the directors' independence or the investment adviser's general performance."
*Migdal v. Rowe Price-Fleming Int'l,* 248 F.3d 321, 328-29 (4th Cir. 2001) (citations and
quotations omitted). Section 36(b), moreover, limits liability to recipients of allegedly excessive
fees and Plaintiffs do not dispute that the fund directors did not receive any of the allegedly
excessive fees at issue in this case. *See Eaton Vance*, 380 F. Supp. 2d at 237 (even under liberal
pleading standards, allegations that the defendants authorized improper Rule 12b-1 fees,
brokerage commissions, and soft dollar payments failed to "demonstrate that the compensation
paid to the defendants was disproportionate to the services rendered.") *See also In re Evergreen
Mut. Funds Fee Litig.*, 423 F. Supp. 2d 249, 258 (S.D.N.Y. 2006).

### C.    Count X Must Also Be Dismissed.

Plaintiff's Count X asserts that the defendants violated Section 48 of the ICA. Section 48
is a secondary liability provision. Liability must be predicated on a violation of another section
of the ICA. In this case, the alleged basis for primary liability under the ICA are violations of
Section 36(b). These claims, as discussed above, are without merit. Therefore, they cannot
serve as the basis for Section 48(a) liability. *See In re Evergreen Mut. Funds*, 423 F. Supp. 2d

249; *In re Am. Mut. Funds Fee Litig.*, No. CV 04-5593-GAFRNBX, 2005 WL 3989803, at *4 ,

(C.D. Cal. Dec. 16, 2005).

Additionally, since the Supreme Court's ruling in *Alexander v. Sandoval*, 532 U.S. 275

(2001), and the Second Circuit's ruling in *Olmsted v. Pruco Life Ins. Co.*, 283 F.3d 429 (2d Cir.

2002), no court has found an implied right of action under Section 48(a).  As Judge Koeltl

observed in *Eaton Vance*, "[f]ollowing the *Olmsted* decision, the parties have pointed to no

opinion in this Circuit that has considered *Olmsted* and found that Congress intended to create a

private right of action under §§ 34(b), 36(a) or 48(a)."  380 F. Supp. 2d at 233.  *See also In re*

*Goldman Sachs*, 2006 WL 126772, at *10 n.29 ("[t]he lack of a private right of action under

Section 48(a) provides an additional ground for dismissal."); *accord In re Salomon Smith*

*Barney*, slip. op. 18-19; *In re Merrill Lynch Inv. Mgmt.*, 2006 WL 1628005, at *5.

Finally, claims under Section 48(a) must be brought derivatively.  *See Eaton Vance*, 380

F. Supp. 2d at 233-36 *9-12 ("[A]ny claim resulting from [the alleged wrongdoing] belongs to

the Eaton Vance Funds and must be brought through a derivative action.").  The Section 48(a)

claim was not brought derivatively, and hence the claim for all the above-enumerated reasons

must be dismissed.

## V.   THE COMPLAINT FAILS TO STATE A CLAIM AGAINST ANY DEFENDANT UNDER STATE LAW.

In Counts XI, XII, and XIII  plaintiffs charge breach of fiduciary duty under New York

State law and violations of Sections 349 and 350 of New York's General Business Law.  These

same claims have been rejected time and again by this and other federal courts.

### A.   SLUSA Preempts the Three Counts Founded upon State Law.

Plaintiffs' state law claims are pre-empted by the Securities Litigation Uniform Standards

Act ("SLUSA"). In this legislation, Congress instructed that "[n]o covered class action based

upon the statutory or common law of any State or subdivision thereof may be maintained in any

State or Federal court by any private party alleging," as relevant here, "a misrepresentation or

omission of a material fact in connection with the purchase or sale of a covered security." 15

U.S.C. § 78bb(f)(1)(A).

Plaintiff does not dispute that this lawsuit is a "covered class action," that the claims are

based on state law, that covered securities are at issue, and that alleged misrepresentations and/or

omissions occurred.  Similarly, there is no doubt that the events related in the Amended

Complaint are "in connection with the purchase or sale of the covered securities." In *Atencio v.

Smith Barney, Citigroup Inc.*, No. 04 Civ. 5653 (MBM), 2005 WL 267556, at *3 (S.D.N.Y. Feb.

2, 2005) (quotations omitted), the claims made by the plaintiffs were similar to the ones here –

claims of kickbacks from certain funds in return for steering potential investors to those funds.

The court ruled that these claims were preempted because they were "inextricably related to [the

plaintiffs'] purchases of shares of those funds." *Id.* at *6.  The meaning of the "in connection

with" language in the SLUSA is coterminous with the meaning of the almost identical language

in 10(b) and Rule 10(b)(5).  *Riley v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 292 F.3d 1334,

1342-43 (11th Cir.), *cert. denied*, 537 U.S. 950 (2002).

While the Plaintiffs bring these claims on behalf of the Financial Plans Subclass, those

individuals who purportedly did not purchase or sell securities during the class period but merely

held them, this distinction makes no difference.  In *Merrill Lynch, Pierce, Fenner & Smith, Inc.

v. Dabit,* 126 S. Ct. 1503 (2006), the Supreme Court recently held that Congress did not intend to

carve out of the SLUSA an exception for securities holders.  The Court emphasized that "federal

law, not state law, has long been the principal vehicle for asserting class action securities fraud

claims," and that Congress's intention to preempt class action holder class actions was evident

51

from the face of the statute. For purposes of SLUSA pre-emption, there is no distinction between purchasers, sellers and holders of securities. *Dabit*, 126 S. Ct. at 1515.[29]

Here Plaintiffs allege that they and other members of the Financial Plan Subclass were wrongfully "steered into Tier I funds," paid "unjustifiable ongoing fees for financial advice," received diminished returns on their investments, and had fund assets paid as kickbacks. (¶ 9.) These state law claims meet all the requirements for preemption under the SLUSA and for that reason the claims must be dismissed.

### B.   Sections 349 and 350 of the New York General Business Law Do Not Apply to Sales of Securities.

Even apart from SLUSA preemption, the state law claims brought under New York General Business Law must be dismissed, for it is well-settled that the statute does not extend its reach to securities claims.  In *Evergreen Mutual Funds*, 2006 WL 753000, at *12,  Judge Sweet held that "Section 349 does not apply to securities-related claims, such [as] the ones involving mutual funds alleged in the instant case."  In *Eaton Vance*, 380 F. Supp. 2d at 240, Judge Koeltl ruled that "N.Y. Gen. Bus.L. § 349 does not apply to securities transactions, even when those actions are brought as claims by 'holders' of shares."  *See also In re Motel 6 Sec. Litig.*, 93 Civ. 2183(JFK), 1995 WL 431326, at *6-7 (S.D.N.Y. July 20, 1995) (claim brought by holders of call options under Section 349 dismissed as not within reach of statute); *Morris v. Gilbert*, 649 F. Supp. 1491, 1497 (E.D.N.Y. 1986) ("[P]eople do not generally buy securities in the same way that they buy an automobile … securities are purchased as investments, not as goods to be 'consumed' or 'used.'"); *Gray v. Seaboard Sec., Inc.*, 788 N.Y.S.2d 471, 472-73 (N.Y. App. Div.

---

[29]    *See also Prof'l Mgmt. Assocs., Inc. Employees' Profit Sharing Plan v. KPMG LLP*, 335 F.3d 800, 803 (8th Cir. 2003) (a plaintiff cannot "avoid preemption by asserting it is only claiming damages suffered as a result of holding its stock."); *In re Am. Mut. Funds Fee Litig.*, No. CV 04-5593-GAFRNBX, 2005 WL 3989803 (C.D. Cal. Dec. 16, 2005) (SLUSA preemption applies even to holders who did not buy or sell during the period).

2005) (Section 349 not applicable to securities transactions).  Since this has been the clear,

unequivocal holding of courts since at least 1986, in *Morris v. Gilbert,* 649 F. Supp. 1491,

Plaintiffs' claims lack even colorable support.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed in its entirety, with

prejudice, pursuant to Fed. R. Civ. P. 9(b), 12(b)(6), the PSLRA, and SLUSA.

Respectfully submitted,

**WILLIAMS & CONNOLLY LLP**

/s/ Christopher N. Manning (CM-4231)
By:_____
    John K. Villa (JV-3390)
    Christopher N. Manning (CM-4231)
    Bradley J. Bondi (BB-7497)

725 Twelfth Street, N.W.
Washington, D.C.  20005
Tel: (202) 434-5000
Fax: (202) 434-5029

Counsel for Defendants UBS-AG, UBS
Global Asset Management (US) Inc., UBS
Global Asset Management (Americas) Inc.,
UBS Global Asset International Ltd., DSI
International Management, Inc., and UBS
Financial Services Inc. f/k/a UBS
PaineWebber, Inc.

July 31, 2006.

53

# APPENDIX A

## Glossary of Key Terms Used in the Mutual Fund Industry[1]

A mutual fund is a company that pools money from individuals and invests this money in stocks, bonds, short-term money-market instruments, or other securities. Each fund is managed by a board of directors. (¶ 208.) The directors are responsible for approving the fund's fee structure and for hiring an investment adviser to manage the day-to-day operations of the fund. (¶ 213.)

The investment adviser manages the underlying portfolio of each fund. (¶ 170.) This task includes choosing the securities in which a mutual fund will invest and conducting the operations required to support the management of the portfolio. *Id.* Investment advisers also have administrative duties with respect to the fund they manage. *Id.* On occasion, investment advisers hire outside money managers, known as sub-advisers, to help choose stocks and bonds for fund portfolios. (¶ 187.)

The distributor is responsible for making shares of the fund available to investors. A distributor may do this either by providing shares for sale directly to investors or, more commonly, by arranging for a broker-dealer to offer sales of the mutual fund to investors. Beyond making shares of the fund available for sale, the distributor advertises the fund and prints and mails prospectuses and sales literature to investors. (¶ 171.)

Investors typically have the most direct contact with a broker-dealer – such as a UBSFS financial advisor. The broker-dealer offers shares of a mutual fund for sale directly to investors. (¶ 60.) Broker-dealers also execute trades on behalf of mutual funds at the direction of the

---

[1] This glossary is drawn from the law and the allegations in the Complaint.

funds' investment advisers.  (¶ 59.)  Broker-dealers may have substantial interaction with investors, and often offer financial planning and other investment services.  (¶¶ 63-64.)

**Fees.**

Mutual fund investors pay a number of different fees associated with the purchase and sale of their investment.  Some fees and commissions are charges paid at the point of sale to compensate the broker-dealer who sells the fund.  Others are paid by the mutual funds themselves from the aggregated mutual fund's assets to the fund's investment adviser and distributor for services rendered to the fund.

The following fees are paid to the broker-dealer:

Sales Loads.  Sales loads are paid by investors to broker-dealers either at the time they purchase a fund or sell a fund. (¶ 60.)   Front-end sales loads are paid at the time of purchase; contingent deferred sales charges are paid when the investment is redeemed.  *Id.*  Whether an investor pays a front-end sales load or a contingent deferred sales charge depends on the nature and size of the particular investment.  *Id.*

Commissions. Because a mutual fund's assets is comprised of securities, it (acting through its investment advisors and sub-advisors) must purchase and sell such securities through broker dealers – oftentimes using the same broker dealers who are selling fund shares to the public. Broker-dealers often make trades on the underlying portfolio of mutual funds at the direction of a fund's investment advisers.  They are compensated for this service in commissions paid to them from the mutual fund.  Investment advisers are allowed  to pay more than the lowest available market rate for execution of trades by Section 28(e) of the Exchange Act to acquire additional services from a broker-dealer, such as research.

12b-1 Fees.  Some broker-dealers also receive ongoing fees from mutual funds based on the

amount of a fund's assets held by the broker-dealer's clients. *Id.* These fees, called "12b-1 fees" after the SEC rule authorizing their payment, are made pursuant to written plan that must be approved by a fund's board of directors. *Id.*

Transfer Agency Fees. Some broker-dealers also receive fees from mutual funds for performing other services for a fund such as handling redemptions of fund shares, maintaining shareholder records, computing the net asset value of the fund daily, and paying out dividends and capital gains to investors. (¶ 173.) These fees, called "transfer agency fees," are typically a fixed amount based on the number of accounts of a particular fund family held by the broker-dealer. (¶ 97.)

The following fees are paid to the investment advisor and distributor:

Investment Advisory Fees. Investment advisory fees are paid out of fund assets to a fund's investment advisor for managing the underlying portfolio, choosing the securities in which a mutual fund should invest, conducting the operations to support the management of the portfolio, and as reimbursement for the overhead and administrative costs involved in managing the fund. (¶ 170.) Investment advisory fees are typically calculated as a percentage of assets under management. *Id.*

Rule 12b-1 Fees. Rule 12b-1 fees, or distribution fees, are paid out of fund assets to the fund's distributor as compensation for marketing and selling fund shares - including advertising, printing and mailing prospectuses and sales literature to investors, and, as described above, making payments to broker-dealers that sell shares of the fund. (¶ 171.) Rule 12b-1 fees are calculated as a percentage of assets under management. *Id.*

Service and Administrative Fees. Service and administrative fees are paid out of fund assets and used to compensate persons – either in-house or third-party – for responding to investor

inquiries, furnishing investors with information about their investments, and providing other services required to enable the functioning of the fund.  (¶ 172.)  Service and administrative fees are not paid pursuant to the written plan governing 12b-1 fees.  *Id.*

Transfer Agency Fees.  As is the case with service and administrative fees, transfer agency fees are paid out of fund assets to individuals – either in-house or third-party – for performing certain services for the fund.  (¶ 173.)  In particular, transfer agency fees are compensation for handling sales and redemptions of fund shares, maintaining shareholder records, computing the net asset value of the fund daily, and paying out dividends and capital gains.  *Id.*

Revenue Sharing and Broker Commissions.  In general, "revenue sharing" derives from the fact that a mutual fund's distributor must take from its own advisory fees (or revenue stream) the amounts it pays in cash to broker dealers "to facilitate the sale and distribution of the fund's shares."  *The Mutual Funds Integrity And Fee Transparency Act Of 2003: Hearing Before the H. Subcomm. on Capital Markets, Insurance, and Government Sponsored Enterprises, Comm. on Financial Services*, 108th Cong. 5471, at 6 (2003) (testimony of Paul F. Roye, Dir. of Inv. Mgmt., U.S. S.E.C.) *available at* http://www.sec.gov/news/testimony/-061803tspfr.htm.

As noted above, a fund also pays commissions to broker-dealers to execute trades on the fund's underlying portfolio.  Associated with this necessary fund expense are the terms, "directed brokerage" (¶ 93) and "soft dollars."  (¶ 166.)  The *Morgan Stanley* court accurately described directed brokerage as "when a mutual fund investment advisor considers sales of fund shares when selecting a broker-dealer to execute transactions in the fund's portfolio" 2006 WL 1008138, at *4.  The term "soft dollars" "generally refers to the practice whereby a [mutual fund investment advisor] uses brokerage commissions from client transactions to pay for research or

brokerage services, in addition to basic execution services." Thomas P. Lemke & Gerald T.

Lins, *Soft Dollars and Other Brokerage Arrangements* (2006 Ed.), at v.

**Required Disclosures.**

Mutual funds have specific disclosure requirements that govern the information provided

to investors. The majority of this disclosure is accomplished through the fund's prospectus – a

document required to be provided to each fund investor with their purchase of fund shares, as

supplemented by a statement of additional information (SAI). The SEC regulates the

information that must be included in the prospectus and SAI through its Form N-1A. *See* Form

N-1A, found at http://www.sec.gov/about/forms/form-n-1a.pdf (Last visited, Jul. 31, 2006).

SEC Rule 10b-10, 17 C.F.R §240.10b-10, prescribes the information broker-dealers must

disclose to investors purchasing mutual fund shares. With respect to commissions and similar

fees, a broker-dealer must disclose "[t]he amount of any remuneration received or to be received

by the broker from such customer in connection with such transaction…", §240.10b-

10(a)(2)(i)(B). There is no requirement for a description of a brokerage firm's internal

compensation system – i.e. incentives, bonuses, contests, etc. The broker-dealer must also

disclose "[t]he source and amount of any other remuneration received or to be received by the

broker in connection with the transaction…" §240. 10b-10(a)(2)(i)(D). As to payments from

mutual fund families – i.e. revenue sharing and directed brokerage – broker-dealers can comply

with their Rule 10b-10 disclosure obligations by providing the fund's prospectus to an investor at

the time of purchase and the SAI upon request.

**APPENDIX B**

**Summary of Reasons For Dismissing All Counts in the Complaint**

| Count | On Behalf Of | Against | For Violations Of | Reasons for Dismissal |
|---|---|---|---|---|
| 1 | Purchaser Subclass | UBSFS | Section 12(a)(2) of the Securities Act | <ul><li>Failure to allege that UBSFS had a duty to disclose its internal compensation structure</li><li>UBSFS complied with its duty to disclose revenue sharing arrangements with Tier I fund families</li><li>Plaintiffs' theory of damages based on lost investment opportunities is foreclosed by Supreme Court precedent</li><li>Failure to plead loss causation</li><li>Failure to allege compensable damages</li><li>Failure to allege that UBSFS was a Section 12 "seller" of securities</li><li>Failure to plead fraud with the requisite particularity under Rule 9(b)</li></ul> |
| 2 | Purchaser Subclass | UBSFS and UBS-AG | Section 15 of the | <ul><li>Failure to allege a primary violation</li></ul> |

| | | | Securities Act | of Section 12 of the Securities Act |
|---|---|---|---|---|
| | | | | • Failure to allege that UBS-AG had actual control over UBSFS |
| 3-5 | Purchaser Subclass | UBSFS | Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder | • Failure to allege that UBSFS had a duty to disclose its internal compensation structure<br><br>• UBSFS complied with its duty to disclose revenue sharing arrangements with Tier I fund families<br><br>• Plaintiffs cannot utilize the fraud on the market doctrine to establish a presumption of reliance<br><br>• Failure to plead the element of loss causation<br><br>• Failure to plead fraud with the requisite particularity under Rule 9(b) and the PSLRA<br><br>• Failure to plead facts giving rise to a strong inference of scienter under the PSLRA |

| 6 | Purchaser Subclass | UBSFS and UBS-AG | Section 20(a) of the Securities Exchange Act | • Failure to allege a primary violation of Section 10(b) of the Securities Exchange Act<br><br>• Failure to allege that UBS-AG had actual control over UBSFS |
|---|---|---|---|---|
| 7 | Financial Plans Subclass | UBSFS | Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder | • Failure to allege that UBSFS had a duty to disclose its internal compensation structure<br><br>• Plaintiffs cannot utilize the fraud on the market doctrine to establish a presumption of reliance<br><br>• Failure to plead the element of loss causation<br><br>• Failure to plead fraud with the requisite particularity under Rule 9(b) and the PSLRA<br><br>• Failure to plead facts giving rise to a strong inference of scienter under the PSLRA |

| 8 | ICA Subclass | UBS-GAM (Investment Adviser and Distributor Defendants) | Section 36(b) of the Investment Company Act (the "ICA") (direct claim on behalf of the Funds) | • Section 36(b) claim must be brought derivatively |
|---|---|---|---|---|
| 9 | ICA Subclass | UBS-GAM (Investment Adviser and Distributor Defendants) | Section 36(b) of the ICA (derivative claim on behalf of the Funds) | • Failure to allege that breaches of fiduciary duty directly resulted in higher fees<br><br>• Failure to allege that fees themselves were improper – Plaintiffs allege rather that fees were used for improper purposes<br><br>• Failure to allege that defendants did not have a written 12b-1 plan approved by directors<br><br>• Failure to allege that fees charged by funds exceeded NASD limits<br><br>• Failure to allege that fees charged by funds provided no benefit to funds<br><br>• Failure to allege that any "soft dollar" arrangements were outside the "safe harbor" of Section 28 of the Securities Exchange Act |

| 10 | ICA Subclass | UBS-GAM (Investment Adviser and Distributor Defendants) UBS-AG | Section 48(a) of ICA | • Failure to allege a primary violation of Section 36(b) of the ICA <br> • No private right of action under Section 48(a) <br> • Failure to bring Section 48(a) claim derivatively |
| :---: | :---: | :---: | :---: | :--- |
| 11 | Financial Plans Subclass | UBSFS | Breach of fiduciary duty | • SLUSA preempts all state law claims |
| 12 | Financial Plans Subclass | All Defendants | Section 349 of New York General Business Law | • SLUSA preempts all state law claims <br> • Section 349 does not apply to sales of securities |
| 13 | Financial Plans Subclass | All Defendants | Section 350 of New York General Business Law | • SLUSA preempts all state law claims <br> • Section 350 does not apply to sales of securities |