## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MICHAEL HOFFMAN, SUSAN HOFFMAN,
and YAKOV PRAGER, on behalf of
themselves and all others similarly situated,

        Plaintiffs,

vs.

UBS-AG, et al.,

        Defendants.

No. 05 Civ. 6817 (DAB)(JCF)

Member Cases:    05 Civ. 7027 (DAB)(JCF)
                         05 Civ. 8448 (DAB)(JCF)

**ECF CASE**

## PLAINTIFFS' CORRECTED MEMORANDUM IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS THE
## <u>CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u>

# TABLE OF CONTENTS

**Page**

Table of Authorities ................................................................................................ iii

INTRODUCTION ..................................................................................................... 1

ARGUMENT ............................................................................................................. 6

I.    STANDARD OF REVIEW ON A MOTION TO DISMISS ................................. 6

II.   COUNTS IV AND V OF THE COMPLAINT ADEQUATELY PLEAD A
      CLAIM AGAINST ALL DEFENDANTS FOR VIOLATION OF § 10(b)
      OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED
      THEREUNDER ...................................................................................................... 6

      A.    Defendants Breached Their Duty to Disclose ............................................. 7

            1.    Defendants Did Not Comply with Regulatory Disclosure
                  Requirements ...................................................................................... 8

            2.    Defendants Failed to Satisfy the Disclosure Requirements
                  of SEC Form N-1A ............................................................................ 10

            3.    Defendants' Argument that Their Disclosure Obligations
                  Are Defined Solely by the SEC's Rule 10b-10 and Form N-
                  1A Is Wrong ....................................................................................... 13

            4.    Defendants Had a Duty to Disclose Based Upon Their
                  Relationship of Trust .......................................................................... 14

            5.    Having Chosen to Speak, Defendants Had a Duty to Speak
                  Truthfully ............................................................................................ 16

      B.    Defendant's Omissions Were Material ....................................................... 17

            1.    None of the Cases Defendants Cite Supports Their
                  Argument that There Was No Duty To Disclose or Material
                  Omissions ............................................................................................ 20

            2.    Defendants Did Not Disclose Their Conflict Of Interest ................. 23

      C.    Plaintiffs Have Adequately Alleged Causation and Damages .................... 24

            1.    The Complaint Adequately Pleads Reliance (or Transaction
                  Causation), Which Is Properly Presumed ......................................... 25

            2.    The Complaint Adequately Pleads Loss Causation .......................... 27

D.     The Complaint Adequately Pleads Scienter ................................................34

III.     PLAINTIFFS HAVE STANDING TO ASSERT CLAIMS ON BEHALF OF INVESTORS IN ALL TIER I FUNDS ..........................................................36

IV.     THE COMPLAINT STATES A CLAIM AGAINST DEFENDANT UBSFS FOR VIOLATION OF § 12(a)(2) OF THE SECURITIES ACT ............38

      A.     The Complaint Sufficiently Alleges That Defendant UBSFS Is a "Seller" Within the Meaning of § 12(a)(2) ...................................38

      B.     The Complaint Adequately Pleads a Claim for Damages Under § 12(a)(2) .........................................................................................41

V.     UBS IS LIABLE AS A CONTROL PERSON UNDER § 15 OF THE SECURITIES ACT AND § 20(a) OF THE EXCHANGE ACT ...........................42

VI.     THE APPLICABLE STATUTE OF LIMITATIONS DOES NOT BAR PLAINTIFFS' CLAIMS UNDER SECTIONS 12 AND 15 OF THE SECURITIES ACT ..............................................................................................43

VII.     PLAINTIFFS HAVE ADEQUATELY SATISIFIED RULE 8 PLEADING REQUIREMENTS FOR THEIR § 36(b) CLAIM AND IT SHOULD BE SUSTAINED ..............................................................................46

VIII.     PLAINTIFFS ADEQUATELY PLEAD § 36(b) AS A DIRECT CLAIM ...........63

IX.     PLAINTIFFS HAVE ADEQUATELY PLED A § 48(a) CLAIM ........................69

X.     SLUSA DOES NOT PREEMPT PLAINTIFFS' STATE LAW CLAIMS ...........70

XI.     PLAINTIFFS' NEW YORK STATE CLAIMS ARE NOT "SECURITIES" CLAIMS AND CANNOT BE DISMISSED ON THIS BASIS ......................................................................................................................71

CONCLUSION ...........................................................................................................................71

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*AUSA Life Ins. Co. v. Ernst & Young,*
  206 F.3d 202 (2d Cir. 2000) ................................................................................27, 29

*Affiliated Ute Citizens v. United States,*
  406 U.S. 128 (1972)................................................................................................3, 4, 25

*In re AllianceBernstein Mut. Funds Excessive Fees Litig.,*
  2006 WL 74439 (S.D.N.Y. Jan 11, 2006) ...............................................................21

*In re Am. Bank Note Holographics, Inc. Sec. Litig.,*
  93 F. Supp. 2d 424 (S.D.N.Y. 2000) ......................................................................38

*Am. High-Income Trust v. AlliedSignal,*
  2006 U.S. Dist. LEXIS 13852 (S.D.N.Y. Mar. 29, 2006) .................................43, 45

*Atencio v. Smith Barney, Citigroup, Inc.,*
  2005 WL 267556 (S.D.N.Y. Feb. 2, 2005).............................................................71

*Auer v. Robbins,*
  519 U.S. 452 (1997)...............................................................................................2

*Backman v. Polaroid Corp.,*
  910 F.2d 10 (1st Cir. 1990)....................................................................................16

*Basic Inc. v. Levinson,*
  485 U.S. 224 (1988).................................................................................. *passim*

*Blue Chip Stamps v. Manor Drug Stores,*
  421 U.S. 723 (1975)................................................................................................33

*Boguslavsky v. Kaplan,*
  159 F.3d 715 (2d Cir. 1998) ....................................................................................42

*Brody v. Transitional Hosp. Corp.,*
  280 F.3d 997 (8th Cir. 2002) ..................................................................................13

*Brzychnalski v. Unesco, Inc.,*
  35 F. Supp. 2d 351 (S.D.N.Y. 1999) .......................................................................37

*Burks v. Lasker,*
  441 U.S. 471 (1979)................................................................................................63

*Caiola v. Citibank, N.A.,*
    295 F.3d 312 (2d Cir. 2002) ................................................................7, 15, 32

*Chris-Craft Indus., Inc. v. Piper Aircraft Corp.,*
    480 F.2d 341 (2d Cir. 1973) ...................................................................14, 15

*Coan v. Kaufman,*
    2006 U.S. App. LEXIS 18444 (2d Cir. July 21, 2006)..........................5, 65, 66, 68

*In re Columbia Entities Litig.,*
    2005 U.S. Dist. LEXIS 33439 (D. Mass. Nov. 30, 2005) .................................64, 66

*Conley v. Gibson,*
    355 U.S. 41 (1957)...................................................................................6, 46

*In re Control Data Corp. Sec. Litig.,*
    933 F.2d 616 (8th Cir. 1991) .........................................................................33

*Daily Income Fund, Inc. v. Fox,*
    464 U.S. 523 (1984)............................................................................. *passim*

*In re Davis Selected Mut. Funds Litig.,*
    2005 U.S. Dist. LEXIS 23203 (S.D.N.Y. Oct. 11, 2005) ...............................21,59

*Davis v. Merrill Lynch, Pierce, Fenner & Smith,*
    906 F.2d 1206 (8th Cir. 1990) ........................................................................32

*De Kwiatkowski v. Bear, Stearns & Co.,*
    306 F.3d 1293 (2d Cir. 2002) .........................................................................15

*DeMarco v. Robertson Stephens Inc.,*
    318 F. Supp. 2d 110 (S.D.N.Y. 2004) ...........................................................14, 26

*Dodds v. Cigna Sec., Inc.,*
    12 F.3d 346 (2d Cir. 1993) ...........................................................................43

*In re Dreyfus Aggressive Growth Mut. Fund Litig.,*
    2000 U.S. Dist. LEXIS 94 (S.D.N.Y. Jan. 6, 2006) ...........................................44

*In re Dreyfus Aggressive Growth Mut. Fund Litig.,*
    2000 U.S. Dist. LEXIS 13469 (S.D.N.Y. Sept. 19, 2000)......................................36

*In re Dreyfus Mut. Funds Fee Litig.,*
    428 F. Supp. 2d 342 (W.D. Pa. 2005)..............................................................4, 53

*Dumond v. Mass. Fin. Services Co.,*
    2006 U.S. Dist. LEXIS 1933 (D. Mass. Jan. 19, 2006)..........................................57

*In re Dura Pharm., Inc. Sec. Litigation,*
    2006 U.S. Dist. LEXIS 41193 (S.D.Cal June 2, 2006)........................................29

*Dura Pharm., Inc. v. Broudo,*
    544 U.S. 336 (2005)..............................................................................27, 29

*In re Eaton Vance Mut. Funds Fee Litig.,*
    380 F. Supp. 2d 222 (S.D.N.Y. 2005) ...........................................21, 58, 59, 63

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group,*
    343 F.3d 189 (2d Cir. 2003) .................................................................27, 28

*In re Eng'g Animation Sec. Litig.,*
    110 F. Supp. 2d 1183 (S.D. Iowa 2000) .........................................................33

*Ernst & Ernst v. Hochfelder,*
    425 U.S. 185 (1976)........................................................................................7

*In re Evergreen Mut. Funds Fee Litig.,*
    423 F. Supp. 2d 249 (S.D.N.Y. 2006) ...........................................................21

*Fecht v. Price Co.,*
    70 F.3d at 1078, 1080-81 (9th Cir. 1995) ......................................................11

*Feinman v. Dean Witter Reynolds, Inc.,*
    84 F.3d 539 (2d Cir. 1996) ...........................................................................22

*Fogarazzo v. Lehman Brothers, Inc.,*
    341 F. Supp. 2d 274, 286 (S.D.N.Y. 2004) ...............................................24, 26

*Foman v. Davis,*
    371 U.S. 178 (1962)......................................................................................72

*Forsythe v. Sun Life Fin., Inc.,*
    417 F. Supp. 2d 100 (D. Mass. 2006)........................................................4, 56

*In re Franklin Mut. Funds Litig.,*
    388 F. Supp. 2d 451 (D.N.J. 2005) ...............................................................63

*Freedman v. La.Pac. Corp.,*
    922 F. Supp. 377, 387 (D. Or. 1996) .............................................................20

*Gebhardt v. ConAgra Foods, Inc.,*
    335 F.3d 824 (8th Cir. 2003) ..........................................................................3

*In re Global Crossing, Ltd. Sec. Litig.,*
    322 F. Supp. 2d 319 (S.D.N.Y. 2004) ...........................................................35

*In re Goldman Sachs Mut. Funds Fee Litig.*,
  2006 U.S. Dist. LEXIS 1542 (S.D.N.Y. Jan. 17, 2006) .......................................21, 59, 63, 89

*Grandon v. Merrill Lynch & Co.*,
  147 F.3d 184 (2d Cir. 1998) ...............................................................................7, 14, 15, 35

*Hicks v. Morgan Stanley & Co.*,
  2003 U.S. Dist. LEXIS 11972 (S.D.N.Y. July 16, 2003) ......................................................36

*Hill York Corp. v. Am. Int'l Franchises, Inc.*,
  448 F.2d 680 (5th Cir. 1971) ..............................................................................................38

*Hopson v. Schilling*,
  418 F. Supp. 1223 (N.D. Ind. 1976) ....................................................................................37

*Hunt v. Invesco Funds Group*,
  2006 U.S. Dist. LEXIS 40944 (S.D. Tex. June 5, 2006) ..............................................*passim*

*ING Principal Prot. Funds Deriv. Litig.*,
  369 F. Supp. 2d 163 (D. Mass. 2005)............................................................................61, 62

*In re Indep. Energy Holdings PLC Sec. Litig.*,
  154 F. Supp. 2d 741 (S.D.N.Y. 2001) ..................................................................................42

*In re Initial Pub. Offering Sec. Litig.*,
  241 F. Supp. 2d 281 (S.D.N.Y. 2003) ..........................................................................*passim*

*Jolly v. Pittore*,
  1992 U.S. Dist. LEXIS 11527 (S.D.N.Y. 1992)....................................................................46

*Jones v. Harris Assoc. L.P.*,
  2005 U.S. Dist. LEXIS  39560 (N.D. Ill. Apr. 7, 2005)..........................................4, 5, 55, 57

*Joseph v. SEC*,
  104 F.3d 285 (9th Cir. 1997) ................................................................................................2

*Kalish v. Franklin Advisers, Inc.*,
  742 F. Supp. 1222 (S.D.N.Y. 1990) ......................................................................50, 59, 60

*Kalnit v. Eichter*,
  264 F.3d 131, 137-38 (2d. Cir. 2001) ..................................................................................35

*Kamen v. Kemper Fin. Servs., Inc.*,
  500 U.S. 90 (1991)..............................................................................................................64

*Keenan v. D.H. Blair & Co.*,
  838 F. Supp. 82 (S.D.N.Y. 1993) ........................................................................................14

*Klein v. PDG Remediation,*
    937 F. Supp. 323 (S.D.N.Y. 1996) ................................................................6, 24

*Krinsk v. Fund Asset Mgmt., Inc.,*
    875 F.2d 404 (2d Cir. 1989) ................................................................47, 53, 63

*Laney v. Am. Equity Inv. Life Ins. Co.,*
    243 F. Supp. 2d 1347 (M.D.Fla. 2003) ................................................................33

*Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,*
    507 U.S. 163 (1993) ................................................................46

*In re Leslie Fay Cos. Sec. Litig.,*
    871 F. Supp. 686 (S.D.N.Y. 1995) ................................................................35

*Levy v. Alliance Capital Mgmt. L.P.,*
    1999 U.S. App. LEXIS 20213 (2d Cir. Aug. 20, 1999) ................................46

*Lowry v. SEC,*
    340 F.3d 501 (8th Cir. 2003) ................................................................2

*In re MCI Worldcom, Inc. Sec. Litig.,*
    93 F. Supp. 2d 276 (E.D.N.Y. 2000) ................................................................35

*In re ML-Lee Acquisition Fund II L.P.,*
    848 F. Supp. 527 (D. Del. 1994) ................................................................69

*Maywalt v. Parker & Parsley Petroleum Co.,*
    147 F.R.D. 51 (S.D.N.Y. 1993) ................................................................36

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit,*
    126 S. Ct. 1503 (2006) ................................................................71

*In re Merrill Lynch & Co. Research Reports Sec. Litig.,*
    272 F. Supp. 2d 243 (S.D.N.Y. 2003) ................................................................21, 57

*Meyer v. Oppenheimer Mgmt Corp.,*
    895 F.2d 861 (2d Cir. 1990) ................................................................60

*Moore v. Comfed Sav. Bank,*
    908 F.2d 834 (11th Cir. 1990) ................................................................37

*In re Morgan Stanley and Van Kampen Mut. Fund Sec. Litig.,*
    2006 U.S. Dist. LEXIS 20758 (S.D.N.Y. Apr. 18, 2006) ............................21, 57

*In re Morgan Stanley & Van Kampen,*
    2006 U.S. Dist. LEXIS 20758 (S.D.N.Y. April 14, 2006) ............................21, 57

*Munoz v. Sesame Place,*
    1998 U.S. Dist. LEXIS 4026 (S.D.N.Y. 1998)...................................................................72

*Mutchka v. Harris,*
    373 F. Supp. 2d 1021 (C.D. Cal. 2005) .......................................................................60

*In re Mut. Funds Inv. Litig.,*
    384 F. Supp. 2d 845 (D. Md. 2005) (MDL 15863) ...................................................30

*In re NTL Inc. Sec. Litig.,*
    347 F. Supp. 2d 15 (S.D.N.Y. 2006) ...........................................................................6

*Nanopierce Techs. v. Southridge Capital Mgmt. LLC,*
    2002 U.S. Dist. LEXIS 24049 (S.D.N.Y. Oct. 10, 2002) .........................................42

*In re NationsMart Corp. Sec. Litig.,*
    130 F.3d 309 (8th Cir. 1997) ...............................................................................25, 38

*Nelson v. Stahl,*
    173 F. Supp. 2d 153 (S.D.N.Y. 2001) .......................................................................45

*Newby v. Enron,*
    2003 U.S. Dist. LEXIS 25038 (S.D. Tex. Dec. 10, 2003)........................................15

*Nortel Network Corp. Sec. Litig.,*
    238 F. Supp. 2d 613 (S.D.N.Y. 2003) .......................................................................34

*Novak v. Kasaks,*
    216 F.3d 300 (2d Cir. 2000) ...............................................................................34, 35

*In re Oppenheimer Funds Fee Litig.,*
    426 F. Supp. 157 (S.D.N.Y. 2006) .............................................................................21

*Ortiz v. Fibreboard Corp.,*
    527 U.S. 815 (1999)....................................................................................................36

*In re Par Pharm., Inc. Sec. Litig.,*
    733 F. Supp. 668 (S.D.N.Y. 1990) .............................................................................16

*Pfeiffer v. Bjurman, Barry & Assoc.,*
    2004 U.S. Dist. LEXIS 16924 (S.D.N.Y. Aug. 26, 2004)........................46, 61, 62

*In re Philip Services Corp. Sec. Litig.,*
    2004 U.S. Dist. LEXIS 9261 .......................................................................................35

*Pinter v. Dahl,*
    486 U.S. 622 (1988)....................................................................................................38

*Press v. Quick & Reilly, Inc.*,
    218 F.3d 121 (2d Cir. 2000) ............................................................................ *passim*

*Pressroom Unions-Printers League Income Sec. Fund v. Cont'l Assurance Co.*,
    700 F.2d 889 (2d Cir.), cert. denied, 464 U.S. 845, 104 S. Ct. 148,
    78 L. Ed. 138 (1983) ................................................................................................65

*Prostic v. Xerox Corp.*,
    1991 U.S. Dist. LEXIS 15950 (D. Conn. July 19, 1991) ......................................68

*In re Prudential Sec. Inc. P'ships Litig.*,
    930 F. Supp. 68 (S.D.N.Y. 1996) ..........................................................................16

*Queen Uno Ltd. P'ship v. Coeur D'Alene Mines Corp.*,
    2 F. Supp. 2d 1345 (D. Colo. 1998)........................................................................35

*Randall v. Loftsgaarden*,
    478 U.S. 647 (1986)..................................................................................................4

*Resnik v. Swartz*,
    303 F.3d 147 (2d Cir. 2002) ..................................................................................14

*Risinger v. Concannon*,
    201 F.R.D. 16 (D. Me. 2001)..................................................................................68

*Rolf v. Blyth, Eastman Dillon & Co.*,
    570 F.2d 38 (2d Cir. 1978), *aff'd in part rev'd in part*, 637 F.2d 77 (2d Cir. 1980)...............32

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) ..................................................................................40

*Rubinstein v. Collins*,
    20 F.3d 160 (5th Cir. 1994) ....................................................................................16

*Ryder Energy Distribution Corp. v. Merrill Lynch Commodities Inc.*,
    748 F.2d 774, 779 (2d Cir. 1984)) ............................................................................6

*SEC v. Mayhew*,
    121 F.3d 44 (2d Cir. 1997) ..............................................................................18, 22

*In re Salomon Smith Barney Mut. Fund Fees Litig.*,
    2006 U.S. Dist. LEXIS 52081 (S.D.N.Y. Jul. 26, 2006) ..................................21, 57

*Siemers v. Wells Fargo & Co.*,
    2006 U.S. Dist. LEXIS 60858 (N.D. Cal. Aug. 14, 2006) ............................... *passim*

*Smith v. Fahnstock & Co.*,
    2002 U.S. Dist. LEXIS 3411 (S.D.N.Y. Feb. 28, 2002)........................................33

*In re Sotheby's Holdings, Inc. Sec. Litig.,*
 2000 U.S. Dist. LEXIS 12504 (S.D.N.Y. Aug. 30, 2000), *aff'd*, 2002 U.S. App.
 LEXIS 5974 (2002) ........................................................................................16

*Stegall v. Ladner,*
 394 F. Supp. 2d 358 (D. Mass. 2005) .......................................................67

*Strigliabotti v. Franklin Res., Inc.,*
 No. 04-0883, 2005 U.S. Dist. LEXIS 9625 (N.D. Cal. Mar. 7, 2005) .............5, 54

*Strougo v. Bassini,*
 282 F.3d 162 (2d Cir. 2002) ......................................................................69

*In re TCW/DW N. America Gov't Income Trust Sec. Litig.,*
 941 F. Supp. 326 (S.D.N.Y. 1996) .............................................................10

*TSC Industrial, Inc. v. Northway, Inc.,*
 426 U.S. 438 (1976) ...................................................................................18

*Tarlov v. PaineWebber CashFund, Inc.,*
 559 F. Supp. 429 (D. Conn. 1983) .............................................................58

*In re Time Warner Sec. Litig.,*
 9 F.3d 259 (2d Cir. 1993) ...........................................................................34

*Titan Group, Inc. v. Faggen,*
 513 F.2d 234 (2d Cir. 1975) .......................................................................25

*In re U.S.A. Classic Sec. Litig.,*
 1995 U.S. Dist. LEXIS 8327 (S.D.N.Y. Jun. 16, 1995) ...........................13, 14, 24

*United States v. Santoro,*
 302 F.3d 76 (2d Cir. 2002) .........................................................................14

*Verkouteren v. Blackrock Fin. Mgmt., Inc.,*
 1999 U.S. Dist. LEXIS 10892 (S.D.N.Y. July 16, 1999) ...........................46

*Voilas v. General Motors Corp.,*
 173 F.R.D. 389 (D.N.J. 1997)....................................................................37

*Wicks v. Putnam Inv. Mgmt., LLC,*
 2005 U.S. Dist. LEXIS 4892 (D. Mass. Mar. 28, 2005).........................5, 55, 56

*Wigand v. Flo-Tek, Inc.,*
 609 F.2d 1028 (2d Cir. 1979) .....................................................................41

*Woodard v. Online Info. Servs.,*
 191 F.R.D. 502 (E.D.N.C. 2000) ...............................................................68

*In re WorldCom Sec. Litig.,*
  294 F. Supp. 2d 392 (S.D.N.Y. 2003) ............................................................ *passim*

*In re Xerox Corp. Sec. Litig.,*
  165 F. Supp. 2d 208 (D. Conn. 2001) ......................................................................6

## DOCKETED CASES

*Enriquez v. Edward D. Jones & Co., L.P.,*
  No. 04 Civ. 00189 042-00126A, slip op., (Mo. Cir. Jan. 6, 2005) ........................32

## FEDERAL STATUTES

15 U.S.C. §77m ..............................................................................................................43

15 U.S.C. § 80a-35(b) ........................................................................................63, 65, 67

17 C.F.R. 240.10b-10(a) ..................................................................................................8

69 Fed. Reg. 9726 ..........................................................................................................10

69 Fed. Reg. 6438, 6441 n.21 ..........................................................................................7

Fed. R. Civ. P. 8 ............................................................................................................40

Fed. R. Civ. P. 23 ..........................................................................................................37

Fed. R. Civ. P. 15(a) ......................................................................................................45

## OTHER AUTHORITIES

Lori Walsh, *The Costs and Benefits to Shareholders of 12b-1 Plans: An Examination of
  Fund Flows, Expenses and Returns* 2 (Apr. 26, 2004) ..........................................62

## INTRODUCTION

Plaintiffs' Consolidated Amended Class Action Complaint (the "Complaint") is divided into two parts. In the first part, Plaintiffs allege a deceptive and secret scheme by UBS-AG ("UBS") whereby its broker ("UBSFS" or "Broker-Dealer Defendant") shoehorned as many investors as possible into a limited number of mutual fund families (referred to herein as the "Tier I Funds" or "Shelf Space Funds") in exchange for kickbacks from these funds. In other words, instead of offering fair, honest and unbiased recommendations to Plaintiffs and the other investors, as it promised, Defendants gave pre-determined recommendations, pushing clients into the pre-selected Shelf Space Funds in order to reap millions of dollars in kickbacks from these Funds with which it had struck secret deals.

In essence, Defendants' conduct is very similar to a broker's "churning" of a client's account merely to obtain commissions, a widely recognized violation of the federal securities laws. The kickbacks injured the Shelf Space Fund shareholders directly as these payments came out of the pockets of investors, disguised as fees they paid as part of their investment in the funds. By failing to make any meaningful or adequate disclosure of these programs, Defendants misled the class members into falsely believing that they were purchasing fund shares at a price that was reasonable in terms of the likely return on investment, when, in fact, the returns were reduced by the improper kickbacks at issue here. These practices violated, *inter alia*, the Securities Act of 1933 ("'33 Act" or "Securities Act") and the Securities Exchange Act of 1934 ("'34 Act" or "Exchange Act"). Additionally, Defendants breached their state law fiduciary duties and violated state consumer protection laws by using Financial Plans as vehicles for steering clients into Tier I Funds, rather than providing unbiased and objective investment advice.

Defendants make numerous arguments regarding this first part of Plaintiffs' Complaint, none of which have merit.  Defendants first argue that they are not liable under the securities laws because they did not have any duty to disclose their shelf space programs to Plaintiffs. Defendants erroneously claim that their disclosure obligations are defined solely by the rules and regulations of the Securities and Exchange Commission ("SEC").  In so arguing, however, Defendants ignore that UBSFS' duty to disclose is also based on its fiduciary relationship with Plaintiffs and that in choosing to make statements calculated to influence the investing public, Defendants had a duty to speak fully and truthfully about the conflicts of interests at issue.

Defendants failed to satisfy their duty to disclose in this case.  Most importantly, Defendants' contentions that they met all the SEC disclosure requirements and all applicable federal securities laws are wrong.  Notably, Defendants' arguments ignore the SEC's actions against sister brokerage firms and mutual fund companies for engaging in the same type of scheme at issue here.   These SEC determinations carry great weight as to the interpretation of those rules and regulations and must be respected.  *See Auer v. Robbins*, 519 U.S. 452, 461 (1997) (an agency's interpretation of its own regulations "is, under our jurisprudence, controlling unless 'plainly erroneous or inconsistent with the regulation'"); *Joseph v. SEC*, 104 F.3d 285, 288 (9th Cir. 1997) (judicial deference accorded to an agency's own construction of its regulations); *Lowry v. SEC*, 340 F.3d 501, 504 (8th Cir. 2003) ("[A]n agency's interpretation of its own regulations is entitled to substantial deference . . ."); *Press v. Quick & Reilly, Inc.*, 218 F.3d 121, 130 (2d Cir. 2000) (same).

Defendants also try to diminish the significance of the kickback scheme, arguing that the payments involved were not material.  Defendants' Brief ("D. Br.") at 21.  However, such payments were material, creating undisclosed conflicts of interest that any reasonable investor

would consider as crucial information when determining whether to trust his or her broker's recommendation to buy a particular mutual fund. *E.g.*, ¶¶8, 120-127.[1]

Additionally, Defendants are wrong to contend that the Complaint fails to plead reliance on the deceptive statements. In *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 155 (1972), the United States Supreme Court made clear that where, as here, a claim is predicated on materially deceptive omissions rather than affirmative misrepresentations, reliance -- and, therefore, transaction causation -- is presumed. Defendants' assertion that Plaintiffs have not been injured by the kickback scheme is also completely without merit and is directly belied by the allegations of the Complaint. Although as mutual fund investors, Plaintiffs and the other Class members purchased their shares at net asset value rather than at a price set by the market, they were misled into believing those shares were a reasonable investment at net asset value. Because the return on investment was less than it would have been if the revenue sharing payments had been actually used to benefit the Funds, loss causation exists regardless of whether a Fund's stock price declined after disclosure of the revenue sharing program. Indeed, "stockholders can be damaged in ways other than seeing their stocks decline. If a stock does not appreciate as it would have absent the fraudulent conduct, investors have suffered a harm." *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 831 (8th Cir. 2003). Moreover, as alleged in the Complaint, a significant portion of those expenses was not being used to provide the services promised, but rather to line Defendants' pockets through the kickback scheme detailed in the Complaint. In such a situation, the correct measure of damages is "the difference between the fair value of all that [the plaintiff] received and the fair value of what he would have received

---

[1] References herein to "¶__" are to the paragraphs in Plaintiffs' Consolidated Amended Class Action Complaint.

had there been no fraudulent conduct." *Randall v. Loftsgaarden*, 478 U.S. 647, 668 (1986) (citing *Affiliated Ute*, 406 U.S. at 155).

In addition, Plaintiffs appropriately plead causes of action under New York's consumer protection statutes arising from Defendants' deceptive practices in selling the Financial Plans. As these claims are brought on behalf of a distinct subclass and relate solely to Defendants' Financial Plans regardless of whether anyone actually purchased securities based upon the Plan, they are not preempted by the Securities Litigation Uniform Standards Act of 1998 ("SLUSA").

The second portion of the Complaint relates to the UBS proprietary funds (the "Funds") and alleges claims under § 36(b) of the Investment Company Act ("§ 36(b)"). As part of their § 36(b) claim, Plaintiffs allege that the compensation and fees paid to the Investment Adviser and Distributor Defendants were excessive because they rose dramatically even though the services provided by these Defendants remained the same, and no additional benefits were provided to the UBS Funds or their investors in return for the additional fees. *See, e.g.*, ¶162. The Complaint sets forth the factual basis for that conclusion with great particularity -- indeed, it provides much more than is even required under applicable pleading standards. Notably, Defendants do not even attempt to dispute -- nor could they -- that the notice pleading standard of Rule 8 of the Federal Rules of Civil Procedure ("Rule 8") applies to a § 36(b) claim. Rule 8 has been satisfied here.

In fact, numerous courts have applied Rule 8 in sustaining § 36(b) claims which included allegations of excessive fees markedly similar to those in this case. *See, e.g., Siemers v. Wells Fargo & Co.*, 2006 U.S. Dist. LEXIS 60858 (N.D. Cal. Aug. 14, 2006); *Hunt v. Invesco Funds Group*, 2006 U.S. Dist. LEXIS 40944 (S.D. Tex. June 5, 2006); *Forsythe v. Sun Life Fin., Inc.*, 417 F. Supp. 2d 100, 116 (D. Mass. 2006); *In re Dreyfus Mutual Funds Fee Litig.*, 428 F. Supp.

2d 342, 349 (W.D. Pa. 2005), *judgment on the pleadings in defendants' favor on other grounds*,

No. 04-128 slip. op. (W.D. Pa. Apr. 10, 2006); *Jones v. Harris Assocs., L.P.*, 2005 U.S. Dist.

LEXIS 39560 (N.D. Ill. Apr. 7, 2005); *Wicks v. Putnam Inv. Mgmt., LLC*, 2005 U.S. Dist.

LEXIS 4892 (D. Mass. Mar. 28, 2005); *Strigliabotti v. Franklin Res., Inc.*, 2005 U.S. Dist.

LEXIS 9625 (N.D. Cal. Mar. 7, 2005). Indeed, Plaintiffs' Complaint demonstrates how

Defendants received "something for nothing" because they received increased fees which were

not the result of any increase or improvement in services being provided to the Funds. *See, e.g.*,

*Jones*, 2005 U.S. Dist. LEXIS 39560, at *6-7.

      In the face of Plaintiffs' well-pled Complaint, Defendants have moved to dismiss on

wholly unavailing grounds. Defendants argue that Plaintiffs have not made sufficient allegations

to support their § 36(b) claim by citing cases involving complaints with far fewer factual

allegations. D. Br. at 3-4, 43-44. Unlike the cases Defendants cite, however, Plaintiffs'

Complaint contains highly detailed factual allegations regarding the funds at issue and does not

rely solely on allegations regarding Defendants' revenue sharing programs to demonstrate the

excessiveness of Defendants' fees. Defendants' repeated attempts to argue the merits of

Plaintiffs' § 36(b) claim, such as whether Defendants' 12b-1 fees actually benefited the Funds,

should also be rejected because such considerations are not appropriate at the motion to dismiss

stage.

      Despite Plaintiffs' pleading of their § 36(b) claim derivatively and, in the alternative,

directly, Defendants also argue that Count VIII, the § 36(b) claim that Plaintiffs brought in the

alternative as a direct claim, should have been brought derivatively. Defendants support their

argument with several arguments which misinterpret the statutory text of § 36(b) and the

Supreme Court's holding in *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523 (1984). Moreover,

Defendants' arguments ignore the Second Circuit's recent decision which confirms that § 36(b) provides Plaintiffs with a primary and direct claim. *See Coan v. Kaufman*, 2006 U.S. App. LEXIS 18444 (2d Cir. July 21, 2006).  Since Plaintiffs have included detailed allegations in their Complaint which demonstrate that Defendants have breached their fiduciary duties by charging and receiving such excessive fees, this Court should sustain their § 36(b) claims.

## ARGUMENT

### I.      STANDARD OF REVIEW ON A MOTION TO DISMISS

Dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief may be granted is not warranted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *In re Xerox Corp. Sec. Litig.*, 165 F. Supp. 2d 208, 213 (D. Conn. 2001) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).  "The task of the court in ruling on a Rule 12(b)(6) motion 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" *Id.* at 213 (quoting *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities Inc.*, 748 F.2d 774, 779 (2d Cir. 1984)) (internal quotation marks and citation omitted).  The Federal Rules require that when considering a motion to dismiss, a "[c]ourt accepts as true all allegations in the complaint and draws all reasonable inferences in the plaintiff's favor." *In re NTL Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 21 (S.D.N.Y. 2006).

### II.     COUNTS IV AND V OF THE COMPLAINT ADEQUATELY PLEAD A CLAIM AGAINST ALL DEFENDANTS FOR VIOLATION OF § 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER

The main purpose of the federal securities laws "is disclosure, with the ultimate goal of investor protection." *Klein v. PDG Remediation,* 937 F. Supp. 323, 328 (S.D.N.Y. 1996) ("The ['33] Act was passed in order to ensure that investors had enough information to enable them to

arrive at their own rational decisions."); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 230 (1988) ("[T]he fundamental purpose of the ['34] Act [is one] implementing a philosophy of full disclosure . . ."); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976) (the Securities Act "was designed to provide investors with full disclosure of material information").  As shown below, Defendants violated the federal securities laws by failing to disclose material information.

### A.    Defendants Breached Their Duty to Disclose

A duty to disclose material facts arises under any one of the following four scenarios: 1) when a statute or regulation requires such disclosure; 2) in the context of a mutual fund prospectus and corresponding Statement of Additional Information ("SAI") (collectively, the "prospectus"); 3) when one party has information that the other party is entitled to know because of a fiduciary or other similar relationship of trust and confidence between them; or 4) when a party chooses to make a disclosure, despite not having been required initially to disclose information, thereby triggering a duty to disclose all material facts to avoid making the voluntary disclosure "untrue or misleading" in any way.  *See, e.g.*, *In re Initial Pub. Offering Sec. Litig.* (IPO), 241 F. Supp. 2d 281, 388 (S.D.N.Y. 2003) (duty to disclose pursuant to SEC rules and regulations); *Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 189 (2d Cir. 1998) (duty to disclose exists where there is a relationship of trust or other special circumstances between the parties); *Caiola v. Citibank, N.A.*, 295 F.3d 312 (2d Cir. 2002) ("[U]pon choosing to speak, one must speak truthfully about material issues.").  While failure to disclose under just any one of these scenarios constitutes an actionable violation under the federal securities laws, here, Defendants are liable under all four.[2]

---

[2]  Defendants argue that neither the SEC nor the NASD prohibited the practice of revenue sharing during the class period and that since "revenue sharing payments were not a fund expense but are made from the advisor's own resources," funds need not disclose these

1.      **Defendants Did Not Comply with Regulatory Disclosure Requirements**

Defendants breached their disclosure obligations under SEC Rule 10b-10 and other rules and regulations by failing to disclose material information concerning the shelf space payments and the inherent conflicts of interest they created.  Rule 10b-10, promulgated under § 10(b) of the Exchange Act of 1934, recites that it is:

> [U]nlawful for any broker or dealer to effect for or with an account of a customer any transaction in, or to induce the purchase or sale by such customer of, any security . . . ***unless such broker or dealer, at or before completion of such transaction, gives or sends to such customer written notification disclosing . . . [the source and] amount of any other remuneration received or to be received by the broker from such customer in connection with the transaction . . . .***

17 C.F.R. 240.10b-10(a) (emphasis added).  This rule addresses the underlying policy concern that "dual agency representation [by a broker] presents a potential for abuse since there is a prima facie problem in representing fairly the rights of parties having conflicting interests."  Rule 10b-10 Adopting Release, Exchange Act Rel. No. 13508, 1977 SEC LEXIS 1818, at *24 (May 5, 1977).

---

payments.  D. Br. at 21.  In so arguing, Defendants miss the point Plaintiffs have made in their Complaint, which is that the Defendants in this case made their revenue sharing payments from fund assets and not the advisor's own resources -- a practice which is not "accepted" as Defendants claim.  *See* ¶¶202-206.  The SEC has expressed concern over these practices, stating that, "[r]evenue sharing arrangements not only pose potential conflicts of interest, but also may have the indirect effect of reducing investors' returns by increasing the distribution-related costs incurred by funds.  Even though revenue sharing is paid to broker-dealers directly by fund investment advisers, rather than out of fund assets, it is possible that some advisers may seek to increase the advisory fees that they charge the fund to finance those distribution activities . . . .  Moreover, revenue sharing arrangements may prevent some advisers from reducing their current advisory fees."  Confirmation Requirements and Point of Sale Disclosure Requirements for Transactions in Certain Mutual Funds and Other Securities, and Other Confirmation Requirement Amendments, and Amendments to the Registration Form for Mutual Funds, 69 Fed. Reg. 6438, 6441 n.21 (Feb. 10, 2004) (to be codified at 17 C.F.R. pts. 239, 240 and 274).

Likewise, the NASD, which is also responsible for regulating the Broker/Dealer Defendants, has extensive rules governing their conduct.  In March of 1994, the NASD issued Notice to Members No. 94-14 to "clarify the level of disclosure necessary to comply with NASD rules," specifically Article III, § 26 of the NASD Rules of Fair Practice (current NASD Rule 2830).  Notice 94-14 states that NASD members, such as the Broker/Dealer Defendants, are prohibited from receiving "any discount, concession, fee, or commission" from mutual fund underwriters in selling mutual funds "unless the compensation is disclosed in the mutual fund prospectus."  Moreover, Notice 94-14 prescribes, "if special compensation arrangements have been made with individual members that are not generally available to all members, ***the details of the arrangements and the identities of the members receiving the special arrangements must be disclosed***." *Id.* (emphasis added).  In other words, Notice 94-14 made clear to broker/dealers, including Defendants, that they could not accept compensation from mutual funds unless they assured themselves that the funds' prospectuses contained adequate disclosures.

Later that same year, the NASD reiterated that this obligation applied to members' current disclosure obligations and was a continuing duty, stating:

> In publishing Notice to Members 94-14, the NASD was addressing its concern that the current level of disclosure in many cases does not meet the requirements of § 26 (1)(1)(C).  The NASD determined to remind members of their obligations under that provision and provide clear guidance to assist members in reviewing and, where necessary, modifying current disclosure in the fund prospectus.

NASD Notice to Members 94-41.  In addition, the NASD's Anti-Reciprocal rule, Rule 2830(k), prohibits members from favoring the distribution of shares of particular mutual funds on the basis of brokerage commissions to be paid by the mutual fund companies, as follows:

> (1)  No member shall directly or indirectly, favor or disfavor the sale or distribution of shares of any particular investment company or group of investment companies on the basis of brokerage commissions received or

expected by such member from any source, including such investment company, or any covered account.

*    *    *

(3)  No member shall . . . request or arrange for the direction to any member of a specific amount or percentage of brokerage commissions conditioned upon that member's sales or promise of sales of shares of an investment company.

Defendants violated these requirements by accepting millions of dollars in improper kickback payments that were not disclosed in the corresponding Fund prospectuses or their own communications with customers.  Furthermore, the SEC has made clear that the form of directed brokerage in which UBS engaged has always been prohibited.  For example, the SEC has stated with respect to the type of directed brokerage revenue sharing payments at issue here that: "our review of current practices, however, suggests that many arrangements that direct brokerage to reward selling brokers for distribution constitute more than mere allocation of brokerage, and are not consistent with our 1981 rationale . . . ." 69 Fed. Reg. 9726, 9728 (emphasis added).

### 2.    Defendants Failed to Satisfy the Disclosure Requirements of SEC Form N-1A

SEC Form N-1A sets forth the information the SEC requires investment companies to disclose in registration statements.  Although, as explained below, the '33 Act and '34 Act impose broader disclosure requirements than those mandated by Form N-1A, a violation of Form N-1A often constitutes a *per se* violation of those Acts.  *In re TCW/DW N. Am. Gov't Income Trust Sec. Litig.*, 941 F. Supp. 326, 339 (S.D.N.Y. 1996).  The purpose of Form N-1A is to "help investors to evaluate the risks of an investment and to decide whether to invest in a fund by providing a balanced disclosure of positive and negative factors.  Disclosure in the prospectus should be designed to assist an investor in comparing and contrasting the Funds with other funds."  Securities Exchange Commission Form N-1A (Form ID 2052), General Instruction C (1)(b)).  Item 15(c) of Form N-1A requires the SAI for a prospectus to include a detailed

-10-

description of "how the Fund will select brokers to effect securities transactions for the Fund."
*Id.* Item 15(c) further recites, "[i]f the Fund will consider the receipt of products or services
other than brokerage or research services in selecting brokers, [the Fund should] specify those
products or services." *Id.*

Defendants' contention that the MFS prospectus and SAI highlighted in the Complaint
satisfied Form N-1A and all other applicable disclosure requirements (D. Br. at 23) is wrong and
flies in the face of what the SEC has determined to constitute adequate disclosure under the
federal securities laws.  To wit, in an action filed against MFS on March 31, 2004 for violation
of the federal securities laws, the SEC determined that statements such as those made in the MFS
prospectus and SAI, *see* ¶¶124-126, "did not adequately disclose to . . . shareholders that [MFS]
allocated fund brokerage commissions to satisfy strategic alliances." *See* SEC Order Instituting
Administrative and Cease-And-Desist Proceedings, Making Findings, and Imposing Remedial
Sanctions, In the Matter of Massachusetts Financial Services Company, Mar. 31, 2004, *available
at* http://www.sec.gov/litigation/admin/ia-2224.htm.  As the SEC explained, such statements in
prospectuses did not effectively communicate and ***"did not adequately disclose that MFS had
entered into bilateral arrangements with those broker-dealers to allocate specific negotiated
amounts to fund brokerage commissions for specified marketing and distribution services."***
*Id.* (emphasis added).

The SEC has also fined and sanctioned Tier I Fund Franklin/Templeton for failing to
make adequate disclosures of the shelf space arrangements it had with broker/dealers, noting,
*inter alia*, that "[a]lthough the SAIs stated that [Franklin/Templeton] could consider a broker-
dealer's sales of fund shares when selecting a broker-dealer to execute portfolio transactions,
***they did not describe FTDI's practice of annually negotiating shelf space arrangements with***

*certain broker-dealers.*" *See* ¶126 n.2 (citing SEC Order Instituting Administrative And Cease-And-Desist Proceedings, Making Findings, And Imposing Remedial Sanctions, In the Matter of Franklin Advisers, Inc. and Franklin/Templeton Distributors, Inc., *available at* http://www.sec.gov/litigation/admin/34-50841.htm (emphasis added)).

In a leading enforcement action on the issue, the SEC fined Edward Jones $75 million for "failure to adequately disclose revenue sharing payments that it received from a select group of mutual fund families that Edward Jones recommended to its customers." *See* ¶129 (citing In the Matter of Edward D. Jones & Co., L.P., Order Instituting Administrative and Cease-and-Desist Proceedings, SEC Release No. 8520, Dec. 22, 2004, *available at* http://www.sec.gov/litigation/admin/33-8632.pdf). The undisclosed facts for which the SEC censured and fined Edward Jones are the same material facts that are the heart of the Complaint in this case. *Id.* The SEC further determined that the "*prospectuses and SAIs fail[ed] to disclose adequate information about the source and the amount of the revenue sharing payments to Edward Jones and the dimensions of the resulting potential conflicts of interests*" and concluded that, as a result, Edward Jones' actions had violated § 17(a)(2) of the Securities Act and SEC Rule 10b-5 under the Exchange Act. *Id.* (emphasis added).

Here, the Tier I Funds' Prospectuses and accompanying SAIs contained the same type of language that the SEC determined in the SEC enforcement actions against MFS, Franklin/Templeton and Edward Jones to be inadequate. In the instant case, Defendants did not adequately disclose in the prospectuses that the corresponding Funds were engaged in "shelf-space programs" at UBS through which brokers were paid to push the Tier I Funds. *See* ¶¶124-130. Nor did they disclose that they were paying higher commissions to certain brokers for preferential marketing treatment rather than for research or other distribution services. *See*

¶¶133-139.  Defendants further failed to reveal the conflicts of interest to shareholders that such
"shelf space programs" created.  *See* ¶¶128-130, 136.    Consequently, under the SEC's
interpretation of its own rules and regulations, Defendants failed to meet the basic reporting
requirements of Form N1-A.  These allegations demonstrate a duty to disclose and whether
Defendants satisfied that duty is an issue for the trier of fact.

### 3.    Defendants' Argument that Their Disclosure Obligations Are Defined Solely by the SEC's Rule 10b-10 and Form N-1A Is Wrong

As shown above, Defendants violated the disclosure requirements of SEC rules and
regulations and Form N-1A, either of which is enough to impose liability under the federal
securities laws.  In addition, however, it is also well-settled that the duty of disclosure is not
limited merely to information explicitly required by SEC rules and regulations and that "the
requirement is that any public statements companies make that could affect security sales . . . not
be misleading or untrue."  *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir.
2002).  Indeed, in *Press*, a case on which Defendants place great reliance in arguing their case
for dismissal, the Second Circuit cited with approval an SEC Release referring to the SEC's
"longstanding position that the antifraud provisions of the federal securities law may impose,
given the circumstances, greater than what may be required by a specific rule or regulation."
*Press*, 218 F.3d at 131.

In their Motion, Defendants define their disclosure obligations to fall narrowly within the
purview of SEC Rule 10b-10 and Form N-1A.  D. Br. at 20-26.  However, as the foregoing
authorities establish, Defendants' duties are much broader.  In *In re U.S.A. Classic Sec. Litig.*,
1995 U.S. Dist. LEXIS 8327, at *5-6 (S.D.N.Y. Jun. 16, 1995), the court rejected the very same
argument that Defendants make here, stating:

> In this regard [the defendants] note that the information allegedly not disclosed is
> not required to be disclosed by the applicable regulations of the Securities &

Exchange Commission. ***What defendants overlook, however, is that they were obligated not to fail to state facts necessary to make those statements that were made not misleading.***

*Id.* (emphasis added). In fact, Defendants are under the same duty discussed in *U.S.A. Classic* to make true statements that are not misleading, regardless of whether such duty is explicitly stated in any SEC rule or regulation, or not. *See Resnik v. Swartz*, 303 F.3d 147, 151 (2d Cir. 2002) ("[O]mission of information from a proxy statement will violate these provisions [of the Exchange Act] if either the SEC regulations specifically require disclosure of the omitted information in a proxy statement, ***or the omission makes other statements in the proxy statement materially false or misleading.***") (emphasis added).

### 4. Defendants Had a Duty to Disclose Based Upon Their Relationship of Trust

By holding themselves out as "financial advisors" and convincing investors to place money in the Tier I Funds, Defendants' brokers created a relationship of trust with Plaintiffs and other investors. *See, e.g., United States v. Santoro,* 302 F.3d 76, 80 (2d Cir. 2002) (noting that a broker has an affirmative duty to disclose all relevant information, including the receipt of excessive commissions); *Grandon,* 147 F. 3d at 189 (brokers had a duty to reveal excessive mark-ups); *Keenan v. D.H. Blair & Co.,* 838 F. Supp. 82, 89 (S.D.N.Y. 1993) ("[S]ecurities dealers owe a special duty of fair dealing to their customers.). Defendants used this special relationship to convince investors to invest in the Tier I Funds that generated enormous fees for them. Because of this relationship, Defendants were under a duty to disclose all material aspects of the investments, including the practices and conflicts of interest complained about in this action.

In *Chris-Craft Indus., Inc. v. Piper Aircraft Corp.,* 480 F.2d 341 (2d Cir. 1973), the Second Circuit held that such a relationship creates an affirmative duty to disclose all material information:

The initial inquiry in each case is what duty of disclosure the law should impose upon the person being sued. . . . In making this determination we should bear in mind that a major congressional purpose behind the securities laws in general, and the antifraud provisions in particular, is the protection of investors who rely on the completeness and accuracy of information made available to them . . . . *Those with greater access to information, or having a special relationship to investors making use of the information, often may have an affirmative duty of disclosure. When making a representation, they are required to ascertain what is material as of the time of the transaction and to disclose fully "those material facts about which the [investor] is presumably uninformed and which would, in reasonable anticipation, affect his judgment."*

*Id.* at 363 (citation omitted) (emphasis added).

Liability has been repeatedly recognized for failure to disclose conflicts regarding compensation.[3] Such decisions reflect the fundamental principle that a broker "is obliged to give honest and complete information when recommending a purchase or sale." *Newby v. Enron,* 2003 U.S. Dist. LEXIS 25038, at * 32 (S.D. Tex. Dec. 10, 2003) (citing *De Kwiatkowski v. Bear, Stearns & Co.,* 306 F.3d 1293, 1302 (2d Cir. 2002)). Here, Defendants failed to give "honest and complete information." Instead they misled investors by not disclosing their kickback scheme, their tactics of coercion, their use of mutual fund fees to effectuate that kickback scheme, and the brokers' resulting conflicts of interest.

---

[3] *See, e.g., Grandon,* 147 F.3d at 189 (brokers had a duty to disclose excessive mark-ups on bonds); *Dep't of Enforcement v. Premier Capital,* 2001 NASD Discip. LEXIS 17 (N.A.S.D.R. June 25, 2001) (failure to disclose receipt of cash in exchange for a buy recommendation); *SEC v. Rumorsearch.com, Inc.,* Exchange Act Release No. 197884, 2001 SEC LEXIS 382 (Feb. 28, 2001) (§10(b) violation for touting stock while receiving compensation from issuer); *In re Shaughnessy,* Exchange Act Release No. 34-40224, 1998 SEC LEXIS 1507, at *4 (June 22, 1998) (failure to disclose broker's revenue arrangement with promoter and receipt of kickbacks while recommending stock violated NASD antifraud Rules 2110 and 2120); *SEC* v. *Hall,* Exchange Act Release No. 15901, 1998 SEC LEXIS 2039 (Sept. 24, 1998) (failure to disclose that defendants were paid compensation by issuers for promoting their stock violated §17(b) of the Securities Act and §10(b) of the Exchange Act).

**5.      Having Chosen to Speak, Defendants Had a Duty to Speak Truthfully**

Defendants also violated the well-settled rule that a duty to speak the full truth arises under the federal securities laws when a defendant undertakes to say anything.  *See e.g.*, *Caiola*, 295 F.3d at 331 ("[U]pon choosing to speak, one must speak truthfully about material issues . . . . Once [defendant] chose to discuss its hedging strategy, it had a duty to be both accurate and complete.") (citation omitted); *In re Sotheby's Holdings, Inc. Sec. Litig.*, 2000 U.S. Dist. LEXIS 12504, at *13 (S.D.N.Y. Aug. 30, 2000) ("[W]hen a corporation does make a disclosure -- whether it be voluntary or required -- there is a duty to make it complete and accurate."), *aff'd*, 2002 U.S. App. LEXIS 5974 (2002); *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 675 (S.D.N.Y. 1990) (same); *Rubinstein v. Collins*, 20 F.3d 160, 170 (5th Cir. 1994) ("a duty to speak the full truth arises when a defendant undertakes a duty to say anything").  Indeed, it is well-established law that, even if a defendant is not otherwise under a duty to disclose information, but voluntarily chooses to make a statement that is reasonably calculated to influence the investing public, the defendant has a duty to disclose sufficient information so that the statement made is not "so incomplete as to mislead."  *Backman v. Polaroid Corp.,* 910 F.2d 10, 16 (1st Cir. 1990) (en banc) (citing *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 862 (2d Cir. 1968)).

The Complaint details the instances where, although Defendants chose to speak, they failed to speak fully and truthfully concerning the conflicts of interest at issue in this litigation. ¶¶120-137.  For example, stating that something is a mere possibility as the Shelf Space Funds prospectuses do, when it is in fact a certainty that has already occurred - as the Complaint and the SEC and NASD actions against sister brokerages evidence - is misleading.  *See, e.g., In re Prudential Sec. Inc. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) (securities disclosures are inadequate that misrepresent a certainty as a possibility, for it is "no protection to someone

who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies only a foot away").[4]  The recent *Wells Fargo* decision found a duty to disclose existed in such a circumstance when it held:

> This order agrees with the SEC administrative rulings that there is a difference between a circumstance where a fund *may* award future business on the basis of sales . . . and a circumstance where a fund *already has* fixed payback arrangements in place . . . Defendants had a duty to state all facts that were necessary to make their affirmative statements not misleading.  The representation left the impression that the payback arrangement might (or might not) materialize when it was, in reality, already a done deal.  This was misleading.

*Wells Fargo*, 2006 U.S. Dist. LEXIS 60858, at *16-17.

**B.    Defendant's Omissions Were Material**

Despite Defendants' assertions to the contrary, the disclosures regarding revenue sharing and directed brokerage that Defendants omitted from the prospectuses are unquestionably material.  "To be material, the information need not be such that a reasonable investor would necessarily change his investment decision based on the information, as long as a reasonable investor would have viewed it as significantly altering the 'total mix' of information available." *SEC v. Mayhew*, 121 F.3d 44, 52 (2d Cir. 1997) citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

Here, Plaintiffs have adequately alleged that Defendants had a conflict of interest which caused them to give investors biased advice.  Plaintiffs allege, *inter alia*, that Defendants gave "pre-determined recommendations, steering clients into a pre-selected, limited number of mutual funds," (¶3); sold Tier I Funds "to the exclusion of other funds, regardless of the shareholders'

---

[4]  Defendants argue that the SEC did not require the "precise disclosures that Plaintiffs seek" (D. Br. at 23), yet as the caselaw above demonstrates, once Defendants chose to speak, they were required to do so in a full and truthful manner.  As explained above, Defendants failed to do so, thus making their disclosures misleading and actionable.

best interests," (¶4); "claimed to provide unbiased financial planning and fund investment advice in their clients' best interests" . . . but instead gave "biased investment advice," (¶4); "aggressively marked [Tier I Funds] to investors," (¶8); and "endemic in UBS' corporate culture was the drive to sell Tier I Funds" ¶62. In the case at bar, Defendants represented that they offered objective investment advice, but in actuality, directed customers into a small group of mutual funds that were designated the Tier I Funds. *See, e.g.*, ¶¶2, 3. While UBS earned a few dollars per transaction involving Tier I Funds, over thousands of transactions, these payments resulted in millions and millions of dollars which biased the Defendants' recommendations. *See, e.g.*, ¶¶59, 93-100. By failing to disclose such information, Defendants misled investors because Defendants' advice was not objective as promised. *See, e.g.*, ¶¶2-3, 124-125. Defendants' misrepresentation of objectivity in selling mutual funds is material under the *Basic*, 485 U.S. at 231-32, standard because Defendants' program to sell the Tier I Funds -- and UBSFS' resulting conflict of interest -- constitutes information that a reasonable investor would view as significantly altering the "total mix" of information made available to the investor. *See, e.g.*, *Press*, 218 F.3d at 130 ("[investors'] knowledge that their broker dealers have a conflict of interest . . . is material"); *Wells Fargo*, 2006 U.S. Dist. LEXIS 60858, at * 17; *In re WorldCom Sec. Litig.*, 294 F. Supp. 2d 392 (S.D.N.Y. 2003).

*WorldCom* is closely on point. There, plaintiffs sued the analyst Jack Grubman and Salomon Smith Barney ("SSB") for failing to disclose that recommendations to purchase WorldCom stock made by Grubman and other SSB analysts were tainted by conflicts of interest due to *quid pro quo* arrangements between WorldCom and the defendants. In denying defendants' motion to dismiss, the court held that:

> [I]nvestors were misled by material misrepresentations and omissions by Jack
> Grubman and SSB in SSB's analyst reports and by SSB in WorldCom's

Registration Statements. The SSB Defendants' analyst reports and the Registration Statements issued in connection with the 2000 and 2001 Offerings were false and misleading not only because they misrepresented WorldCom's financial condition, ***but also because they failed to disclose key information regarding the nature and extent of an illicit quid pro quo arrangement that existed between the SSB Defendants and WorldCom***.

294 F. Supp. 2d at 404 (emphasis added).  Here, Plaintiffs have alleged essentially the same type of *quid pro quo* arrangement that existed in *WorldCom*.  As stated in *WorldCom*, such information would be material to an investor:

Had that self-serving arrangement been adequately disclosed, it would have been apparent that Grubman's positive reports . . . and recommendations to buy . . . ***were not reliable advice from an independent analyst and trustworthy brokerage house***.

*Id.* (emphasis added).  Here, too, Plaintiffs and the other class members would certainly have wanted to know that the advice they were receiving was not reliable and was coming from an untrustworthy source.  Manifestly, facts concerning Defendants' revenue sharing and directed brokerage arrangements with the Tier I Fund families created conflicts of interest that any reasonable investor would certainly want to know before deciding whether to invest.  Moreover, "[w]hether an omission is 'material' is a determination that 'requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts and the significance of those inferences to him and these assessments are peculiarly ones for the trier of fact.'" *Fecht v. Price Co.*, 70 F.3d 1078, 1080-81 (9th Cir. 1995); *Freedman v. La.-Pac. Corp.*, 922 F. Supp. 377, 387 (D. Or. 1996) ("[W]hether an omission is material and whether a statement is misleading are two interrelated, but separate, fact-specific inquiries.").

*DeMarco v. Robertson Stephens Inc.*, 318 F. Supp. 2d 110, 118 (S.D.N.Y. 2004) is similarly on point.  There, plaintiffs alleged that analysts from Robertson Stephens, which wrote purportedly unbiased recommendations to buy certain stocks, were in fact self-interested, and that their reports were compromised by the resulting conflicts of interest.  In denying the

defendants' motion to dismiss, the court found that the type of information that Robertson Stephens failed to disclose was material, stating: "it is entirely reasonable that investors would consider [it] as part of the 'total mix' of information available when making purchases." *Id.* Here, Plaintiffs complain about the same type of conflicts of interest that the court in *DeMarco* found would be material information to an investor.

In *Wells Fargo*, the court found that very similar omissions to those made in this case were material under the standard of *Basic*, 485 U.S. at 231-32 because, *inter alia*:

> The very nature of the [revenue sharing] program suggests that the failure to disclose it was material. The investment advisers who compensated the broker-dealers obviously believed that the payments led to increased sales of their funds. If the investment advisers believed that the payments were enough to drive sales, then it is reasonable now for us to infer the same. If the payments were enough to drive sales, disclosure of them would have been material to an investor considering a broker's advice to buy those shares.

*Wells Fargo*, 2006 U.S. Dist. LEXIS 60858, at *18. Moreover, the court in *Wells Fargo* held that "the distinction between a firm, already-extant kickback arrangement and a mere possibility of additional compensation sufficiently alleges a material omission, at least at the pleading stage." *Id.* Here, Plaintiffs have given several examples of Tier I funds prospectuses which stated that the prospect of the brokers' additional compensation per the shelf space program was a mere possibility when in fact Defendants knew that such compensation had already been given. ¶¶120-137. Here, as in *Wells Fargo*, these omissions were unquestionably material.

### 1. None of the Cases Defendants Cite Supports Their Argument that There Was No Duty To Disclose or Material Omissions

Defendants argue that Plaintiffs have not adequately plead a material omission, or to put it another way, Defendants argue there was no duty to disclose that Defendants' advice was not objective. D. Br. at 19-20. Defendants suggest that nine decisions from the United States District Court for the Southern District of New York support their view. *Id.* at 1, 14, and 15. A review

of those nine decisions shows that they do not support Defendants' arguments regarding the duty to disclose in the context of an action alleging a violation of the Exchange Act and Securities Act. Only three of those cases were based upon Securities Act or Exchange Act liability. Six of the decisions, *In re Oppenheimer Funds Fee Litig.*, 426 F. Supp. 157 (S.D.N.Y. 2006); *In re Evergreen Mut. Funds Fee Litig.*, 423 F. Supp. 2d 249 (S.D.N.Y. 2006); *In re Goldman Sachs Mut. Funds Fee Litig.*, 2006 U.S. Dist. LEXIS 1542 (S.D.N.Y. Jan., 17, 2006); *In re AllianceBernstein Mut. Funds Excessive Fees Litig.*, 2006 U.S. Dist. LEXIS 939 (S.D.N.Y. Jan. 11, 2006); *In re Davis Selected Mut. Funds Fee Litig.*, 2005 U.S. Dist. LEXIS 23203 (S.D.N.Y. Oct. 11, 2005); and *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222 (S.D.N.Y. 2005), alleged that certain defendants affiliated with mutual funds companies charged mutual fund investors excessive fees in violation of the Investment Company Act, the Investment Advisers Act, and state law. The decisions did not address the issue of whether a conflict of interest can be material to a purchaser of mutual funds.

Of the three cases alleging violations of the Exchange Act and Securities Act, the opinions granted dismissal for reasons that do not bear upon the duty to disclose alleged in the case at bar. *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 2006 U.S. Dist. LEXIS 52081 (S.D.N.Y. Jul. 26, 2006) only addressed the issue of loss causation and did not address the issue of Defendants' duty to disclose. In *In re Morgan Stanley and Van Kampen Mut. Fund Sec. Litig.*, 2006 U.S. Dist. LEXIS 20758 (S.D.N.Y. Apr. 18, 2006) and *In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.,* 434 F. Supp. 2d 233 (S.D.N.Y. 2006), the alleged omissions were the defendants' failure to disclose revenue sharing payments made to individual broker-dealers. In *Morgan Stanley,* the court held that these omissions were immaterial because the payments, a

participation fee of 15 to 20 basis points[5] on gross sales and 5 basis points annually on shares the investor held for one year, were not sufficiently large. In this case, by contrast, Plaintiffs have alleged that the Broker-Dealer Defendants were paid an additional 1%, or 100 basis points, when proprietary funds were sold. ¶99. These payments are material because Plaintiffs were more likely than those in *Morgan Stanley* to have seen disclosure of these payment amounts, which were much higher than those in *Morgan Stanley*, as significantly altering the "total mix" of information available. *See, e.g., Mayhew*, 121 F.3d at 52.

Moreover, in reaching his decision in *In re Morgan Stanley*, Judge Owen quoted *Feinman v. Dean Witter Reynolds, Inc.*, 84 F.3d 539, 541 (2d Cir. 1996) that "[n]o reasonable investor would have considered it important, in deciding whether or not to buy or sell stock, that a transaction fee of a few dollars might exceed the broker's actual handling charges." Yet it makes little difference whether a particular investor paid a small amount or large amount of fees on an individual transaction. What matters in this case is the fact that the aggregate revenue sharing payments Defendants received created an undisclosed conflict of interest which caused Defendants to give investors biased advice. Here, Defendants made revenue sharing payments that they believed would have the cumulative effect of increasing the sales of the Shelf-Space Funds. As the *Wells Fargo* court correctly held, "if payments were enough to drive sales, disclosure of them would have been material to an investor considering a broker's advice to buy those shares." 2006 U.S. Dist. LeXIS 60858, at *18.

---

[5] A basis point ("bp") is one-hundredth of a percentage point (0.01%). For example, 10bps of $1 billion equals $1 million.

## 2. Defendants Did Not Disclose Their Conflict Of Interest

While Defendants spend considerable effort at the beginning of their brief arguing that they had no duty to disclose revenue sharing payments, Defendants seem to change position and argue that they did have a duty to disclose their revenue sharing payments, but that they made adequate disclosures. D. Br. at 22 ("Moreover, while broker-dealers like UBSFS are required under Rule 10b-10 to disclose their receipt of revenue sharing payments . . ."). According to Defendants, the decision in *Press* stands for the proposition that Defendants met the SEC's applicable disclosure requirements as set forth in its rules and regulations. *Id.* Defendants are wrong for several key reasons.

First, in *Press*, the Second Circuit held that the plaintiffs' "knowledge that their broker-dealers have a conflict of interest, *i.e.*, that their broker-dealers are paid by the money market funds the broker dealers selected for 'automatic sweeps' of plaintiffs' uncommitted account balances, *is material.*" *Id.*, 218 F.3d at 130 (emphasis added). Second, although the Second Circuit held that defendants did not omit material information because defendants had fully complied with the requirements of SEC Rule 10b-10, it did so only because the SEC had filed an amicus brief stating that, *on the particular facts of that case*, the defendants' disclosure comported with Rule 10b-10. Although the Second Circuit expressed some concern as to whether the disclosures made were adequate, it deferred to the SEC's expertise in this area, stating:

> By concluding that the disclosures in the fund prospectuses and SAIs were sufficient to satisfy defendant's disclosure obligations under Rule 10b-10, the SEC must have determined, as a policy matter, that the broker-dealer defendants' conflict of interest was sufficiently disclosed to plaintiffs.

*Id.*

Although the SEC has not yet spoken specifically regarding UBS, analogous cases demonstrate that the SEC would find that UBS violated Rule 10b-10.  For example, the SEC specifically found that Morgan Stanley, which engaged in the same conduct as UBS, inadequately disclosed its brokers' conflicts of interest.  As a result, the SEC determined that Morgan Stanley violated both § 17(a)(2) of the Securities Act and SEC Rule 10b-10, the very rule at issue in *Press*.  Following the logic of *Press*, the Court should defer to the expert determination of the SEC when it has spoken as to the meaning of its own rule on the very facts of this case.[6]

As stated by the Supreme Court in *Basic v. Levinson*, "the fundamental purpose of the [Exchange] Act [is one] implementing a philosophy of full disclosure." 485 U.S. at 230 (quoting *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477-78 (1977)).  That duty is not limited to specific disclosures mandated by the SEC.  *See, e.g., In re U.S.A. Classic Sec. Litig.*, 1995 U.S. Dist. LEXIS 8327, at *5-6.  Likewise, the main purpose of the federal securities laws "is disclosure, with the ultimate goal of investor protection," and the Securities Act "was passed in order to ensure that investors had enough information to enable them to arrive at their own rational decisions." *Klein*, 937 F. Supp. at 328.  Here, Defendants' investors were not given enough information to enable them to arrive at their own rational decisions.

**C.   Plaintiffs Have Adequately Alleged Causation and Damages**

To state a claim for securities fraud, plaintiffs must plead "(i) that [they] relied upon defendants' allegedly fraudulent conduct in purchasing or selling securities, and (ii) that

---

[6] Defendants assert that Plaintiffs' references to SEC cease-and-desist orders are used for the purposes of binding Defendants to those rulings. D. Br. at 26 n.16.  Plaintiffs, however, reference them in the Complaint because they may be relevant in showing that Plaintiffs adequately plead a claim based upon Defendants' failure to disclose material information.

defendants' conduct caused, at least in part, plaintiffs' loss." *Fogarazzo v. Lehman Bros., Inc.*,

341 F. Supp. 2d 274, 286 (S.D.N.Y. 2004).  These elements are known as "reliance" and "loss

causation," respectively.[7]  Plaintiffs have adequately alleged both.

**1.  The Complaint Adequately Pleads Reliance (or Transaction Causation), Which Is Properly Presumed**

In federal securities cases, reliance, *i.e.*, transaction causation, is properly presumed

under one of two scenarios -- where the case is one that is based primarily on material omissions,

and under the fraud-on-the-market theory.  *See Basic*, 485 U.S. at 224; *Affiliated Ute*, 406 U.S. at

155.

In *Affiliated Ute*, the United States Supreme Court ruled:

> Under the circumstances of this case, involving primarily a failure to disclose,
> positive proof of reliance is not a prerequisite to recovery.  All that is necessary is
> that the facts withheld be material in the sense that a reasonable investor might
> have considered them important in the making of this decision.  This obligation to
> disclose and this withholding of a material fact establish the requisite element of
> causation in fact.

406 U.S. at 153-54 (citations omitted).

Defendants readily concede that "it is evident that [Plaintiffs'] "allegations are omission-

based." Def. Br. at 35.  Moreover, they do not even attempt to argue that the *Affiliated Ute*

presumption does not apply.  As demonstrated above, those omissions were material.

Accordingly, under *Affiliated Ute*, Plaintiffs are not required to plead reliance because it is

presumed from the materiality of the omissions.  *See Simon DeBartolo Group L.P. v. Richard E.*

*Jacobs Group, Inc.*, 186 F.3d 157, 173 (2d Cir. 1999) ("Where the claim rests on an omission . .

reliance may be presumed upon a showing that the omitted information was material."); *Titan*

---

[7]  Transaction causation is often also referred to as "reliance" and those terms are used
interchangeably in this Brief.

*Group, Inc. v. Faggen*, 513 F.2d 234, 239 (2d Cir. 1975) ("determination of materiality allows

logically an inference of reliance"); *see also, e.g., In re NationsMart Corp. Sec. Litig.*, 130 F.3d

309, 321 (8th Cir. 1997) ("In a case involving a failure to disclose information to investors,

courts will presume reliance if the omitted information is shown to be material.").  In the recent

*Wells Fargo* case, on similar facts, the court easily found, under *Affiliated Ute*, that transaction

causation had been adequately alleged.  *Wells Fargo*, 2006 U.S. Dist. LEXIS 60858, at *16-17.

Defendants here do not even dispute the application of *Affiliated Ute*.  This Court need go no

further.

   The only challenge Defendants make to Plaintiffs' transaction causation allegations is the

applicability of the fraud-on-the-market doctrine here to satisfy the transaction causation

requirement.  Defendants argue that it does not apply to open-ended mutual funds because the

share price is not affected by alleged misrepresentations or omissions.  D. Br. at 36-37.

Defendants' reading of that doctrine is far too narrow and ignores the case law.

   Under the fraud-on-the-market doctrine, it is presumed that, in an open and developed

securities market, a securities investor relies on the integrity of the process by which security

prices and market trends are affected and that a material misstatement or omission that affects

the apparent value of a security will be relied upon by the investor, even if investors were not

directly aware of, and cannot show direct reliance on, a fraudulent statement or omission.  *See,

e.g., Worldcom*, 294 F. Supp. 2d at 413; *DeMarco*, 318 F. Supp. 2d  at 119.  The presumption

operates "even where a plaintiff was unaware of the fraudulent conduct at the time of the

purchase or sale." *Fogarazzo v. Lehman Bros., Inc.*, 341 F. Supp.2d at 286.  For the fraud-on-

the-market theory to apply, "it is sufficient that [the investor] bases her transactions on the

market trends **or** securities prices that are altered by the fraud." *DeMarco*, 318 F. Supp. 2d at

119 (emphasis added) (citing *IPO*, 241 F. Supp. 2d at 375; *Basic*, 485 U.S. at 246). Here, at a minimum, the Complaint alleges that market trends were altered. ¶241.

Count III alleges that Defendants altered the market trends by leading prospective investors to believe that many other investors were enthusiastic about the Tier I Funds when in fact other investors were buying these funds due to Defendants' steering of such investors into the Tier I Funds. Plaintiffs and the class members relied on the integrity of the market for fund shares, unaware that the market was tainted because of Defendants' kickback scheme and the resulting conflicts of interest. Additionally, Plaintiffs are entitled to invoke the fraud-on-the-market theory because Defendants' failure to disclose the existence, nature and materiality of the programs at issue misled the class members with respect to the prospective return on investment in the Tier I Funds. As a result, investors were misled into believing that the purchase prices of the Tier I Funds were fair value, when, in fact, they were not. For all these reasons, reliance is properly presumed here.

### 2.     The Complaint Adequately Pleads Loss Causation

Defendants argue that Plaintiffs have failed to allege loss causation because (1) *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005) rejected as insufficient to plead loss causation "[a] claim that Plaintiffs purchased the [Tier I fund shares] at 'distorted' prices" (D. Br. at 28); and (2) excessive fees cannot be the basis for alleging loss causation. *Id.* Defendants are incorrect because they misconstrue *Dura* and Plaintiffs' allegations in the Complaint.

Loss causation is defined as "the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group*, 343 F.3d 189, 197 (2d Cir. 2003). Loss causation can be compared to the tort law concept of proximate cause, in that "damages suffered by plaintiff must be a foreseeable

consequence of any . . . material omission." *Id.* (citation omitted); *see also AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 211-12 (2d Cir. 2000). "If the allegations support an inference that a defendant could reasonably have foreseen that the misrepresentation pertained to an issue that would cause the eventual damage, loss causation will be considered adequately pleaded." *Worldcom*, 294 F. Supp. 2d at 402 (citation omitted).

In the recent *Wells Fargo* case, which is highly analogous to the instant case, the court rejected similar challenges by the defendants and found that plaintiffs' loss causation allegations were sufficient at the pleading stage. The *Wells Fargo* court stated:

> None of these arguments categorically defeats plaintiff's loss-causation theory. The secret paybacks to the broker-dealers came out of the mutual funds' assets. Without any such secret diversion, the net assets of the fund would have been greater, thus saving investors money and increasing their net return on their investment. Extra payments to broker-dealers might not have been a problem if investors had gotten something in return, such as better investment research. But all the kickbacks did was bring in more investors. The additional investors did nothing to benefit *existing* investors, such as plaintiff. By footing the bill for the undisclosed diversions, investors were unwittingly paying extra but getting nothing in return.

2006 LEXIS 60858 at *34-35 (emphasis in original). As the *Wells Fargo* court further explained, the plaintiff "claims that defendants deceived him into thinking the fees were for worthwhile investment advice or something else of value to shareholders when, in fact, these fees were merely a cover for funneling kickbacks to broker-dealers. For the present, the only issue is whether the complaint states a cognizable theory of loss causation. Plaintiff's theory is plausible enough at the Rule 12 stage." *Id.*

As in *Wells Fargo*, Plaintiffs here have alleged a similar sufficient theory of loss causation. Plaintiffs allege that the undisclosed kickbacks came out of the mutual funds' assets and the net assets would have been greater absent those kickbacks. *E.g.*, ¶¶10, 61, 68, 93, 95. That would have saved investors money and increased their net return on their investments. *E.g.*,

*id.* Because the kickbacks only benefited Defendants, Plaintiffs and members of the Class paid

extra but got nothing in return and were in this way damaged by Defendants' failure to disclose

the kickbacks. As in *Wells Fargo*, these allegations provide the "causal link between the alleged

misconduct and the economic harm ultimately suffered by the plaintiff." *See Emergent Capital*,

343 F.3d at 197. Surely it was foreseeable to Defendants that their undisclosed kickbacks, which

siphoned monies from the Funds, would result in a decrease in the net return on the investments

in the Funds for Plaintiffs and the Class. *See AUSA*, 206 F.3d at 211-12. Moreover, as in *Wells

Fargo*, Plaintiffs here also allege that Defendants deceived them into thinking the fees were for

worthwhile investment advice or something else of value to shareholders when, in fact, these

fees were merely a cover for funneling kickbacks to broker-dealers. *E.g.*, ¶¶10, 61, 68.[8] Thus,

Defendants' attempt to argue that Plaintiffs simply allege that "excessive fees" form the basis for

their loss causation argument is overly simplistic and has been rejected by the *Wells Fargo* court.

Defendants' reliance on the Supreme Court's decision in *Dura*, 544 U.S. 336 (2005) to

argue that Plaintiffs have failed to plead loss causation is misplaced. D. Br. at 15, 27-29. In

*Dura*, the Supreme Court held that an allegation that a plaintiff paid an artificially inflated price

for a security does not in and of itself plead loss causation, rejecting the Ninth Circuit view that

---

[8] Key considerations confronting any investor in determining whether to purchase mutual fund shares are the fees and expenses that are part of the calculation of the price paid for the fund shares. SEC Form N1-A requires their disclosure in the prospectus because a significant part of the costs paid by investors over time for investing in a mutual fund are reflected in these fees and expenses. These fees and expenses are paid regardless of the quality of performance. The fees and expenses associated with a mutual fund are supposed to pay for services that will benefit the Fund, such as advice from an investment adviser as to which securities should be held in the mutual fund's underlying portfolio, marketing and distribution services, research, and commissions paid for the trades of the securities in the underlying portfolio. Here, however, a substantial portion of the fees and expenses paid by Plaintiffs and other members of the class were used to finance the undisclosed directed brokerage and revenue sharing engaged in by Defendants rather than being used to benefit the Funds and their shareholders, a fact that was not disclosed to investors.

"at the end of the day plaintiffs need only 'establish,' *i.e.*, prove that 'the price on the date of purchase was inflated because of the misrepresentation.'" 544 U.S. at 342-43 ("To 'touch upon' a loss is not to cause a loss, and it is the latter that the law requires.").[9]  Here, as discussed fully above, the Complaint alleges that Plaintiffs were injured because they paid excessive fees, expenses and commissions in connection with their Tier I Fund investments that were not disclosed and that were used to pay for revenue sharing instead of being used to benefit the Tier I funds themselves.  Moreover, as also discussed above, had Plaintiffs known that the undisclosed expenses, fees and commissions were being used to fund Defendants' revenue sharing activities rather than being used to benefit the Funds, they would have placed a lower value on their Tier I investments at the time of purchase.  In any event, the determination of the value of Plaintiffs' mutual fund investments at any given time is a fact-intensive inquiry not properly considered on the instant Motion to dismiss.  *See IPO*, 241 F. Supp. 2d  at 351 (" It would be inappropriate to resolve this question at the motion to dismiss stage . . . .").

A recent decision involving mutual funds shows that damages may be recovered under § 10(b) when activity that is concealed from the investors diminishes a mutual fund's profits and rate of return, even if disclosure of that activity does not cause the market price of the fund's shares to drop. *In re Mutual Funds Investment Litigation*, 384 F. Supp. 2d 845 (D. Md. 2005) (MDL 15863) involved securities fraud claims against mutual fund investment advisers and traders who engaged in late traded or market-timed transactions and the broker-dealers that

---

[9]  Subsequent to the Supreme Court's decision, the Ninth Circuit remanded the case to the district court "to allow Plaintiffs an opportunity to amend the complaint in conformity with the Supreme Court's decision." *In re Dura Pharmaceuticals, Inc. Sec. Litig.*, 2006 U.S.Dist. LEXIS 41193, at *32 (S.D. Cal June 2, 2006).  In finding that the plaintiffs' §10(b) and Rule 10b-5 claims against certain defendants withstood dismissal, the district court held that the complaint, as amended, alleged loss causation since it "now alleges that Defendants' misrepresentations . . . artificially inflated Dura's stock price." *Id.* at *32-39.

facilitated those transactions.  Upholding plaintiffs' § 10(b) claims, the court stated that plaintiffs

there "were harmed as result of defendants' fraudulent scheme and course of business which

*diminished the value of their shares by, inter alia¸ siphoning off from the funds profits to*

*which shareholders were entitled [and] substantially increasing transaction expenses and*

*fees.*"  *Id.* at 864 (emphasis added).  The court found those § 10(b) damages to be adequately

pled, stating: "[t]hese allegations of loss are clear and direct, and while the theory upon which

they are based must ultimately be put to the test of evidentiary proof, it is at least facially

plausible."  *Id.* at 864-65.  Moreover, the court specifically held that a price drop subsequent to

purchase was not a requirement for damages under § 10(b):

> Here, plaintiffs have not alleged facts demonstrating that they (or the other
> members of the putative class) have sold their shares (or could have sold their
> shares at the time suit was filed) for an amount less than they paid for the shares.
> The failure to make such allegations is not fatal to their 10b-5 claims because, as I
> have previously indicated, *plaintiffs have articulated and pled a theory of*
> *damages that does not depend upon their having paid more for their shares*
> *than they received (or could have received) in selling them.*

*Id.* at 867.

Plaintiffs in the present case were harmed in much of the same manner as the plaintiffs in

*In re Mutual Funds.*  The undisclosed kickback compensation Defendants received increased the

transaction fees and expenses of the Tier I Funds, diminishing their value and their rate of return.

In other words, a substantial portion of the fees and expenses paid by Plaintiffs and the other

class members was improperly inflated because the fees were upstreamed to finance the directed

brokerage and "UBS space" kickback scheme rather than used to pay for services that would

have benefited the Funds, such as advice from an investment adviser as to which securities

should be held in the mutual fund's underlying portfolio.  Defendants' failure to disclose the true

nature and purpose of the fees, and the fact that no return on investment would be earned on the

substantial amounts paid as kickbacks, *harmed Plaintiffs* and the other class members.  Thus,