they sustained loss because they were deceived into paying more than fair value for Fund shares. Moreover, Plaintiffs and the other class members are entitled to recover the excessive fees and expenses they paid as owners of the Tier I Funds that went to UBS as kickbacks. In essence, Defendants collected kickbacks paid from the fees on the accounts of their clients invested in the Tier I Funds.

Furthermore, by receiving undisclosed profits in breach of their fiduciary duties, Defendants became "involuntary trustees" to Plaintiffs and the other class members of the amounts wrongfully obtained. *See, e.g., Enriquez v. Edward D. Jones & Co.*, L.P., No. 04 Civ. 00189 042-00126A, slip op., (Mo. Cir. Jan. 6, 2005) (holding that a brokerage firm that received secret revenue sharing kickbacks from mutual fund complexes would have to disgorge those profits under traditional principles of agency law).[10] Plaintiffs are entitled to recover damages sufficient to place them in the position they would have been in had Defendants not breached their fiduciary duty to provide unbiased, candid financial advice and services. In cases involving unsuitability or churning,[11] the plaintiffs are not limited to recovering damages from diminution

---

[10] In reaching this conclusion, *Enriquez* noted that, "under traditional agency law, an agent who makes a profit in connection with transactions conducted on behalf of the principal is under a duty to remit that profit to the principal absent an agreement to the contrary." *See* Restatement (Second) of Agency §388 (1958). *See also, e.g.*, Comment A. to §388 stating, among other things, "an agent who, without the knowledge of the principal, receives something in connection with, or because of, a transaction conducted for the principal, has a duty to pay this to the principal even though otherwise he has acted with perfect fairness to the principal and violates no duty of loyalty in receiving the amount."

[11] *Caiola*, 295 F.3d at 324 ("Churning claims, which depend on a broker's liability for excessive trading . . . have been recognized under Rule 10b-5."); *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 49-50 (2d Cir. 1978), *aff'd in part rev'd in part*, 637 F.2d 77 (2d Cir. 1980) (recovery of excessive commissions); *Davis v. Merrill Lynch, Pierce, Fenner & Smith*, 906 F.2d 1206, 1218-19 (8th Cir. 1996) (recovery of commissions, even where churned investments resulted in a profit to plaintiff). Plaintiffs' damages also include the commissions charged them and the other class members by the UBS brokers for pushing them into Tier I Funds.

in the value of their securities (*i.e.*, their "out-of-pocket loss"), but in appropriate circumstances may recover the difference between the value their account would have achieved had the investments been suitable, and the value actually obtained, even if the value of the plaintiff's portfolio went up under defendant's management. *See, e.g., Laney v. American Equity Inv. Life Ins. Co.*, 243 F. Supp. 2d 1347, 1355 (M.D.Fla. 2003) ("a Florida court would allow in an appropriate churning case 'benefit-of-the-bargain' damages, which consist of an investor's well managed account losses"); *Smith v. Fahnstock & Co.*, 2002 U.S.Dist. LEXIS 3411 at *9 (S.D.N.Y. Feb. 28, 2002) ("[i]n an unsuitability case . . . [t]he measure of damages can be 'out-of-pocket' loss, the benefit of the bargain, or some other appropriate standard").

Defendants' contention that Plaintiffs' damages claim for securities fraud is foreclosed by the Supreme Court's decision in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975) is wrong and completely mischaracterizes the bases for Plaintiffs' claims. In *Blue Chip Stamps*, the Supreme Court found that the offerees of a stock offering could not maintain a private right of action for money damages under Rule 10b-5 *where they had neither purchased nor sold any of the offered shares*. 421 U.S. at 725, 749. In stark contrast, here, Plaintiffs, unlike the plaintiffs there, in fact, bought and owned the shares at issue. *See id.* at 727. Plaintiffs and the other class members are seeking damages for the investment *they did make,* as a result of the fraudulent omissions by and on behalf of the Defendants. Consequently, Defendants' argument in reliance on *Blue Chip Stamps* is irrelevant.

Finally, Defendants' loss causation argument is premature. "Determination of whether a misrepresentation would have the effect of defrauding the market and inflating the stock price is a jury question." *In re Control Data Corp. Sec. Litig*, 933 F.2d 616, 621 (8th Cir. 1991); *see also In re Eng'g Animation Sec. Litig.*, 110 F. Supp. 2d 1183, 1193-94 (S.D. Iowa 2000) (defendants'

causation argument cannot be determined as a matter of law).  Accordingly, at this stage of the litigation, Defendants have not and cannot demonstrate that their omissions did not alter the value placed on the Tier I Funds by investors.  Their attempt to have this Court address this issue now should be rebuffed.

### D.    The Complaint Adequately Pleads Scienter

Defendants argue that Plaintiffs cannot plead scienter because "scienter cannot be shown when Defendants fully complied with applicable law -- embodied in relevant decisions of the courts and the explicit requirements of Form N-1A -- during the relevant time period." D. Br. at 32. Defendants' argument fails.  As shown above in Part II, Defendants' disclosures did not comply with applicable law, including the requirements of SEC Form N-1A.  Moreover, contrary to Defendants' assertions, the Complaint meets the pleading standard applicable to the element of scienter of Plaintiffs' § 10(b) and Rule 10b-5 claims.[12]

In this Circuit, "[i]n order to plead scienter, plaintiffs must 'state with particularity the facts giving rise to a strong inference that the defendant acted with the required state of mind." *Novak v. Kazaks*, 216 F.3d 300, 311 (2d Cir. 2000).  The particularity requirement does not rise to a level of pleading with "great specificity." *See Nortel Network Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 630 (S.D.N.Y. 2003) (citing *In re Time Warner Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993)).  Thus, Plaintiffs *do not* have to plead USBFS' actual knowledge, but only the facts giving rise to a strong inference that USBFS acted with the required state of mind. *See IPO*, 241 F. Supp. 2d at 346.  "[T]he inference may arise where the complaint sufficiently alleges that the defendants: (1) benefited in a concrete and personal way from the purported fraud . . . (2) engaged in deliberately illegal behavior . . . (3) knew facts or had access to information

---

[12]   Scienter is not an element of Plaintiffs' §12(a)(2) claim.

suggesting that their public statements were not accurate . . . or (4) failed to check information

they had a duty to monitor . . . ." *Novak*, 216 F.3d at 311. "A fact finder can infer intent from

motive and opportunity, gross recklessness, or a combination of the two." *In re Leslie Fay Cos.*

*Sec. Litig.*, 871 F. Supp. 686, 699 (S.D.N.Y. 1995) (citing *Time Warner*, 9 F.3d at 268-69); *see*

*also Nortel. Sec. Litig.*, 238 F. Supp. 2d at 630 n.16 (citations omitted); *see also Novak*, 216 F.3d

at 308; *In re MCI Worldcom, Inc. Sec. Litig.*, 93 F. Supp. 2d 276, 283 (E.D.N.Y. 2000); *In re*

*Philip Servs. Corp. Sec. Litig.*, 2004 U.S. Dist. LEXIS 9261, at *13-14.[13]

The Complaint sufficiently alleges that Defendants, *inter alia*: 1) benefited in a concrete

and personal way from the purported fraud; 2) engaged in deliberately illegal behavior; (3) knew

facts or had access to information suggesting that their public statements were not accurate; and

(4) were highly motivated to allow and facilitate the conduct alleged.  ¶¶148-50; *see Novak*, 216

F.3d at 311.

Furthermore, contrary to Defendants' assertion, *see* D. Br. at 35-36, the "sole basis" for

Plaintiffs' § 10(b) claims is not omissions.  Rather, Plaintiffs base these claims upon the entire

kickback scheme averred in the Complaint.  Such pleading adequately states an additional claim

pursuant to Sections (a) and (c) of Rule 10b-5.  As stated in *In re Global Crossing, Ltd. Sec. Litig.*:

> [S]ubsections (a) and (c) encompass much more than illegal trading activity; they
> encompass the use of "any device, scheme or artifice, or "any act, practice or course
> of business," used to perpetrate a fraud on investors.  17 C.F.R. § 240.10b-5(a),

---

[13]  Scienter is a fact-specific issue properly left to the trier of fact and, as such, should be
evaluated liberally at the motion to dismiss stage. *Press*, 166 F.3d at 538; *Grandon*, 147 F.3d at
194.  Viewing the allegations in their totality with all reasonable inferences drawn in Plaintiffs'
favor, the Complaint sufficiently pleads scienter. *See Queen Uno Ltd. P'ship v. Coeur D'Alene*
*Mines Corp.*, 2 F. Supp. 2d 1345, 1359 (D. Colo. 1998)(totality of the allegations must be
considered in determining whether the complaint sufficiently pleads scienter and "all reasonable
inferences [must be drawn] in the plaintiff's favor'"); *Philip Servs.*, 2004 U.S. Dist. LEXIS 9261,
at *27 n.6; *Kalnit v. Eichler*, 264 F.3d 131, 137-38 (2d Cir. 2001); *IPO*, 241 F. Supp. 2d at 332.

(c)...[A] cause of action lies for claims that involve allegations of manipulative schemes used in connection with securities markets . . . .

322 F. Supp. 2d 319, 328 (S.D.N.Y. 2004).

## III.   PLAINTIFFS HAVE STANDING TO ASSERT CLAIMS ON BEHALF OF INVESTORS IN ALL TIER I FUNDS

Defendants argue that Plaintiffs lack standing to bring claims with respect to funds none of them owns. D. Br. at 37-38. Defendants are wrong. Each of the named Plaintiffs has presented claims of injury to himself or herself and has alleged facts which present a case or controversy under the Constitution. *Hicks v. Morgan Stanley & Co.*, 2003 U.S. Dist. LEXIS 11972, at *19-20 (S.D.N.Y. July 16, 2003). Moreover, under *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), whether Plaintiffs may represent persons who bought shares in the other Tier I Funds is so intertwined with issues pertinent to class certification that decision on this issue should be deferred until the class certification stage of the litigation.

In analogous circumstances, courts have recognized a plaintiff's entitlement to represent persons who purchased interests in entities that were not the same as, but were closely related to, the entity in which the plaintiff purchased an interest, when the nature of the alleged wrongdoing was the same. *See, e.g.*, *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, 2000 U.S. Dist. LEXIS 13469 (S.D.N.Y. Sept. 19, 2000); *Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 56-57 (S.D.N.Y. 1993). *In re Dreyfus* is directly on point. In that case the court certified a class of plaintiffs who invested in one mutual fund to represent purchasers in another fund among the same family, holding that:

> Courts have repeatedly held that on allegations such as these, class representatives need not have invested in each security so long as the plaintiffs have alleged a single course of wrongful conduct with regard to each security. Court have not addressed this concern *vis a vis* the doctrine of standing but rather have examined such concerns pursuant to Rule 23(a)(3)'s typicality requirement.

2000 U.S. Dist. LEXIS 13469 at *8.  In *In re Dreyfus*, certification was supported by the same

factors that exist in this case:

> Here, the claims of the named plaintiffs and prospective class members derive
> from the same course of events.  The plaintiffs have alleged that both Funds made
> similar misrepresentations and omissions in the Registration Statements,
> Prospectuses, Statements of Additional Information and annual and semi-annual
> reports used to sell the Funds. . . .  And indeed the claims of the named plaintiffs
> and prospective class members are based on the same legal theories.

*Id.* at *14.

The same result is supported by ample case law holding that where, as here, many

juridical links exist between defendants, a class plaintiff may sue on behalf of those who were

injured by any of the defendants, even though the class plaintiff only dealt with one of them.

*See, e.g., Moore v. Comfed Sav. Bank*, 908 F.2d 834, 838 (11th Cir. 1990); *Hopson v. Schilling*,

418 F. Supp. 1223, 1228 (N.D. Ind. 1976).

Plaintiffs have standing to assert claims with respect to all of the Tier I Funds, including

all classes of such Funds, despite the fact that they did not hold shares in all of the Tier I Funds.

Plaintiffs' ability to assert claims as class representatives on behalf of shareholders in all of the

Tier I Funds is not an issue of standing but rather, if anything, an issue for class certification

pursuant to Fed. R. Civ. P. 23 and therefore premature to address prior to full briefing and

discovery on a class certification motion.

In essence, Defendants contend that a plaintiff is required for each and every Tier I Fund

family.  Plaintiffs disagree as this case alleges conduct that applies uniformly to all Tier I Fund

investors.  This issue, however, need not be decided until the class certification motion, where

non-named plaintiffs repeatedly have been allowed to be included as class representatives.  *See,*

*e.g., Brzychnalski v. Unesco, Inc.*, 35 F. Supp. 2d 351, 354 (S.D.N.Y. 1999); *Voilas v. General*

*Motors Corp.*, 173 F.R.D. 389, 393 (D.N.J. 1997).

**IV.    THE COMPLAINT STATES A CLAIM AGAINST DEFENDANT UBSFS FOR VIOLATION OF § 12(a)(2) OF THE SECURITIES ACT**

**A.     The Complaint Sufficiently Alleges That Defendant UBSFS Is a "Seller" Within the Meaning of § 12(a)(2)**

Defendants argue that the Complaint does not allege the elements required to state a

claim under § 12(a)(2) of the '33 Act.  D. Br. at 32-35.  Defendants are wrong.  Any person who

sells or offers to sell a security "by means of a prospectus or oral communication, which includes

an untrue statement of a material fact or omits to state a material fact necessary in order to make

the statements . . . not misleading" is liable for violation of § 12(a)(2). 15 U.S.C. § 77l(a)(2); *see*

*Worldcom*, 194 F. Supp. 2d at 399 ("[l]iability under Securities Act § 12(a)(2) flows from the

requirement to distribute prospectuses").

A seller, under § 12(a)(2), is either the issuer, who passes title to the mutual fund share to

the customer, or the person, who, as an agent or other person closely aligned with the issuer,

solicits sales based on an elevated financial interest. *Pinter v. Dahl*, 486 U.S. 622, 647 (1988);

*see In re American Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 437-38

(S.D.N.Y. 2000) ("In applying *Pinter* analysis to 12(2) claims, courts have consistently held that

a plaintiff must plead or prove (1) that a defendant directly sold stock to the plaintiff or (2)

directly solicited the plaintiff's purchase of stock."); *In re NationsMart Corp. Sec. Litig.*, 130

F.3d at 318 ("[a] 'seller' under § 12(a)(2) is 'anyone who successfully solicits the purchase of

securities, motivated at least in part by a desire to serve his own financial interests or those of the

securities owner'").  Thus, "a broker not passing title to a security can, nevertheless, be a seller

for § 12(a)(2) purposes if the injury to the purchaser flowed directly and proximately from the

actions of the broker." *Hill York Corp. v. American Int'l Franchises, Inc.*, 448 F.2d 680, 692-93

(5th Cir. 1971).

The Complaint alleges that, under the solicitation prong of the *Pinter* test, UBSFS was a seller for purposes of § 12(a)(2).  The Complaint alleges that UBSFS solicited the purchase of and sold interests in the Tier I Funds by and to the Purchaser Subclass and that the primary, if not sole, motivation driving these solicitations and sales was the desire to serve the financial interests of both UBS and the Tier I Funds.  Under *Pinter*, these allegations are sufficient to state a claim under § 12(a)(2) against UBSFS as a seller of the Tier I Funds.  *See American Bank Note*, 93 F. Supp. 2d at 438 ("ABN is a seller, under both prongs of Pinter" upon allegations that it transferred title and actively solicited the sale of the securities . . .).

For example, the Complaint alleges that UBSFS, the Broker-Dealer Defendant, aggressively pushed its brokers, whom it called "Financial Advisors," to sell the Tier I Funds, to the exclusion of other funds, so that UBSFS could reap millions of dollars in kickbacks and improper fees.  ¶¶64-84, 230-35. As alleged in the Complaint, pursuant to the secret and highly-lucrative revenue sharing arrangements that had been established *inter se*, the Tier I Funds provided financial incentives and rewards to UBSFS and its employees in exchange for this undisclosed marketing preference.  *Id.*  As the Complaint further alleges, disclosures of the revenue sharing arrangements, kickbacks and hidden incentives in connection with the Tier I Funds, and of the resulting conflicts of interest, "were necessary for UBS's clients to make informed investment decisions." ¶120.  However, as Plaintiffs aver, to the contrary:

> UBSFS made false and misleading statements to Class members through its websites and Financial Advisors' interaction with investors because UBSFS portrayed its promotion and prioritization of funds as based on objective analysis and due diligence. Additionally, Financial Advisors misled investors into believing that the prospectuses delivered to investors provided all the material information that the investors would need to make a decision about the mutual fund they were purchasing.  However, none of the sources provided by UBSFS disclosed that USBFS promoted and prioritized certain funds over others because of the kickback arrangements.

Indeed, as Plaintiffs allege, the prospectuses and SAIs distributed during the Class Period contained materially false and misleading omissions because they failed to disclose: 1) UBS' practice of steering investors into Tier I Funds; 2) material information about the mutual funds and the fees and costs associated with them; and, 3) the revenue sharing arrangements, kickbacks and hidden incentives at issue. ¶¶120-38; 230-35. Accordingly, Defendants' contention that "Plaintiffs' factual allegations fall far short of imposing § 12 liability on UBSFS" because "the Complaint lacks any specific instances where UBSFS solicited individual class members to purchase Tier I fund shares" (D. Br. at 35), lacks merit. *See, e.g., Worldcom*, 294 F. Supp. 2d at 423 ("While the Complaint does not identify from which defendant either named plaintiff purchased its notes, it does contain sufficient allegations, when judged against the requirements of Rule 8, Fed. R. Civ. P., to give the Underwriter Defendants fair notice of the basis for the [§ 12(a)(2)] claims against them, to wit, that they solicited the named plaintiffs in the sale of the notes or sold notes to them."). The allegations of the Complaint adequately state a claim for violation of § 12(a)(2) against UBSFS in satisfaction of Rule 8 pleading standards, which apply to this claim.[14]

---

[14] Where, as here, a plaintiff's' §12(a)(2) claim is not based on allegations of fraud, Rule 8 supplies the applicable pleading standard. *See Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004)("We hold that the heightened pleading standard of Rule 9(b) applies to §11 and §12(a)(2) claims insofar as the claims are premised on allegations of fraud."). Defendants do not contend that the Complaint fails to differentiate adequately the allegations on which the §12(a)(2) claims are premised from the allegations made in support of Plaintiffs' securities fraud claims. *See* D. Br. at 31 and n.19. Indeed, on the basis of the Complaint's express disclaimer of "any allegation that could be construed as alleging fraud or intentional or reckless misconduct," ¶230, Defendants argue that Plaintiffs' §12 and 15 claims "are not subject to the statute of limitations extension under Sarbanes-Oxley . . . ." D. Br. at 39-40. Defendants cannot have it both ways.

**B.      The Complaint Adequately Pleads a Claim for Damages Under § 12(a)(2)**

Defendants' argument that Plaintiffs fail to state a compensable claim for damages under

§ 12(a)(2) because "the Complaint does not allege that Plaintiffs have tendered or offered to

tender their securities," D. Br. at 32-34, is unfounded in law and should be rejected.  Even where

a complaint contains neither an express offer to tender nor an express demand for rescission, a

§ 12(a)(2) claim does not fail because such defects can be cured by amendment.  *Worldcom*, 294

F. Supp. 2d at 423 (observing "§ 12(a)(2) does not offer any guidance as to the time at which a

tender or offer of tender must occur") (citing *Wigand v. Flo-Tek, Inc.*, 609 F.2d 1028, 1034 (2d

Cir. 1979)).  Thus, as in *Worldcom*, "[b]y pleading their § 12(a)(2) claim, plaintiffs have already

signaled . . . their claim for the relief to which that provision of the securities laws entitles them

[ . . . and] may amend their pleading to make their offer of a tender and a demand for rescission

explicit." *Id.* at 423-24.[15]

Likewise, the Court should reject, as devoid of legal merit, Defendants' argument that

any claim by Plaintiffs for damages under § 12(a)(2) is precluded because the Complaint fails to

"allege that Plaintiffs sold their shares of Tier I mutual funds at a loss."  D. Br. at 33-34.  The

Complaint need not contain a specific allegation that Plaintiffs sold their shares to survive

dismissal of a § 12(a)(2) claim for damages.  *See Worldcom*, 294 F. Supp. 2d at 423 -24

("§ 12(a)(2) does not allow a plaintiff . . . any choice of remedy.  'If plaintiff owns the stock, he

is entitled to rescission but not damages.  If plaintiff no longer owns the stock, he is entitled to

damages but not rescission.'") (quoting *Wigand*, 609 F.2d at 1035).

---

[15]  It is settled law that "[a] complaint's demand for rescission is construed as an implicit offer to
tender." *Id.* at 423.  In their "Prayer for Relief" set forth in the Complaint, Plaintiffs expressly
request the Court to rescind their contracts with UBS Financial Advisors, as Defendants note.
D. Br. at 33.

Finally, even if some investors ultimately cannot show that they have any damages under § 12(a)(2), at this stage in the litigation, this Court is not required to dismiss the claims of those class members who do have damage. *See, e.g., IPO*, 241 F. Supp. 2d at 351 (parsing claims under § 11 of the Securities Act to dismiss only the claims of plaintiffs who made a profit, leaving the remaining § 11 claims intact).

## V.   UBS IS LIABLE AS A CONTROL PERSON UNDER § 15 OF THE SECURITIES ACT AND § 20(a) OF THE EXCHANGE ACT

A § 15 claim under the '33 Act and a § 20 claim under the '34 Act requires that a plaintiff establish "(1) control, and (2) an underlying violation of § 11 (or § 12(a)(2))." *In re IPO*, 241 F. Supp. at 352; *see also In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 770 (S.D.N.Y. 2001). A § 20(a) claim under the '34 Act requires that a plaintiff establish the same elements as for a § 15 claim and also "'that the controlling person was in some meaningful sense a culpable participant' in the primary violation." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (citation omitted).

Defendants argue that Plaintiffs' Complaint lacks any factual basis for imposing control liability on UBS because Plaintiffs only offer "conclusory statements" as to UBS' control relationship with UBSFS. D. Br. at 38-39. In so arguing, however, Defendants ignore that "[a]t the motion to dismiss stage, plaintiffs need only plead facts supporting a reasonable inference of control." *Nanopierce Techs. v. Southridge Capital Mgmt. LLC*, U.S. Dist. LEXIS 24049, at *33-34 (S.D.N.Y. Oct. 10, 2002) (quoting *In re Emex Corp. Sec. Litig.*, 01 Civ. 4886 (SWK), 2002 U.S. Dist. LEXIS 17528, at *27-28 (S.D.N.Y. Sept. 17, 2002)).

The Complaint demonstrates that UBS was in control of UBSFS. For example, Plaintiffs allege that UBS was the corporate parent of, and had operational control over, UBSFS. ¶¶49, 238. Moreover, UBS was in charge of providing financial advisory services and products,

including financial planning and advice and investment advisory services and products, such as the mutual funds which are the focus of the kickback scheme. ¶49. The Complaint further asserts that UBS had the power to influence and control and did influence and control, directly or indirectly, the decision-making and actions of UBSFS. *See* ¶¶238, 264. At a minimum, a reasonable inference must be drawn to conclude that UBS, as the entity in charge of financial advice and planning, was a controlling party and a culpable participant dictating to UBSFS the manner in which financial advice and planning was relayed to Plaintiffs and other members of the Class. *See* ¶¶236-240, 262-266.

## VI. THE APPLICABLE STATUTE OF LIMITATIONS DOES NOT BAR PLAINTIFFS' CLAIMS UNDER SECTIONS 12 AND 15 OF THE SECURITIES ACT

Defendants' argument that the § 12(a)(2) and 15 claims of "plaintiffs who purchased shares longer than a year before filing suit are barred because they should have discovered the alleged omission had they exercised reasonable diligence," *see* D. Br. at 39-40, misapplies applicable law on inquiry notice.[16] Defendants do not identify a single allegation of fact or circumstance on the face of the Complaint that they purport demonstrates that these Plaintiffs had any sufficient " '[s]torm [w]arnings in the form of company-specific information . . . trigger[ing] a duty to investigate'" more than a year before commencing the instant litigation.[17] *See American High-Income Trust v. AlliedSignal*, 2006 U.S. Dist. LEXIS 13852, at * 6

---

[16] Plaintiffs do not dispute that the three-year statute of repose applies to these claims and any purchases outside this time frame are not part of the class.

[17] Under §13 of the '33 Act, the statute of limitations for causes of action under Sections 12(a)(2) and 15 is "one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence . . . ." 15 U.S.C. §77m; *see Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 349 n.1 (2d Cir. 1993) ("Since §15 merely creates a derivative liability for violations of Sections 11 and 12, §13 applies to it as well.").

(S.D.N.Y. Mar. 29, 2006) ("In securities cases, inquiry notice is often called storm warnings.")

(internal quotations and citation omitted); *In re Dreyfus Aggressive Growth Mut. Fund Litig.*,

2000 U.S. Dist. LEXIS 94, at * 9-10 (S.D.N.Y. Jan. 6, 2000) ("misrepresentation or omission

'reasonably should have been discovered' . . . when all facts and circumstances would alert 'a

person of ordinary intelligence to the probability that he has been defrauded") (citations omitted).

Plaintiffs filed their initial Class Action Complaint for Violation of Federal Securities

Laws and for Violation of the Investment Company Act on July 29, 2005 ("Initial Complaint").

While Defendants resort to generalities and point to no specific facts to support their argument,

the earliest possible date that Plaintiffs could have learned of sufficient "storm warnings" as to

UBS was the February 24, 2005 article on Morningstar.com entitled, "Fund Spy:  The Sordid

Business of Revenue Sharing," which stated:

> For example, take UBS, which separates fund firms into "tiers" and then gives
> some shops access to their branch offices for training, marketing, and "other
> promotional activities."  Although the company says that "such payments . . . are
> never the sole determinant in these decisions" it does admit that they are "a
> factor" in deciding which tier a fund company falls into.  Rest assured, however,
> that there's no great prize for second place in this game.  If you're not a tier I
> company, don't bother trying to get your wares sold by UBS or any other
> brokerage that uses a similar system.  UBS is at least somewhat open when
> explaining the difference between tier I and tier II.  Those who don't qualify for
> tier I simply can't come in.  That's right.  If you don't represent a tier I fund
> company, you generally don't get access to UBS' branch offices.  And although
> it's still possible to do business with the company as a tier II provider, you'll have
> to work pretty hard to do so.  UBS' disclosure notes that 90% of its 2003 business
> went to tier I companies.

¶70. Indeed, it was not until 2005, in the face of recent regulatory action taken with respect to

the illegal practice of undisclosed revenue sharing, that Defendants began to disclose, albeit

vaguely and inadequately, on their website the formula they generally use for their arrangements

with the Tier I funds.  ¶¶140-41.  Because Plaintiffs brought their claims within one year of all

such information, Plaintiffs' claims under Sections 12(a)(2) and 15 are timely brought.[18]

Defendants point to § I(A) of their Motion and argue that, given the "widespread practice

of revenue sharing," the "Plaintiffs could have discovered these alleged omissions through the

use of reasonable diligence." D. Br. at 40. First, it is not clear to what Defendants are even

referring in § I(A) of their Motion. The argument should be rejected on this basis alone.

Moreover, the fact that revenue sharing may have been "widespread" does not, in and of itself,

trigger inquiry notice under the federal securities laws. As noted above, facts need to be

sufficient "storm warnings," *i.e.*, "company specific information... triggering a duty to

investigate," *AlliedSignal*, 2006 U.S. Dist. LEXIS 13852, at *6, to trigger inquiry notice.

Defendants present no such information in their faulty argument regarding the "widespread

practice of revenue sharing." Accordingly, this argument should be rejected. Indeed, at the very

least, the question of whether Plaintiffs had inquiry notice of the relevant facts more than one

year before this suit was commenced is a question of fact for the jury and is not properly

disposed of on the present Motion to Dismiss. *See, e.g., Nelson v. Stahl*, 173 F. Supp. 2d 153,

166 (S.D.N.Y. 2001) (declining on motion to dismiss to reach issue of whether plaintiffs were on

inquiry notice "because the question of whether Plaintiffs should have discovered the fraud

earlier than they did, and thus whether the action is timely, is a question for the trier of fact"); *In*

*re Dreyfus Aggressive Growth*, 2000 U.S. Dist. LEXIS 94, at * 10-11 ("Nonetheless, drawing all

reasonable inferences in favor of the plaintiffs -- as the Court must do in the context of a motion

to dismiss -- the issue of constructive knowledge and inquiry notice should more properly be

---

[18] Under Fed.R.Civ.P. 15(a), any new allegations contained in the Amended Complaint relate
back to the date of the Initial Complaint.

resolved by the trier of fact at a later stage in this litigation."); *Jolly v. Pittore*, 1992 U.S. Dist.

LEXIS 11527, at * 6 (S.D.N.Y. 1992) ("If there is a question regarding whether the plaintiff

exercised 'reasonable diligence,' the jury should decide this issue.").

## VII. PLAINTIFFS HAVE ADEQUATELY SATISIFIED RULE 8 PLEADING REQUIREMENTS FOR THEIR § 36(b) CLAIM AND IT SHOULD BE SUSTAINED

Defendants argue that Plaintiffs have failed to adequately plead a § 36(b) claim in Count

IX of the Complaint. D. Br. at 43-49. Defendants are incorrect. Plaintiffs more than adequately

plead their § 36(b) claim under Rule 8.[19] Rule 8 only requires "'a short and plain statement of

the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds

upon which it rests." *Leatherman v. Tarrant County Narcotics Intelligence & Coordination*

*Unit*, 507 U.S. 163, 168 (1993) (quoting *Conley*, 355 U.S. at 47). Courts uniformly hold that

Rule 8 applies to § 36(b). *Yampolsky v. Morgan Stanley Inv. Advisers Inc.*, 2004 U.S. Dist.

LEXIS 8573 (S.D.N.Y. May 11, 2004); *Pfeiffer v. Bjurman, Barry & Assocs.*, 2004 U.S. Dist.

LEXIS 16924 (S.D.N.Y. Aug. 26, 2004). On a motion to dismiss a complaint for failure to state

a claim, the court is "to construe its allegations in the light most favorable to the plaintiff and

accept as true all facts alleged." *Verkouteren v. Blackrock Fin. Mgmt., Inc.*, 1999 U.S. Dist.

LEXIS 10892, at *4 (S.D.N.Y. July 16, 1999); *accord Levy v. Alliance Capital Mgmt. L.P.*, 1999

U.S. App. LEXIS 20213, at *6-7 (2d Cir. Aug. 20, 1999).

When determining under § 36(b) whether a defendant has breached a fiduciary duty with

respect to the fees received, the Second Circuit follows the *Gartenberg* factors, as Defendants

correctly assert in their motion. D. Br. at 43 (citing *Gartenberg v. Merrill Lynch Asset Mgmt.,*

---

[19] To the extent Defendants are arguing that Plaintiffs fail to satisfy applicable pleading requirements for Count VIII's §36(b) claim alleged as a direct claim, the arguments in this section apply to that Count as well.

*Inc.*, 694 F.2d 923 (2d Cir. 1982)).  However, these factors are a guide to some of the relevant

considerations in proving a claim under § 36(b) and do not alter the application of Rule 8's

notice pleading principles.  As the court in *Wells Fargo*, 2006 U.S. Dist. LEXIS 60858, at *52,

recently explained:

> It [*Gartenberg*] did not purport to determine how "to state a claim" (*i.e.*, set
> pleading standards), much less assert a *heightened* pleading standard.
> Furthermore, *Gartenberg* did not claim that its list of relevant factors was
> exclusive of any others.  Nor must a plaintiff plead facts relative to all the
> *Gartenberg* factors in order to withstand a motion to dismiss.
>
> ***
>
> [Plaintiffs] need prove breach of fiduciary duty to one of the funds to prevail ]on a
> 12(b)(6) motion].

Here, Plaintiffs adequately plead sufficient facts to satisfy Rule 8, as demonstrated below.

In *Gartenberg*, which involved a bench trial of the plaintiffs' § 36(b) claim, the Second

Circuit set forth a standard for determining whether fees were excessive, which included

examining whether a fee is "so disproportionately large that it bears no reasonable relationship to

the services rendered and could not have been the product of arm's-length bargaining."  694 F.2d

at 928.  In applying this standard, courts may consider the following relevant factors: "(a) the

nature and quality of the services provided to fund shareholders; (b) the profitability of the fund

to the adviser-manager; (c) fall-out benefits; (d) economies of scale; (e) comparative fee

structures; (f) the independence and conscientiousness of the trustees."  *Krinsk v. Fund Asset*

*Mgmt., Inc.*, 875 F.2d 404, 409 (2d Cir. 1989).

The Complaint makes allegations with great specificity that fall within the *Gartenberg*

factors about the individual Funds, all which amply plead a claim under § 36(b).  For example, to

illustrate the *Gartenberg* factor concerning economies of scale not being passed to investors, the

Complaint presents statistical data regarding various UBS Funds, which shows that even though

-47-

the assets were increasing, the expense ratios were not decreasing, but were either remaining the same or increasing from 2 to 7 bps. (*See* ¶¶180-184). For example, the Complaint alleges that between 2003 and 2005: (1) four classes of UBS PACE Strategic Fixed Income Investments Fund's expense ratios either remained the same or increased by up to 2 bps even though the assets increased by $162 million (¶180); (2) three classes of UBS S&P 500 Index Fund's expense ratios either remained the same or increased by up to 3 bps even though the assets increased by close to $100 million (¶181); (3) the one class of UBS PACE Small/Medium Company Value Equity Fund's expense ratio increased by 5 bps even though the assets increased by $171 million (¶182); and (4) the four classes of UBS PACE Global Fixed Income Investments Fund's expense ratios increased by up to 7 bps even though the assets increased by close to $100 million (¶183). The stagnation or increase in basis points for fees while services remain the same illustrates that economies of scale were not passed to the Funds. *See, e.g., Hunt*, 2006 U.S. Dist. LEXIS 40944, at *8-9.

The Complaint also illustrates the existence of economies of scale and Defendants' failure to pass them to the Funds by comparing the placement of breakpoints in the advisory fee contract with where the subadvisory fee breakpoints were placed.[20] As the Complaint alleges, this comparison demonstrates that the Defendants pocket an additional 5 to 15 bps without providing any additional services to the Funds. *See* ¶¶187-192. For example, (1) UBS PACE International Equity Fund's subadvisory fee breakpoint is for asset growth between $150 million

---

[20]  As the Complaint explains, breakpoints are a "declining rate structure in which the percentage fee rate decreases in steps or at designated breakpoints as assets increase . . . . The declining rate schedule reflects the expectation that costs efficiencies or scale economies will be realized in the management and administration of the fund's portfolio and operations as the fund grows." John P. Freeman & Stewart L. Brown, *Mutual Fund Advisory Fees: The Cost of Conflicts of Interest*, 26 Iowa J. Corp. L. 609, 620 n.59 (2001). *See* ¶185.

to $350 million, while the investment advisory fee's first breakpoint is at $500 million, which results in Defendants receiving an additional 5 to 15 bps in managing the first $500 million without performing any additional services (¶188); (2) UBS PACE International Emerging Market Fund similarly allows Defendants to receive additional fees without providing additional services by having subadvisory breakpoints that are at $150 million and $250 million even though the advisory fee breakpoints begin at $500 million (¶189); (3) UBS PACE International Emerging Market Fund's subadvisory fee breakpoints are at $250 million, while the first investment advisory fee breakpoint is at $500 million, which results in the Defendants receiving an additional 15 bps in managing the first $500 million without performing any additional services (¶190); and (4) UBS PACE Global Fixed Income Investments Fund's subadvisory fee breakpoints are for assets under $400 million, even though the investment advisory fee's first breakpoint is at $1 billion, which results in the Defendants receiving additional fees for managing the first $1 billion, without performing any additional services (¶191).  Inconsistent breakpoints between the investment advisor and subadvisor illustrate that Defendants failed to pass economies of scale because "it is reasonable . . . to infer that a lower breakpoint for the sub-adviser than for the investment adviser may indicate that the investment adviser's costs are dropping as assets increase without any commensurate decrease in fees paid by the funds." *Wells Fargo,* 2006 U.S. Dist. LEXIS 60858, at *57.

Additionally, the Complaint alleges that the placement of the advisory fee breakpoints were illusory because the Funds' assets never reached the first advisory fee breakpoint.  For example, (1) UBS PACE Small/Medium Company Growth Fund's first breakpoint is at $750 million, but the Fund is at $431 million and has never been over $750 million since its inception in August, 1995 (¶186); (2) UBS PACE International Emerging Market Equity Fund's first

breakpoint is at $500 million, but as of the date of the institution of this action, the Fund did not

hold over $500 million in assets from its inception in August, 1995 (*Id.*); and (3) UBS PACE

Strategic Fixed Income Investment Fund's first breakpoint is at $500 million, but as of the date

of the institution of this action, the Fund did not hold over $500 million in assets from its

inception in August, 1995 (*Id.*).  These allegations further demonstrate and plead that Defendants

were not passing economies of scale to the Funds but were instead keeping them as a windfall

for themselves.  *Hunt*, 2006 U.S. Dist. LEXIS 40944, at *8.

      The Complaint also alleges that under the *Gartenberg* factor which considers the nature

and quality of the services provided, the performance of the Funds does not justify the excessive

fees being charged to the Funds.  The advisory services do not justify the fees being charged

because the Funds' performance is not superior and the Funds' performance rankings have been

falling during the relevant period.  *See* ¶¶194-196.  For example, (1) UBS PACE Small/Medium

Company Growth Equity Fund's performance ranking in 2003 was 39th percentile of all funds in

its category, but by 2004 it had fallen to 69th and in 2005 it slipped to 90th in terms of

performance in its category of Funds (¶194); (2) UBS PACE Small/Medium Company Value

Equity Fund's performance ranking in 2003 was 61st percentile, but by 2004 it had slipped to 75th

and by 2005 it fell further to the 81st in terms of its performance in its fund category (¶195); and

(3) UBS S&P 500 Index Fund has both fairly average returns and fairly average risk, which do

not justify the excessive fees charged to it (¶196).  Courts have found that in the § 36(b) context,

"the most significant indication of the quality of an investment adviser's services is the fund's

performance relative to other funds of the same kind." *Kalish* v. *Franklin Advisors, Inc.*, 742 F.

Supp. 1222, 1229 (S.D.N.Y 1990).

The Complaint also looks at comparative fee structures, which is another *Gartenberg* factor used by courts to determine whether a fund's fees are excessive. The Complaint shows that comparatively UBS US Allocation Fund's expense ratio is significantly higher, by 25 bps, than the category average. *See* ¶198. The higher fee demonstrates that the fees charged to the Fund were excessive, since comparable funds were able to provide similar services for significantly less. Such allegations plead a claim under § 36(b). *Wells Fargo*, 2006 U.S. Dist. LEXIS 60858 at *57-58.

The Complaint also adequately pleads that the directors did not independently and conscientiously approve the fees charged to the Funds. The Complaint alleges that the directors' deliberation should not be given any significance because they did not spend sufficient time analyzing the Funds' fees (¶218), the directors failed to ensure that the Funds' economies of scale were shared with investors through lower breakpoints (¶222), and the directors failed to recognize that the Funds were being charged excessive fees to cover Defendants' out of pocket expenses (¶220). The Plaintiffs' allegation regarding the directors' lack of independence and conscientiousness in approving the fees charged to the Funds is adequately established by the lack of time given to analyzing the Funds and decisions that were to the detriment of investors and the great benefit of Defendants. Such allegations support a claim under § 36(b). *See Hunt*, 2006 U.S. Dist. LEXIS 40944.

Courts have held that allegations similar to those described above contained in the Complaint state a claim under notice pleading rules for § 36(b). For example, the *Wells Fargo* court found that: (1) the plaintiff's illustrations of the underperformance of some of the funds was sufficient to plead that the nature and quality of services did not justify the fees charged; (2) the failure to pass economies of scale can be illustrated by ineffective breakpoint structures

and statistical data; and (3) "statistical comparisons to relevant industry wide averages are relevant to whether [...] funds have higher expense ratios than other funds and, by inference, excessive advisory and distribution fees." 2006 U.S. Dist. LEXIS 60858, at *57-58.  Here, Plaintiffs have made similar factual allegations to support their § 36(b) claims.  As previously explained, the Complaint shows how the services provided did not justify the expenses charged by pleading fund specific allegations regarding certain Funds' underperformance.  *See* ¶¶194-196.[21]  In addition, the Complaint also alleges, as in *Wells Fargo*, that the relationship with the sub-adviser allowed Defendants to earn up to an extra 15 bps without providing any additional services.  *See* ¶¶180-184.  The Complaint also gives an example of how the expense ratio of the Funds was 25 bps higher than the industry's category average.  *See* ¶198.

In *Hunt*, the court sustained the plaintiffs' § 36(b) claim based on allegations that are also similar to the ones presented in the Complaint.  In *Hunt*, the court found that: (1) the plaintiffs had adequately pled that the nature and quality of services did not justify the fees since the defendants' services "remained unchanged despite dramatic growth in the assets of the [f]unds and the advisory revenue"; (2) higher comparative fees charged by pension funds and industry peer funds supported a § 36(b) violation; (3) the trustees did not receive adequate information to fulfill their fiduciary duties; (4) allegations regarding the fund complex and its participation in revenue sharing arrangements also supported the § 36(b) claim; and (5) fall-out benefit allegations regarding soft-dollar credits are relevant, noting that "fall-out benefits reaped by the advisers are relevant in determining whether the advisers have breached their duties under § 36(b)." 2006 U.S. Dist. LEXIS 40944.  As illustrated above, Plaintiffs here have also made

---

[21]  Defendants readily concede that comparative fee structures in the industry are relevant to §36(b). D. Br. at 46 (conceding relevance of "whether a fee was above or even far below its peers").

allegations regarding the increase in the Funds' fees while services remained the same (¶¶177-192), and that the Funds' fees were higher than peer funds' fees (¶198). The Complaint also makes allegations concerning directors' failure to remain informed, independent and conscientious in approving the Funds' fees (¶¶218, 220, 222), the fund complex's payment of excessive fees to cover revenue sharing arrangements (¶¶199-210), and how fall out benefits such as cost savings from soft-dollar transactions made the fees charged to the Funds excessive. *See* ¶¶202-224. As in *Hunt*, these allegations state a § 36(b) claim.

In *In re Dreyfus Mut. Funds Fee Litig.*, 428 F. Supp. 2d at 350, Judge Lancaster of the Western District of Pennsylvania applied "the deferential motion to dismiss standard" to deny the defendants' motion regarding a similar (but much less detailed) complaint against the adviser and distributor defendants based on allegations that the savings realized from economies of scale were not passed on to investors.[22] Plaintiffs' Complaint here includes similar allegations, as described above, which should also be sustained. In *Dreyfus*, the court also found that the plaintiffs' allegations that the trustees or directors of the funds were "neither independent or conscientious" further supported the plaintiffs' allegations that the defendants' fees were excessive. *Id.* As stated in *Krinsk*, 875 F.2d at 412:

> The expertise of the trustees, whether they are fully informed, and the extent of
> care and conscientiousness with which they perform their duties are among the

---

[22] While Judge Lancaster later granted judgment on the pleadings for the plaintiffs' §36(b) claim on the ground that it should have been pled derivatively, this procedural ruling does not affect the court's ruling denying the defendants' motion to dismiss with respect to the substance of the plaintiffs' claim. In fact, Judge Lancaster explicitly referenced in the later ruling his prior determination that the complaint adequately alleged excessive fees under §36(b) and said nothing to suggest any change to that ruling. *In re Dreyfus Mut. Funds Fee Litig.*, No. 04-0128, slip op. at 2-3 (W.D. Pa. Apr. 7, 2006) ("we ***found*** under 12(b)'s deferential standard, plaintiffs ***had*** sufficiently pled a cause of action under §36(b)") (emphasis added). Here, Plaintiffs have pled their §36(b) claim both directly and, in the alternative, derivatively.

most important factors to be examined in evaluating the reasonableness of
compensation under § 36(b).

Plaintiffs include similar allegations regarding the directors' failure to fulfill their duties of
independence, care and conscientiousness in their failure to adequately spend sufficient time on
deliberating the fees charged to the Funds and approving contracts that failed to pass on the
economies of scale through effective breakpoints to the Funds and their investors, which further
support that the fees are excessive.  ¶¶211-224.

In *Strigliabotti*, 2005 U.S. Dist. LEXIS 9625, the plaintiffs alleged that:  (1) the
defendants charged much higher fees to plaintiffs than to other clients for equivalent advisory
services; (2) although the funds' assets grew significantly over a ten-year period, the nature of
the services rendered had not changed, making the defendants' increased fees disproportionately
large; and (3) defendants retained excess profits resulting from economies of scale.  The court
concluded that these facts were sufficient to allege a disproportionate relationship between fees
and services and therefore satisfied Rule 8's "liberal pleading standard."  *Id.* at *12.  Similar
allegations here should be upheld.  For example, in this case, as in *Strigliabotti*, Plaintiffs allege
that although the Funds' assets grew and Defendants received additional fees, these fees were
disproportionate given that the nature, quality and level of the services Defendants provided
remained the same.  ¶¶178-197.  Plaintiffs further allege that as the Funds' assets grew, so did
Defendants' fees because Defendants retained the economies of scale for their own benefit and
continued charging greatly increased expenses without providing additional, commensurate
services. *Id.*

In *Jones*, 2005 U.S. Dist. LEXIS 39560, the court also upheld § 36(b) allegations similar
to, yet less detailed than, those in this case, stating:

> [While § 36(b)] does not explicitly refer to excess profits, the scenario described
> in the complaint could indicate a setting in which [the defendant] is retaining

unearned fees.  In other words, if the money [the defendant] is receiving can be fairly characterized as a fee and *it is in essence something for nothing*, clearly that would represent an actionably disproportional relationship between the fees paid and the services rendered ... Thus, we cannot say that this claim is so devoid of potential merit as to warrant dismissal ...

*Id.* at *8-9 (citation omitted) (emphasis added).  In denying the defendants' motion to dismiss the plaintiffs' § 36(b) claim, the *Jones* court noted that it is "in no position based on the allegations of the complaint to determine what services Plaintiffs received from [the defendant] or how much they can fairly be worth.  It is not inconceivable that the fees charged . . . were so disproportionate to the value of the services rendered that a violation of § 36(b) would lie." *Id.* at *7.  As in *Jones*, Plaintiffs here have adequately alleged how the fees charged "would represent an actionably disproportional relationship between the fees paid and the services rendered," (*i.e.*, "something for nothing"), thereby stating a claim for excessive fees under § 36(b).

In *Wicks*, 2005 U.S. Dist. LEXIS 4892 (D. Mass. Mar. 28, 2005), the plaintiff sued the investment manager for certain Putnam Funds based upon the allegation that "[t]he defendants [. . . .] direct the payment of excessive commissions to securities broker-dealers to execute trades for the Funds in exchange for 'soft dollars' (said to be a form of kickback) that benefit the defendants and not the Funds." *Id.* at *3.  The *Wicks* defendants (and not the investors) benefited because, as the plaintiffs alleged, "[a]lthough assets held by the Funds [. . .] increased significantly over time, the nature and quality of the services rendered by the defendants to the Funds has not substantially changed [ . . ., creating] benefits from economies of scale which the defendants [. . .] failed to share with the Funds." *Id.*  As the plaintiffs alleged, the "defendants continue[d] to receive larger fees from the Funds, capturing all benefits from the economies of scale for themselves." *Id.*  In denying the defendants' motion to dismiss, the court held that such allegations are sufficient under § 36(b) to survive a motion to dismiss.  *Id.* at *13.  Plaintiffs here have alleged that Defendants violated the § 36(b) proscription against payment of excessive fees

-55-

to the Investment Adviser Defendants and their affiliates because Plaintiffs and the Funds did not

receive the benefits of increased Fund assets, including economies of scale.  As in *Wicks*, this

states a § 36(b) claim.

      In *Forsythe v. Sun Life Financial, Inc.*, the court sustained the plaintiffs' § 36(b) claim

based on allegations similar to, yet far less detailed than, Plaintiffs' allegations in this case:

> I conclude that [the plaintiffs' § 36(b) claim] sufficiently comports with Rule 8's
> pleading standard.  It alleges wrongful conduct specific to the defendants in some
> factual detail.  In addition, it alleges that the defendants have caused the MFS
> funds to pay improper "kickbacks" to brokers in exchange for steering clients into
> MFS Funds via "shelf-space arrangements," to pay excessive commissions under
> the guise of "soft dollars," to engage in improper "directed brokerage"
> arrangements, and to make improper "hard dollar" revenue sharing payments that
> were then reimbursed out of MFS Fund assets.  . . .  There are also illustrating
> allegations regarding these types of arrangements with one particular broker-
> dealer, as well as allegations that a large number of other broker-dealers were
> similarly involved.  . . . .  The plaintiffs also give adequate notice of how these
> arrangements . . . ***benefited*** the defendants while at the same time ***harming*** the
> MFS Funds and their investors.  . . . The plaintiffs allege that as the MFS Funds
> grew the defendants failed to pass on economies of scale from that growth by
> failing to reduce fees accordingly.  Finally, the plaintiffs allege that the advisory
> fees MFS Company received were wrongfully inflated by shifting to the MFS
> Funds and their investors costs which should have rightfully have been borne by
> the MFS Company.

417 F. Supp. 2d at 115-16 (emphasis added).

      In so ruling, the *Forsythe* court rejected the defendants' argument that the plaintiffs'

complaint failed to allege facts demonstrating the services the defendants rendered were

disproportionate to the fees charged, explaining that the plaintiffs' complaint was ***not*** like one

where "the plaintiffs only alleged the fees were high but made no allegations regarding services

rendered and the relationship between the two."  *Id.* at 116.  Although, according to the court, the

plaintiffs may not have made specific allegations "regarding the quality of the services rendered,

that factor may be irrelevant to their theory of excessiveness" because:

> [t]he plaintiffs' contention is that the fees were excessive because they were unauthorized and taken from fund assets to the benefit of the defendants only, not the funds. The plaintiffs' theory is that fees that amount to "something for nothing" are inherently excessive. At least one court concluded . . . [that fees] . . . that were in essence "**something for nothing**" could represent a disproportional relationship between fees and services. *See Jones v. Harris Assocs., L.P.*, 2005 U.S. Dist. LEXIS 39560, Civ. No. 04C8305, 2005 WL 831301, at *3 (N.D. Ill. Apr. 7, 2005). For present purposes, the plaintiffs' pleading of this claim is sufficient to survive a motion to dismiss.

*Id.* (emphasis added). Here, as described above, Plaintiffs do make allegations regarding the quality of the services rendered. Plaintiffs' § 36(b) claim should similarly be sustained.[23]

Defendants argue that Plaintiffs fail to adequately plead their § 36(b) claim because the Complaint focuses on the same types of allegations that were not sustained in *In re Salomon Smith Barney*, 2006 U.S. Dist. LEXIS 52081 (S.D.N.Y. July 25, 2006), *In re Morgan Stanley & Van Kampen*, 2006 U.S. Dist. LEXIS 20758, and *In re Merrill Lynch & Co. Research Reports Securities Litigation*, 272 F. Supp. 2d 243 (S.D.N.Y. 2003). D. Br. at 43. Defendants' argument is critically flawed because their motion fails to address the significant and distinctive factual support in the Complaint that differentiates it from the cases mentioned above. This Complaint contains far more facts and relevant analyses than any of the ones that were dismissed -- which Defendants conveniently ignore. Specifically, Defendants' motion fails to address the factual support alleging that (1) economies of scale were not passed to the Funds and their investors by Defendants (¶¶177-184, 185-192); (2) the nature and quality of Defendants' services did not

---

[23] In *Dumond v. Mass. Fin. Services  Co.*, 2006 U.S. Dist. LEXIS 1933 (D. Mass. Jan. 19, 2006), the same court as in *Forsythe* held that the plaintiffs' §36(b) claim satisfied Rule 8 based on the plaintiffs' allegations that the defendants' fees were excessive because, *inter alia*, they did not reduce their fees to reflect benefits received from arrangements such as: (1) soft dollars and kickbacks from brokers and (2) securities lending arrangements. *Id.* The court also sustained §36(b) allegations that while the funds grew in size, services had changed little resulting in the defendants receiving disproportionately large fees, and allegations that the funds charged higher management fees to retail investors than institutional investors. Similar allegations should be sustained here.

justify the fees charged to the funds (¶¶178, 179, 184, 193-197); (3) the Funds' fees were higher

than comparable peer funds (¶198); (4) certain practices of the entire fund complex provide

further factual support of the fees being excessive relative to the services provided (¶¶199-224);

(5) the use of fund assets, such as advisory fees, 12b-1 fees and soft dollars to pay for out-of-

pocket expenses further demonstrates that the fees were excessive; and (6) the directors were not

informed, independent or conscientious in their decisions because of the limited time they spent

making decisions per Fund and their failure to recognize that the fees were excessive.[24]

Defendants incorrectly argue that the misuse of certain fees is the central theme of the

Complaint and that such allegations do not state a claim under § 36(b).  D. Br. at 45.  This is

Defendants' transparent attempt to shoehorn this case into the rubric of *In re Eaton Vance*

*Mutual Funds Fee Litigation*, 380 F. Supp. 2d at 22 and subsequent cases that adopt Judge

Koeltl's holding in *Eaton Vance*.  However, the crux of the *Eaton Vance* court's holding was that

the plaintiffs had not properly pled a § 36(b) claim because the court erroneously believed the

plaintiffs had only alleged that the payments were improper, rather than excessive.[25]  Plaintiffs in

---

[24]  Defendants incorrectly argue that the damages period is limited to the one year prior to filing
the initial complaint.  D. Br. at 41 n.25.  The Court need not reach that issue on this motion.
However, the damages period extends until the closing of the case, covering excessive fees
charged throughout the period.  *Tarlov v. PaineWebber CashFund, Inc.*, 559 F. Supp. 429, 433
(D. Conn. 1983); cf. *Hunt*, 2006 U.S. Dist. LEXIS 42064, at *4-5 ("the court recognizes that the
language of the ICA that '[n]o award of damages shall be recoverable for any period prior to one
year before the action was instituted,' does not limit damages for the period following the filing
of the action.").

[25]  Defendants also cite *In re Davis Selected Mut. Funds Litig.*, 2005 U.S. Dist. LEXIS 23203, in
which Judge Cedarbaum adopted Judge Koeltl's reasoning in *In re Eaton Vance Mut. Fee Funds
Litig.*, 380 F. Supp. 2d at 222, regarding the plaintiffs' §36(b) and other claims in that case
without any additional analysis.  *See* D. Br. at 45.  In addition, Judge Buchwald in *In re
Goldman*, 2006 U.S. Dist. LEXIS 1542, adopted the rulings of Judge Cedarbaum and Judge
Koeltl in dismissing the plaintiffs' §36(b) and other claims.  Defendants also cite *In re Evergreen
Mut. Funds Fee Litig.*, 423 F. Supp. 2d at 249,which similarly relied on *Eaton Vance* and its
progeny.  Plaintiffs disagree with these decisions.  The appeal in *Eaton Vance* is fully briefed

this case have not alleged that Defendants' fees violated § 36(b) because they were improper, but rather because the fees, including the portion used to pay for revenue sharing, were disproportionate to the services rendered.  These allegations are closely analogous to those made in *Wells Fargo*, where the court found that where "investment advisers and distributors were funding kickbacks by increasing fees to the funds or by keeping the fees steady when they otherwise would have declined, they may have breached their duty if the funds did not benefit from the kickback scheme."  2006 U.S. Dist. LEXIS 60858, at *53.  As in *Wells Fargo*, the Complaint's allegations are not exclusively focused on Defendants' relationship with brokers and the increase in assets, but also on the ineffective fee structures and increasing expense ratios that are the result of Defendants' failure to pass the economies of scale to the Funds so Defendants can use the excess fees to pay for out-of-pocket expenses, such as revenue sharing arrangements, and exclusively enjoy the benefits of the incoming assets from the revenue sharing relationships.  *See* ¶¶202-210.[26]

---

before the Second Circuit.  All other similar appeals on the other cases are being held in abeyance pending a decision in *Eaton Vance*.  In any event, this Complaint is far more detailed than those in *Eaton Vance* and its progeny and those cases do not require dismissal here.

[26] Defendants cite *Kalish*, 742 F. Supp. at 1238.  However, as the *Wells Fargo* court recently noted:

> Movants note that, although plaintiff alleges that they enjoyed economies of scale, he does not allege how *much* the investment adviser's costs per unit fell. They cite *Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222, 1238 (S.D.N.Y. 1990), which stated, "[p]laintiffs in prior cases have argued in substance that since a fund increased dramatically in size, economies in scale must have been realized. The courts reject that argument." In *Kalish* and the decisions to which it cited, the issue was whether economies of scale had been *proven* after trial, not whether they had been *pleaded* properly. *Id.* at 1238-39.

2006 U.S. Dist. LEXIS 60858, at *54-55.

In fact, in *Eaton Vance* and its progeny, the allegations of excessive fees centered principally on revenue sharing allegations. Not so here. The Complaint's allegations provide significantly more detail about the Funds' fees and services than the cases cited and concern much more than allegations regarding revenue sharing. As illustrated above, the Complaint examines the fees charged to the Funds using all the *Gartenberg* factors as a guideline. Revenue sharing is not the Complaint's primary focus, but rather an arrangement taken into consideration when determining whether the nature and quality of services provided to the Funds justify the fees charged. Judge Koetl did not find such allegations present in *Eaton Vance* or its progeny and Defendants' reliance on those cases is thus inapposite.[27]

In addition, Defendants argue that Plaintiffs must allege the entire fee is disproportionate to the services rendered, not solely that a component of the fee is improper, *i.e.* 12b-1 fees. D. Br. at 45. Defendants' argument is incorrect and misplaced. Under *Meyer v. Oppenheimer Management Corp.*, 895 F.2d 861, 866 (2d Cir. 1990), the Second Circuit explains:

> In *Meyer II*, we stated that "[a] claim that payments made under Rule 12b-1 are excessive when combined with advisory fees, where both payments are made to 'affiliated persons' of an investment adviser, is cognizable under § 36(b)." 764 F.2d at 83. This statement stands only for the proposition that the costs of 12b-1 plans involving such affiliates as well as advisory fees are subject to review under § 36(b). Were such review not available, investment advisers might be able to extract additional compensation for advisory services by excessive distributions under a 12b-1 plan. The statement does not, however, stand for the additional proposition that 12b-1 payments to an adviser's affiliates are to be aggregated with advisory fees to determine the merits of a § 36(b) claim. The two kinds of payments are for entirely different services, namely advice on the one hand and sales and distribution on the other. If the fee for each service viewed separately is

---

[27] Defendants' citation to *Mutchka v. Harris*, 373 F. Supp. 2d. 1021 (C.D. Cal. 2005), is not applicable here because the court was resolving whether a breach of any type of fiduciary duty to the funds, in addition to the the fiduciary relationship between the Investment Adviser's services to the funds and the fees charged, establishes a claim under §36(b). Here, the allegations are squarely focused on whether the fees charged to the Funds were excessive relative to the services provided to the Funds.

not excessive in relation to the service rendered, then the sum of the two is also permissible.

Here, the Complaint alleges that the fees charged to the Funds were excessive both separately and as aggregated. For example, the Complaint looks at how the advisory fee was excessive because its breakpoints were illusory and failed to pass economies of scale to investors. *See* ¶¶180-184. The Complaint also alleges that the 12b-1 fees were excessive because they were used to pay for revenue sharing arrangements that provided no benefit to investors. *See* ¶¶208-210. At the same time, the Complaint examines the expense ratios of the Funds, which represents the aggregate of all the expenses, and demonstrates how the UBS Funds' expense ratios were increasing when they should have been decreasing and are higher than those of their peers. *See* ¶¶179-183, 198. This further demonstrates the excessiveness of the fees.

Defendants also incorrectly argue that the NASD limit on sales loads and 12b-1 fees determines whether distribution fees charged to the Funds are excessive. D. Br. at 46. Under § 36(b) the issue is whether the fees are disproportionate to the services provided to the Fund, not whether they surpass limits on what can be charged for specific services to the Fund. *See Pfeiffer*, 2004 U.S. Dist. LEXIS 16924, at *16-18; *ING Principal Prot. Funds Deriv. Litig.*, 369 F. Supp. 2d 163 (D. Mass. 2005). Both *Pfeiffer* and *ING* were decided *after* the advent of NASD Rule 2830, both analyzed the plaintiffs' actions for excessive 12b-1 fees under § 36(b) and rejected Defendants' argument here: that the defendants' 12b-1 fees were *per se* reasonable under § 36(b) because they did not exceed the limits of NASD Rule 2830. *See ING*, 369 F. Supp. 2d at 167-78; *Pfeiffer*, 2004 U.S. Dist. LEXIS 16924, at *17-18.

Defendants additionally argue that Plaintiffs fail to recognize the benefits of 12b-1 fees and soft dollars to the Funds and that these fees do not provide an adequate basis for a § 36(b)

claim. D. Br. at 47-48. Defendants improperly attempt to dispute factual allegations regarding the benefits of 12b-1 fees and soft dollars, which is an inappropriate factual argument not properly considered on a motion to dismiss. For example, Defendants argue that 12b-1 fees have facilitated multiple class structures. However, the purpose of 12b-1 fees was for an increase in size of assets to result in economies of scale, which is passed to the investor. Although 12b-1 fees are used to support different multiple class structures (*i.e.* Class A, B, C, R), academics have found that the multiple class structures have not resulted in providing more benefits to investors than non-class structured funds. Therefore, Defendants' argument regarding the supposed benefits created by these fees is conclusory and questionable and illustrates why such arguments should not be -- and are not -- accepted on a motion to dismiss. Mathew R. Morey, *Multiple-Share Classes and Mutual Fund Composition*, Financial Services Review, Spring 2004. Furthermore, an SEC Financial Economist has determined that 12b-1 fees do not benefit fund shareholders as Defendants claim. *See* Lori Walsh, *The Costs and Benefits to Shareholders of 12b-1 Plans: An Examination of Fund Flows, Expenses and Returns* 2 (Apr. 26, 2004), *available at* http://www.sec.gov/rules/proposed/ s70904/walsh042604.pdf.

Furthermore, despite Defendants' improper factual arguments, fall-out benefits such as the cost-savings afforded to Defendants through their use of fund assets, such as brokerage commissions, to cover their out of pocket expenses, is properly considered by this Court as a factor supporting an allegation that the advisory fees are excessive. *See Hunt*, 2006 U.S. Dist. LEXIS 40944, at *16 ("the fall-out benefits reaped by the advisers are relevant in determining whether the advisers have breached their fiduciary duties under § 36(b). *See, e.g., Krinsk*, 875 F.2d at 409."). Plaintiffs are also not required to plead specific amounts of such fees to support a

§ 36(b) claim, (*id.*), as Defendants wrongly suggest.  Instead, Plaintiffs properly allege that soft

dollars used to pay for costs such as revenue sharing illustrate how fees are excessive.  ¶¶93-96.

## VIII.   PLAINTIFFS ADEQUATELY PLEAD § 36(b) AS A DIRECT CLAIM

Defendants argue that Count VIII alleging Plaintiffs' § 36(b) claim should be dismissed

because it was improperly brought directly as a class action rather than derivatively.[28]  D. Br. at

41-43.  In arguing that a § 36(b) claim is derivative, Defendants rely on cases which have

misinterpreted the statutory text and the Supreme Court's opinion in *Daily Income Fund, Inc. v.*

*Fox*, 464 U.S. 523 (1984).  D. Mem. at 42 (citing *Eaton Vance Mut. Fund Fees Litig.*, 380 F.

Supp. 2d at 222; *In re Franklin Mut. Funds Litig.*, 388 F. Supp. 2d 451 (D.N.J. 2005); *In re*

*Goldman Sachs*; 2006 U.S. Dist. LEXIS 1542; *In re Dreyfus Mut. Funds Fee Litig.*, 428 F. Supp.

(W.D. Pa. 2006)]; *Burks v. Lasker*, 441 U.S. 471 (1979)).  Although § 36(b) claims are brought

"on behalf of" the mutual fund (15 U.S.C. § 80a-35(b)), the Supreme Court in *Daily Income*

confirmed that, "[t]he fact that derivative suits are brought on behalf of a corporation does not

mean, however, that all suits brought on behalf of a corporation are derivative."  464 U.S. at 535.

By statute, a § 36(b) claim may only be brought by a security holder or the SEC, not the fund

itself.  As the Supreme Court has held, § 36(b) claims are direct because the fund itself has no

right of action.  *Id.*

The Supreme Court held in *Daily Income* that, "Congress intended the unique right

created by § 36(b) to be enforced solely by the SEC and security holders of the investment

company."  *Id.* at 536.  Therefore, the primary or direct right to bring such claim is held by the

---

[28]  Defendants argue that because Plaintiffs have pled in the alternative their §36(b) claim
derivatively, Plaintiffs anticipate that their direct §36(b) claim will be dismissed.  To the
contrary, because courts are split on the issue as to whether the claim is direct or derivative,
Plaintiffs properly pled it in the alternative to create judicial efficiency and prevent the delay
related with having to replead the §36(b) claim in whichever form the Court deems proper.

security holder, not the mutual fund.  This conclusion was subsequently confirmed by the

Supreme Court in *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 108 (1991), in which

the Supreme Court stated that "a shareholder action 'on behalf of' the company under § 36(b) is

direct rather than derivative."  *See also In re Columbia Entities Litig.*, 2005 U.S. Dist. LEXIS

33439, at *18 (D. Mass. Nov. 30, 2005) (holding that a § 36(b) claim is not derivative).

Furthermore, the overwhelming thrust of the Supreme Court's discussion in *Daily Income*

is that in deciding whether the proper party plaintiff to a lawsuit is the shareholder or the

corporation, the determining factor is whether the corporation itself is entitled to assert that claim

in court.  In *Daily Income*, the Supreme Court specifically stated, "a shareholder action that the

corporation cannot control raises no proper party concerns."  464 U.S. at 533 n.9, 538-39.

§ 36(b) claims are thus direct and a class action may be brought on behalf of all investors in all

UBS Funds, who are the proper parties to bring suit.

Indeed, the Complaint alleges that, consistent with *Daily Income*, "the Count is brought

by the Class [as UBS Funds securities holders] on behalf of the UBS Funds against the Adviser

and Distributor defendants for breach of their fiduciary duties as defined by § 36(b) of the

Investment Company Act."  ¶282.  Because the allegation is made by the investors -- the only

entities other than the SEC with the right to bring this action -- and because it is brought on

behalf of the UBS Funds, the entity that would properly receive the recovery, it is properly

brought no matter what nomenclature is used to describe the nature of the claim.

In *Coan v. Kaufman*, 2006 U.S. App. LEXIS 18444, the Second Circuit recently provided

insight into whether it would find that § 36(b) is direct.[29]  In *Coan*, the Second Circuit was

---

[29] *Coan* was decided after all of the Southern District of New York cases on which Defendants rely which held that §36(b) is derivative.

primarily examining whether § 502(a)(2) of ERISA was derivative or due to its structure required that derivative principles apply to it.[30]  The Court first held that Rule 23.1 governing derivative suits did not apply to § 502(a)(2).  *Id*. at \*16-18.  The Court further found, by analogizing § 502(a)(2) to § 36(b) of the ICA, that the claim was not governed by general principles of a derivative suit.  Citing *Daily Income*, the Second Circuit stated:

> As the Supreme Court explained in *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 529, 104 S. Ct. 831, 78 L. Ed. 2d 645 (1984), "the term 'derivative action' . . . has long been understood to apply only to those actions in which the right claimed by the shareholder is one the corporation could itself have enforced in court." Relying in part on this general "understanding . . . of the term 'derivative action,'" *id*. at 528, the Daily Income Fund Court concluded that the demand requirement of Rule 23.1 did not apply to a shareholder suit brought under § 36(b) of the Investment Company Act of 1940 (ICA), 15 U.S.C. § 80a-35(b), because the ICA did not grant a cause of action to the corporation, see *Daily Income Fund*, 464 U.S. at 542.

> The Court explained in *Daily Income Fund* that because corporations could not bring suit in their own right under the ICA, individual shareholders' suits were not derivative.  That reasoning applies with equal force here.  Because ERISA plans cannot bring suit against fiduciaries on the plans' own behalf under § 502, the lawsuits of individual participants are not derivative either.  See *Pressroom Unions-Printers League Income Sec. Fund v. Cont'l Assurance Co.*, 700 F.2d 889, 893 (2d Cir.) ("In light of the frequent references in {ERISA} and its legislative history to 'participants, beneficiaries and fiduciaries,' [the] conclusion [that funds also have standing to bring suit] is untenable.") (citations omitted), cert. denied, 464 U.S. 845, 104 S. Ct. 148, 78 L. Ed. 138 (1983). § 502(a)(2), like the law considered by Supreme Court in Daily Income Fund, creates an "unusual cause of action . . . [that] differs significantly from those traditionally asserted in shareholder derivative suits." *Daily Income Fund*, 464 U.S. at 535.  We therefore doubt that § 502(a)(2) actions can, in any meaningful sense, be governed by the "same general principles" of procedure that control derivative actions.  *Coan II*, 349 F. Supp. 2d at 275 (internal quotation marks and citation omitted).

---

[30]  Similar to §36(b) of the ICA, §502(a)(2) requires that the damages return to the plan and its beneficiaries.  An individual can not bring a claim solely for the injury that he or she personally suffered.  *Coan*, 2006 U.S. App. LEXIS 18444 at \*14-15 (quoting *Massachusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134, 105 S. Ct. 3085, 87 L. Ed. 2d 96 (1985)).

*Id.* at *19-*21.  The Second Circuit thus concluded that just as § 36(b) is not derivative, neither is § 502(a)(2).

Finally, the *Coan* Court concluded that claims under § 502(a)(2) of ERISA must be brought in a "representative capacity." *Id.* at *21.  Because any recovery for alleged breaches of fiduciary duty by plan fiduciaries goes back to the plan, "the representative nature of the § 502(a)(2) right of action implies that plan participants must employ procedures to protect effectively the interests they purport to represent." *Id.* at * 23.  One of the ways in which a participant could do so, according to the *Coan* Court, is to file the claim as a class action. *Id.* at *24-28.[31]  Given the strong similarity of § 502(a)(2) to § 36(b), as the *Coan* Court aptly noted, the Second Circuit's reasoning in *Coan* would likely apply to § 36(b) as well, thereby reinforcing that in this case, the § 36(b) claim was properly brought as a direct claim and as a class action.

Several recent decisions have also found § 36(b) claims to be direct not derivative.  In *In re Columbia*, an action also alleging violations of § 36(b) against the *Columbia* mutual fund family, although Judge Keeton improperly dismissed all of the plaintiffs' claims, he correctly found that, based on *Daily Income*, a claim under § 36(b) is direct in nature:

> In [*Daily Income*], the Court held that, due to the purposes of the statute, § 36(b) of the ICA provided for a direct action to be brought by a shareholder, rather than for a derivative action to be brought on behalf of the corporation.  [464 U.S. at 540-41.]  The Court elaborated that, regardless of state law, § 36(b) did not provide for a derivative action because the right of action was not one that could be asserted by the corporation itself. Id. at 528-29.

2005 U.S. Dist. LEXIS 33439, at *18-19.  As Judge Keeton recognized, the Supreme Court in *Daily Income* did not look to state law to determine the nature of a § 36(b) claim as Defendants

---

[31]  In *Coan*, the plaintiff failed to file her claims in a "representative capacity," such as a class action, and the Second Circuit thus affirmed the district court's dismissal of the §502(a)(2) claim on this ground. *Coan*, 2006 U.S. App. LEXIS 18444 at *30-31.

wrongly argue. D. Br. at 41. Rather, as the Supreme Court recognized, a § 36(b) claim is direct by its very terms.

In *Stegall v. Ladner*, 394 F. Supp. 2d 358 (D. Mass. 2005), Judge Woodlock confirmed that "courts have found a direct cause of action under § 36(b)." *Id.* at 373 n.16 (citing *Strigliabotti*, 2005 U.S. Dist. LEXIS 9625, at *25; *Krantz v. Fidenity Mgmt. & Research, Co.*, 98 F. Supp. 2d at 157-58). In *Stegall*, Judge Woodlock explained that, "[a]s the Supreme Court determined in *Daily Income* [. . .]a shareholder's § 36(b) 'suit on the fund's behalf was not a derivative one in the sense that the shareholder was seeking to enforce a cause of action that the fund had but refused to enforce on its own.'" 394 F. Supp. 2d at 373 (quoting *Wicks*, 2005 U.S. Dist. LEXIS 4892, at *3).

The language of § 36(b) confirms that the fund investors have a primary and direct right of action under § 36(b). § 36(b) states that the "investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof." 15 U.S.C. § 80a-35(b). As stated in *Daily Income*, "[t]he fiduciary duty imposed on advisers by § 36(b) is owed to the company itself as well as its shareholders." 464 U.S. at 535 n.11.

Although § 36(b) provides that an action may be brought by a security holder "in respect of such compensation or payments paid by such registered investment company or by the security holders thereof," the statute requires that any recovery go to the mutual fund regardless of whether the excessive payments were made by the mutual fund itself or by the security holders. Thus, the language and structure of § 36(b) manifest a recognition that, in substance, mutual funds are pools of assets owned by the shareholders, so that a suit for the benefit of the

fund will automatically be a suit for the shareholders' own benefit even if the payments giving rise to the cause of action are made by the shareholders themselves.

The fact that any recovery on a § 36(b) claim goes to the fund rather than to the individual shareholder does not render the suit "derivative" rather than direct. This situation is analogous to when a fiduciary, such as an executor or a guardian, sues for the benefit of his or her beneficiary, which does not make that suit derivative merely because the plaintiff is not the beneficiary of any recovery in the lawsuit. Indeed, many such fiduciaries have been certified to represent a class, despite the fact that the plaintiff's individual claim is asserted on behalf of the plaintiff's beneficiary.[32] Indeed, as noted above, in *Coan*, the Second Circuit found that § 502(a)(2), which has a similar damages structure as § 36(b) in that a recovery belongs to the plan and not the individual, must be brought in a representative capacity, preferably a class action, and is not derivative. *Coan*, 2006 U.S. App. LEXIS 18444 at *23-24. The Second Circuit concluded that the fact that an individual could not bring an individual claim for personal damages made such a claim more amenable to it being brought as a class action, and did not make it derivative. The Second Circuit explained that the individual bringing such a claim was bringing it in a "representative capacity" -- in other words, that individual becomes a bona fide representative of other interested parties and any recovery goes back to the plan for their benefit. Similarly, a security holder bringing a § 36(b) claim brings a direct claim in a representative

---

[32] *See, e.g., Risinger v. Concannon*, 201 F.R.D. 16 (D. Me. 2001) (parents on behalf of their disabled children); *Woodard v. Online Info. Servs.*, 191 F.R.D. 502 (E.D.N.C. 2000) (guardian of legally incompetent plaintiff); *Prostic v. Xerox Corp.*, No. B-90-113, 1991 U.S. Dist. LEXIS 15950 (D. Conn. July 19, 1991) (securities fraud class action brought by representative of the estate of deceased investor). "[T]here is nothing inherent in this status that would preclude fiduciaries or trustees from serving as class representatives on behalf of their own beneficiaries as well as others similarly situated, and many courts have so held." *Woodard*, 191 F.R.D. at 506 (quoting Newberg on Class Actions, §3.34 (3d ed. 1992)).

capacity (here -- a class action) and any recovery goes back to the fund for the benefit of the

shareholders. As recently stated by the *Wells Fargo* court:

> That subsection [36(b)] provides a private right of action for the benefit of
> registered investment companies, *i.e.*, the mutual funds themselves. The ultimate
> beneficiary of this right of action, however, is the security holders of such fund, to
> whom the statute gives the right to bring claims under that subsection. It is
> significant that the subsection does not provide any cause of action to the funds
> themselves. This fact emphasizes that it was the investors who Congress intended
> to be the ultimate beneficiaries, not simply the funds themselves.

2006 U.S. Dist. LEXIS 60858, at *65.

Accordingly, Plaintiffs here may bring a § 36(b) claim directly on their own behalf for

the benefit of UBS Funds they own, as well as a class action on behalf of similarly situated

investors in the UBS Funds.

## IX.    PLAINTIFFS HAVE ADEQUATELY PLED A § 48(a) CLAIM

Defendants argue that Plaintiffs' § 48(a) claim should be dismissed for three reasons,

none of which has merit. First, despite Defendants' contention that there is no private right of

action, courts have implied a private right of action under § 48(a) to impose "control person"

liability to fully effectuate the purposes of the ICA, and doing so is appropriate here. *See, e.g., In

re ML-Lee Acquisition Fund II L.P.*, 848 F. Supp. 527, 545-46 (D. Del. 1994) (upholding § 48(a)

claim). Courts have thus permitted plaintiffs to proceed with discovery under § 48(a) where the

plaintiffs have based their § 48(a) claim on an underlying violation of the ICA, such as § 36(b).

*See Strougo v. Bassini*, 282 F.3d 162 (2d Cir. 2002) (upholding an implied right of action under

ICA Sections 36(a) and 48(a)).

Second, Defendants argue that the § 48(a) claim should be dismissed because Plaintiffs

have failed to plead it derivatively. D. Br. at 49-50. § 48(a) is not an independent claim, and in

the case at bar, Plaintiffs' § 48(a) claim is predicated upon liability under § 36(b). If the Court

finds § 36(b) to be derivative and upholds only Count IX which so pleads § 36(b), then Plaintiffs request leave to amend to plead § 48(a) in the same form.

Finally, Defendants argue that Plaintiffs fail to establish a § 48(a) claim because there is no viable underlying claim.  D. Br. at 50.  As shown above, Plaintiffs have adequately pled a viable § 36(b) claim and therefore the § 48(a) claim is adequately pled.

**X.      SLUSA DOES NOT PREEMPT PLAINTIFFS' STATE LAW CLAIMS**

Defendants argue that Plaintiffs' state law claims are preempted by SLUSA because they are made "in connection with the purchase or sale of a covered security."  D. Br. at 50-52. Defendants are wrong.  Plaintiffs allege three state law claims on behalf of the Financial Plans Subclass (the "FP Subclass").  The crux of these claims is that Defendants purported to offer FP Subclass members "unbiased" advice regarding mutual funds for a "participation fee" of up to 1.5% of eligible assets, while in reality Defendants were providing biased advice which favored their own interests.  ¶¶113, 115.  Plaintiffs allege that the FP Subclass members were injured not because of the purchase of securities under their Financial Plans, but instead because they were subjected to the 1.5% fee, for which they were not getting the "unbiased" advice that Defendants promised.  Plaintiffs allege that Defendants' conduct with respect to the FP Subclass is a breach of Defendants' fiduciary duty and a violation of New York General Business Law § § 349 and 350 ("New York state claims").  ¶¶295-311.  Plaintiffs' New York state claims are premised on the idea that Defendants concealed the biased nature of their recommendations and that this concealment induced FP Subclass members to purchase Defendants' Financial Plans.  ¶¶301-303, 307-310.

Plaintiffs' state law claims are not preempted by SLUSA because they are not based on the purchase of securities but are instead based on the purchase of Defendants' Financial Plans which carried with them a 1.5% asset-based fee that the FP Subclass members were unwittingly

paying for biased advice.  Under the Supreme Court's ruling in *Merrill Lynch, Pierce, Fenner &*
*Smith, Inc. v. Dabit*, 126 S.Ct. 1503 (2006), such claims are not preempted by SLUSA.[33]  In
*Dabit*, unlike here, the misconduct about which the plaintiff had complained was the "fraudulent
manipulation of stock prices" which the court held "unquestionably qualifies as fraud 'in
connection with the purchase or sale' of securities."  126 S.Ct. at 1515.

## XI.   PLAINTIFFS' NEW YORK STATE CLAIMS ARE NOT "SECURITIES" CLAIMS AND CANNOT BE DISMISSED ON THIS BASIS

Defendants further argue that Plaintiffs' New York state claims should be dismissed
because the New York consumer fraud statutes do not apply to securities claims.  As explained
above, however,  the claims of the FP Subclass members are not "securities claims," but are
instead claims based on the purchase of Financial Plans and Defendants' charging of an asset-
based fee of up to 1.5% while failing to provide the unbiased Financial Plans they promised to
the FP Subclass members.  This is a classic consumer fraud claim--not a "securities" claim--and
is properly brought under New York's consumer fraud statutes.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court deny
Defendants' Motion to Dismiss in its entirety.  If the Court is inclined to grant the Motion to
Dismiss in any respect, however, Plaintiffs respectfully request that they be allowed leave to
amend to cure any deficiencies.[34]

---

[33] *Atencio v. Smith Barney, Citigroup, Inc.*, 2005 WL 267556, at *3 (S.D.N.Y. Feb. 2, 2005),
does not support Defendants' argument either.  In that case, the court held that claims of
kickbacks paid to brokers were related to the plaintiffs' purchases of fund shares. In this case,
unlike in *Atencio*, the FP Subclass members are alleging injury based on their purchase of a
biased Financial Plan for which they were charged an asset-based fee of up to 1.5%.

[34] *See Foman v. Davis*, 371 U.S. 178, 182 (1962) ("if the underlying facts or circumstances
relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an

Dated: September 21, 2006

Respectfully submitted,

**MILBERG WEISS BERSHAD**
**& SCHULMAN LLP**

By:  ___/s/ Janine L. Pollack___
Jerome Congress (JC-2060)
Janine Pollack (JP-0178)
One Pennsylvania Plaza
New York, New York 10119-0165
Tel: (212) 594-5300
Fax: (212) 868-1229


**STULL, STULL & BRODY**
Jules Brody (JB-9151)
Mark Levine (ML-9620)
6 East 45th Street
New York, New York 10017
Tel: (212) 687-7230
Fax: (212) 490-2022

***Lead Counsel for Plaintiffs and the Class***

**WEISS & LURIE**
Joseph H. Weiss
551 Fifth Avenue - Suite 1600
New York, New York 10176

**BROWER PIVEN, A PROFESSIONAL**
**CORPORATION**
Charles J. Piven
The World Trade Center-Baltimore
401 East Pratt Street, Suite 2525
Baltimore, Maryland 21202

---

opportunity to test his claim on the merits"); *Munoz v. Sesame Place*, 1998 U.S. Dist. LEXIS
4026 at *5 (S.D.N.Y. 1998) (leave to amend should be "freely given").

**MURRAY, FRANK & SAILER LLP**
Eric J. Belfi
275 Madison Avenue
New York, New York 10016

**DELL & LITTLE, L.L.P.**
Joseph G. Dell
350 Old Country Road - Suite 105
Garden City, NY  11530

*Additional Plaintiffs' Counsel*