**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

MICHAEL HOFFMAN, SUSAN HOFFMAN,
and YAKOV PRAGER, on behalf of themselves
and all others similarly situated,

                         Plaintiffs,

            vs.

UBS-AG, et al.,

                         Defendants.

No. 05 Civ. 6817 (DAB)(JCF)

Member Cases:  05 Civ. 7027 (DAB)(JCF)
                         05 Civ. 8448 (DAB)(JCF)

**ECF CASE**

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**
**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

**WILLIAMS & CONNOLLY LLP**
John K. Villa (JV-3390)
Christopher N. Manning (CM-4231)
725 Twelfth Street, N.W.
Washington, D.C.  20005

*Counsel for Defendants UBS-AG, UBS*
*Global Asset Management (US) Inc., UBS*
*Global Asset Management (Americas) Inc.,*
*DSI International Management, Inc., and*
*UBS Financial Services Inc. f/k/a UBS*
*PaineWebber, Inc.*

November 14, 2006

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

INTRODUCTION ....................................................................................................... 1

I.    PLAINTIFFS' LOSS CAUSATION AND TRANSACTION CAUSATION
      ARGUMENTS FAIL AS A MATTER OF LAW. ............................................ 4

      A.    Loss Causation. ...................................................................................... 5

      B.    Transaction Causation. ........................................................................... 7

II.   THE DISCLOSURES COMPLIED WITH APPLICABLE LAW. ..................... 9

      A.    The Disclosures Met SEC and NASD Requirements. ............................ 9

      B.    Defendants' Relationship With Investors Did Not Give Rise to a Duty. ............ 13

      C.    Defendants Did Not Have a Duty To Disclose Based on Statements
            Made. ..................................................................................................... 15

      D.    None of the Alleged Omissions Were Material. ................................... 16

III.  PLAINTIFFS HAVE FAILED TO ALLEGE A RULE 10b-5 CAUSE OF
      ACTION. ......................................................................................................... 18

      A.    Damages. ................................................................................................ 18

      B.    Scienter. ................................................................................................. 19

      C.    Standing. ................................................................................................ 19

IV.   PLAINTIFFS HAVE FAILED TO PLEAD A SECTION 12(a)(2) CAUSE OF
      ACTION. ......................................................................................................... 20

      A.    Damages. ................................................................................................ 20

      B.    Plaintiffs Do Not Allege that UBSFS Solicited Investors. ................... 22

V.    PLAINTIFFS HAVE NOT ADEQUATELY PLED CONTROL PERSON
      LIABILITY AS TO UBS-AG. ......................................................................... 22

VI.   THE STATUTE OF LIMITATIONS BARS CERTAIN CLAIMS. ................. 24

VII.  PLAINTIFFS HAVE FAILED TO PLEAD A CAUSE OF ACTION UNDER
      THE INVESTMENT COMPANY ACT. .......................................................... 25

      A.    The Allegations in the Complaint Do Not Meet the Second Circuit's
            Requirements for Pleading a Section 36(b) Claim. .............................. 25

            1.    The Nature and Quality of Services Provided ........................... 27

            2.    The Profitability of the Fund to the Adviser-Manager .............. 28

            3.    Fall-Out Benefits to UBS ........................................................... 28

            4.    Economies of Scale .................................................................... 28

            5.    Comparative Fee Structures ....................................................... 29

    6.  *Trustee Independence and Conscientiousness*..........................................30

  B.  Plaintiffs Erroneously Assert that a Direct Cause of Action Is Available Under Section 36(b)...................................................................31

  C.  Section 48(a) of the ICA Does Not Provide for a Private Right of Action...........................................................................................................33

VIII. ALL OF PLAINTIFFS' STATE LAW CLAIMS MUST BE DISMISSED. ...................34

  A.  Plaintiffs' State Law Claims Are Preempted By SLUSA....................................34

  B.  Sections 349 and 350 of the New York General Business Law Are Not Applicable to the Purchase of Financial Plans.....................................................35

CONCLUSION...................................................................................................................................36

# TABLE OF AUTHORITIES

## FEDERAL CASES

Affiliated Ute Citizens v. United States, 406 U.S. 128 (1972)........................................8

Alexander v. Sandoval, 532 U.S. 275 (2001) .............................................................34

In re AllianceBernstein Mut. Fund Excessive Fee Litig., No. 04 Civ. 4885(SWK),
    2005 WL. 2677753 (S.D.N.Y. Oct. 19, 2005)....................................................20

In re Alstom SA Sec. Litig., 406 F. Supp. 2d 433 (S.D.N.Y. 2005)..............................23

Amron v. Morgan Stanley Inv. Advisors Inc.,
    464 F.3d 338 (2d Cir. 2006)................................................................... passim

In re Application of First Honolulu Sec. Inc., 51 S.E.C. 695 (Sept. 21, 1993) .............12

Arthur Lipper Corp. v. SEC, 547 F.2d 171 (2d Cir. 1976),
    cert. denied, 434 U.S. 1009 (1978) ...........................................................12, 19

Backman v. Polaroid Corp., 910 F.2d 10 (1st Cir. 1990) ...........................................15

Basic Inc. v. Levinson, 485 U.S. 224 (1988)........................................................7, 17

In re Bayer AG Sec. Litig., No. 03 Civ. 1546, 2004 WL. 2190357
    (S.D.N.Y. Sept. 30, 2004)...........................................................................23

Binder v. Gillespie, 184 F.3d 1059, superseding 172 F.3d 649 (9th Cir. 1999).............9

Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975)..................................18

Boguslavsky v. Kaplan, 159 F.3d 715 (2d Cir. 1998) ..............................................23

Bond Opportunity Fund v. Unilab Corp., No. 99 Civ. 11074(JSM), 2003 WL. 21058251
    (S.D.N.Y. May 9, 2003), aff'd, 87 F. App'x. 772 (2d Cir. 2004).........................24

Brody v. Transitional Hospitals Corp., 280 F.3d 997 (9th Cir. 2002)..........................15

Capri v. Murphy, 856 F.2d 473 (2d Cir. 1988)........................................................22

Bowen v. Georgetown University Hospital, 488 U.S. 204 (1988) ...............................10

Castillo v. Dean Witter Discover & Co., No. 97 Civ. 1272(RPP),
    1998 WL. 342050 (S.D.N.Y. June 25, 1998) ...............................................5

Clark v. Nevis Capital Mgmt., LLC, No. 04 Civ. 2702 (RWS),
    2005 WL 488641 (S.D.N.Y. Mar. 2, 2005) ...................................................................8

Coan v. Kaufman, 457 F.3d 250 (2d Cir. 2006) ........................................................................33

Cox v. Collins, 7 F.3d 394 (4th Cir. 1993) ................................................................................9

Daily Income Fund, Inc. v. Fox, 464 U.S. 523 (1984) ...............................................................32

In re Davis Selected Mut. Funds Litig., No. 04-CIV-4186 (MGC),
    2005 WL 2509732 (S.D.N.Y Oct. 11, 2005) ...........................................................34

Dodds v. Cigna Sec., Inc., 12 F.3d 346 (2d Cir. 1993)................................................................24

In re Dreyfus Mut. Funds Fee Litig., 428 F. Supp. 2d 357 (W.D. Pa. 2006) ........................33, 34

In re Dreyfus Aggressive Growth Mut. Fund Litig.,
    No. 98 Civ. 4318(HB), 2000 WL 1357509 (S.D.N.Y. Sept. 20, 2000)............................20

Dura Pharm., Inc. v. Broudo, 544 U.S. 336 (2005) ...........................................................5, 6, 26

In re Eaton Vance Mut. Funds Fee Litig., 380 F. Supp. 2d 222 (S.D.N.Y. 2005).......................34

In re Eaton Vance Mut. Funds Fee Litig., 403 F. Supp. 2d 310 (S.D.N.Y. 2005).......................34

Feinman v. Dean Witter Reynolds, Inc., No. 94 CIV 7798 (DLC), 1995 WL 562177
    (S.D.N.Y. Sept. 21, 1995), aff'd, 84 F.3d 539 (2d Cir. 1996).......................................9, 17

Forsythe v. Sun Life Finance, Inc., 417 F. Supp. 2d 100 (D. Mass. 2006) .................................20

In re Franklin Mut. Funds Fee Litig., 388 F. Supp. 2d 451 (D.N.J. 2005) ............................33, 34

GMS Group, LLC v. Benderson, 326 F.3d 75 (2d Cir. 2003).....................................................11

GSC Partners CDO Fund v. Washington, 368 F.3d 228 (3d Cir. 2004).......................................16

Gartenberg v. Merrill Lynch Asset Mgmt., 694 F.2d 923 (2d Cir. 1982) ............................ passim

Glassman v. Computervision Corp., 90 F.3d 617 (1st Cir. 1996) ...............................................18

In re Global Crossing Ltd. Sec. Litig., 322 F. Supp. 2d 319 (S.D.N.Y. 2004)............................23

In re Goldman Sachs Mut. Funds Fee Litig., No. 04-CIV-2567(NRB),
    2006 WL 126772 (S.D.N.Y. Jan. 17, 2006) ...........................................................34

Hertzberg v. Dignity Partners, Inc., 191 F.3d 1076 (9th Cir. 1999) ...........................................10

Indep. Order of Foresters v. Donald, Lufkin & Jenrette, Inc.,
157 F.3d 933 (2d Cir. 1998)..............................................................................13, 14

Joseph v. Wiles, 223 F.3d 1155 (10th Cir. 2000) ........................................................9

Kahn v. Kohlberg, Kravis, Roberts & Co., 970 F.2d 1030 (2d Cir. 1992)....................24

Kamen v. Kemper Finance Servs., Inc., 500 U.S. 90 (1991)........................................33

Krinsk v. Fund Asset Mgmt., Inc., 875 F.2d 404 (2d Cir. 1989)......................29, 30, 31

Lentell v. Merrill Lynch & Co., 396 F.3d 161 (2d Cir.),
cert. denied, 126 S. Ct. 421 (2005) ...........................................................2, 4

Levitt v. Bear Stearns & Co., 340 F.3d 94 (2d Cir. 2003) .........................................24

In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp. 2d 371 (S.D.N.Y. 2001) ........23

In re Lord Abbett Mut. Funds Fee Litig., 385 F. Supp. 2d 471 (D.N.J. 2005), vacated by,
417 F. Supp. 2d 624 (D.N.J. 2005) ......................................................33, 34

In re Lord Abbett Mut. Funds Fee Litig., 407 F. Supp. 2d 616 (D.N.J. 2005)..............20

Maurizio v. Goldsmith, 84 F. Supp. 2d 455 (S.D.N.Y. 2000),
aff'd, 230 F.3d 518 (2d Cir. 2000) ...........................................................37

In re Merrill Lynch & Co. Research Reports Sec. Litig.,
218 F.R.D. 76 (S.D.N.Y. 2003) ...............................................................10

In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.,
434 F. Supp. 2d 233 (S.D.N.Y. 2006).................................................5, 6, 34

Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 126 S. Ct. 1503 (2006).......35, 36

Metz v. United Counties Bancorp, 61 F. Supp. 2d 364 (D.N.J. 1999) .........................21

Meyer v. Oppenheimer Mgmt. Corp., 895 F.2d 861 (2d Cir. 1990)................................6

Montcalm County Board of Comm'rs v. McDonald & Co. Sec., Inc.,
833 F. Supp. 1225 (W.D. Mich. 1993) .......................................................22

Morin v. Trupin, 747 F. Supp. 1051 (S.D.N.Y. 1990).................................................21

In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.,
No. 03-CIV-8208 (RO), 2006 WL. 1008138 (S.D.N.Y. Apr. 18, 2006)................. passim

In re Mut. Funds Inv. Litig., 384 F. Supp. 2d 845 (D. Md. 2005) ....................................7

Mutchka v. Harris, 373 F. Supp. 2d 1021 (C.D. Cal. 2005) ........................................34

Nanopierce Techs. v. Southridge Capital Mgmt. LLC, No. 02 Civ. 0767(LBS),
    2002 WL. 31819207 (S.D.N.Y. Oct. 10, 2002) ..................................................23

Olmsted v. Pruco Life Insurance Co., 283 F.3d 429 (2d Cir. 2002) .........................33, 34

In re Oppenheimer Funds Fees Litig., 426 F. Supp. 2d 157 (S.D.N.Y. 2006) ...............34

In re Parmalat Sec. Litig., 376 F. Supp. 2d 472 (S.D.N.Y. 2005) ............................19

Parnes v. Gateway 2000, Inc., 122 F.3d 539 (8th Cir. 1997) ...................................18

In re Philip Services Corp. Sec. Litig., 383 F. Supp. 2d 463 (S.D.N.Y. 2004) .............23

Press v. Chemical Inv. Servs. Corp., 166 F.3d 529 (2d Cir. 1999)..............................13

Press v. Quick & Reilly, Inc., 218 F.3d 121 (2d Cir. 2000) ....................................9, 16

In re Prudential Sec. P'ships Litig., 930 F. Supp. 68 (S.D.N.Y. 1996) .......................16

Randall v. Loftsgaarden, 478 U.S. 647 (1986) .................................................20, 21

Resnik v. Swartz, 303 F.3d 147 (2d Cir. 2002) .....................................................15

Ryder International Corp. v. First America National Bank,
    943 F.2d 1521 (11th Cir. 1991) ..................................................................22

SEC v. First Jersey Securities, Inc., 101 F.3d 1450 (2d Cir. 1996),
    cert. denied, 522 U.S. 812 (1997) ...............................................................23

In re Salomon Smith Barney Mut. Fund Fees Litig.,
    441 F. Supp. 2d 579 (S.D.N.Y. 2006)....................................................... passim

Siemers v. Wells Fargo & Co., No. C 05-04518(WHA), 2006 WL. 2355411
    (N.D. Cal. Aug. 14, 2006)......................................................................7, 17

Starr ex rel. Estate of Sampson v. Georgeson Shareholder, Inc.,
    412 F.3d 103 (2d Cir. 2005).......................................................................9

Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87 (2d Cir. 2001)..................23

Titan Group, Inc. v. Faggen, , 513 F.2d 234 (2d Cir. 1975)........................................8

United States v. Alvarado, No. 01 CR. 156(RPP), 2001 WL. 1631396 (S.D.N.Y Dec. 19, 2001) ...................................................................................................................14

United States v. Santoro, 302 F.3d 76 (2d Cir. 2002)..............................................13, 14

United States v. Szur, 289 F.3d 200 (2d Cir. 2002)..................................................13, 14

Upton v. SEC, 75 F.3d 92 (2d Cir. 1996) .........................................................................12

In re Van Wagoner Funds, Inc. Sec. Litig., 382 F. Supp. 2d 1173 (N.D. Cal. 2004)....................8

In re WorldCom, Inc. Sec. Litig., 294 F. Supp. 2d 392 (S.D.N.Y. 2003) .......................21, 22, 24

## STATE CASES

Gray v. Seaboard Sec., Inc., 14 A.D.3d 852 (3d Dep't. 2005)....................................36, 37

## FEDERAL STATUTES & RULES

15 U.S.C. § 77l(a)(2) (2000)........................................................................................21, 22

15 U.S.C. § 78u-4(b)(4) (2000) ......................................................................................4, 19

15 U.S.C. § 77m (2000) ..............................................................................................24, 25

## MISCELLANEOUS

Confirmation Requirements and Point of Sale Disclosure Requirements for Transactions in Certain Mutual Funds and Other Securities, and Other Confirmation Requirement Amendments, and Amendments to the Registration Form for Mutual Funds; Proposed Rule, 69 Fed. Reg. 6437, 6442 (Feb. 10, 2004)........................11

Self-Regulatory Organizations; Order Approving Proposed Rule Change by NASD, Inc., Relating to Investment Company Portfolio Transactions, 69 Fed. Reg. 77286 (Dec. 27, 2004) .................................................................................................................11

## INTRODUCTION

Plaintiffs' Opposition quotes isolated passages from a number of disparate cases and claims that these snippets state the law governing mutual fund litigation, but Plaintiffs generally avoid substantive discussion of the large and growing body of precedent in this District that applies the basic securities laws to mutual fund disclosure and fees.[1]  This head-in-the-sand approach is not surprising given the precedent arrayed against them, but the Court's starting point should be to compare this case to prior cases and determine whether there is any basis not to dismiss it as well.

Notably, Plaintiffs' Opposition abandons several bedrock theories of their case. In their Amended Complaint, Plaintiffs repeatedly insinuated that UBSFS received a higher payout from selling Tier I mutual funds as opposed to Tier II funds, and that in an effort to secure the higher Tier I fees, UBSFS fraudulently "pushed" investors into Tier I funds.  *E.g.*, Compl., ¶¶ 80-81.[2]  After all, absent an increased payout from the sale of Tier I as opposed to Tier II funds, there would have been no conceivable motive for UBSFS to fraudulently divert investors into Tier I.  However, in our opening Memorandum we pointed out that, when read carefully, the Amended Complaint does not (and cannot) allege a higher payout from Tier I funds.  Defs.' Mem. in Support of Mot. to Dismiss ("Defs.' Mem.") at 4-5.  In lieu of a response, Plaintiffs have sidestepped the issue in their Opposition and left this key theory of their case for dead.  In addition, throughout the Amended Complaint, Plaintiffs made numerous references to the internal compensation UBSFS brokers received for selling Tier I funds.  Compl., ¶¶ 75-79.

---

[1]    Although much of this precedent resulted from the dismissal of cases brought by Lead Counsel, for reasons unknown they have chosen either not to appeal or to dismiss the appeal of each such adverse ruling, save the one rendered by Judge Koetl in the *Eaton Vance* litigation.

[2]    All citations in the form of "Compl., ¶" refer to paragraphs in the Consolidated Amended Complaint.

Apparently after considering the point made in our opening Memorandum that such information need not be disclosed as a matter of law, see Defs.' Mem. at 20-21, Plaintiffs also have abandoned this theory.

   Perhaps most striking is Plaintiffs' change of course with respect to their theory of loss causation.  In our opening Memorandum, we established that Plaintiffs' loss causation argument has been uniformly rejected by the courts.  At that time, the gravamen of Plaintiffs' alleged injury was that "Plaintiffs and the members of the Class received diminished returns on their Tier I Fund investments as (a) the Tier I Funds did not perform as well as comparable, non-Tier I funds during the Class Period. . . ."  Compl., ¶ 10.  We not only demonstrated that this assertion was insufficient as a matter of law, we also invited the Court to take judicial notice that during the Class Period, nineteen of the twenty-one Tier I families had more than half of their front-load funds outperform the market.  See Defs.' Mem. at 5-6 & n.8.  Plaintiffs now have backed away from the loss causation allegations they made in the Amended Complaint, as the Opposition no longer challenges the superior performance of Tier I fund families.  Instead, Plaintiffs have substituted an entirely different theory of loss causation based on fees.

   Plaintiffs' new theory appears to be that they suffered a loss because if there had been no revenue sharing, "the net assets [of the funds invested in by Plaintiffs] would have been greater."  Pls.' Corr. Opp'n to Defs.' Mot. to Dismiss ("Opp'n") at 28.  They suggest that "[b]ecause the return on investment was less than it would have been if the revenue sharing payments had been actually used to benefit the Funds" their complaint has alleged the requisite loss causation.  Opp'n at 3.  Plaintiffs' claim, in other words, is that the intrinsic value of their mutual funds was less than they "expected."  Clearly, this does not meet the standard for pleading loss causation established by the Second Circuit in *Lentell v. Merrill Lynch & Co.* and

the Supreme Court in *Dura Pharmaceuticals v. Broudo*, because there is no allegation that the share prices were inflated by a fraudulent statement, and then declined when the "truth" was disclosed. Plaintiffs also claim that they were misled about how the fees were used, but such a claim does not plead loss causation and, in any event, Plaintiffs make no allegation as to how they were deceived. If Plaintiffs cannot allege loss causation, then their claims under the Securities Act of 1933 ("33 Act") and the Securities Exchange Act of 1934 ("34 Act") must be dismissed (as has been the fate of all similar cases in this District), and this Court need not reach Plaintiffs' other arguments.

Our opening Memorandum also pointed out other fatal flaws in Plaintiffs' 33 and 34 Act claims. The responses in their Opposition are utterly unpersuasive and generally take no account of the case law. They allege that UBS failed to meet SEC and NASD disclosure requirements in effect during the Class Period, but identical claims have been repeatedly rejected by courts in both the Southern District and the Second Circuit. They divine a new duty to disclose on UBS's part based on a relationship of trust with investors, yet the cases they cite in support of this claim are inapposite. In addition, Plaintiffs have done nothing to defend their failure to allege other threshold requirements of both a Rule 10b-5 cause of action and a Section 12(a)(2) claim, including transaction causation, materiality, scienter, damages and standing.

With respect to the second distinct aspect of Plaintiffs' claim – that Defendants violated Section 36(b) of the ICA by charging excessive fees – the allegations fall far short of the standards set by the Second Circuit in *Gartenberg v. Merrill Lynch Asset Management* and *Amron v. Morgan Stanley Investment Advisors, Inc.*. Every applicable decision in the Southern District and Second Circuit supports the conclusion that the fees charged by Defendants were not

excessive.  In addition, the law is indisputable that Plaintiffs' Section 36(b) claim must be brought derivatively.

Plaintiffs also make little attempt to save their state law claims from dismissal, and the law is clear that those claims should be dismissed both because they are preempted and because the statutes under which they bring their claims do not apply to the sale of securities.

As we discussed in our opening Memorandum, this suit is the most recent in a string of analytically identical claims brought by Plaintiffs' counsel in the Southern District against many financial services firms, the overwhelming majority of which have been dismissed and not appealed.  We respectfully submit that this Court should follow the other decisions in this District and dismiss the Complaint.

## I.     PLAINTIFFS' LOSS CAUSATION AND TRANSACTION CAUSATION ARGUMENTS FAIL AS A MATTER OF LAW.

This Court need look no further than causation in order to dismiss Plaintiffs' 33 and 34 Act claims.  In order to state a claim for a violation of Section 10(b) and Rule 10b-5, a plaintiff must plead facts which, if true, establish both loss causation <u>and</u> transaction causation. *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir.), *cert. denied*, 126 S. Ct. 421 (2005).  A claim under Section 12(a)(2) of the Securities Act should likewise be dismissed where a plaintiff has not pled loss causation.  *See* 15 U.S.C. § 78u-4(b)(4) (2000); *see also In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 588 (S.D.N.Y. 2006). Independent of all other grounds for dismissal, therefore, Plaintiffs' claims under Section 10(b) of the Exchange Act, and Rule 10b-5, as well as under Section 12(a)(2) of the Securities Act, must be dismissed because Plaintiffs have not adequately alleged either loss causation or transaction causation.

A.      **Loss Causation.**

Plaintiffs offer no persuasive response to the arguments in Defendants' opening Memorandum that neither allegations of "distorted" prices nor allegations of excessive fees can satisfy the required element of loss causation.[3] Defs.' Mem. at 27-29.

Rather, Plaintiffs continue to assert that "they would have placed a lower value on their Tier I investments at the time of purchase" if they had known the allegedly concealed information. Opp'n at 30. Whatever subjective valuation they claim, however, courts deciding analytically identical claims have ruled that because mutual fund prices are determined by a statutory formula, there is "no mechanism by which a mutual fund share's price could differ from its objective 'value.'" *In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, No. 03 Civ. 8208(RO), 2006 WL 1008138, at *9 (S.D.N.Y. Apr. 18, 2006). *Accord In re Salomon Smith Barney*, 441 F. Supp. 2d at 590. Mutual fund prices are determined based on the basis of net-asset value – fund assets minus fund liabilities such as fees and expenses. Where, as here, investors are told at the outset what the total fees and expenses will be, they have no securities claim based on alleged and subjective "distortion" of fund prices. *See, e.g., In re Morgan Stanley*, 2006 WL 1008138, at *9; *In re Salomon Smith Barney*, 441 F. Supp. 2d at 590; *In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*, 434 F. Supp. 2d 233, 238 (S.D.N.Y. 2006); *Castillo v. Dean Witter Discover & Co.*, No. 97 Civ. 1272(RPP), 1998 WL 342050 (S.D.N.Y. June 25, 1998).

Moreover, this type of claim – that a plaintiff paid an inflated price for an investment "at the time of purchase" – is precisely the type of claim precluded by *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 340 (2005). The *Dura* court made clear that an

---

[3]      Plaintiffs apparently have abandoned any theory of loss based on the allegedly poor performance of the Tier I funds.

"'artificially inflated purchase price' is not itself a relevant economic loss." *Id.* at 347. That rule

applies with full force here and is fatal to Plaintiffs' claim.

Plaintiffs attempt to distinguish *Dura* by stating that they "were injured because

they paid excessive fees, expenses and commissions in connection with Tier I fund investments

that were not disclosed." Opp'n at 30. But even if fees could give rise to loss causation (which –

at least in this Circuit – they cannot),[4] the total amounts of the fees and expenses <u>were</u> disclosed,

and there is no allegation otherwise. Rather, at most, plaintiffs criticize the alleged failure to

disclose "the true nature and purpose of the fees," Opp'n at 31 – a claim that multiple courts

have rejected. *See, e.g., In re Merrill Lynch*, 434 F. Supp. 2d at 238 ("The precise allocation of

those fees is not material information under the securities laws.").

Finally, even if such a claim were cognizable, Plaintiffs do no more than assert in

conclusory fashion that "Defendants deceived them into thinking the fees were for worthwhile

investment advice or something of value to shareholders." Opp'n at 29 (citing Compl., at ¶¶ 10,

61, 68). Nowhere in the Opposition, or the cited paragraphs of the Complaint, do Plaintiffs

allege any specific act of deception.[5]

---

[4]     *See, e.g., In re Salomon Smith Barney*, 441 F. Supp. 2d at 590 ("excessive fees fall[]
entirely outside of the federal securities scheme"); *In re Merrill Lynch*, 434 F. Supp. 2d at 238
("The fees charged to shareholders . . . do not constitute a 'loss.'").

[5]     Moreover, plaintiffs plead no factual basis for their assumption that every dollar in fees
was to pay for something directly of value to current shareholders. To the contrary, it is widely
known and in fact enshrined in the governing regulations that mutual-fund fees and expenses
may include the costs of, among other things, marketing fund shares to new investors. *See, e.g.*,
Mutual Fund Fees and Expenses (Mar. 1, 2006), *available at* http://www.sec.gov/answers/
mffees.htm (last visited Nov. 14, 2006) (describing distribution fees as including fees paid for
marketing and selling fund shares, "such as compensating brokers and others who sell fund
shares"). Paying brokers to encourage them to sell a fund's shares does benefit the fund, for
example by reducing the possibility that a fund will be faced with potentially damaging large-
scale redemptions. *See, e.g., Meyer v. Oppenheimer Mgmt. Corp.*, 895 F.2d 861, 865 (2d Cir.
1990). But there is no legal requirement that all such payments must buy something of
immediate and direct value to shareholders, nor any basis to assume that here.

Plaintiffs place great reliance on *Siemers v. Wells Fargo & Co.*, No. C 05-04518(WHA), 2006 WL 2355411 (N.D. Cal. Aug. 14, 2006), but that case is an outlier that cannot be squared with governing law (especially in this Circuit) or with any adequately pled facts in this case. The *Siemers* court ignored multiple decisions – including those of this District – that have rejected allegedly excessive fees as a basis for loss causation. Furthermore, the *Siemers* court apparently credited the plaintiff's allegations that he was deceived into thinking all fees were for something of value to current shareholders, an inference which cannot be drawn here, as discussed above. For these reasons, *Siemers* is inapposite, and would not be followed even if this case were brought in the Ninth Circuit.[6]

**B.      Transaction Causation.**

Plaintiffs also have failed to plead transaction causation – i.e., that they relied upon a misrepresentation in purchasing mutual fund shares, and that they would not have done so absent the misrepresentation. Plaintiffs' attempts to plead transaction causation are based in part on their misplaced invocation of the "fraud-on-the-market" doctrine – a rebuttable presumption that the market price of a publicly traded security reflects the effects of any material misrepresentation.[7] As demonstrated in Defendants' opening Memorandum, courts, including those in the Southern District, repeatedly have held that the fraud-on-the-market doctrine does

---

[6]      Also inapposite is *In re Mut. Funds Inv. Litig.*, 384 F. Supp. 2d 845 (D. Md. 2005), which involved substantially different facts. That case involved allegations of late trading and market-timing, not the conduct at issue here. In any event, the court's decision cannot be reconciled with *Dura* and is neither binding nor persuasive.

[7]      The fraud-on-the-market doctrine, as described by the Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), creates a rebuttable presumption that (1) misrepresentations by an issuer affect the price of securities traded in the open market, and (2) investors rely on the market price of securities as an accurate measure of their intrinsic value. *See id.* at 245-47. This presumption, if unrebutted, allows plaintiffs to satisfy the element of reliance in securities fraud claims under the Exchange Act.

not apply to open-ended mutual funds because their price is determined by a mathematical formula involving the assets held, not a "market" dependent upon investors' valuation of the securities as influenced by disclosures. *See Clark v. Nevis Capital Mgmt., LLC*, No. 04 Civ. 2702(RWS), 2005 WL 488641, at *18 (S.D.N.Y. Mar. 2, 2005) ("a plaintiff who has allegedly acquired shares in a mutual fund, the price for which is unaffected by alleged misrepresentations and omissions concerning the fund itself, may not establish reliance by invoking the integrity of the market or the so-called fraud-on-the-market theory."); *In re Van Wagoner Funds, Inc. Sec. Litig.*, 382 F. Supp. 2d 1173 (N.D. Cal. 2004). Plaintiffs simply ignore these cases. Instead, they argue that the fraud-on-the-market doctrine is applicable here because they relied on "market trends" – a new theory that they have fashioned from whole cloth. Opp'n at 27. Beyond the fact that Plaintiffs make no attempt to define what a "market trend" might be, or what alleged legal significance it has in our jurisprudence, Plaintiffs' theory is unsupportable because, as already noted, the price of a particular mutual fund share does not depend on the market (or "market trend") for that share, but rather on the combined value of the underlying securities that make up the mutual fund share. The fraud must impact the market for the underlying securities in order to affect the price of the mutual fund share; and there is no such allegation here. This point was made clearly in the very cases that Plaintiffs have chosen to ignore.

As an alternative to their invocation of the fraud-on-the-market doctrine, Plaintiffs suggest that under the Supreme Court's decision in *Affiliated Ute Citizens v. United States,* 406 U.S. 128 (1972), reliance should be presumed. The Second Circuit, interpreting *Affiliated Ute,* has reasoned that "[u]nlike instances of affirmative misrepresentation where it can be demonstrated that the injured party relied upon affirmative statements, in instances of total non-disclosure . . . it is of course impossible to demonstrate reliance." *Titan Group, Inc. v. Faggen,*

513 F.2d 234, 239 (2d Cir. 1975). Thus, there is a rebuttable presumption of reliance in pure

omission cases. By Plaintiffs' own admission, however, this is not a pure omission case. Rather,

Plaintiffs have pled the case as one involving both omissions and misrepresentations of material

facts. *See, e.g.,* Opp'n at 35 (conceding that the basis for Plaintiffs' 10b-5 claims is not

omissions alone); Opp'n at 16 (discussing instances where Defendants allegedly made

misstatements). When allegations of failure to disclose are based on both omissions and

misstatements, a plaintiff is not entitled to the presumption of reliance. *See Starr ex rel. Estate of*

*Sampson v. Georgeson S'holder, Inc.,* 412 F.3d 103, 109 n.5 (2d Cir. 2005) (presumption of

reliance did not apply where claim was based on both omissions and misstatements). *Accord*

*Feinman v. Dean Witter Reynolds, Inc.,* No. 94 CIV. 7798(DLC), 1995 WL 562177 (S.D.N.Y.

Sept. 21, 1995), *aff'd,* 84 F.3d 539 (2d Cir. 1996); *accord also Joseph v. Wiles,* 223 F.3d 1155

(10th Cir. 2000); *Binder v. Gillespie,* 184 F.3d 1059, *superseding* 172 F.3d 649 (9th Cir. 1999);

*Cox v. Collins,* 7 F.3d 394 (4th Cir. 1993). Accordingly, Plaintiffs are not entitled to the

presumption of reliance.

## II.  THE DISCLOSURES COMPLIED WITH APPLICABLE LAW.

Wholly apart from the fatal defects in Plaintiffs' loss causation and transaction

causation allegations, the disclosures at issue complied with the applicable law.

### A.  The Disclosures Met SEC and NASD Requirements.

Plaintiffs assert that Defendants failed to comply with the regulatory disclosure

requirements of the SEC and NASD. Opp'n at 8. As we demonstrated in our opening

Memorandum, however, the Defendants complied with all applicable regulatory guidance, which

was embodied in the requirements of Form N-1A and the Second Circuit's decision in *Press v.*

*Quick & Reilly, Inc.,* 218 F.3d 121 (2d Cir. 2000), adopting the position taken by the SEC in its

*amicus curiae* brief in that case. *See* Defs.' Mem. at 21-26.

Plaintiffs' only answer to this point is to present the Court with a number of fairly recent SEC administrative actions against financial companies other than UBS, and to claim that these recent positions on revenue-sharing somehow provide the relevant disclosure requirements for years past. This, of course, is nonsense. Courts, including those of the Second Circuit, consistently and repeatedly have held that consent orders of the type cited by the Plaintiffs have no precedential value. *See* Defs.' Mem. at 26 n.16 (collecting cases). As this Court observed in *In re Morgan Stanley*, "statements made by the SEC and NASD in the settlement documents are not law; they are rather untested assertions made by litigants." 2006 WL 1008138, at *5.[8] As such, the consent orders that Plaintiffs rely upon do <u>not</u> represent the regulatory standard to which Defendants were bound to adhere. *See In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 218 F.R.D. 76, 78-79 (S.D.N.Y. 2003) (striking references in brief to NASD and SEC complaints).[9] *Cf. Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988) (warning courts against "[d]eference to what appears to be nothing more than an agency's convenient litigating position. . . .").

Plaintiffs also attempt to make NASD Rule 2830(k), the "Anti-Reciprocal Rule," the relevant disclosure standard.[10] *See* Opp'n at 9-10. However, insofar as Plaintiffs assert that the rule itself creates a duty to disclose above and beyond the disclosures mandated by the SEC,

---

[8]     In *In re Morgan Stanley*, the court dismissed the complaint despite the fact that the company had paid $50 million in an SEC settlement which concerned aspects of their revenue-sharing program. 2006 WL 1008138, at *1.

[9]     An exception is made for *amicus* briefs. *See Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1082 (9th Cir. 1999) ("[W]e make an exception to the denial of deference where, as here, the agency's interpretation is expressed in an *amicus* brief. Such an interpretation is in no sense a *post hoc* rationalizatio[n] advanced by an agency seeking to defend past agency action from attack.") (alteration in original) (internal quotation marks omitted).

[10]     This Court rejected precisely the same claim without comment in both *In re Salomon Smith Barney* and *In re Merrill Lynch*.

it is clear that there is "no right of action simply for a violation of NASD rules." *GMS Group, LLC v. Benderson,* 326 F.3d 75, 82 (2d Cir. 2003). In any event, Plaintiffs, perhaps inadvertently, fail to disclose that this rule contained a safe harbor that mirrored the SEC's position on disclosure as set forth in *Press.* Throughout virtually the entire Class Period, subparagraph (7)(B) of the Anti-Reciprocal Rule explicitly permitted a NASD member to sell the shares of, or act as underwriter for, an investment company that "follows a policy . . . of considering sales of shares of the investment company as a factor in the selection of broker/dealers to execute portfolio transactions," provided that such policy was disclosed in the prospectus.[11] As described in our opening Memorandum, the Tier I prospectuses <u>did</u> disclose their revenue sharing policies. *See* Defs.' Mem. at 21-25. Thus, Defendants' activity falls squarely within the Anti-Reciprocal Rule's safe-harbor and therefore Defendants did not violate the rule and its accompanying disclosure obligations. This, of course, would explain why NASD never initiated any actions under this Rule against UBS during the Class Period.

Further, a sea-change in the SEC's approach to revenue-sharing reinforces that prior rules did not prohibit the conduct that Plaintiffs now challenge as unlawful. In 2004, the SEC proposed new rules and amendments to Form N-1A "to require improved disclosure regarding sales loads and revenue sharing arrangements." *Confirmation Requirements and Point of Sale Disclosure Requirements for Transactions in Certain Mutual Funds and Other Securities, and Other Confirmation Requirement Amendments, and Amendments to the Registration Form for Mutual Funds; Proposed Rule,* 69 Fed. Reg. 6437, 6442 (Feb. 10, 2004). The SEC observed

---

[11] On December 20, 2004, the SEC approved amendments to NASD Rule 2830(k). The effective date of the rule change was February 14, 2005. *See Self-Regulatory Organizations; Order Approving Proposed Rule Change by NASD, Inc., Relating to Investment Company Portfolio Transactions,* 69 Fed. Reg. 77286 (Dec. 27, 2004). The amendments, *inter alia,* eliminated paragraph (k)(7)(B) from the rule.

that changes in the industry had prompted "significant concerns about the adequacy of current disclosure practices," *id.* at 6443, and that under then-current law, "[p]rospectus disclosure does not identify which individual broker-dealers receive revenue-sharing, let alone quantify those arrangements." *Id.* at 6444 n.47; *see also id.* at 6439 n.5 ("the proposed rule would require brokers, dealers and municipal securities dealers to inform customers about whether their salespersons or other associated persons receive extra compensation for selling certain fund shares or fund share classes."). The NASD also requested comment on proposed rules that would <u>alter</u> revenue-sharing disclosure obligations.

The mere fact that the SEC and NASD considered changing their regulatory approach does not retroactively render the historical disclosures in this case fraudulent, particularly in light of the fact that <u>neither the SEC or NASD has adopted the proposed rule changes</u>. Throughout the Class Period, the requirements for disclosure, as defined by the SEC and the Second Circuit in *Press*, remained the "last word" on the subject. As demonstrated in our opening Memorandum, Defendants' disclosures complied with these requirements. *See* Defs.' Mem. at 21-25. If new regulatory approaches were to be applied retroactively, Defendants would be deprived of fair notice of the requirements of law.[12]

---

[12]   As the Second Circuit explained in *Upton v. SEC*, 75 F.3d 92, 98 (2d Cir. 1996), "we cannot defer to the [SEC's] interpretation of its rules if doing so would penalize an individual who has not received fair notice of a regulatory violation. This principle applies, albeit less forcefully, even if the rule in question carries only civil rather than criminal penalties." (citation omitted); *see also Arthur Lipper Corp. v. SEC*, 547 F.2d 171, 184 (2d Cir. 1976) (limiting SEC sanctions where the violations occurred during "years of considerable uncertainty as to the regulatory climate concerning [the violation]"), *cert. denied*, 434 U.S. 1009 (1978). *Cf. In re Application of First Honolulu Sec. Inc.*, 51 S.E.C. 695 (Sept. 21, 1993), *available at* 1993 WL 380039, at *4 (setting aside NASD findings of violations because "it may not have been clear" that practices were unfair).

Because Defendants complied with all applicable regulatory disclosure requirements during the Class Period, Plaintiffs' claims under Rule 10b-5 and Section 12(a)(2) fail as a matter of law.

**B.      Defendants' Relationship With Investors Did Not Give Rise to a Duty.**

Plaintiffs claim that UBSFS brokers had a relationship of trust and confidence with investors and therefore were "under a duty to disclose all material aspects of the investments, including the practices and conflicts of interest complained about in this action."[13] Opp'n at 14.  Putting aside the fact that this theory appears for the first time in Plaintiffs' Opposition, and was not alleged in their Complaint, the controlling case law squarely forecloses Plaintiffs' claims.

It is well-established in the Second Circuit that "'there is no general fiduciary duty inherent in an ordinary broker/customer relationship.'"  *United States v. Santoro*, 302 F.3d 76, 80 (2d Cir. 2002) (*quoting Indep. Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 940 (2d Cir. 1998)).  While the Second Circuit has held that a broker does have a relationship of trust and confidence with an investor, the duty arising from that relationship is a narrow one. *See United States v. Szur*, 289 F.3d 200, 211 (2d Cir. 2002).  In particular, the duty extends only to "those matters that have been entrusted to the broker."  *Id.*  In the case of the one-time purchase of a security, all that is entrusted to the broker is "the narrow task of consummating the transaction."  *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 536 (2d Cir. 1999).  In this context, the only information about the consummation of a transaction that the cases have required be disclosed is a broker's receipt of excessive commissions.  *See, e.g., Santoro*, 302 F.3d at 80; *Indep. Order of Foresters*, 157 F.3d at 940.

---

[13]      This Court rejected precisely the same claim without comment in *In re Salomon Smith Barney*, *In re Merrill Lynch*, and *In re Morgan Stanley*.

Plaintiffs do not make the claim that UBSFS brokers failed to disclose information about excessive commissions or indeed that UBSFS charged excessive commissions in connection with their purchase of Tier I fund shares.  Though they highlight alleged sales contests and financial incentives for brokers to sell Tier I and proprietary mutual fund shares, *see* Compl., ¶¶ 98-100, courts have definitively held that such information need not be disclosed. *See, e.g., In re Morgan Stanley*, 2006 WL 1008138, at *7; *United States v. Alvarado*, No. 01 CR. 156(RPP), 2001 WL 1631396, at *8 (S.D.N.Y Dec. 19, 2001) ("Neither the SEC nor NASD have required registered representatives of broker/dealers to disclose their own compensation in a securities transaction, although both have been fully aware that registered representatives often received special incentives beyond the normal compensation to sell a particular product."). Indeed, the types of commissions held to be excessive by the Second Circuit are far greater than anything alleged by Plaintiffs here. *See Szur*, 289 F.3d at 212 (holding that 45-50% commissions were excessive); *Santoro*, 302 F.3d at 80 (holding that 15% commissions were excessive).

Plaintiffs also cite a number of cases for the proposition that a broker has a duty to give "honest and complete" information to an investor when recommending a purchase or sale. Opp'n at 15.  However, Plaintiffs do not point to any authority suggesting that this "duty" supersedes the duties imposed on brokers by the regulatory bodies charged with overseeing the industry.  And, as demonstrated both in our opening Memorandum and this Reply, Defendants at all times during the Class Period complied with the duties imposed on them by the SEC and NASD.

Thus, despite Plaintiffs' attempts to stretch their claims to fit the controlling case law, UBSFS' relationship with them did not create additional duties beyond those mandated by federal regulators.

**C.     Defendants Did Not Have a Duty To Disclose Based on Statements Made.**

Plaintiffs claim that Defendants had a duty to disclose <u>all</u> information about their

revenue-sharing programs based on the fact that they chose to disclose some information about

those programs. *See* Opp'n at 16. That misstates the legal standard. Every disclosure is an

exercise in line-drawing and a plaintiff can always claim that more information should have been

disclosed. It is for this reason that the law as recognized in *Brody v. Transitional Hospitals*

*Corp.,* is that Rule 10b-5 "prohibit[s] only misleading and untrue statements, not statements that

are incomplete." 280 F.3d 997, 1006 (9th Cir. 2002) (emphasis omitted). "No matter how

detailed and accurate disclosure statements are," the court found,

> there are likely to be additional details that could have been
> disclosed but were not. To be actionable under the securities laws,
> an omission must be misleading; in other words it must
> affirmatively create an impression of a state of affairs that differs
> in a material way from the one that actually exists.

*Id. Accord Glazer v. Formica Corp.*, 964 F.2d 149, 154-55 (2d Cir. 1992) (quoting *Basic Inc. v.*

*Levinson*, 485 U.S. 224, 238 (1988)). The First Circuit in *Backman v. Polaroid Corp.,* 910 F.2d

10, 16 (1st Cir. 1990), reached a similar conclusion, ruling that Section 10(b) and Rule 10b-5

"do[] not mean that by revealing one fact about a [topic] one must reveal all others." In this

case, even if the disclosures were less complete than Plaintiffs believe they ought to have been,

they were not themselves misleading and therefore did not violate the securities laws.[14]

In this same vein, Plaintiffs assert that there is a duty to disclose if a financial

services firm warns of a risk that has, in fact, already occurred. But the case they cite for this

---

[14]     Plaintiffs rely on a boilerplate statement of law in *Resnik v. Swartz*, 303 F.3d 147 (2d Cir.
2002), but in that case the Second Circuit affirmed the district court's dismissal of the complaint
for failure to demonstrate either the violation of a specific SEC disclosure requirement, or an
omission that made other statements in the proxy statement materially false or misleading. In the
instant case as well, no specific disclosure requirement was violated and no alleged omission
made the disclosures misleading or deceptive.

principle, *In re Prudential Sec. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996), addressed

the bespeaks-caution doctrine, not the issue of duty.  The Second Circuit has never held that

warnings of risk may be independently actionable, and that proposition is at best highly

questionable.  In *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 243 (3d Cir. 2004), the

Third Circuit held just such an argument to be "frivolous."

### D.       None of the Alleged Omissions Were Material.

Finally, Plaintiffs claim that "the disclosures regarding revenue sharing and

directed brokerage that Defendants omitted from the prospectuses are unquestionably material."

Opp'n at 17.  But this position cannot be reconciled with the relevant authority.

In *Press v. Quick & Reilly*, the Second Circuit held that,

> because the SEC has decided precisely what type of disclosure is
> necessary to reveal a conflict of interest arising from third-party
> payments to broker-dealers in the context of Rule 10b-10, we will
> not undermine the SEC's interpretation of its regulation by
> requiring even greater disclosure about that conflict of interest
> under the general antifraud provisions of Rule 10b-5.
> Accordingly, we are compelled to conclude that additional
> disclosure beyond what the fund prospectuses and SAIs reveal is
> not, as a matter of law, material.  For the foregoing reasons, we
> hold that defendants' compliance with Rule 10b-10 renders the
> allegedly omitted information immaterial as a matter of law.

218 F.3d 121, 131-32 (2d Cir. 2000) (footnote omitted) (emphasis added).  As we demonstrated

in our opening Memorandum, the disclosures at issue in this case were materially identical to

those made in *Press*.  Defs.' Mem. at 25.  Thus, Plaintiffs' position that more information should

have been disclosed above and beyond that required by the SEC and NASD, cannot be

reconciled with the holding in *Press*.

In addition, Judge Owen's opinion in *In re Morgan Stanley* held in circumstances

nearly identical to those here that the information Plaintiffs asserted had been omitted from

prospectuses did not satisfy the materiality requirement for civil liability under the federal securities laws. *See* 2006 WL 1008138, at *7.

Plaintiffs make a tortured effort to distinguish *Morgan Stanley* by parsing through the types and amounts of revenue-sharing payments at issue. They contend that,

> [i]n *Morgan Stanley* the court held that these omissions were immaterial because the [revenue sharing] payments, a participation fee of 15 to 20 basis points on gross sales and 5 basis points annually on shares the investor held for one year, were not sufficiently large. In this case, by contrast, Plaintiffs alleged that Broker-Dealer Defendants were paid an additional 1%, or 100 basis points, when proprietary funds were sold.

Opp'n at 22. Plaintiffs then urge the Court to reject *Morgan Stanley* and adopt the reasoning of the Northern District of California in *Siemers v. Wells Fargo & Co.* by looking at "the aggregate revenue sharing payments" and not at whether a reasonable investor would have considered the issue important in making a decision whether or not to buy mutual fund shares. Opp'n at 22. Yet the test urged by Plaintiffs runs counter to the one mandated by the Supreme Court in *Basic Inc. v. Levinson,* 485 U.S. 224, 231-32 (1988), and by the Second Circuit in cases such as *Feinman v. Dean Witter Reynolds, Inc.*, 84 F.3d 539, 541 (2d Cir. 1996). Those courts looked at how the information would impact the decision of a <u>single investor</u>, not the impact they would have had when aggregated. *See, e.g., Feinman*, 84 F.3d at 541 ("[N]o reasonable investor would have considered it important, in deciding whether or not to buy or sell stock, that a transaction fee of a few dollars might exceed the broker's actual handling charges.").

And, while there is no threshold amount that, as a rule, would be important to a reasonable investor, the case law fully supports the conclusion that the dollar amounts at issue here were not material. *See Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546-47 (8th Cir. 1997) (misstatements, taken in context, immaterial as a matter of law because they amounted to only

2% of the company's total assets); *Glassman v. Computervision Corp.*, 90 F.3d 617, 633 & n.26 (1st Cir. 1996) (dismissal where omitted information was 3% to 9% of revenues and thus immaterial as a matter of law). By contrast, Plaintiffs fail to cite a single case which holds that the alleged payment of an additional 1% to broker-dealers at the time of sale is "material" under the relevant case law.

## III.   PLAINTIFFS HAVE FAILED TO ALLEGE A RULE 10b-5 CAUSE OF ACTION.

In addition to the deficiencies described above, Plaintiffs have failed to allege other threshold elements of a Rule 10b-5 cause of action, particularly damages and scienter. Plaintiffs also have failed to establish that they have standing to bring suit.

### A.   Damages.

Plaintiffs' Amended Complaint alleged that they suffered harm because the mutual funds they purchased did not perform as well as mutual funds they <u>might</u> have purchased. Even if the Court declined to take judicial notice of the superior, not inferior, performance of Tier I funds, Plaintiffs' theory is foreclosed by the Supreme Court's ruling in *Blue Chip Stamps*, that the "loss of the opportunity to purchase" a better performing security is not actionable in a lawsuit seeking damages for alleged violations of Rule 10b-5. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 753-54 (1975).

In light of the apparent factual and legal obstacles, Plaintiffs tacitly have abandoned this theory of their case. They urge instead that without revenue-sharing the net assets of the funds they invested in would have been greater, and therefore they suffered damages. Opp'n at 30-31. This line of argument, however, is similarly unavailing.

Plaintiffs wrongly presume that if there had been no revenue-sharing, all else would have remained unchanged and they would have benefited. This entirely overlooks the fact that revenue-sharing was a recognized means to promote the growth of mutual funds. If

18

revenue-sharing were eliminated selectively, and that means of marketing abandoned, funds surely would have had to charge fees for alternative forms of marketing. Plaintiffs' theory is nothing more than a dispute with management over how to market their product in the most cost-effective way. If Plaintiffs' theory were to be credited, any decision of fund management with respect to a fund's operation could be the predicate for a claim of securities fraud – and the possibility of a windfall recovery. This Court should not countenance such an unwarranted expansion of the federal securities laws.

### B.      Scienter.

Under the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (2000). The requisite state of mind is "an intent to deceive, manipulate, or defraud." *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 491 (S.D.N.Y. 2005) (quotation marks omitted). While we maintain that all applicable disclosure requirements were satisfied, it cannot be disputed that the industry and its regulators accepted these disclosures throughout the Class Period. This, alone, negates an inference of scienter. In addition, as discussed above, the regulatory environment with respect to revenue sharing was in flux toward the end of the Class Period. *See* pp. 11-12, *supra*. When the law itself is uncertain, scienter cannot be established. *See Arthur Lipper Corp. v. SEC,* 547 F.2d 171, 184 (2d Cir. 1976) (limiting SEC sanctions where the violations occurred during "years of considerable uncertainty as to the regulatory climate concerning [the violation]").

### C.      Standing.

Plaintiffs lack standing for a large number of Tier I funds in which they did not own shares during the Class Period. While Plaintiffs continue to urge that Article III standing is

not a problem, their position has been roundly rejected.[15]  For example, the Southern District in

*In re Salomon Smith Barney* recently denied standing with respect to funds that plaintiffs had not

purchased. "With regard to the sixty-eight funds of which Plaintiffs own no shares," wrote the

Court, "Plaintiffs do not have standing to assert any claims."  441 F. Supp. 2d at 607.  Other

courts are in agreement.  *See, e.g., In re AllianceBernstein Mut. Fund Excessive Fee Litig.*, No.

04 Civ. 4885(SWK), 2005 WL 2677753, at *9 (S.D.N.Y. Oct. 19, 2005); *Forsythe v. Sun Life

Fin., Inc.,* 417 F. Supp. 2d 100, 119 (D. Mass. 2006).  While there are occasional decisions to the

contrary, including, in the Southern District, *In re Dreyfus Aggressive Growth Mut. Fund Litig.,*

No. 98 Civ. 4318(HB), 2000 WL 1357509 (S.D.N.Y. Sept. 20, 2000), the better reasoned

decisions, and the weight of the case law, favors denying standing in these circumstances.

## IV.    PLAINTIFFS HAVE FAILED TO PLEAD A SECTION 12(a)(2) CAUSE OF ACTION.

Plaintiffs' allegations under Section 12(a)(2) must be dismissed because Plaintiffs

have failed properly to plead damages and that Defendants were "sellers" of securities within the

meaning of the statute.

### A.    Damages.

Under Section 12(a)(2), any Plaintiffs who still own shares of Tier I mutual funds

cannot recover damages as a matter of law.  Instead, they may obtain only rescission, i.e. a return

of the purchase price in exchange for the security.  *See Randall v. Loftsgaarden,* 478 U.S. 647,

655-56, 666 (1986).  Moreover, as a prerequisite to obtaining rescission, Plaintiffs must plead

that they tendered – or at the very least offered to tender – their shares to the Defendants.  *See* 15

U.S.C. § 77*l*(a)(2) (2000); *Morin v. Trupin,* 747 F. Supp. 1051, 1063 (S.D.N.Y. 1990).  But,

---

[15]      It is clear that the Court may address the standing issue prior to the class certification
stage.  *See, e.g., In re Lord Abbett Mut. Funds Fee Litig.*, 407 F. Supp. 2d 616, 623 (D.N.J. 2005)
(citing cases).

there are no allegations in the Amended Complaint that Plaintiffs have made such a tender – nor can the Amended Complaint itself serve as such an offer. *See Metz v. United Counties Bancorp*, 61 F. Supp. 2d 364, 379 (D.N.J. 1999) (complaint's assertion that plaintiffs were "entitled either to rescind their purchases . . . to receive payment from the defendants for damages sustained" held insufficient to constitute an offer of tender under Section 12) (quotation marks omitted).

Plaintiffs do not dispute that they have failed to properly allege an offer to tender. Instead, they cavalierly state that this defect is of no importance because they can further amend the Complaint. Opp'n at 41. To support this proposition they cite *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392 (S.D.N.Y. 2003), but this case is a far cry from *WorldCom* in which the stock price collapsed and the plaintiffs would have happily rescinded their transactions if given the opportunity. Here, it is doubtful at best that Lead Plaintiffs or their counsel could persuade the putative class to tender back their shares of a superior-performing mutual fund in a broadly rising market. This Court need not speculate, however, as Plaintiffs do not even attempt to plead the requisite offer of tender.

If Plaintiffs' theory is that they are entitled to money damages under Section 12(a)(2), they must plead that they sold the shares at issue at a loss. *See* 15 U.S.C. § 77l(b); *see also Randall*, 478 U.S. at 656 ("[T]he plaintiff is entitled to a return of the consideration paid, reduced by the amount realized when he sold the security and by any 'income received' on the security."). Nowhere in the Complaint do Plaintiffs allege that they sold their shares, much less sold them at a loss. Despite Plaintiffs attempts to avoid this fatal pleading defect by referencing an irrelevant quotation from the *Worldcom* case, *see* Opp'n at 41 (quoting *In re WorldCom*, 294 F. Supp. 2d at 423-24), their failure to plead that they sold their shares at a loss precludes them from seeking money damages.

21

**B.      Plaintiffs Do Not Allege that UBSFS Solicited Investors.**

Plaintiffs' Section 12(a)(2) claim suffers from another independently fatal defect. To plead a Section 12(a)(2) claim successfully, Plaintiffs must assert that Defendant UBSFS, the broker-dealer, is a "seller" under the statute. *See* 15 U.S.C. 77*l*(a)(2). To be a seller, the defendant must have "actually solicited" a plaintiffs' investment. *Capri v. Murphy*, 856 F.2d 473, 479 (2d Cir. 1988). While "all brokers generally solicit business," the courts have held that "such general solicitation of business does not convert a broker into a section 12(2) 'seller.'" *Montcalm County Bd. of Comm'rs v. McDonald & Co. Sec., Inc.*, 833 F. Supp. 1225, 1234 (W.D. Mich. 1993); *see also Ryder Int'l Corp. v. First Am. Nat'l Bank*, 943 F.2d 1521, 1534 (11th Cir. 1991) (observing that although "[a]ll brokers generally solicit business," Section 12(a)(2) liability applies only to the specific instances where a broker "persuaded" an investor to purchase securities). Though Plaintiffs repeatedly assert that UBSFS had incentives to sell Tier I funds, *see* Opp'n at 39, there simply are no allegations that a single UBSFS broker ever solicited a Plaintiff to purchase a share of a Tier I fund. Without such an allegation, Plaintiffs' Section 12(a)(2) claims fail as a matter of law.

**V.      PLAINTIFFS HAVE NOT ADEQUATELY PLED CONTROL PERSON LIABILITY AS TO UBS-AG.**

Even assuming *arguendo* that Plaintiffs could maintain their claims alleging primary violations of law, their claims under Section 15 of the Securities Act and Section 20(a) of the Exchange Act still would fail because they have failed to adequately plead control person liability. Rather, Plaintiffs simply allege that UBS-AG is liable for all actions of UBSFS and argue that at the motion to dismiss stage they must only plead "facts supporting a reasonable inference of control." Opp'n at 42 (*citing Nanopierce Techs. v. Southridge Capital Mgmt. LLC*, No. 02 Civ. 0767(LBS), 2002 WL 31819207 (S.D.N.Y. Oct. 10, 2002)). But this is not the law.

As the Southern District observed in *In re Alstom SA Securities Litigation*, 406 F. Supp. 2d 433 (S.D.N.Y. 2005), "the phrasing used by some courts – that a plaintiff must plead facts supporting a reasonable inference that defendant had the power to 'influence and direct' the primary violator – is not accurate to the extent that it implies that influence alone is enough." *Id.* at 487 n.50. Rather, "the Section 20(a) defendant must not only have actual control over the primary violator, but [must] have <u>actual control over the transaction in question.</u>'" *Id.* at 487 (emphasis added), *quoting In re Global Crossing Ltd. Sec. Litig.*, No. 02 Civ. 910(GEL), 2005 WL 1875445, at *3 (S.D.N.Y. Aug. 5, 2005). And while decisions of the Second Circuit are not entirely clear on this point, the Southern District generally has read Second Circuit precedent, such as *SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996), as requiring a plaintiff to plead culpable participation in order to state a claim for Section 20(a) liability.[16] *See In re Alstom*, 406 F. Supp. 2d at 489; *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 416 (S.D.N.Y. 2001); *In re Bayer AG Sec. Litig.*, No. 03 Civ. 1546(WHP), 2004 WL 2190357, at *16 (S.D.N.Y. Sept. 30, 2004*); In re Global Crossing Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 349 & n.24 (S.D.N.Y. 2004); *In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 486 n.13 (S.D.N.Y. 2004).

Plaintiffs have not met these pleading requirements. They assert only that "UBS was the corporate parent of, and had operational control over UBSFS," and that UBS "was in charge of providing financial advisory services and products," and "had the power to influence and control the actions of UBSFS." Opp'n at 42-43. Because these allegations are insufficient as a matter of law, Plaintiffs' control liability argument must be dismissed.

---

[16]     *See also Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101-02 (2d Cir. 2001); *Boguslavsky v. Kaplan*, 159 F.3d 715, 721 (2d Cir. 1998), both of which appear to require allegations of culpable participation.

## VI.   THE STATUTE OF LIMITATIONS BARS CERTAIN CLAIMS.

Plaintiffs bring their Section 12 and Section 15 claims on behalf of a "Purchaser Subclass" that made purchases during the period May 1, 2000 through April 30, 2005.  Under 15 U.S.C. § 77m (2000), these claims must be asserted "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence."  The Sarbanes-Oxley Act extends the statute of limitations for claims based on "fraud, deceit, manipulation or contrivance," but does not extend the limitations period for negligence and strict liability claims brought under Sections 11, 12 and 15 of the Securities Act.  *In re WorldCom, Inc.*, 294 F. Supp. 2d at 444 (quotation omitted).  Because Plaintiffs disclaim allegations that could be construed as asserting fraud or intentional or reckless conduct under Sections 12 and 15, *see* Compl., ¶¶ 230, 236, those claims are not subject to the Sarbanes-Oxley limitations extension, and thus, the one-year limitations period applies to those claims.

The one-year statute of limitations commences running after the plaintiff "obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge." *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1042 (2d Cir. 1992).  Moreover, "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises." *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 350 (2d Cir. 1993). *See also Levitt v. Bear Stearns & Co.*, 340 F.3d 94, 101 (2d Cir. 2003).  An investor does not "have to have notice of the entire fraud being perpetrated" to have inquiry notice. *Dodds,* 12 F.3d at 352. *See Bond Opportunity Fund v. Unilab Corp.*, No. 99 Civ. 11074(JSM), 2003 WL 21058251 (S.D.N.Y. May 9, 2003) (inquiry notice sufficient to trigger the statute of limitations), *aff'd*, 87 F. App'x. 772 (2d Cir. 2004).

Plaintiffs claim in their Opposition that they did not have "company specific information" about revenue sharing practices and therefore were not on inquiry notice of the existence of their claims. Opp'n at 45. However, at least one of the cease-and-desist orders cited by Plaintiffs in both their Amended Complaint and Opposition was filed by the SEC on March 31, 2004, Opp'n at 11 – and thus was publicly available over a year before Plaintiffs filed their initial Complaint on July 29, 2005. This order was filed against MFS, one of the UBS Tier I fund families, alleging that MFS' fund prospectuses did not provide adequate disclosure. Thus, this order gave Plaintiffs inquiry notice of the basis for their claims. Because this order provided at least inquiry notice to the Plaintiffs but they failed to file suit within a year from the order, their claims under Sections 12 and 15 are barred by the statute of limitations.[17]

## VII.   PLAINTIFFS HAVE FAILED TO PLEAD A CAUSE OF ACTION UNDER THE INVESTMENT COMPANY ACT.

### A.   The Allegations in the Complaint Do Not Meet the Second Circuit's Requirements for Pleading a Section 36(b) Claim.

In an effort to draw attention away from the many decisions of this Court that have dismissed Section 36(b) claims identical to the one Plaintiffs make here, Plaintiffs point to several decisions from other jurisdictions that they claim support their legal theories. Opp'n at 51-57. Indeed, <u>every</u> opinion on which Plaintiffs rely for support of their Section 36(b) claim is from another jurisdiction. Despite their attempts at creative pleading, Plaintiffs simply cannot avoid the law <u>in this Circuit</u>. Every district court within the Second Circuit to have addressed Section 36(b) claims like those made by Plaintiffs has dismissed them. And, very recently, the Second Circuit further illuminated what is required to plead successfully a Rule 36(b) cause of

---

[17]     Plaintiffs concede that those Plaintiffs in the Purchasers Subclass who sold their shares prior to July 29, 2002, are barred by Section 77m even if they were included in the initial Complaint. *See* Opp'n at 43, n.16.

action.  *See Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338 (2d Cir. 2006).  Although

Plaintiffs filed a letter with this Court on October 18, 2006 (the "Oct. 18 Let.") in an effort to

distinguish *Amron*, the letter does nothing more than repeat arguments made in the Amended

Complaint and Opposition.  *Amron*, which affirmed this Court's dismissal of a complaint that

included Section 36(b) claims, requires dismissal of Plaintiffs' Section 36(b) claims here.

Amron involved claims nearly identical to those pled by Plaintiffs – specifically

that the plaintiffs purchased Morgan Stanley proprietary funds that performed poorly but charged

excessive fees to fund investors.  *Id.* at 340.  And, the plaintiffs' Section 36(b) claim in *Amron*,

like Plaintiffs' claims in the instant matter, attempted to track the factors enumerated in

*Gartenberg v. Merrill Lynch Asset Management*, 694 F.2d 923 (2d Cir. 1982).[18]  Further, like the

Plaintiffs here, the *Amron* plaintiffs also argued that regardless of whether their complaint

tracked the *Gartenberg* factors, it should withstand a motion to dismiss because of the limited

notice pleading required by Rule 8 of the Federal Rules of Civil Procedure.  *Amron*, 464 F.3d at

344; *compare* Opp'n at 47.  The Second Circuit soundly rejected this argument in *Amron*, noting

that pursuant to the Supreme Court's decision in *Dura Pharmaceuticals*, a "plaintiff's

allegations, accepted as true, must be sufficient to establish liability."  *Amron*, 464 F.3d at 344.

Thus, unless a plaintiff alleges facts that, if proven, would meet the requirements of *Gartenberg*,

the claim must be dismissed.  Here, Plaintiffs have failed to make this showing: they make no

effort to address two of the *Gartenberg* factors, and their allegations regarding the other four

factors fall well short of the Second Circuit's requirements.  While Plaintiffs claim in their letter

---

[18]     The six *Gartenberg* factors are: (1) the nature and quality of the services provided by the
advisers  to the shareholders; (2) the profitability of the mutual fund to the adviser-manager; (3)
"fall-out" benefits; (4) the economies of scale achieved by the mutual fund and whether such
savings were passed on to the shareholders; (5) comparative fee structures with other similar
funds; and (6) the independence and conscientiousness of the mutual fund's outside trustees.
*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 927-30 (2d Cir. 1982).

of October 18 that the *Amron* Court "did not set a minimum number of *Gartenberg* factors which must be pled." Oct. 18 Let., at 1, the fact that the Second Circuit conducted a detailed analysis of each factor, and explicitly noted that the plaintiffs had made no showing with respect to several factors, makes plain that all six factors must be considered.  Because Plaintiffs have pled only four factors, and the pleadings with respect to even those four are deficient, Plaintiffs' Section 36(b) claim must be dismissed in its entirety.

        *1.*      *The Nature and Quality of Services Provided*

        With respect to the first *Gartenberg* factor, the nature and quality of services provided by the investment adviser, Plaintiffs' only allegation is that because two UBS funds fell to the bottom quartile of their respective categories during the Class Period, and another fund performed at the average in its category, those funds were not justified in the fees they charged. Opp'n at 50.  Beyond the fact that Plaintiffs allege performance data for only <u>three</u> of the <u>thirty-nine</u> UBS funds, the Second Circuit flatly rejected this kind of *post hoc* performance analysis in *Amron*.  There, the plaintiffs alleged that one fund performed worse than 80% of the funds in its category, and that the other fund at issue lost money (incidentally, a claim that the Plaintiffs here do not make).  *Amron*, 464 F.3d at 344.  The Second Circuit held that "allegations of underperformance alone are insufficient to prove that an investment adviser's fees are excessive."  *Id.* (quotation marks omitted).  As Plaintiffs' selective allegations about the nature and quality of services provided by the UBS funds are identical to those in *Amron*, they are also insufficient and therefore the first factor weighs against Plaintiffs in the *Gartenberg* analysis.[19]

---

[19]      In their letter of October 18, Plaintiffs try to distinguish *Amron* by pointing out that the Amended Complaint compares certain UBS funds to their peers, while one of the two complaints in *Amron* did not.  *See* Oct. 18 Let. at 4-5.  But what Plaintiffs fail to disclose is that the Second Circuit found that the second complaint <u>also</u> had not pled this factor sufficiently either because, while it compared the fund to its peers, it made "scant additional showing as to the first factor." *Amron*, 464 F.3d at 344.

### 2.      The Profitability of the Fund to the Adviser-Manager

Plaintiffs fail to address the second *Gartenberg* factor – the profitability of the

fund to the adviser-manager – in their Amended Complaint, their Opposition, and their letter of

October 18.  The closest Plaintiffs come is in the context of claiming that defendants failed to

pass economies of scale onto investors, when they make bald assertions that UBS Global AM

received a "windfall" in fees and list the total assets for several UBS funds.  Compl., ¶¶ 178-84.

But nowhere do Plaintiffs allege the costs incurred in operating the funds, as would be necessary

in any determination of profitability.  This absence of cost information was fatal to the plaintiffs'

claims in *Amron*, as the Second Circuit held that without such information, "assertions regarding

the size of 12b-1 and advisory fees . . . are irrelevant to a showing of profitability."  *Amron*, 464

F.3d at 344.  Here too, Plaintiffs' allegations about the amount of fees collected are similarly

irrelevant, and the second factor also weighs against Plaintiffs in the *Gartenberg* analysis.

### 3.      Fall-Out Benefits to UBS

Here, as in *Amron*, Plaintiffs make no allegations beyond rank speculation about

the third *Gartenberg* factor – whether any fall-out benefits accrued to UBS.  Because of this

pleading defect, the Second Circuit in *Amron* held that plaintiffs had failed to make a showing

with respect to the third *Gartenberg* factor.  Plainly, the same is true here and the third factor,

like the first two, weighs against a finding of excessive fees.

### 4.      Economies of Scale

Plaintiffs concentrate most of their efforts in the Complaint, Opposition, and

October 18 letter on the fourth *Gartenberg* factor – whether Defendants passed economies of

scale on to investors.  Plaintiffs allege that: (1) as the assets under management for several funds

increased, the amount of each investment that was paid toward fees (the "expense ratio")

remained the same or increased slightly; (2) several funds had break points at levels of assets

they have never reached; and (3) UBS investment advisers were able to negotiate lower

breakpoints with investment sub-advisers than they negotiated with investors.  Compl.,

¶¶ 185-92.  These allegations are similarly insubstantial.

      Here, as in *Amron*, Plaintiffs make no substantive allegations regarding the <u>actual</u>

transaction costs for each of the funds, and whether the costs per investor increased or decreased

as the assets under management grew.  Without such information, there is no way to determine

whether any economy of scale even existed that could have been passed on to investors, or

whether there was instead another explanation for the statistics cherry-picked by Plaintiffs.  The

Second Circuit found such defects to weigh against the plaintiffs in *Amron*, highlighting their

failure to make "allegations regarding the costs of performing fund transactions or the

relationship between such costs and the number of transactions performed."  *Amron*, 464 F.3d at

345 (*citing Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404, 411 (2d Cir. 1989) ("[T]o show

economies of scale, plaintiff bore the burden of proving that the per unit cost of performing Fund

transactions decreased as the number of transactions increased.")).  Because the Amended

Complaint suffers from the same deficiency, this factor weighs against Plaintiffs as well.

      5.    *Comparative Fee Structures*

      With respect to the fifth *Gartenberg* factor – comparative fee structures –

Plaintiffs' rely on a disingenuous bait-and-switch.  UBS Global AM is the investment adviser for

thirty-nine different mutual funds, all of which have different expense ratios and performance

statistics.  Plaintiffs point to one of the thirty-nine UBS funds, the US Allocation Fund, as having

a higher expense ratio than its category average.  *See* Compl., ¶ 198; Oct. 18 Letter at 5.  But,

Plaintiffs do not offer any information in the Complaint about the <u>comparative performance or

services</u> of the US Allocation Fund.  Rather, when examining fund performance, Plaintiffs cite to

three <u>other</u> UBS funds (whose expense ratios they do not criticize): the UBS PACE

Small/Medium Company Value Equity Fund, the UBS PACE Small/Medium Company Growth Equity Fund, and the UBS S&P 500 Index Fund. *See* Compl., ¶¶ 194-96. The performance of one UBS fund, standing alone, and the expense ratio for a <u>different</u> UBS fund, standing alone, is not relevant to whether any particular UBS fund charged excessive fees. Performance and expense data are relevant only where they are provided for the <u>same</u> fund, not piecemeal. Indeed, when the Second Circuit enumerated the factors governing a Section 36(b) cause of action in *Gartenberg* and *Krinsk*, it did so by reviewing the expense ratio and performance of the same money market fund. *See Krinsk*, 875 F.2d at 406; *Gartenberg*, 694 F.2d at 925. Plaintiffs' attempts at creative pleading are a non-starter, and thus this factor weighs against them as well.

### 6.    *Trustee Independence and Conscientiousness*

Finally, Plaintiffs fail to make a sufficient challenge to the independence and conscientiousness of the trustees of UBS funds – the sixth *Gartenberg* factor. Plaintiffs twice cite to statements by SEC officials about mutual fund directors generally, but these do not refer to UBS fund directors. Compl., ¶¶ 211, 222. Plaintiffs also cite to a 2003 <u>Forbes</u> article about UBS fund directors as "evidence" that the fund directors did not spend adequate time reviewing the fee structures of the various funds, *id.* ¶ 218, but without information about what <u>other</u> fund directors do to review fund expenses, this information is meaningless. Finally, Plaintiffs simply restate all of their previous allegations as to why UBS Global AM violated Section 36(b) and state that, because the directors let these things happen, they could not have been independent. *Id.* ¶¶ 220, 222. But, as the Second Circuit held in *Amron*, without allegations "specific to the [Fund] directors nor to the purchase of the . . . stock at issue," there is no showing as to the sixth *Gartenberg* factor. *Amron*, 464 F.3d at 346 (quotation marks omitted). At bottom, the only specific allegations Plaintiffs make about UBS fund directors is about how much time they spent reviewing fund fee structures, but that has no bearing on their independence. Plaintiffs' letter of

October 18 simply repeats these allegations, while doing nothing to cure these pleading defects. Therefore, this factor also weighs against Plaintiffs.

Because Plaintiffs have not made allegations sufficient to meet the requirements of even one of the six *Gartenberg* factors, their Section 36(b) claim should be dismissed in its entirety.

### B.     Plaintiffs Erroneously Assert that a Direct Cause of Action Is Available Under Section 36(b).

Plaintiffs, who have pled their Section 36(b) claims as both direct (Count VIII) and derivative (Count IX), spend six pages of text attempting to show that these claims may be brought directly, rather than derivatively.  The decisions of both the Southern District and the Second Circuit, however, are to the contrary.

Though Plaintiffs concede that under controlling law their Section 36(b) claim must be brought derivatively, they urge that those cases were wrongly decided, and that each and every court misread the Supreme Court's decision in *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523 (1984). Opp'n at 63.  The Supreme Court in *Daily Income* concluded that "[t]he fiduciary duty imposed on advisers by § 36(b) is owed to the company itself as well as its shareholders and any recovery obtained in a § 36(b) action will go to the company rather than the plaintiff.  In this respect, a § 36(b) action is undeniably 'derivative' in the broad sense of that word."  *Id.* at 535 n.11 (citation omitted).  The Court went on to hold, however, that in the context of that case, pre-suit demand under Rule 23.1 was not required, even though the suit was derivative.  To be sure, the *Daily Income* decision is not the model of clarity; as one district court has pointed out, in *Daily Income* "the Court characterizes section 36(b) claims as both 'not a derivative action' and 'undeniably derivative.'" *In re Dreyfus Mut. Funds Fee Litig.*, 428 F. Supp. 2d 357, 359 n.1 (W.D. Pa. 2006) (quotation marks omitted).  However, neither the *Dreyfus* court, nor the courts

31

within the Southern District have had reason to doubt that the holding of *Daily Income* characterized Section 36(b) actions as derivative.[20]

Plaintiffs devote much of their argument to lengthy block quotes from the Second Circuit's recent decision in *Coan v. Kaufman*, 457 F.3d 250 (2d Cir. 2006). They claim that *Kaufman's* reading of *Daily Income* has altered the legal landscape. Yet *Kaufman* was an ERISA suit which did not directly construe Section 36(b). Nothing in *Kaufman* suggests that *Daily Income* should be read any differently than courts in the Southern District have read it, i.e. as a decision permitting only derivative actions under Section 36(b). Indeed, the Second Circuit, in *Olmsted v. Pruco Life Ins. Co.*, 283 F.3d 429 (2d Cir. 2002), earlier observed that "Congress explicitly provided in § 36(b) of the ICA for a private right of *derivative* action for investors in regulated investment companies alleging that investment advisors breached certain fiduciary duties." 283 F.3d at 433 (emphasis added). *Kaufman* does not alter the *Olmstead* ruling.

In sum, there is no merit to Plaintiffs' argument that a direct action is permitted under Section 36(b). Countless district courts, within the Southern District and without, have properly held that only derivative actions are available under Section 36(b). *See, e.g., In re*

---

[20]     Plaintiffs make much of a phrase in *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90 (1991), a subsequent Supreme Court decision, in which the Court wrote that "a shareholder action 'on behalf of' the company under § 36(b) is direct rather than derivative." *Id.* at 108. However, the *Kamen* Court characterized a claim brought under Section 36(b) in this way to explain the inapplicability of Rule 23.1 to actions brought under it. This *dictum*, as one court has presciently observed, when "examined in context," "states nothing more than the incontestable proposition that a shareholder may bring a derivative claim under Section 36(b) without making a pre-complaint demand. However, that suit remains a 'derivative' action brought on behalf of the company." *In re Lord Abbett Mut. Funds Fee Litig.*, 385 F. Supp. 2d 471, 488 n.6 (D.N.J. 2005), *vacated by*, 417 F. Supp. 2d 624 (D.N.J. 2005); *accord In re Franklin Mut. Funds Fee Litig.*, 388 F. Supp. 2d. 451, 468 (D.N.J. 2005).

*Eaton Vance Mut. Funds Fee Litig.*, 403 F. Supp. 2d 310, 320 (S.D.N.Y. 2005); *In re Dreyfus*, 428 F. Supp. 2d at 357.[21]

    **C.**    **Section 48(a) of the ICA Does Not Provide for a Private Right of Action.**

        Plaintiffs still are unable to point to a decision after the Supreme Court's ruling in *Alexander v. Sandoval*, 532 U.S. 275 (2001), and the Second Circuit's ruling in *Olmsted v. Pruco Life Ins. Co.*, 283 F.3d 429 (2d Cir. 2002), that has found an implied right of action under Section 48(a) of the ICA.  Indeed, six separate opinions in the Southern District alone have determined that in the wake of *Sandoval* and *Olmsted* Section 48(a) definitively <u>does not</u> contemplate a private right of action.[22]  Simply put, there is no support for Plaintiffs' argument that they may pursue a private right of action under Section 48(a), and their claims under that section should be dismissed.

---

[21]    *See also Olmsted*, 283 F.3d at 433 (finding 36(b) a "private right of derivative action"); *In re Franklin Mut. Funds Fee Litig.*, 388 F. Supp. 2d at 468 (dismissing claim since "§ 36(b) does not provide for a direct private right of action"); *In re Lord Abbett Mut. Funds Fee Litig.*, 385 F. Supp. 2d at 489 (plaintiffs "may not maintain [a 36(b) claim] as a class claim, given the derivative nature of the claim"); *Mutchka v. Harris*, 373 F. Supp. 2d 1021, 1025 (C.D. Cal. 2005) (A Section 36(b) claim "must fail because it has not been brought derivatively.").

[22]    *See In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579 (S.D.N.Y. 2006); *In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*, 434 F. Supp. 2d 233 (S.D.N.Y. 2006); *In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, No. 03-CIV-8208(RO), 2006 WL 1008138 (S.D.N.Y. Apr. 18, 2006); *In re Oppenheimer Funds Fees Litig.*, 426 F. Supp. 2d 157 (S.D.N.Y. 2006); *In re Goldman Sachs Mut. Funds Fee Litig.*, No. 04-CIV-2567(NRB), 2006 WL 126772 (S.D.N.Y. Jan. 17, 2006); *In re Davis Selected Mut. Funds Litig.*, No. 04-CIV-4186 (MGC), 2005 WL 2509732 (S.D.N.Y Oct. 11, 2005); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222 (S.D.N.Y. 2005).

## VIII.   ALL OF PLAINTIFFS' STATE LAW CLAIMS MUST BE DISMISSED.

### A.      Plaintiffs' State Law Claims Are Preempted By SLUSA.

Plaintiffs' Opposition re-casts their state law claims as having nothing to do with the purchase or sale of securities.[23]  In particular, Plaintiffs claim that "FP Subclass members were injured not because of the purchase of securities under their Financial Plans, but instead because they were subjected to the 1.5% fee, for which they were not getting the 'unbiased' advice that Defendants promised."  Opp'n at 70.  The transparent purpose of such statements is to avoid SLUSA, which as interpreted by the Supreme Court in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 126 S. Ct. 1503 (2006), broadly preempts all state law class actions that bear any connection to the purchase or sale of securities.  *See Dabit*, 126 S. Ct. at 1515.

Plaintiffs' *post hoc* change of theory is futile, as the *Dabit* Court also rejected a nearly identical theory.  The lead plaintiff in *Dabit*, a former Merrill Lynch broker, sued Merrill Lynch for a breach of fiduciary duty stemming from the firm's dissemination of misleading research.  The plaintiff attempted to avoid SLUSA preemption by arguing that his injury did not result from the purchase of securities, but rather from misleading research that caused him to hold onto overvalued securities, and brokerage fees he allegedly lost when his clients discovered that Merrill Lynch had been misleading them.  *Dabit*, 126 S. Ct. at 1507.  The *Dabit* Court rejected this theory and held that that a claim based on misstatements – i.e., misleading research

---

[23]      Obviously, the Opposition's characterization of the claims of the Financial Plans Subclass as not related to the purchase or sale of securities represents a wholesale departure from the facts espoused in the Amended Complaint.  There, Plaintiffs attempted numerous times to tie the alleged fraud associated with UBS financial plans to the purchase of securities, alleging, for example, that members of the Financial Plans Subclass "paid unjustifiable ongoing fees for financial advice in connection with their Financial Plans only to be steered into predetermined proprietary funds," and that "Defendants simply used the Financial Plans as an additional mechanism to push Plaintiffs and members of the Financial Plans Subclass to purchase Tier I Funds."  Compl., ¶¶ 9, 11 (emphases added).  Under either characterization, they lose.

– was preempted by SLUSA regardless of whether the plaintiff actually purchased any securities based on that information. *See id.* at 1515.

The claims of members of the Financial Plans Subclass are materially identical to those made by the lead plaintiff in *Dabit*. The claims of the Financial Plans Subclass purportedly do not hinge on the purchase of securities but rather on payment for biased advice. Like the misleading research in *Dabit*, that "biased advice" was "in connection with the purchase" of securities, as it allegedly touted Tier I funds as sound investments when they were not. Indeed, according to Plaintiffs, the only purpose for the allegedly fraudulent advice was to steer unwitting investors into Tier I funds. *See, e.g.*, Compl., ¶ 115. Thus, whether or not members of the Financial Plans Subclass in fact purchased Tier I funds, the allegedly biased advice on which they base their claim was offered "in connection with the purchase or sale" of securities and, under *Dabit*, their state law claims therefore are preempted and must be dismissed.

**B.**     **Sections 349 and 350 of the New York General Business Law Are Not Applicable to the Purchase of Financial Plans.**

Plaintiffs halfheartedly attempt to refute that Sections 349 and 350 of the New York General Business Law cannot form the basis of the claims brought on behalf of the Financial Plans Subclass, but precedent on this issue mandates dismissal. In *Gray v. Seaboard Securities, Inc.*, 14 A.D.3d 852 (3d Dep't 2005), the Appellate Division upheld the dismissal of claims brought under Section 349 materially identical to those brought by Plaintiffs here. The plaintiffs in *Gray* claimed that they were "induced to do business with defendant . . . based upon representations that defendants would provide plaintiffs with proprietary research to assist them in the purchase of securities." *Id.* at 852. Plaintiffs claimed that because defendants "failed to provide the promised investment advice" they had engaged in a "deceptive business practice within the ambit of General Business Law § 349." *Id.* On appeal, plaintiffs argued that their

claim "[did] not involve securities transactions per se but rather relate[d] to the furnishing of services, i.e., the promised but not provided investment advice." *Id.* at 853. The court flatly rejected plaintiffs' argument and held that Section 349 did not apply to the sale of securities and that, regardless of plaintiffs' attempts to color their claim as one based on the furnishing of services, "the promised advice [was] clearly ancillary to the purchase of securities," and the claim should be dismissed. *Id.* at 854 (quotation marks omitted).

Here, as in *Gray*, Plaintiffs have tried to cloak securities claims in the guise of an action for consumer fraud. But, as *Gray* plainly holds, the New York courts have explicitly rejected such an argument, and the claims under Sections 349 and 350 thus must be dismissed.[24]

## CONCLUSION

For the foregoing reasons, and those in our opening Memorandum, the Complaint should be dismissed in its entirety, and with prejudice.

Dated: November 14, 2006                    Respectfully submitted,

**WILLIAMS & CONNOLLY LLP**

By:   /s/ Christopher N. Manning (CM-4231)
      John K. Villa (JV-3390)
      Christopher N. Manning (CM-4231)

      725 Twelfth Street, N.W.
      Washington, D.C.  20005
      Tel: (202) 434-5000
      Fax: (202) 434-5029

*Counsel for Defendants UBS-AG, UBS Global Asset Management (US) Inc., UBS Global Asset Management (Americas) Inc., DSI International Management, Inc., and UBS Financial Services Inc. f/k/a UBS PaineWebber, Inc.*

---

[24]   Though *Gray* dealt only with claims under Section 349, both Sections 349 and 350 are consumer protection statutes and often are dealt with interchangeably. *See, e.g., Maurizio v. Goldsmith*, 84 F. Supp. 2d 455, 469 (S.D.N.Y. 2000), *aff'd*, 230 F.3d 518 (2d Cir. 2000).