UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
MICHAEL HOFFMAN, SUSAN HOFFMAN,        :
and YAKOV PRAGER, on behalf of themselves   :
and all others similarly situated              :
                                               :
                    Plaintiffs,                :
                                               :
                                               :   **OPINION AND ORDER**
                                               :
                                               :   No. 05 Civ. 6817 (LBS)
                                               :   No. 05 Civ. 7027 (LBS)
                                               :   No. 05 Civ. 8448 (LBS)
          v.                                   :
                                               :
UBS-AG, et al.,                                :
                                               :
                    Defendants.                :                              :
---------------------------------------------------------------x

SAND, J.:

    Plaintiffs in this case purchased shares of mutual funds sold by UBS Financial Services

Inc. ("UBSFS") or participated in a UBS financial plan between May 1, 2000 and April 20, 2005

("Class Period").[1]  Plaintiffs bring a class action lawsuit[2] against the following parties: UBSFS, a

registered broker-dealer; UBS Global Asset Management (US) Inc. ("UBS Global AM"), alleged

to the distributor of UBS proprietary funds; UBS Global Asset Management (Americas) Inc.

("UBS Global Americas"), the parent company of UBS AM; UBS Global Asset Management

---

[1] Plaintiffs bring this action on behalf of a class that is purportedly comprised of three subclasses: (1) the Purchaser Subclass, (2) the Financial Plans Subclass, (3) the Investment Company Act Subclass ("ICA Subclass").  Members of the Purchaser Subclass purchased from UBS one or more non-proprietary funds participating in the UBS revenue-sharing program (Tier I funds).  Members of the Financial Plans Subclass incurred fees or charges during the class period in connection with the opening or maintenance of a UBS financial plan.  Finally, members of the ICA Subclass held shares or like interests in any UBS Fund on or after July 29, 2004 and continue to hold them.
[2] Class certification is not before this Court at this stage in the litigation.  No action related to the class action status of this case has occurred since December 13, 2006, when Judge Batts, to whom this case was previously assigned, consolidated the related actions against Defendants, appointed lead Plaintiff and the steering committee, and approved selection of lead counsel and coordinating counsel.

International Ltd. ("UBS Global International"), the international parent company of UBS Global Americas; DSI International Management, Inc. ("DSI"); and UBS-AG, a global investment banking and securities firm incorporated in Switzerland and the ultimate parent entity of the Defendants named in the complaint.[3]  UBS Global AM, UBS Global Americas, UBS Global International, and DSI are alleged to oversee the day-to-day management of UBS' proprietary funds and are thus collectively referred to as Investment Advisor Defendants.

Plaintiffs bring claims alleging violations of the Securities Act of 1933 ("Securities Act"), the Securities Exchange Act of 1934 ("Exchange Act"), the Investment Company Act ("ICA") of 1940, and New York state law.  Plaintiffs allege that UBSFS violated the Securities Act and the Exchange Act by failing to disclose to investors that (1) Tier I mutual fund families were engaged in revenue-sharing with UBSFS and (2) UBSFS' internal compensation system was structured to encourage individual financial advisors to steer investors into purchasing Tier I funds, UBS proprietary funds, and UBS' Personal Asset Consulting and Evaluation (PACE) service. (Compl. ¶ 58.)  In addition to the alleged wrongdoing of the broker-dealer arm of UBS, Plaintiffs also allege that the Investment Advisor Defendants violated the ICA by charging excessive fees to investors of UBS proprietary funds.  (Compl. ¶ 58.)  Finally, Plaintiffs bring several claims under New York state law for breach of fiduciary duty and fraud.[4]  Defendants move to dismiss the action in its entirety.  For the reasons set forth below, Defendants' motion to dismiss is granted.

---

[3] The complaint cited in this opinion refers to the currently operative complaint, entitled the "Consolidated Amended Class Action Complaint."

[4] Although not pled in the complaint, Plaintiffs presumably seek for this Court to exercise supplemental jurisdiction over these state law claims via 28 U.S.C. § 1367(a).

## I.  Background

UBS mutual funds are separated into different tiers for investing.  During the Class Period, UBS offered 21 mutual fund families in its Tier I category.[5]  Plaintiffs allege that fund families were placed in the Tier I category only if the funds engaged in revenue-sharing with UBSFS.  (Compl. ¶ 61.)  This sort of revenue-sharing arrangement is referred to as buying "shelf-space."  As alleged in the complaint, UBSFS financial advisors would not sell shares offered by fund families that did not share revenue.  The financial advisors would instead steer investors into Tier I funds regardless of the performance of these funds.  (Compl. ¶ 3.)

Plaintiffs allege that the failure to disclose certain arrangements between the Tier I mutual fund families and UBSFS violated securities law.  The arrangements that were not disclosed include "[directed] brokerage commissions, shareholder fees, advisory fees and 12b-1 fees."  (Compl. ¶ 93.)  Directed brokerage, the "kickback" mentioned most often in the complaint, is the practice of allotting trades and the resulting commissions to broker-dealers in exchange for the broker-dealer pushing a specific mutual fund to investors.[6]  (Compl. ¶ 93.)  In addition to directed brokerage, Plaintiffs allege that Tier I fund investors paid other expenses to brokers, including paying networking fees from investors' assets beyond the 12b-1 fees generally paid for distribution and administrative expenses (Compl. ¶ 96) and "sponsoring UBS company events, office parties, training, educational meetings and conferences in exchange for their fund company being ranked a 'Tier I' company" (Compl. ¶ 81).

---

[5] UBS financial advisors offer, in total, over 8,000 mutual funds from 150 different mutual fund families.  (Compl. ¶ 67.)

[6] Plaintiffs' complaint alleges neither how much money was paid from Tier I funds to UBSFS financial advisors per transaction, nor the total worth of the "kickbacks."

In addition to failing to disclose payments from Tier I funds, Plaintiffs allege that UBSFS failed to disclose internal incentives to push both Tier I and UBS proprietary funds. With respect to Tier I funds, Plaintiffs allege that branch manager compensation was tied to sales of Tier I funds. (Compl. ¶¶ 71–74.) With respect to UBS proprietary funds, Plaintiffs allege that financial advisors received higher compensation in the form of increased basis points[7] for selling UBS proprietary funds. With respect to the proprietary funds, Plaintiffs allege that an additional 1% (or one hundred basis points) was paid to financial advisors when UBS PACE Multi-Advisor and Select Advisor Funds[8] were sold and that financial advisors received an additional nine to ten basis points of commission when they sold other UBS proprietary funds. (Compl. ¶ 99.) Additionally, UBS allegedly gave financial advisors other incentives to sell its proprietary funds, including rewarding employees with additional house accounts and leads based on the volume of proprietary funds sold. (Compl. ¶ 110.)

In addition to the allegations against UBSFS, Plaintiffs allege that the UBS Global Investors violated the ICA by charging excessive fees to investors in UBS funds.[9] Plaintiffs offer numerous allegations supporting their claim that excessive fees were charged. Plaintiffs first suggest that UBS proprietary funds grew during the Class Period but that these funds did not pass along any corresponding reduction in fees charged to investors.[10] (Compl. ¶¶ 177–184.) Second, Plaintiffs allege that the breakpoints, the asset levels at which investors' fees are

---

[7] A basis point is one-hundredth of a percentage point (0.01%). For example, ten basis points of one billion dollars equals one million dollars.

[8] UBS PACE is a 100% mutual fund investment vehicle for which investors pay up to 1.5% annually on eligible assets to participate. There are two PACE platforms, the Select Advisor and the Multi-Advisor Programs. The PACE Selection program is a UBS-specific product, whereby UBS reallocates and picks the funds to include in the PACE Selection program, which is comprised of solely UBS funds. The PACE Multi-Advisor Program is structured such that the UBSFS financial advisor builds a client's portfolio from multiple firms' fund families available to the investor. (Compl. ¶113.)

[9] It should be noted that Plaintiffs nowhere allege that the fees charged to them were not fully disclosed. Their claim is only that the fees were excessive in nature.

[10] For example, the complaint alleges that between 2003 and 2005 expense ratios of four classes of UBS PACE Global Fixed Income Investments Fund's increased by seven basis points even though assets increased by close to one hundred million dollars. (Compl. ¶ 183.)

reduced,[11] were set excessively high.  (Compl. ¶¶ 187–192.)  Plaintiffs specifically point out that UBS Global AM was able to negotiate lower breakpoint arrangements with sub-advisors, such that UBS Defendants were able to gain additional compensation without providing any additional services to the funds.  (Compl. ¶¶ 187–192.)

Third, Plaintiffs claim that despite the underperformance of its funds, UBS Global AM charged higher fees than other similar funds.[12]  (Compl. ¶¶ 192–194.)  Fourth, Plaintiffs allege that UBS fund assets were used to pay large amounts of 12b-1 fees without any benefit accruing to the UBS funds or their investors.[13]  (Compl. ¶ 166.)  Finally, Plaintiffs allege that the directors of UBS were not independent and did not properly review the funds' fee plans.  (Compl. ¶¶ 211– 224.)

## II.            Causes of Action

Plaintiffs assert numerous causes of action against Defendants.  Plaintiffs, on behalf of the Purchasers Subclass, allege that UBSFS violated Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), by failing to disclose "the ongoing costs, directed brokerage, and other unlawful inducements . . . that its Financial Advisers and firm received." (Compl. ¶ 233.).  Related to UBSFS' alleged violation of 12(a)(2), Plaintiffs also bring an action against UBS under Section 15 of the Securities Act, 15 U.S.C. § 77o, as a control person of UBSFS.[14]  On

---

[11] Breakpoints have been described as a "declining rate structure in which the percentage fee rate decreased in steps or at designated breakpoints as assets increase."  John P. Freeman & Stewart L. Brown, *Mutual Fund Advisory Fees: The Costs of Conflicts of Interest*, 26 Iowa J. Corp. L. 609, 620 n.59 (2001).

[12] For example, the complaint asserts that UBS U.S. Allocation Fund's Class B expense ratio was twenty-five basis points higher than the category average.

[13] More specifically, Plaintiffs allege that the management fees were excessive because fund assets were used "to pay for [advisors'] out-of-pocket expenses although [advisors] were already being compensated on a basis that reimbursed them for such expenses."  Plaintiffs also allege that "Soft Dollar commissions were utilized by Defendants to shift significant expenses from the investment advisors to the UBS Funds and their investors without any corresponding offset in the level of management fee." (Compl. ¶ 166.)  Soft dollars are commissions charged by brokerages to investment advisers in excess of the actual execution price of the trades.

[14] Because the Court resolves this case on other grounds, this opinion does not address Defendants' arguments that Plaintiffs who purchased shares longer than one year before filing suit are barred by the statute of limitations from bringing Section 12 or Section 15 claims.  To resolve this question, the Court would have to make a determination

behalf of the Purchasers Subclass, Plaintiffs also allege that UBSFS violated Section 10(b) of the

Exchange Act, 15 U.S.C. (Compl. ¶ 233.) § 78j(b), and Rule 10b-5(b) promulgated thereunder,

17 C.F.R. § 240.10b-5(b), for inadequate disclosure.  Purchasing Plaintiffs also assert violations

of Section 10(b) and Rule 10(b)-5(a) and (c), 17 C.F.R. § 240.10b-5(a), (c), for inadequate

disclosure.  Purchasing Plaintiffs finally allege control person liability under Section 20(a) of the

Exchange Act, 15 U.S.C. § 78t(a), against UBS for UBSFS' alleged violations of the Exchange

Act.

Additionally, Plaintiffs, on behalf of the Financial Plans Subclass, allege that UBSFS

violated Section 10(b) and Rule 10b-5 promulgated thereunder, and Rule 10b-5(a), (c).  The

Financial Plan Plaintiffs also bring several state law claims against all Defendants for breach of

fiduciary duty and fraud.  And, on behalf of the ICA Plaintiffs Subclass, Plaintiffs allege that

Investment Advisor Defendants violated Section 36(b) of the ICA, 15 U.S.C. § 80a-35(b), for

breach of their fiduciary duties to the UBS funds by receiving fees that were excessive in

nature.[15]

### III.        Discussion

#### A.  Motion to Dismiss Standard

In deciding a motion to dismiss, the court ordinarily accepts as true all well-pleaded

factual allegations and draws all reasonable inferences in the plaintiff's favor.  *Levy v.*

*Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001).  However, "a plaintiff's obligation to

provide grounds of his entitlement to relief requires more than labels and conclusions," the

---

about when Plaintiffs should have discovered the alleged omission had they exercised reasonable diligence, an issue more appropriately addressed in connection with class action status. *See* note 2, *supra*.

[15] It should be noted that Plaintiffs originally brought a claim under Section 48(a) of the ICA, Count X of the complaint, but withdrew that claim in their supplemental memorandum to the court.  (Pls. Supp. Mem. Opp'n Defs' Mot. Dismiss Consol. Amend. Class Action Compl. 2 n.2.)

plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient "to raise a right to relief above the speculative level." *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1964–65 (2007)).

### B.  Standing

At the outset, this Court will determine whether Plaintiffs have presented a justiciable "Case[]" or "Controversy."  U.S. Const. art. III, § 2, cl. 1.  "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  Defendants move to dismiss the complaint as to mutual funds in which the named Plaintiffs did not invest during the Class Period, arguing that Plaintiffs have no standing to bring claims for the funds in which they had no stake.

Courts have standing under Article III of the United States Constitution where a plaintiff has (1) a personal injury, (2) that is fairly traceable to the defendant's allegedly unlawful conduct, and (3) that is likely to be redressed by the requested relief.  *Allen v. Wright,* 468 U.S. 737, 751 (1984).  A plaintiff must plead that he "personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91, 100 (1979).  Plaintiffs in this case cannot meet the injury requirement for claims relating to funds in which they have not purchased shares because they cannot claim to be personally injured by the violations relating to those funds. *AllianceBernstein Mutual Fund Excessive Fee Litig.*, No. 04-CV-4885, 2005 WL 2677753, at *9 (S.D.N.Y. Oct. 19, 2005); *see Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 749 (1975) (holding only purchasers and sellers of securities can recover under Section 10(b) and

Rule 10b-5). Accordingly, Plaintiffs lack standing for claims relating to funds that Plaintiffs did not own.

Plaintiffs argue that an inquiry into standing at this stage is premature and that a Rule 23(a) typicality analysis is more appropriate at this stage. Plaintiffs argue that *Ortiz v. Fiberboard Corp.*, 527 U.S. 815 (1999), counsels for deferring the standing decision until after the class certification stage because determining "whether Plaintiffs may represent persons who bought shares in the other Tier I Funds is so intertwined with the issue pertinent to class certification." (Pls. Mem. Opp'n Defs' Mot. Dismiss Consol. Amend. Class Action Compl. 36.) In *Ortiz*, the Supreme Court analyzed whether it was permissible for a court to determine class certification prior to a deciding whether the court has standing. *Ortiz*, 527 U.S. at 831. The case took place in the context of a global settlement of asbestos-related tort claims. *Id.* The Supreme Court ruled that class certification prior to a standing determination was appropriate in that case because the certification issues were "logically antecedent to Article III concerns." *Id.* (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997)).

Significant authority in this circuit has limited *Ortiz* (and *Amchem*) to the unique context of global-mass settlements. *See In re Salomon Smith Barney Mut. Fund Fees Litig.,* 441 F. Supp. 2d 579, 607 (S.D.N.Y. 2006) ("[T]he Article III standing determination should precede that of class certification. With regard to the sixty-eight funds of which Plaintiffs own no shares, Plaintiffs do not have standing to assert any claims because Plaintiffs cannot satisfy the standing requirements."); *In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.,* 434 F. Supp. 2d 233, 236 (S.D.N.Y. 2006) (finding no standing where plaintiffs attempted to "assert claims on behalf of shareholders of all of the Shelf Space Funds"); *AllianceBernstein,* 2005 WL 2677753, at *9 (noting that the rationale behind the *Ortiz* rule does not apply in the securities class action

8

context).  In this regard, *Ortiz* is not particularly instructive in the securities class action context. In *Ortiz* the district court was called on only to approve a pre-negotiated settlement of actual and potential claims; the claims involved were not intended to be litigated.  *Ortiz*, 527 U.S. at 824–26.

Class certification in this case is not similarly dispositive.  Plaintiffs' case will move forward regardless of whether Defendants prevail on their standing argument because Defendants are not contesting standing for all of Plaintiffs' claims.  Standing is not contested for Plaintiffs' claims regarding the funds in which they owned shares.  Unlike *Ortiz*, Plaintiffs' case cannot be entirely disposed of by merely addressing class certification, and accordingly the constitutional question cannot be avoided by merely addressing the issue of class certification.

Nevertheless, some cases in the Southern District of New York have recognized standing in similar cases where (1) the funds in which named plaintiffs have not invested were "substantially identical" to the funds in which the named plaintiffs had invested, and (2) the named plaintiffs "alleged a single course of wrongful conduct with regard to each security."  *In re Dreyfus Aggressive Growth Mutual Fund Litig.*, 98-CV-4318, 2000 U.S. Dist. LEXIS 13469, *8 (S.D.N.Y. Sept. 19, 2000); *accord Hicks v. Morgan Stanley & Co.*, 01-CV-10071, 2003 U.S. Dist. LEXIS 11972, at *19–*20 (S.D.N.Y. July 16, 2003); *Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 56–57 (S.D.N.Y. 1993).  These decisions have avoided ruling on standing by instead looking to Rule 23(a)(3)'s typicality requirement in determining whether plaintiffs can bring claims for harms committed to funds in which they did not invest.  *Dreyfus*, 2000 U.S. Dist. LEXIS 13469, at *8.  In analyzing typicality, they have focused on whether "by proving their claims, plaintiffs will necessarily prove the claims of all other class members."  *Id.*

While this issue may be relevant in questions of typicality, it has no place in the standing analysis.

Standing concerns the scope of the courts' power in the first instance. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). The standing question is antecedent to the class certification issue to the extent that a court can only certify a class for claims over which it has power.[16] *See Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class must allege that they personally have been injured, not that injury has been suffered by other, unidentified members of a class to which they belong and which they purport to represent."); *Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 319 (5th Cir. 2002). If a party, such as Plaintiffs in this case, is not personally injured by the alleged action of a defendant then he is not entitled to come into court and litigate that action, regardless of whether the disposition of his case necessarily requires the same result as the case of another. As such, Plaintiffs lack standing for claims relating to funds in which they did not personally invest.

### C. Securities Claims

Defendants claim that they are not liable under Section 10(b) or Section 12(a)(2) because they did not have a duty to disclose either the specifics of UBS' revenue-sharing arrangements with Tier I families or the internal incentives that existed at UBSFS to sell specific funds. The Court agrees. An actionable claim under the Securities Act or the Exchange Act must plead an omission that involves information that the defendant has a duty to disclose. *In re Time Warner*

---

[16] While the Supreme Court in *Ortiz* recognized that it is possible for class certification to create a jurisdictional issue in rare instances, such as global settlements of asbestos-related tort claims, that situation is not present in the case before this Court because "the question of whether the named plaintiffs here have standing to litigate claims about funds of which they did not own shares would have to be answered whether or not the plaintiffs filed their claim as part of a class." *In re AIG Financial Advisors, Inc. Securities Litig.*, 06-CV-1625, 2007 WL 1213395, at *5 (E.D.N.Y. Apr. 25, 2007) (citing *Rivera*, 283 F.3d at 319 n.6).

*Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993).  There are two ways that a plaintiff can establish

a duty to disclose: (1) through an explicit regulatory or statutory requirement, or (2) when the

omitted information is otherwise material.  *Id.*  "To be material, the information need not be such

that a reasonable investor would necessarily change his investment decision based on the

information, as long as a reasonable investor would have viewed it as significantly altering the

'total mix' of information available."  *SEC v. Mayhew*, 121 F.3d 44, 52 (2d Cir. 1997) (citation

omitted).

As to the first prong, it is settled Second Circuit law that "no SEC rule requires the

registered representatives who deal with [customers] to disclose their own compensation,

whether pegged to a particular trade or otherwise."  *United States v. Skelly*, 442 F.3d 94, 97 (2d

Cir. 2006) (citation omitted).  Plaintiffs' claim concerning the non-disclosure of internal

incentive structures is easily disposed of.  There is no duty to disclose the incentives that a

company provides its own employees to encourage those employees to sell specific products.

*Castillo v. Dean Witter Discover & Co.*, No. 97-CV-1272, 1998 WL 342050, at *9 (S.D.N.Y.

June 25, 1998); *In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, No. 03-CV-8208,

2006 WL 1008138, at *7 (S.D.N.Y. Apr. 18, 2006); *In re Merrill Lynch Inv. Mgmt. Funds Sec.

Litig.*, 434 F. Supp. 2d 233, 238 (S.D.N.Y. 2006).

However, Plaintiffs' claims as to the non-disclosure of Defendants' shelf-space

arrangements require additional analysis.  Despite decisions in this district holding that there is

no duty to reveal the existence of a shelf-space arrangement,[17] Plaintiffs claim that Defendants

---

[17] *E.g.*, *In re Morgan Stanley* 2006 WL 1008138, at *7 (citing *U.S. v. Alvarado*, No. 01-CR-156, 2001 WL 1631396 (S.D.N.Y. Dec. 19, 2001)) (stating that neither the SEC nor NASD have imposed a duty "to disclose the allocation of broker compensation"); *In re Merrill Lynch*, 434 F. Supp. 2d at 238.

failed to meet the disclosure requirements of SEC Form N-1A.[18]  Item 16(c) of Form N-1A,[19]

requires prospectuses to provide a detailed description of "how the Fund will select brokers to

effect securities transactions for the Fund."  It further states that "[i]f the Fund will consider the

receipt of products or services other than brokerage or research services in selecting brokers, [the

Fund should] specify those products or services."  Securities and Exchange Commission, Form

N-1A, at 41, http://www.sec.gov/about/forms/formn-1a.pdf (last visited Oct. 21, 2008).

Plaintiffs claim that Defendants failed to meet the requirements of Item 16(c) by failing to

disclose the existence and details of their alleged bilateral shelf-space agreements.[20]

      Although a superficial reading of this language suggests an obligation to disclose the

existence of shelf-space fund agreements, closer inspection reveals that Form N-1A imposes no

such obligation unless additional information is sought.  As noted by the District of New Jersey

in a recent case, "Form N-1A requires mutual funds to disclose certain basic information in a

prospectus and allows—but does not require—mutual funds to issue a more detailed statement of

additional information.  Item 16 describes disclosures that a mutual fund may make in a

statement of additional information—not disclosures a mutual fund must make in a prospectus . .

. ." *Ulferts v. Franklin Res, Inc.*, No. 07-CV-1309, 2008 WL 2683310, at *3 (D.N.J. June 30,

2008).

---

[18] Plaintiffs also claim that Defendants violated the NASD's Anti-Reciprocal Rule 2830(k) and SEC Rule 10b-10. However, Plaintiffs do not cite a single case that has held that shelf-space arrangements violate either of these rules. Given the Second Circuit rulings in *GMS Group v. Benderson*, this Court does not find occasion to uphold liability based on a potential violation of an NASD rule.  *GMS Group, LLC v. Benderson*, 326 F.3d 75, 82 (2d Cir. 2003) (holding that there is "no right of action simply for a violation of NASD rules").  Plaintiffs' argument that Rule 10b-10 was violated is similarly without merit in light of the court's holding that Defendants met their Form N-1A disclosure obligations.  *In re AIG Financial Advisors, Inc. Securities Litig.*, 06-CV-1625, 2007 WL 1213395, at *8 (E.D.N.Y. Apr. 25, 2007).

[19] Mutual funds must register with the SEC using the Form N-1A.  17 C.F.R. § 239.15A.  SEC Form N-1A sets forth the requirements for information that must be contained in offering prospectuses and statements.  *Benzon v. Morgan Stanley Dist., Inc.*, 420 F.3d 598, 608 (6th Cir. 2005).

[20] Plaintiffs spend significant time in their complaint citing recent SEC administrative actions against financial companies other than UBS.  As Judge Owen noted in *In re Morgan Stanley*, "statements made by the SEC and NASD in the settlement documents are not law; they are rather untested assertions made by litigants." *In re Morgan Stanley*, 2006 WL 1008138, at *5.

Although current Second Circuit law supports the conclusion that no SEC rule requires disclosure of specific shelf-space arrangements without further inquiry, it remains an open question as to whether a securities violation would occur if a defendant failed to disclose the fact that the fund *may* enter into a shelf-space fund agreement.  That question is not before of the Court today.  Defendants' prospectuses[21] disclosed that they might enter into agreements akin to shelf-space agreements.[22]  Defendants' prospectuses were not misleading or incomplete to the extent that they disclosed the possibility of entering into a shelf-space arrangement.[23]  However, to demand that a fund communicate through a prospectus all the details of its shelf-space agreements would be unfeasible and unnecessary.  *Ulferts*, 2008 WL 2683310, at *682.  The language used in Defendants' prospectuses gave investors adequate notice of the possibility of shelf-space agreements, arrangements about which investors could have inquired if they felt that such agreements would compromise the service that they were receiving.  Current regulatory

---

[21] Although the language used in the Hartford Funds' Prospectus provides the basis for this opinion, for the reasons discussed in Section III.B, *supra*, named Plaintiffs have no standing to bring a claim for actions related to the Hartford Funds because no Plaintiff is alleged to have been a purchaser or seller of shares of that fund. Nevertheless, the text of the prospectus provides a basis for this Court to answer the principal question raised by Defendants—whether omitting the existence of Defendants' shelf-space arrangements violated securities laws— because Plaintiffs assert that the Hartford Funds' Prospectuses and their SIAs are identical in substance to the Prospectuses and SIAs of all Tier I funds.

[22] The Hartford Funds' Prospectus cited in the complaint provides a good example.  The prospectus states that "General Distribution fees paid to HIFSCO may be spent on any activities or expenses primarily intended to result in the sale of the applicable Company's shares including: (a) payment of initial and ongoing commissions and other compensation payments to brokers, dealer, financial institutions or others who sell each Fund's shares . . . ." Moreover, it states that "Upon instructions from HIFSCO, Wellington Management may direct certain brokerage transactions to broker/dealers who also sell shares of funds in the fund complex.  Upon instructions from HIFSCO, Wellington Management may also direct certain brokerage transactions to broker/dealers that pay for certain other services used by the Fund."

[23] The facts of *In re AIG Financial Advisors* provide a good contrast.  Judge Gleeson, upon reviewing the prospectus in that case, found that the prospectus was misleading because it only stated that "commissions would be paid to broker-dealers in return for their brokerage and research" and did not mention that commissions might also be paid out from the fund assets in return for broker-dealers selling the fund.  *In re AIG Financial Advisors*, 2007 WL 1213395, at *8.  On the issue of the defendants' non-disclosure, he noted that while the Form N-1A, and thus the Rule 10b-10, obligations were met, the disclosure requirements of Rule 10b-5 continue to apply to categories of information not specifically covered by Rule 10b-10.  *Id.* (citing *Press v. Quick and Reilly, Inc.*, 218 F.3d 121, 132 n.12 (2d Cir. 2000)).  As a result, even if a defendant were to comply fully with his Form N-1A obligations, it does not necessarily mean than a Rule 10b-5 violation would not occur if more information would be necessary to make another statement contained in the prospectus not misleading.  *Id.*

requirements do not demand anything more of mutual funds than what was contained in Defendants' prospectuses.

Plaintiffs also suggest two other bases for a duty to disclose.  First, Plaintiffs suggest that a duty to disclose was created by a relationship of trust between the brokers and the investors. Second, Plaintiffs suggest that a duty to speak truthfully arose from Defendants' statements concerning the possibility of entering into shelf-space arrangements.  The Court rejects both of these claims.

First, it is well-established Second Circuit law that the fiduciary duty in the broker/customer relationship is only to "the narrow task of consummating the transaction requested."  *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 536 (2d Cir. 1999) (citation omitted).  With regard to disclosing commissions, the Second Circuit has stated that a broker ordinarily only has a duty to disclose "excessive commissions."  *United States v. Santoro*, 302 F.3d 76, 80 (2d Cir. 2002).  The commissions alleged in this case,[24] however, simply do not rise to the level of what has been deemed an excessive commission.  *E.g.*, *id.* (holding that 15% commissions were excessive); *United States v. Szur*, 289 F.3d 200, 212 (2d Cir. 2002) (holding that 45–50% commissions were excessive).

Second, the Court rejects Plaintiffs' assertion that disclosing the possibility of the shelf-space arrangements but not the details of the specific arrangements violates a duty to speak truthfully.  Plaintiffs essentially assert that Defendants had a duty to disclose all information about their revenue-sharing programs based on the fact that they disclosed the possibility of entering into these arrangements.  This conclusion runs contrary to the basic requirement of Rule 10b-5, which holds parties liable for misleading statements, not merely incomplete statements. *See Glazier v. Formica Corp.*, 964 F.2d 149, 154–55 (2d Cir. 1992).  Defendants cannot be held

---

[24] The commissions in this case, as alleged in the complaint, are in the general range of .09%–1.0%. (Compl. ¶ 99.)

liable given that their statements did not affirmatively create an impression that was materially

different from the truth.  *See Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir.

2002).

In the absence of a statutory or regulatory requirement, Defendants' omissions must be

material in order to trigger a duty to disclose.  The omissions alleged in this case were not

material as a matter of law.  As Judge Owen noted in *In re Morgan Stanley*, nominal incentives

to brokers and financial advisors to sell a particular group of funds are immaterial.  *In re Morgan

Stanley*, 2006 WL 1008138, at *8.

Plaintiffs rest their materiality claim on the fact that internal payments in this case were

higher than payments in analogous cases in this district where materiality was not found.[25]

Plaintiffs specifically argue the one hundred basis points paid to financial advisors for selling the

UBS PACE Multi-Advisor and Select Advisor Funds was greater than the amounts provided in

both *In re Morgan Stanley* and *In re Merrill Lynch* cases.[26]  Although the compensation to

financial advisors in this case was slightly higher than the payments in those cases, the difference

in compensation does not warrant divergence from those decisions.  Judge Owen's conclusion in

*In re Merrill Lynch* that a mere faction of a percentage point is not material applies with equal

---

[25] *In re Merrill Lynch*, where materiality was not found, involved payments to brokers of sixteen dollars for each investor who entered into a designated space-shelf fund as well as twenty-five basis points of compensation.  *In re Merrill Lynch*, 434 F. Supp. 2d at 235.  *In re Morgan Stanley*, where materiality was also not found, involved payments to brokers of fifteen to twenty basis points on gross sales of mutual fund shares as well as five basis points annually on shares that had been held by investors for at least one year.  *In re Morgan Stanley*, 2006 WL 1008138, at *2.  In this case, financial advisors were allegedly receiving internal compensation of up to an additional twenty-five basis points for new sales of Tier I funds (Compl. ¶ 77), twenty-five basis points to push the UBS Strategy Fund (Compl. ¶ 91), one hundred basis points when UBS PACE Multi-Advisor and Select Advisor Funds were sold (Compl. ¶ 99), and an additional nine to ten basis points of commission when financial advisors sold other UBS proprietary funds (Compl. ¶ 99).  Other than the alleged promotion of events, office parties and training sessions, Plaintiffs' complaint does not allege the level of compensation that Tier I funds paid to UBSFS financial advisors in relation to the revenue-sharing program.

[26] It is noteworthy that even if Plaintiffs' argument is correct that PACE funds compensation was material, the other compensation arrangements that Plaintiffs allege, including the Tier I fund payments and the payments to UBS propriety funds other than the PACE funds, would not be material under the analysis of *In re Morgan Stanley* and *In re Merrill Lynch*.

force to the single percentage point paid for selling the PACE Funds.  Plaintiffs point to no case

law which holds that the payment of 1% is material for the purpose of establishing a duty to

disclose.  Moreover, in other contexts, courts have found that non-disclosure of one percentage

point is not material as a matter of law.  *E.g.*, *Parnes v. Gateway 2000 Inc.*, 122 F.3d 539, 546–

47 (8th Cir. 1997) (misstatements, taken in context, immaterial as a matter of law because they

only amounted to 2% of the company's total assets); *Glassman v. Computervision Corp.*, 90 F.3d

617, 633 & n.26 (1st Cir. 1996) (dismissal where omitted information was 3%–9% of revenues

and thus immaterial as a matter of law).

Plaintiffs also argue that the impact of the aggregate amount of the revenue-sharing fees

on the bias of financial advisors is relevant to the materiality determination.  While the impact on

financial advisors is, indeed, relevant to this inquiry, Plaintiffs' argument focuses on the wrong

issue.  The impact on financial advisors is driven by what the advisors individually stood to gain

from the revenue-sharing program and not the extent of the program as a whole, as Plaintiffs

suggest.  *In re AIG Financial Advisors, Inc. Securities Litig.*, 06-CV-1625, 2007 WL 2750676, at

*4 (E.D.N.Y. Sept. 20, 2007).  An inquiry into the amount of money received by any given

financial advisor reveals a glaring inadequacy in Plaintiffs' complaint:  Nowhere in the

complaint do Plaintiffs allege how much any financial advisor received from pushing Tier I or

UBS propriety funds.

Rule 9(b) of the Federal Rules of Civil Procedure requires that "in all averments of fraud

or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

Fed. R. Civ. P 9(b).  More specifically, the Second Circuit has held that in order to comply with

Rule 9(b) a complaint must "(1) specify the statements that the plaintiff contends were

fraudulent, (2) identity the speaker, (3) state where and when the statements were made, and (4)

explain why the statements were fraud.  *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)

(quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).  Because

Plaintiffs' Section 12(a)(2) claims and Section 10(b) claims sound in fraud, they must meet the

Second Circuit's pleading requirements as laid out in *Rombach*.[27]  *In re Merrill Lynch*, 434 F.

Supp. 2d at 239.  As noted, Plaintiffs' complaint does not allege the total amount of directed

brokerage received by any UBSFS financial advisor.  Without knowing the amount of fees

received as a result of the revenue-sharing, the complaint is inadequate as to materiality.  *In re*

*AIG Financial Advisors*, 2007 WL 2750676, at *4.

   The Court's holding that Defendants did not violate a duty to disclose also results in the

conclusion that Plaintiffs' scienter allegations are inadequately pled.  The Private Securities

Litigation Reform Act ("PLSRA") requires a plaintiff alleging omission in violation of Section

10(b) of the Exchange Act "to state with particularity facts giving rise to a strong inference that

the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(1).  The requisite

state of mind for a Section 10(b) violation is scienter.  As an initial matter, Plaintiffs cannot

establish fraudulent intent given that the actions of Defendants for which Plaintiffs seek relief

were not fraudulent.  Moreover, Plaintiffs' allegations that Defendants benefited from the

purported fraud do not satisfy the heightened pleading requirements of Rule 9(b).  *In re Morgan*

*Stanley*, 2006 WL 1008138, at *9.  And finally, scienter cannot be established for failure "to

disclose in a prospectus information that is neither material nor is required to be disclosed under

SEC regulations."  *Geiger v. Solomon-Page Group, Ltd.*, 933 F. Supp. 1180, 1191 (S.D.N.Y.

1996).

---

[27] Moreover, Plaintiffs' claims under Section 10(b) of the Exchange Act and Rule 10b-5 are subject to the heightened pleading requirements of the Private Securities Litigation Reform Act, which requires that a complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all the facts on which that belief is formed.  15 U.S.C. § 78u-4(b)(1).

For the foregoing reasons, Plaintiffs have failed to state causes of action under Section 10(b) of the Exchange Act and Section 12(a)(2) of the Securities Act.[28]  Because Plaintiffs did not state underlying violations of the securities laws, their control person liability claims under Section 20(a) of the Exchange Act and Section 15 of the Securities Act also fail.

### D.  Investment Company Act Claims

Plaintiffs allege, in two counts, that Investment Advisor Defendants violated Section 36(b) of the ICA.[29]  15 U.S.C. § 80a-35(b).  Count VIII is brought as a direct claim by the ICA Subclass, and Count IX is brought derivatively on behalf of the UBS funds held by Plaintiffs. Defendants move to dismiss Count VIII on the grounds that Section 36(b) requires Plaintiffs to sue derivatively, not directly.  Defendants move to dismiss Count IX on the grounds that Plaintiffs fail to allege adequately excessive fees.

Under Section 36(b), a plaintiff has the burden of proving breach of fiduciary duty by a recipient of excessive compensation or payments.  15 U.S.C. § 80a-35(b)(1).  "Congress enacted Section 36(b) in large part because it recognized that as mutual funds grew larger, it became less expensive for investment advisers to provide additional services.  Congress wanted to ensure that investment advisers passed on to fund investors the savings that they realized from these economies of scale."  *Pfeiffer v. Bjurman, Barry & Assocs.*, No. 03-CV-9741, 2004 WL 1903075, at *4 n.8 (S.D.N.Y. Aug. 26, 2004) (citations omitted).  An adviser-manager is liable

---

[28] Because this case is resolved by the Court's holding that Defendants did not breach a duty to disclose, the Court does not have occasion to address the disagreement among courts as to the validity of Plaintiffs' theory of loss causation.  Plaintiffs' theory is that they were deceived into believing that the fees paid out of the mutual funds' assets were used to invest in or purchase something valuable to the investor, when in reality the investors received nothing in return for the revenue-sharing payments.  (Pls. Mem. Opp'n Defs' Mot. Dismiss Consol. Amend. Class Action Compl. 36.)  While decisions in this district have rejected this theory, *e.g.*, *In re Morgan Stanley*, 2006 WL 1008138, at *9, the Court notes the recent conclusion by Judge Gleeson that "a rational jury . . . could conclude that the subject of the defendants' alleged non-disclosure and misrepresentation caused economic harm to the plaintiffs." *In re AIG Financial Advisors*, 2007 WL 1213395, at *12.

[29] Section 36(b) states in relevant part: "[T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser."  15 U.S.C. § 80a-35(b).

under Section 36(b) when he receives fees that are "so disproportionately large that they [bear] no reasonable relationship to the services rendered and would not have been the product of arms-length bargaining." *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 928 (2d Cir. 1982).

Although Plaintiffs argue that Supreme Court case law can be read to support a direct claim under Section 36(b), there is no decision from a court within the Second Circuit that has supported such an interpretation.  In a recent decision, Judge Batts surveyed the relevant statutory language and case law as it pertains to this issue, and concluded that the confluence of the text of Section 36(b), the dicta in the Supreme Court decision of *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523 (1984), and the Second Circuit's dicta in *Olmstead v. Pruco Life Ins. Co. of New Jersey*, 283 F.3d 429 (2d Cir. 2002), requires a ruling that Section 36(b) provides for derivative, not direct, suits.  *In re Scudder Mutual Funds Fee Litig.*, No. 04-CV-1921, 2007 WL 2325862, at *14 (S.D.N.Y. Aug. 14, 2007).  This Court agrees with that conclusion.  Specifically looking to the statute's reference to the security holders' right to bring actions "on behalf of such company," 15 U.S.C. § 80a-35(b), and the Second Circuit's statement in *Olmstead* that Section 36(b) provides "a private right of derivative action for investors in regulated investment companies," *Olmstead*, 283 F.3d at 433, this Court holds that Section 36(b) does not permit a direct claim on behalf of Plaintiffs.  *Id.*; *see also Salomon Smith Barney Mutual Fund Fees Litig.*, 441 F. Supp. 2d 579, 597 (S.D.N.Y. 2006).

Dismissing Count VIII does not resolve the ICA issues, however, because Plaintiffs also bring their Section 36(b) claims derivatively, on behalf of the UBS funds held by Plaintiffs.  In determining whether a fee violates Section 36(b), courts look to six factors: (1) the nature and quality of the services provided by the advisers to the shareholders; (2) the profitability of the

mutual fund to the adviser-manager; (3) "fall-out" benefits;[30] (4) the economies of scale achieved by the mutual fund and whether such savings are passed on to the shareholders; (5) comparative fee structures with other similar funds; and (6) the independence and conscientiousness of the mutual fund's outside directors. *Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338, 340–41 (2d Cir. 2006); *Gartenberg*, 694 F.2d at 929–30 (setting forth "the *Gartenberg* factors"). At the pleading stage a court need not consider whether all six factors are met, but rather only determine whether the facts as alleged would meet the basic standard as articulated in *Gartenberg*.[31] *In re Goldman Sachs Mutual Funds Fee Litig.*, No. 04-CV-2567, 2006 WL 126772, at *9 (S.D.N.Y. Jan. 17, 2006). Given the factors and standard set forth in the Second Circuit, the facts as pled in Plaintiffs' complaint are insufficient to survive a motion to dismiss.

With regard to the nature and quality of the services provided by the investment advisors, Plaintiffs allege that Defendants were not justified in the fees that they charged because some UBS funds fell in performance-ranking during the relevant period. (Compl. ¶¶ 194–196.) However, as the Second Circuit noted in *Amron*, "allegations of underperformance alone are insufficient" to satisfy this factor. *Amron*, 464 F.3d at 344. Plaintiffs' complaint offers no allegations about the actual services provided by the funds. Instead, Plaintiffs rest their complaint only on post hoc performance, an approach that was rejected in *Amron*. *In re Salomon Smith Barney Mutual Fund Fees Litig.*, 528 F. Supp. 2d 332, 338 (S.D.N.Y. 2007) (stating that *Amron* requires more than mere performance analysis). Accordingly, Plaintiffs' allegations fail to satisfy the first *Gartenberg* factor.

---

[30] "Fall-out" benefits are those benefits other than the advisory fees that flow to the adviser or its affiliates as a result of the adviser's relationship with the fund. *See Levy v. Alliance Capital Mgmt. L.P.*, No. 97-CV-4672, 1998 WL 744005, at *2 (S.D.N.Y. Oct. 26, 1998).

[31] As stated above, liability attaches when an adviser-manager receives fees that are "so disproportionately large that they [bear] no reasonable relationship to the services rendered and would not have been the product of arms-length bargaining." *Gartenberg*, 694 F.2d at 928.

Plaintiffs' complaint does not address the second or third *Gatenberg* factors with any specificity.  With respect to the profitability of the mutual fund to the adviser-manager, the complaint alleges the UBS Global AM received a "windfall." (Compl. ¶ 179.)  This allegation, however, is entirely unsatisfactory given that the complaint does not allege sufficient information for the Court to determine the profitability of Defendants, which is a prerequisite to establishing this factor.  *Amron*, 464 F.3d at 344.  Similarly, Plaintiffs make no allegation about the fall-out benefits that may have accrued to UBS.  Plaintiffs' allegations regarding 12b-1 fees, and compensation for soft-dollar and revenue-sharing payments, refer to the propriety of the fees, not to the amount charged.  This form of pleading is insufficient to the extent that "Section 36(b) permits actions where fees are disproportionately large, not where fees are merely applied improperly."  *Scudder*, 2007 WL 2325862, at *14; *accord In re Goldman Sachs*, 2006 WL 126772, at *9–*10 ("[P]laintiffs have at most alleged that the advisory and 12b-1 fees were used for improper purposes . . . . [S]uch allegations do not suffice to state a claim under 36(b).").

Plaintiffs concentrate most of their efforts on the fourth *Gartenberg* factor—whether Defendants passed along economies of scale to investors.[32]  Plaintiffs allege that Defendants did not pass along economies of scale in the following ways: (1) as the assets under management increased, the amount of each investment that was allocated as fees (the expense ratio) either remained the same or only slightly increased; (2) several funds set breakpoints unreasonably high; and (3) UBS investment advisors were able to negotiate lower breakpoints with investment sub-advisors than they negotiated with investment advisors.  (Compl. ¶¶ 185–192.)  These allegations do not satisfy the economies of scale factor.

---

[32] An economy of scale is defined as a "decline in a product's per-unit production cost resulting from increased output, [often] due to increased production facilities; savings resulting from the greater efficiency of large-scale processes." Black's Law Dictionary (8th ed. 2004).

Plaintiffs' initial claim about the increase in expense ratio in relation to the assets under management is insufficient under Second Circuit law.  As the Court of Appeals noted in *Krinsk v. Fund Asset Management., Inc.*, the fact that "expenses . . . declined at a time when the Fund size grew . . . does not establish that such decline was necessarily due to economies of scale." 875 F.2d 404, 411 (2d Cir. 1989).  In order to meet their burden, Plaintiffs must make a substantive allegation regarding the actual transaction costs at issue and whether the costs per investor increased or decreased as the assets under management grew.  *Id.* (stating that the "plaintiff bore the burden of proving that the per unit cost of performing Fund transactions decreased as the number of transactions increased") (citation omitted); *Amron*, 464 F.3d at 345. Without such information, there is no way to determine whether any economy of scale even existed that could have been passed on to investors or whether there is another explanation for the statistics chosen by Plaintiffs.  *See Krinsk*, 875 F.2d at 411.

Moreover, Plaintiffs' claims concerning the differential in breakpoints between sub-advisors and investment advisors is irrelevant to the issue of economies of scale.  As Plaintiffs' complaint acknowledges, investment advisers and sub-advisers perform distinct services. (Compl. ¶ 187.)  The differences in services and compensation packages alone justify the different breakpoint arrangements.  And finally, while Plaintiffs' claim that the breakpoint fees were set unreasonably high is not disputed by Defendants, this allegation alone is not sufficient to establish a failure to pass along economies of scale since the allegation does not address the Defendants' alleged increase in economies of scale but merely the compensation structure of the fund as originally set.

Plaintiffs' complaint also does not satisfy the fifth *Gartenberg* factor—comparative fee structures.  Plaintiffs' complaint alleges that one of the thirty-nine UBS funds, the US Allocation

Fund, had a higher expense ratio than its category average.  (Compl. ¶ 198.)  However, the complaint makes no allegations about the comparative performance or services of the US Allocation Fund.  Rather, when examining fund performance, Plaintiffs cite to three other UBS funds, none of whose expense ratios are discussed.  (Compl. ¶¶ 194–196.)  The expense ratio of one UBS fund and the performance of another fund is not relevant to the inquiry of whether excessive fees were charged.  Performance and expense data are relevant only where they are provided for the same fund.

Plaintiffs' attempt to satisfy the sixth *Gartenberg* factor by reference to statements of SEC officials about mutual fund directors generally (Compl. ¶ 211) and to a *Forbes* magazine article asserting that the UBS board of directors spent little time considering the fees of UBS funds (Compl. ¶ 218).  The statements of SEC officials are clearly irrelevant since none of them refer to UBS fund directors.  And a single magazine article discussing the general operating procedures of a board of directors does not overcome "the ICA's express presumption that mutual fund trustees and natural persons who do not own 25% of the voting securities are disinterested."  *Salomon Smith Barney*, 528 F. Supp. 2d at 339 (citing *Amron,* 464 F.3d at 344 (noting that "a plaintiff's burden to overcome this presumption is a heavy one") (citations omitted)).  The *Forbes* article does not state for what reason a board member would lack independence and/or overlook a system of excessive fees, nor does it give any information about what other fund directors do to review fund expenses, which would allow this Court to compare the relative independence of these directors.

Defendants cite many decisions in the Second Circuit, based on pleadings of similar strength and specificity, that have concluded that the *Gartenberg* factors demand more substance.  In contrast, Plaintiffs cite no opinion from any court within the Second Circuit that

has found ICA allegations analogous to theirs to be sufficient. Defendants point this Court to

many cases that support its conclusion, including the recently decided *In re Salomon Smith*

*Barney* case. In that case, a court in this district held that Plaintiffs' ICA claims were

insufficiently pled. *In re Salomon Smith Barney*, 528 F. Supp. 2d at 337. Plaintiffs in that case

pinned their excessiveness claims on, among other things, (1) the defendants' failure to reduce

fees as the mutual funds grew, (2) the defendants' funds' alleged underperformance relative to

comparable funds, (3) the plaintiffs' assertion that the higher fees were charged to offset the cost

of defendants' participation in revenue-sharing programs, (4) the plaintiffs' claim that the

distributor took no steps to ensure that the Rule 12b-1 fees charged were reasonably related to

the services provided to investors, and (5) the plaintiffs' allegation that the fees charged to them

were higher than the fees charged by comparable funds. *Id.* at 336. For many of the reasons set

forth in this opinion, Judge Crotty found that the plaintiffs' allegations were insufficient to meet

the pleading requirements as set forth in *Gartenberg* and applied in *Amron*. This Court agrees

with Judge Crotty and the numerous other cases in this district that require more substantial

pleadings in order to bring a claim under the ICA.

For the foregoing reasons, Plaintiffs have failed to state a cause of action under Section

36(b) of the ICA, either directly or derivatively. With all federal claims dismissed in the action,

this Court does not have subject matter jurisdiction to adjudicate Plaintiffs' state law claims,

which are dismissed without prejudice.

**SO ORDERED.**

Dated:   October 22, 2008
       New York, NY

                                              U.S.D.J.